# ☐ ORIGINAL

IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| DAVID WILLIAMSON, | ) |
| Plaintiff | ) Civil Action # 06-379-SLR |
| v. | ) |
| CORRECTIONAL MEDICAL SERVICES, Inc., et al, | ) |
| Defendants | ) |
| | ) |

FILED

OCT - 2 2006

DISTRICT COURT
DISTRICT OF DELAWARE

## MOTION FOR LEAVE TO AMEND PLAINTIFF'S COMPLAINT

COMES NOW, pro se, Plaintiff pursuant to the appropriate Court rule and does hereby ⚖ Scanned

request leave from the Court to amend His complaint to correct certain material spelling mistakes

and clarify the ambiguous phrase "reasonable medical exam" with newly discovered material.

Plaintiff offers the following:

1. Plaintiff is a pro se friend of the Court and requests pleading leniency under Haines v.
   Kerner, 404 U.S.519, 92 S.C.T. 594 (1972).

2. The Court docketed Plaintiff's complaint on or about June 21, 2006.

3. The Court accepted docketed Plaintiff's Supplemental Complaint, which added a new
   defendant, on or about July 18, 2006.

4. Defendants have not yet been served; as such, have not yet filed any responsive
   pleadings to date. Defendants face no prejudice if Plaintiff's reasonable request is
   granted by the the Court.

5. In fact, by granting the few corrections listed below, and which are reproduced in the
   Amended Complaint, defendants will be aided by having a more clarified complaint
   and will avoid the risk of responding to incorrect or incomplete statements.

6. Plaintiff comes in good faith, not to create undo delay, and does not add any
   additional defendants or claims, but merely corrects material spelling mistakes and
   clarify said phrase.

7. Indeed had defendant CMS not refused to provide plaintiff's request for his medical records, etc. regarding his knee injury, Plaintiff would have likely received the pertinent knee exam information. (See exhibit A-CMS Denial).

8. Plaintiff did not receive the knee exam information (e.g. Lachman test, valgus stress test, and anthrometer test) until He contacted an outside doctor who had subsequently examined Plaintiff (Dr. DuShuttle). Doctor DuShuttle provided the information of what constitutes a reasonable knee exam in August 06, sometime after the July 06 Supplemental Complaint was filed and docketed. Plaintiff took every reasonable effort to avoid any inconvenience to the Court and is not responsible for failing to clarify the phrase "reasonable medical exam" with information not yet in his possession.

9. Moreover, Plaintiff faces substantial prejudice in the event the Court is not inclined to grant Plaintiff's amendments as "relating back" and consequently leaves the filing date unchanged at July 18, 06. For example, if the filing goes beyond July 26, 06 then Plaintiff would likely have part or all of his knee injury claim barred by the applicable statute of limitations. The interest of justice would thus be thwarted and Plaintiff would be forced to withdraw the instant motion to avoid possible irreparable prejudice.

10. In addition, it is appropriate to accept these amendments as "relating back" under Fed. R. Civ. P, Rule 15..., and or any applicable federal and Delaware Local rules or case authority, because Plaintiff only corrects five individual clerical errors and clarifies a phrase; however, none of which adds any new claims, defendants, or expands time frames. All corrections relate back to the existing complaint.

11. Below is a list of all additions/deletions (the former is underlined and the latter is bracketed with a strikethrough) in accord with local rules.

<u>Corrections to July 18, 2006 Complaint</u>

12. [Alterior] corrected to <u>Anterior</u> at page 30 paragraph 99 c).

13. [Hauqu] corrected to <u>Hauqu's</u> at page 33 paragraph 109.

14. the following was intended to clarify "reasonable medical exam" at page 33 paragraph 109:

   <u>For example, knee injuries of this type require a doctor</u>

   <u>– at the minimum – to perform a Lachman test and a</u>

   <u>valgus stress test.  Both of which are hands-on exams</u>

   <u>that do not require any special equipment.  Plaintiff</u>

   <u>received neither physical exam from Alie, thus</u>

   <u>defendant's exam was a "non-exam".  Also recommended</u>

   <u>is the anthrometer test, which is used to measure</u>

   <u>stability of the injured knee.  It too, was not performed.</u>

15. Deleted from page 34 paragraph 110 was [CMS].

16. Corrected was [stops] to <u>steps</u> on page 37 paragraph 124.

17. Inserted on page 37 paragraph 128 was the article <u>a</u> between the words "allow" and "passing."

WHEREFORE, Plaintiff prays that this Honorable Court grants the instant request to "relate back" the proposed amendments to His complaint in the interest of justice.  If the Court, however, is not persuaded to grant the request to "relate back" these amendments

to the July 18, 2006 filing date, then Plaintiff regretfully, simultaneously withdraws the

instant motion for leave to amend.

The above is true and correct and Plaintiff signs this under penalty of perjury.

9.28-06
9-22-06

David Williamson                                    Date
SBI#183022,W-1,L-12
1181 Paddock Rd.
Smyrna, DE 19977

# Exhibit A



David Williamson
SBI # 183022, W-1, L-12
1181 Paddock Road
Smyrna, DE 19977

10 May 2006

Dear Mr. Williamson,

Your medical records are the property of the Department of Corrections and the State of Delaware. Copies of your records will be available after your release. You would address your request to the Department of Corrections Health Services Unit, 245 McKee Road, Dover Delaware 19904. Please include your name, SBI number and dates that you are requesting information about. The cost for these copies would be determined by the Department of Corrections.

Your Partner in Healthcare,

Scott S. Altman
Quality Assurance Monitor
Correctional Medical Services

CC:  Warden Thomas Carroll
     Medical Record

     Dorothy Williamson
     19 Cornwall Road
     New Castle DE 19720

I/M  David Williamson

SBI# 183022   UNIT W-4-1-12

DELAWARE CORRECTIONAL CENTER

1181 PADDOCK ROAD

SMYRNA, DELAWARE 19977

Clerk of U.S. District Court

844 King St., Lockbox 18

Wilmington, DE 19801



 **ORIGINAL**

IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| DAVID WILLIAMSON,<br>    PLAINTIFF    ,<br>          V.<br>CORRECTIONAL MEDICAL SERvICES, Inc.<br>C_____MALANEY,<br>DONNA PLANTE,<br>MAGGIE BAILEY,<br>CHUKS IHUOMA,<br>Dr. SITTA C. ALIE,<br>Dr._____ZIMBULL,<br>MICHELLE ROBINSON,<br>JUANITA CLARK,<br>JANE DOE (Dentist)_____<br>FIRST CORRECTIONAL MEDICAL<br>Defendants. | Case No._____ 06- 379-SLR<br><br>Jury Trial Demand<br><br><br>FILED<br><br>OCT - 2 2006<br><br>U.S. DISTRIC...<br>DISTRICT ... |

D scanned

_____. AMENDED COMPLAINT

This is a civil rights action brought by David W. Williamson, a pro se plaintiff and a state

prisoner of Delaware, pursuant to 42U.S.C. section 1983 and 1997, requesting declaratory

judgment, injunctive relief, and damages. Williamson claims herein that Defendants committed

several distinct acts of deliberate indifference to Williamson's known serious medical needs in

violation of his constitutional rights: specifically the Eighth and Fourteenth Amendments to the

United States Constitution and deliberate acts of retaliation against Williamson for his exercise

of constitutionally protected activities in violation of the Fifth and Fourteenth Amendment's Due

Process Clause; Eighth Amendment's Equal Protection and Ban on Cruel and Unusual

Punishment Clauses; First Amendment's Freedom of Speech; and the Privileges and Immunities

Clauses of Article IV.

## JURISDICTION

1. The Court has jurisdiction over Williamson's claims of violation of his federal constitutional rights under 42 U.S.C. subsections 1331(a), 1334, and supplemental jurisdiction over any state law (secondary) tort claims under 28 U.S.C. section 1367 and or any other applicable statutes.

## PARTIES

2. Plaintiff, David W. Williamson, is a state prisoner who is incarcerated at the Delaware Correctional Center (D.C.C.) (2001-current) during the events described in the instant complaint. Williamson comes as a pro se friend of the court.

3. Defendant, Correctional Medical Services, Inc. (CMS) is a privately held company/corporation that is contracted as an agent of the State as its health care provider (HCP[1]) for the inmate population within and for all the Department of Corrections (DOC) prisons-specifically DCC. CMS is responsible for: ensuring all facets of medical/health care to prisoners (e.g. timely examinations, diagnostic tests, any appropriate medical, dental or mental health treatment, or prescriptions); and referral for specialist evaluation or treatment etc. CMS is sued in its individual and official capacities.

4. Defendant, C_____ Malaney, is believed to be the on-site medical administrator, however her exact title/duties have yet to be discovered. Malaney is employed by CMS and is assigned to D.C.C. during the pertinent events described herein. She is believed to be responsible in a direct and supervisory capacity within the D.C.C. hospital. She administers CMS

[1] CMS and HCP are employed interchangeably herein

2

policy, custom, and or corrects and ratifies the behavior of subordinates in accord with above, and she responds to inmate health care needs/complaints. Malaney is sued in her individual and official capacities.

5. Defendant, Donna Plante, is believed to be the on-site director of nursing, however, her exact title/duties have yet to be discovered. Plante is employed by CMS and is assigned to D.C.C. during the pertinent events described herein. She is believed to be responsible in a direct and supervisory capacity within the D.C.C. hospital. She administers CMS policy, custom, and or corrects and ratifies the behavior of subordinates in accord with above; and she responds to inmate health care needs and complaints (e.g. Medical Grievances). Plante is sued in her individual and official capacities.

6. Defendant, Maggie Bailey, is believed to be a nurse practitioner, however her exact title/duties has yet to be discovered. Bailey is employed by CMS and assigned to D.C.C. hospital during the pertinent events described herein. She is believed to be responsible for administering adequate and reasonable treatment/care to inmate patients; conducting medical consultations, exams, chronic care clinics (Clinics); and responding to Sick Call referrals etc. Bailey is sued in her individual and official capacities.

7.Defendant, Chucks Ihuoma is believed to be a nurse practitioner, however her exact title/duties have yet to be discovered. Ihuoma is employed by CMS and was assigned at D.C.C. during the pertinent events described herein. She is believed to be responsible for administering adequate and reasonable treatment/care to inmate patients, conducting medical consultations, exams, clinics, and responding to medical sick-call referrals (referrals) etc. Ihuoma is sued in her individual and official capacities.

3

8.Defendant, Sitta C. Alie is believed to be a general practice doctor, however her [first name and her] exact title/duties have yet to be discovered. Alie [is employed by CMS and] was employed by FCM; and subsequently she is believed to have been briefly retained by CMS upon FCM's replacement, and Alie was assigned at DCC during the pertinent events described herein. She is believed to be responsible for administering adequate and reasonable treatment/care to inmate patients, conducting medical consultations, exams, diagnostic tests, clinics, responding to referrals, and ordering prescribed treatments, medications, and/or recommending outpatient specialist referrals or diagnostic testing, etc. Alie is sued in her individual and official capacities.

9.Defendant, Michelle Robinson, is believed to be a dentist, however her exact title/duties have yet to be discovered. Robinson was employed by CMS and assigned at DCC during the pertinent events described herein. She is believed to be responsible for providing adequate and reasonable dental care to the inmate patients, which include emergency, diagnostic, maintenance, outpatient specialist referrals when needed, and prescribing medications. Robinson is sued in her individual and official capacities.

10.Defendant, Juanita Clark, is believed to be a dental assistant, however her exact title/duties have yet to be discovered. Clark was employed by CMS and assigned at DCC during the pertinent events described herein. She is believed to be responsible for assisting the dentist in providing adequate and reasonable dental care to the inmate patients, which include evaluation, emergency care, diagnostic, maintenance, and referral to dentist and/or outpatient specialist. Clark is sued in her individual and official capacities.

11.Defendant, Dr._____ Zimbull, is believed to be a dentist, however his first name and his exact title/duties have yet to be discovered. Zimbull is employed by CMS and assigned at DCC during the pertinent events described herein. He is believed to be responsible for

4

providing adequate and reasonable dental care to the inmate patients, which include emergency, diagnostic, maintenance, outpatient specialist referrals when needed, and prescribing medications. Zimbull is sued in his individual and official capacities.

12.Defendant, Jane Doe dentist, is believed to be a dentist, however her name and her exact title/duties have yet to be discovered. Jane Doe is/was employed by CMS and assigned at DCC during the pertinent events described herein. She is believed to be responsible for providing adequate and reasonable dental care to the inmate patients, which include emergency, diagnostic, maintenance, outpatient specialist referrals when needed, and prescribing medications. Jane Doe is sued in her individual and official capacities.

(b) Defendant First Correctional Medical (FCM) is believed to be a privately held company/corporation that was contracted as an agent of the State as its HPC for the inmate population within and for the DOC prisons – specifically DCC. FCM was responsible for: ensuring all facets of medical/health care to prisoners (e.g. timely and adequate examinations, diagnostic testing, any appropriate medical, dental or mental health treatment, or prescriptions); and referrals for specialist examinations or diagnostic testing, or recommendations and treatments etc. FCM is sued in its individual and official capacities.

13.All Defendants have acted and/or continue to act under the color of State Law at all times relevant to this complaint.

## Facts

### Count I: Denial of Reasonably Adequate Medical Care[1]

14 Defendants CMS, Malaney, Plante, Bailey, and Ihuoma have intentionally denied, delayed, and/or provided less efficacious, medical care with intentional and deliberate indifference to Williamson's known serious medical needs. Defendants' intentional acts – both continuous and pervasive – have caused Williamson to needlessly suffer impairment of His normal daily functions and do pose a likely risk of substantial harm and danger to Williamson's future health, however, without any legitimate penological objective and based on non-medical factors.

15.Williamson's chronic condition is known by Defendants (listed at #14) both subjectively and objectively to be a serious medical need under any of the following factors:

a) Williamson had been diagnosed by a doctor as having a chronic disease that requires continuous daily medication chronic-care medications (CC Meds) (e.g. Levothyroxine or equivalent and multivitamins) to control the dangerous and acute effects of His thyroid disease. Williamson can never recover, but with the uninterrupted CC Meds, He is able to replace the necessary hormones etc. that His body no longer produces naturally.

b) Williamson has received CC Meds from 2001- present, but He has experienced a pervasive and continuous pattern of unnecessary and harmful CC Meds interruptions[2]

c) Impairment of normal daily functions – First, the common effect of Williamson's chronic condition is both life altering and dangerous to future health. Some

---

[1] Though Plaintiff structures the instant complaint as separate numerical "counts," he does not wave any claims that may arise under the fact situation.

[2] "Lapse and interruptions" are employed interchangeably regarding any Chronic Care Medication lapse.

6

of which are <u>chronic fatigue</u> (lethargy, lack of energy both physical and mentally);

<u>inability to concentrate</u>; causes production of <u>dangerous cholesterol;</u> causes production of

dangerous <u>inflammation in the bloodstream</u> (of which does pose a significant risk of heart

disease or stroke and does cause painful swelling of the extremities); <u>slowing of</u>

<u>metabolism;</u> and the acute <u>loss of hair</u> about face, head, and body.  Williamson

experiences all of these and their inherent effects to his overall health (i.e. acute

deterioration of health) and Defendants who are contracted health care professionals are

knowledgeable of these effects etc. by virtue of their expertise and common knowledge

of these well documented symptoms.

d) Actual notice of impairment of normal daily functions and threat to future

health.[1]  Williamson specifically placed CMS, Plante, and Malaney on notice of

Williamson's unnecessary suffering and how it impaired His daily functions, for

example:

> i. chronic fatigue adversely impairs ability to exercise and promote good
>
> health*, impairs ability to work, study, or learn effectively;
>
> ii. <u>painful inflammation</u> causes painful swelling of hands, feet and body
>
> (sometimes referred to as phantom allergies because it resembles an
>
> allergic reaction, but absent an actual allergy), and moreover, the
>
> incidence of inflammation in the bloodstream is recognized as a major
>
> contributing factor in causing coronary and other related cardiovascular
>
> disease (e.g. stroke) – raising the likelihood of incidence by as much as
>
> fifty or more percent.

---

[1] Threat to future health is synonymous with "poses a likely risk of substantial harm and danger to future health."

iii. Williamson's slowing metabolism aggravates His chronic fatigue – inability to promote good health via meaningful exercise etc. – to cause acute deterioration of His overall health and body (e.g. acute loss of lean muscle mass in favor of high fat content, lower body temperature, and degradation of cardiovascular system);

iv. High cholesterol production is a classic effect of Williamson's disease and it is further aggravated by His inability to realize meaningful exercise, and both conspire to pose a likely and significant risk of heart disease or other related coronary problems;

v. Hair loss about face, head, and body that causes Williamson to look like a diseased cancer patient or leper (e.g. eyebrows, mustache fell out, and bald patches about head and nearly complete loss of body hair). This has caused Williamson to be ridiculed and embarrassed by his peers, supervisors, and DCC staff alike, and He suffers a destroyed self-image, self-esteem, emotional distress and depression due to both the hair loss and His needlessly deteriorating body and mind, and He fears for His future health. Any layman can easily observe the many tangible effects and discern that Williamson needlessly suffers symptoms that greatly impair His normal daily functions and/or quality of life and health. Thus defendants CMS, Malaney and Plante are also knowledgeable by virtue of Williamson's repeated notices and pleas.

e) Prescription requirements of thyroid CC Meds not followed by Defendants. Specifically, thyroid CC Meds are of the type that must be taken daily – at the same time

8

– to be effective. Any lapse disrupts the hormonal balance or interrupts the input stream and causes Williamson to needlessly suffer a resurgence of the above listed effects at 15 (c) and (d). Defendants CMS, Malaney, Plante, Bailey, and Ihuoma are knowledgeable of this prescription requirement by virtue of common professional knowledge and by virtue of Williamson's "notice."

f) Poses a likely risk of substantial threat of harm to future health. Specifically, Defendants know that the classic effects, of which Williamson is experiencing, (e.g. high and rising cholesterol, inflammation in blood stream, and chronic fatigue impairing ability to promote good health through meaningful exercise all conspire to greatly increase the likelihood of Williamson experiencing a stroke, heart attack, cardiovascular disease, and/or other coronary related event. This is likely and substantial – in fact – it is natural and foreseeable consequence because the inflammation alone raises the risk by some fifty or more percent and if the other two effects are factored, there is a marked increase. Moreover, Williamson has a hereditary incidence of heart diseases – thus predisposed and disadvantaged. Four bullets of a six-chamber revolver are loaded and Defendants knowingly hold the gun to Williamson's head and pull the trigger every time they cause an unnecessary lapse.

16. Defendants CMS, Malaney, Plante, Bailey, and Ihuoma individually and officially acted with intentional and deliberate indifference to Williamson's known serious medical needs in any or all of the following:

> a) By creating a pervasive and pattern of CC Med lapses and/or by failing to correct this known pattern of lapses and therefore ratifying said lapses;

9

b) By creating a pervasive and continuous pattern of deliberately withholding/delaying CC Meds from Williamson despite actually possessing them and/or actually possessing suitable alternate "Stock" supplies;

c) By failing to adhere to established "medication administration system" procedures (i.e. ordering and dispensing procedures);

d) By failing to realize repeat promises of corrective action

e) By employing a policy or custom of cost-avoidance – as a non-medical criteria – to deny, delay, and otherwise limit/short Williamson's necessary CC Meds;

f) By intentionally denying the necessary "Chronic-care clinics (Clinic[s])[1]

g) By intentionally retaliating against Williamson because of his petitioning for redress of grievances, which is without any penological objective and is also a non-medical criteria; and

h) As evidenced by Defendants' repeated display of bad attitudes, actual malice, and motives toward Williamson, such as subjecting Williamson to contempt, scorn, sarcasm, hostility, retaliation (i.e. retribution), and treating him as a nuisance rather than as a patient.

17. The following events support the above claims and do illustrate the subjective/objective components and personal involvement of defendants listed at #14.

---

[1] "Chronic-care clinics" are automatically scheduled about every 90-days to, in part, to renew the doctors' prescription of CC Meds.

18. CMS accepted a no-bid contract as the health care provider to the DOC's prison population (of which DCC is a part), in July '05 and is believed to have assumed all responsibilities, liabilities, and or continuing claims from the prior health care provider First State Correctional Systems. CMS's structure is believed to be a privately held, for-profit corporation, and it has actively employed customs/policy designed to realize unconstitutional cost-avoidance measures that intentionally deprive their charges of the minimal and necessary medical/dental treatment.

19. Williamson experienced ["seven"] "nine" consecutive CC Meds interruptions between July '05 and [April '06] June '06. All were unnecessary and easily preventable, and Defendants were placed on "Notice" prior to "every" impending lapse as well as thereafter. Defendants, CMS, Malaney, and Plante failed to take corrective action, though it was needed and they were made fully aware of the continuous and systematic failures, and did ratify the failures thus creating a custom/policy of intentionally denying/delaying doctor's prescribed medication with malice toward Williamson.

20. Williamson experienced a needless CC Med interruption from 7-15-05 to 7-27-05. It was unnecessary because Williamson wrote Dr. Alie of the pending lapse on 7-11-05 (and because Stock supplies of an acceptable alternate are and were kept in the CMS on-site pharmacy (pharmacy)).

21. Dr. Alie ordered 120 doses of both CC Meds (e.g. Synthroid and multivitamins) to begin on 7-18-05 and run until 11-15-05, but CMS failed to provide Williamson's prescribed CC Meds.

22. Williamson filed an Emergency Medical Grievance (EMG # 15453) on 7-15-05 that placed CMS on "Notice" of the CC Meds lapse and Williamson's adverse effects. CMS failed to

11

respond within the 24-hour period as required by Inmate Grievance Procedure 4.4 for EMGs (IGP 4.4).

23. Williamson also filed a notice/complaint on 7-22-05 directly with the CMS Delaware Offices that outlined the past repeat CC Meds lapses; His needless suffering; CMS's failure to comply/respond to IGP 4.4 – EMG; and failure to provide alternate stock supplies during the interim; and it placed CMS in notice of potential litigation if not corrected.

24. On 7-27-05 CMS pharmacy finally released the belated CC Meds, but the pharmacy had actually possessed them since 7-22-05 and refused to dispense them despite knowledge of lapse.

25. On 7-28-05, CMS rep. Mr. Linton conducted a grievance hearing for EMG # 15453. Mr. Linton refused to explain why the EMG was not heard within the allotted 24-hours or who was responsible for constructively deciding the EMG was not an emergency, but he did acknowledge as troubling the fact that the pharmacy refused to dispense the already lapsed CC Meds until five days after receiving them. Linton failed to explain how or why this occurred on view of ample notice. Linton did provide the names of two administrative personnel (Mrs. C. Malaney and Mrs. D Plante) who he stated were directly responsible to help in these matters at the DCC hospital/pharmacy, and he encouraged Williamson to contact them for more direct assistance in the future.

26. Linton promised in writing that CMS would correct the CC Meds interruptions: "CMS will follow the medication administration system [(Med System)] to avoid a repeat of a lapse in medicine." Williamson believed this assurance was merely an empty/token promise designed to frustrate meaningful redress and allow CMS to manipulate the grievance process, Williamson refused to "sign off" on the EMG. Williamson had been given similar assurance

12

before only to be deceived while CMS continued to intentionally short/deny CC Meds that is was otherwise required to dispense via its custom to fail to correct the pervasive pattern.

27. Mr. Linton's referenced Med System operates in the following:

- a) A chronic Care Clinic (Clinic) is scheduled every 90 days in which a doctor/authorized personnel places an order for 120 doses (i.e. four 30 day self administered med cards (med card)) of meds;

- b) Patient's name appears in the CMS Medication Pick-up List (Med List) within his final five doses to receive new Med Card.

- c) The process continues, and in or around the 90-day mark the patient is automatically scheduled in for a Clinic to renew the 120 doses of CC Meds, which ensures a 30-day cushion.

- d) CMS employs a "fax and fill" med ordering system that normally results in the pharmacy receiving meds within 48 hours or, at worst, within four days according to CMS rep. Linton.

- e) CMS failed to adhere to its own Med System and its token assurances to Williamson to correct CC Meds lapses and did and continues to intentionally short/deny said prescription CC Meds in order to realize its unwritten custom/policy.

28. Williamson experienced [six] eight additional, consecutive CC Med lapses after receiving CMS's promise to follow the "Med System." Moreover, this is even after the doctor's orders were made on 7-18-05 and again in January '06 for 120 doses each of CC Meds respectively.

13

29. Also, the Med System called for a Clinic scheduling within 90 days of the 7/15/05 order (e.g. on or about 10/15/05), but CMS refused to ensure said Clinic and more lapses occurred.

30. Williamson's first Med Care (7-27-05 to 8-27-05) ran out, but Williamson gave notice to Malaney and Plante on 8-26-05 of the pending CC Med lapse. Although corrective action was assured and needed, and despite Malaney and Plante having the ability to easily correct the lapse, they refused to do so.

31. Williamson's second consecutive unnecessary CC Med lapse occurred from8-27-05 to 9-5-05, and ironically Williamson's name did not appear on the "Med List" on 9-5-05. Instead, Williamson was at the hospital for blood work and He pleaded with a new nurse to check the pharmacy for His lapsed Meds. Again the pharmacy had possession of said meds and despite notice to Malaney and Plante, and assurances to correct via following the Med System, Williamson was not scheduled to pick up his CC Meds.

32. Williamson even sought outside assistance via the Delaware Center for Justice and met with case manager Nikita Robins on 9-22-05. Unfortunately, DCJ was unable to effect any meaningful change in CMS's behavior, policy, or custom.

33. Williamson filed a subsequent EMG in response to the 8/05-lapse incident (EMG #17197) directly with the health care provider by placing same in their Sick Call box, however, CMS disregarded this EMG. Consequently, the EMG was forwarded to the Inmate Grievance Chair (IGC) who summarily rejected it as being a "Duplicate Grievance" to EMG #15453. This violation IGP 4.4 because

      a) All medical grievances are to be forwarded to the contract health care provider "directly" and

14

b) Multiple grievances for the same incident are prohibited but are appropriate
for separate individual incidents. Nevertheless DOC, via the IGC, deemed the
subsequent incident of CC Med lapse as a continuing/duplicate incident (i.e.
continuing and pervasive pattern).

34. Williamson was erroneously scheduled in for a Clinic with Mrs. Bailey on 8/31/05,
however, it was not needed due to the fact Dr. Alie had already renewed the 120 day order on
7/15/05 thru to 11/15/05. Bailey verified this information was contained in Williamson's file.

35. Williamson further informed Mrs. Bailey that He was currently experiencing a CC
Med lapse Bailey stated that Williamson would have to wait until his name appeared on the Med
List, however, Williamson refused this deliberate indifference and stated that this was
"unacceptable" and recited the resurgence of symptoms Plaintiff was needlessly experiencing in
detail; and the fact that in the past he had received alternate stock supplies from the on-site
pharmacy – that there was no legitimate reason to deny or refuse to provide the already lapsed
meds now.

36. Bailey became visibly agitated and stormed off to the pharmacy; Williamson
followed.

37. Bailey emerged from the pharmacy and stated, "You can't have them!" Williamson
inquired whether that meant they were out or that she was refusing to dispense the meds, and
Bailey confirmed that 80 mic doses were doses were in stock, but stated "I'm not going to give
you 80!"

15

38. Williamson explained that on two prior occasions he received 80 mic doses broke in half as an alternate emergency supply, but Bailey exploded with "It's not my problem, you'll have to wait!" and she stormed off.

39. Moreover, Williamson was later informed by Dr. Burns that thyroid meds generally range within 80 to 150 mic doses for initial trials to determine how a particular patient responds, and that Williamson's 50 mic dose was the lowest dose available and clearly inadequate in view of the acute symptoms experienced by Williamson. Dr. Burns doubled Williamson's dose from 50 to 100 mic doses on January 4, 2006 and provided twenty-seven doses of 88 mic stock supply doses in the interim. These stock supplies had been in the pharmacy since 3/19/05 (i.e. during the entire five consecutive med lapses) and could have been used to correct any of these prior lapses, but were intentionally withheld. Also, on January 5, 2006, a nurse called Williamson over to the daily early morning Nurse dispensed meds and gave Him to 50 mic doses (the equivalent of the new 100 mic doses) and Williamson inquired as to why was being called over to the "Nurse Dispensed Meds." She said that she took two 50 mic doses from stock supplies to affect Dr. Burns' new order until they came in. Thus, Williamson realized that the pharmacy also kept the 50 mic doses in stock but had refused to provide either the 50, 80, or 88 mic doses throughout all five consecutive CC Meds Lapse, and did cause Williamson to needlessly suffer no legitimate penological objective and for non-medical factors.

40. Bailey refused to provide alternate stock supplies despite having knowledge of Williamson's Aug/Sept. 05, CC Med lapse, despite verifying clearly acceptable stock supplies, and despite Williamson's pleas that He "is" suffering. Bailey treated Williamson with hostility, malice, and as a nuisance as opposed to a chronic care patient who required his needed and doctor prescribed CC Meds.

16

41. Williamson's second 30-day card ran from 9/05/05 to 10/04/05 and because it was clear to Williamson that CMS, Plante, and Malaney had no intention of following the Med System or correcting the continuing CC Med lapses, he filed a Sick-call Slip, with a CC Med "refill sticker" (from his existing 30-day card) affixed, directly to the pharmacy on 9/27/05. The pharmacy verified receipt of the refill request on 10/02/05.

42. Williamson nevertheless experienced his third needless consecutive CC Med lapse on 10/04/05.

43. Williamson filed yet another notice on 10/03/05 to Malaney and Plante of the pending CC Med lapse, of their inexcusable failure to correct and/or effect meaningful and timely medical treatment, and of Bailey's refusal to provide stock supplies. Copies went to Nikita Robins of DCJ.

44. Williamson was erroneously scheduled in for Sick Call on 10/04/05 even though the Sick Call slip Williamson filed was forwarded to the pharmacy and was merely a friendly request for a timely refill of His CC Meds.

45. Williamson had taken his last dose on 10/04/05 and was not on the Med List to pick up a refill 30-day card, so Williamson requested the nurses Cathy and Crystal to follow up on this lapse. They took great pains to justify why Williamson was not going to receive his prescription CC Meds, and this was before they even attempted to check with the pharmacy (a mere 20-feet away) to learn whether any were in. They were operating from established policy/custom and not by fact or medical need.

46. Specifically, Cathy stated, "because your [Williamson's] particular types of meds are nonformulary, they have to be authorized." Williamson stated that they were authorized by Dr. Alie and good until Nov. 05. But Cathy continued, "Just because you had a doctor sign off

17

doesn't mean that you're automatically authorized." Williamson inquired as to "who else

screens the meds?" And Cathy responded "Regional does." Williamson inquired as to what

criteria Regional employs in making its decision. Cathy firmly and unequivocally replied,

"Cost!" And then she invited Debbie the pharmacist to concur with her justification of why

Williamson was not going to receive His CC Meds and Debbie agreed.

47. Williamson checked for clarification: "You mean to tell me that Regional – who is

not present in this building – second guesses a doctors order based on non-medical criteria,

namely cost?" "Sure," Cathy replied.

48. Cathy referenced CMS's custom/policy of improper cost-avoidance and it is

supported by the facts: Williamson experienced CC Med lapses between July 15, 2005, and

[March 28, 2006] June 25, 06 – an approximate of [a span of 255] 344 days which required [255]

344 doses of both thyroid meds and multivitamins (mv). CMS refuses to provide the [255/255]

344/344 doses and only provided approximately [184] 243 thyroid doses and [124] 183 mv

doses over this period. [Thus] CMS intentionally failed to distribute and/or intentionally failed

to take corrective action despite repeat acknowledgment of Williamson's many CC Meds lapses

and clear knowledge that effective corrective action was needed to ensure Williamson's proper

dosage was realized. [that equated] CMS's custom/policy of cost-avoidance equated to an

approximate [to a] 30% reduction in thyroid and over 50% reduction in mv CC Meds. In fact,

CMS intentionally and with malice aforethought offered an already tested and known failed

medication system as an ostensible corrective action to the existing failed system (described

above at #27) on or about April/May 06, circa, and Williamson challenged CMS's so-called

corrective action as a ruse. Williamson did, however, comply with the "new" so-called

corrective Meds procedure and still experienced subsequent CC Meds interruptions from 4-27-06

18

to 5-8-06 (12 days) and 6-8-06 to 6-25-06 (18 days) and Williamson's claims came to pass.
Extended over the inmate chronic care population for the period of CMS's contract period, this
custom creates a windfall profit that is based on non-medical factors and shocks the conscience.

49. Williamson requested alternate stock supplies from Debbie, but she stated none were
available, however, this proved to be a fabrication because Bailey confirmed stock supplies on
8/31/05 and so did Dr. Burns in 1/04/06 (which were dated 3/19/05). These very stock supplies
were indeed present in the pharmacy despite the pharmacist's fabrication.

50. Williamson experienced his third lapse on 10/05/05.

51. Williamson was not placed on the Med List for 10/06/05, but was scheduled in for his
second medical grievance hearing. (EMG # 15453).

52. Plante abused the grievance process and treated Williamson with contempt, scorn,
and disdain. She refused to address the stated problem instead playing word games with
semantics; intentionally misread the stated problem of "on-going" and repeat problem of CC
Med lapse and attempted to narrowly read it as a single isolated incident of which was corrected
upon Williamson receiving CC Meds belatedly on 7/27/05. In fact, Plante's narrow reading was
clearly untenable because it was in conflict with the grievance itself, in conflict with the DOC's
treatment of Williamson's subsequent EMG that was rejected as a duplicate (i.e.
continuing/ongoing)

53. Plante stated that we are only going to deal with the July incident, so Williamson
opened his folder containing documentation of – as then – three consecutive lapses etc. and
Plante became visibly agitated. Williamson recited the lapses and letters of Notice to her,
Malaney, and CMS that went unanswered. Plante jumped up from the table and began to talk

over Williamson in an attempt to silence him, however, he blurted out "Well, I'm currently out of my meds now- how can you say this has been dealt with?"

54. Plante replied with contempt and sarcasm by stating, "Make sure you write this down too! That I'm going above and beyond for you – I'm going to call the pharmacy to see if your meds are in." Williamson was then ejected from the grievance hearing despite never actually addressing the problem of repeat and continuous CC Med lapses or how the continuing problem would be corrected.

55. Plante's behavior and hostile attitude is revealing, She believes belatedly providing Williamson with his doctor prescribed and necessary CC Meds isn't and obligation of CMS or her duty, or even ethically or morally correct, but is actually considered "going above and beyond" the call of duty as she articulated. Plante's hostile attitude towards Williamson explains why Plante never replied to his several pleas for help (i.e. notices) and evinces a clear intent to be deliberately indifferent to Williamson's known serious medical needs, and intentionally cause Williamson harm.

56. CMS was also on notice via several pleas and Williamson's grievance activity and CMS utterly failed to correct the ongoing problem, utterly failed to correct the clear breakdown in services, utterly failed to correct and or reprimand the several instances of unconstitutional behavior of its on-site personnel and their hostile attitudes etc., and has by default acquiesced and ratified this behavior, as a custom to be employed routinely - not corrected

57. CMS has engaged in customs or procedures and encouraged a culture and attitudinal approach that evinces deliberate indifference to Williamson's known serious medical needs.

58. Williamson received his C Meds that same day, 10/6/05, but again He was not listed on the Med List. Thus despite notice of another CC Med lapse and despite CMS actually

20

possessing the CC Meds (and/or stock supplies) the pharmacy refused to dispense the lapsed meds and Williamson only received them that day due to the confrontation at the grievance hearing.

59. Williamson appealed the grievance and as such has exhausted administrative remedies. Williamson was not made aware of any proposed corrective measure made by the grievance board until He received a copy of His timely filed medical grievance appeal. Plante had ejected Him from the meeting before any final recommendation was made.

60. Plante stated therein, "Inmate will be placed on the pill call to prevent missed medication," but this also proved to be an empty/token promise.

61. Williamson's third 30-day card ran from 10/6/05 to 11/05/05, so when He again did not appear on the Med List as promised, he filed another notice to Plante on 11/01/05.

62. Moreover, the Med System called for an automatically scheduled Clinic, to renew the doctor's order for the next allotment of 120-day CC Meds, on or about 10/15/05 but this never occurred as promised. Thus Williamson also notified Plante of this fact in the 11/01/05 plea.

63. Williamson nevertheless experienced his fourth consecutive and unnecessary CC Med lapse between 11/05/05 until 11/08/05. Once again the pharmacy had checked in said CC Meds on 11/05/05 (i.e. actually possessed them) but refused to dispense them to Williamson, thus causing an unnecessary CC Med lapse.

64. Plante and CMS were specifically placed on notice and on two occasions promised to ensure (a) compliance with Med System and (b) to put "Inmate on pill call to prevent missed medication," but they all failed to ensure that Williamson receive the very meds that they themselves possessed but refused to dispense in a timely manner. Plante and CMS have

21

acquiesced and ratified these blatant and intentional CC Med lapses in deliberate indifference to Williamson's serious medical needs.

65. Williamson was ostensibly scheduled in for His belated Clinic with Ihuoma on 11/11/05, yet His name did not appear on the "Offender Activity Schedule" placed in His housing unit to alert CC patients of same[1]. Evidently a nurse called the building and the building Sgt. sent Williamson directly at code green 10:45a.m.

66. Williamson explained His excusable tardiness to Ihuoma, but she refused to conduct the needed Clinic (Clinics normally take about ten minutes and consist of the CMS employee perfunctorily completing a questionnaire and signing off on the next 120-day allotment).

67. Ihuoma replied (to Williamson's explanation and His pleas that a denied Clinic will undoubtedly cause another unnecessary CC Med lapse) by stating, "I don't care, you will have to be rescheduled."

68. Williamson filed a Medical Grievance of this incident on 11/14/05 with two exhibits attached (a) the Notice letter dated 11/09/05 and (b) the "Offender Activity Schedule" that omitted Williamson's name. It specifically sited Ihuoma as arbitrarily and capriciously denying Williamson his needed Clinic, which did indeed cause the fifth consecutive lapse.

69. Williamson filed another notice to Plante of the pending CC Med lapse, however, again she failed to reply or take corrective action and Williamson experienced His fifth consecutive and unnecessary CC Med lapse between 12/07/05 until 1/04/06 (28 day lapse – the largest yet).

70. Williamson was scheduled in for a Clinic on 11/29/05, however, was again refused the belated and necessary Clinic. The notice stated, "They're not going to see you today- you

---

[1] Failure to report to scheduled hospital appointment results in the inmate receiving a disciplinary "Write-Up," but Williamson did not receive any disciplinary action due to the fact that He could not have been aware having His name omitted from the schedule

22

can go." "...She's not here..." However, this was a fabrication because Williamson physically witnessed both Plante and Ihuoma present at the hospital while He was there waiting.

71. Williamson was again rejected and denied His needed Clinic and intentionally subjected to another unnecessary CC Med lapse – fifth consecutive and of the longest duration to date – in retaliation and because of Williamson's grievance activity against Ihuoma and Plante (i.e. because of His petitioning of redress). Their behavior is both deliberately indifferent and designed to intentionally inflict harm upon Williamson and/or punish Him for His grievance activity, that he filed on 11/14/05 and with the retaliatory action occurring shortly thereafter on 11/29/05. This behavior shocks the conscience of a civilized society.

72. Williamson filed an Addendum to the 11/14/05 "Medical Grievance," because He feared that raising a subsequent incident of denied Clinic would be summarily dismissed (like MG# 17197 was) by the IGC. It was filed on 11/30/05 and articulated the claims of deliberate indifference for another denial of Clinic and it raised the claim of retaliation. Copies were sent directly to CMS, thus they have adequate notice.

73. On 12/16/05 the IGC improperly and unilaterally rejected the 11/14/05 Medical Grievance in clear violation of IGP 4.4. For example, IGP 4.4 directs the IGC to forward all Medical Grievances directly to the contract medical provider – the IGC refused to do so. Also, the IGC stated an erroneous reason for its summary rejection (e.g. because Grievant requested monetary damages) (among other injunctive relief). However, IGP 4.4 does not prohibit one from requesting monetary damages and even gives an example of monetary damages as appropriate relief (i.e. compensatory).

74. The IGC is and has acted in violation of IGP 4.4 and Williamson's constitutionally protected right to seek meaningful redress in the courts by and through inserting itself as a

23

gatekeeper and attempting to shield CMS from responding to Williamson's valid medical and retaliatory claims.

75. Williamson appealed directly to the Warden and when He failed to respond within the time period allotted by IGP 4.4, Williamson exhausted administrative remedies on all the aforementioned claims by filing a final Appeal to the Bureau Chief Officer on 1/13/06. Copies were filed with Warden Carroll and Commissioner Taylor.

76. Also, Williamson articulated all the above pertinent events in a letter of notice directed to Commissioner Taylor on 12/30/05 (Copies to CMS at the Delaware Offices) and all parties have been afforded adequate notice yet they conspire to frustrate any meaningful discussion or corrective action, IGC and CMS conspire, through direct action or intentionally failing to correct, and did retaliate against Williamson because of His petitions for redress.

77. As noted Williamson experienced his fifth consecutive and unnecessary CC Med lapse (12/07/05 to 1/04/06), but even here CMS personnel did not willingly provide the Clinic and CC Meds, did not willingly provide what CMS promised to do – is obligated by contract to do, obligated by constitutional law to do, and obligated morally and ethically to do; but in contrast, were forced by a third party.

78. Specifically, Williamson's mother contacted the Warden's Office with a complaint on 12/29/05 and did receive from Deputy Warden Pierce an assurance that the lapse would be corrected. Dep. Warden Pierce recalled Williamson's mother from similar earlier complaints and recalled that it involved Williamson's thyroid medication.

79. On 1/04/06 Williamson was neither scheduled on the "Offender Activity Schedule" or the Med List, thus the hospital, CMS, its personnel - who were all on notice of the current fifth

24

consecutive lapse – had no intent or plans to see Williamson that day. They had yielded to Pierce's influence, a third party.

80. Williamson was contacted on the work-site and directed to go to the hospital after work on 1/04/06 to pick up his lapsed CC Meds, due to Pierce's intervention.

81. Williamson met Dr. Burns for the first time and she was unaware of His current lapse or why He was there, so Williamson informed Dr. Burns of the acute resurgence of symptoms and current extended lapse. This was the 1/04/06 impromptu call in visit.

82. Dr. Burns produced stock supplies (88 mics) dated from 3/19/05 (those stock supplies had been there all along, but CMS, Plante, Bailey, Malaney, and Ihuoma refused to correct a single episode of a lapse with them). Also, Dr. Burns doubled Williamson's dose from the lowest (50 mics), to a more appropriate 100 mics.

83. Dr. Burns also placed the doctor's order for the next 120 dose allotment of CC Meds to run from 1/06/06 to 5/06/06, however, the Med System called for this order to have been placed back in mid-October 2005 to run from 11/15/05 to 3/15/05.

84. Williamson received the new order of CC Meds on 1/11/06 (30 day card) and when again Williamson's name was not placed on the Med List, He filed a notice prior to the lapse with Plante and CMS offices. Williamson experienced his sixth consecutive CC Med lapse between 2/11/06 and 2/13/06, but again it was an unnecessary CC Med lapse because the pharmacy had logged these meds in on 2/9/06, but refused to dispense them to Williamson.

85. A so-called ombudsman by the name of Mr. Altman replied to Williamson's February notice and incredibly stated that he had investigated the matter and found it to be without merit. However, Altman proceeded to provide dates that Williamson picked up recent meds, which indeed demonstrated a CC Med lapse.

25

86. Of the five prior CC Med lapses, not once was Williamson's complaints about the interruptions, nor His notice to CMS of His suffering a resurgence of symptoms were ever challenging and Altman's investigation was in reality a "sham investigation" to obfuscate the matter.

87. On 3/13/06 to 3/28/06 (fifteen days) Williamson experienced His seventh consecutive CC Med lapse, and Williamson sent notices on 3/13/06, 3/21/06, and 3/27/06 to Plante, CMS Offices, and DOC Bureau Chief for MG# 15453.

88. On 3/26/06 Williamson received a reply from Ombudsman Altman (dated 3-22-06) and Altman stated that he had met with the DCC on-site pharmacy staff and that as of 3/2206 the pharmacy had received Williamson's CC Meds.

89. However, between the 3/22/06 date and the time Williamson received Altman's reply on 3/26/06, Williamson's name never appeared on the Med List[1] and no CC Meds were dispensed to Williamson.

90. As of 3/28/06 Williamson still was not placed on the Med List, but Williamson did receive a physical (among some dozen inmates held at the WIAC bldg. – not hospital) and Williamson explained in detail His fifteen day CC Med lapse, Altman's statement that the pharmacy had them since 3/22/06, and Williamson's needlessly suffering a resurgence of symptoms to nurse practitioner Ihuoma.

91. Ihuoma dismissed Williamson's pleas to check the pharmacy for His interrupted CC Meds with: "You have to be patient; they will schedule you for your meds." Williamson replied:

---

[1] DCC has strict security rules governing the movement of prisoners and absent a valid listing of one's name on the Med List or a Request from the hospital an inmate cannot simply go to the hospital/pharmacy.

26

"That is unacceptable! I've been out two weeks - Mr. Altman stated they were in, and this is my seventh consecutive medication interruption!"

92. Ihuoma displayed an attitude of indifference by rolling her eyes and mumbling something unintelligible, and instead of ensuring that Williamson received His CC Meds (i.e. taking meaningful affirmative action), Ihuoma simply wrote a direction in Williamson's medical file (which was not even in the hospital or available to the pharmacy staff at the time): Schedule in for med pick-up (paraphrased).

93. Ihuoma then stated: "There, I've placed an order – they will schedule you in, so look for your name on the medication list."

94. Williamson filed two prior medical grievances against Ihuoma for deliberate indifference and retaliation (i.e. retribution) of which was related to the CC Med interruptions and because Ihuoma is fully aware of the current and on-going matter, but intentionally chose to create an unnecessary delay in Williamson receiving His CC Meds instead of taking more immediate and appropriate steps (e.g. call the pharmacy, verify CC Meds, and send Williamson there), Ihuoma continues her retaliation and does intentionally inflict harm upon Williamson.

95. Williamson returned to His housing unit and showed Altman's letter to the bldg. Sgt. and explained the matter, He then provided Williamson with a "pass" to the pharmacy.

96. Williamson received His belated CC Meds that some afternoon due to DCC Staff's intervention despite Ihuoma's attempts to prolong the CC Med lapse.

97. Again, however, the pharmacy possessed the CC Meds but refused to place Williamson on the Med List and dispense them to Him.

(b) Williamson experienced his eighth and ninth consecutive and needless CC Meds interruptions from 4-27-06 to 5-8-06 and 6-8-06 to 6-25-06 for a total lapse of thirty days.

27

CMS's Mr. Altman claimed to have replaced the existing system with a new corrective system, however, this was merely a ruse because the so-called new replacement system was actually employed and found to be a failure during CMS's earlier contract period – as well as during FCM's contract period – and CMS merely and intentionally replaces one known failed meds distribution system for another known failed meds distribution system in bad faith to create an illusion of taking corrective action and as a deliberate attempt to create a defense, however, maintain its custom/policy of cost-avoidance. In deed, Williamson experienced subsequent CC Meds interruptions after this so-called corrective action though no fault of his own and despite following it and providing notice to CMS and its staff.

## Count II. Denial of Reasonably Adequate Medical Care

98. Defendants CMS, FCM, Ihuoma, and Dr. Alie have either intentionally denied, delayed, and/or knowingly provided a less efficacious and inadequate medical care with intentional and deliberate indifference to Williamson's known serious medical needs. FCM is believed to have been the contracted HCP over the period spanning July 04 through June 2005, circa, and had employed both Ihuoma and Dr. Alie over the same period. CMS then became the HCP in July 2005 and appears to have retained both Ihuoma and Dr. Alie for a period of time. These Defendants engage in a pervasive and continuous pattern of deliberate acts to deny adequate medical care to Williamson that cause Williamson to needlessly suffer acute pain, impairment of His normal daily functions, permanent, injury, and a likely risk of substantial harm and danger to future health absent any legitimate penological objective.

99. Williamson's serious medical condition is known by CMS, FCM Ihuoma, and Alie under the following factors:

28

a) Acute pain and suffering. Williamson specifically placed FCM, CMS and
Alie on notice that He experienced an acute knee injury involving muscle,
tendon, and ligament damage (MTL). That the right knee frequently grinds,
shifts, pops; that the upper leg and lower leg momentarily and painfully
dislocates with an audible popping sound that can be heard with the un-aided
ear; that the knee involuntarily buckles out-upon standing or straightening the
leg with weight upon it – following a sharp stabbing pain; and that these
problems did not precede the 7/26/04 circa knee injury, nor has the residual
knee damage healed in over twenty months since the initial injury.

b) Impairment of normal daily functions. Williamson specifically placed on
notice Defendants (listed at #98) that His acute knee injury has and continues
to impair His normal daily functions: ability to stand, walk, run, climb, or
descend stairs, carry or lift and support weight, perform manual labor, shift or
pivot on His foot, and impairs Williamson's ability to promote good health via
exercise. In fact, Williamson is a Certified Taekwon-do (martial arts)
Instructor who is now disabled and unable to professionally pursue such
employment for which He had prior to the untreated knee injury. Any layman
can discern Williamson's acute pain and impairment.

c) Permanent injury. Williamson placed [Defendants] CMS on notice that the
residual injuries to His knee continues with all of the above mentioned effects
and no relief or improvement for some twenty months after the incident.
Moreover, these residual injuries/effects described by Williamson (via Notice,
Medical Grievances, MG #7463 and MG#          dated 11/29/05, and in

person to Ihuoma, Alie, -during their employment by FCM- and other medical staff at various visits) depict the classic and elemental symptoms of an [Alterior] Anterior Cruciate Ligament (ACL) tear (Dr. Durst on 4/3/06 confirmed this fact with no additional information than what had already been given to CMS and Alie). Also, an X-ray was performed and showed no bone damage thus suggesting other MTL damage (e.g. ACL tear), but Alie performed two "non-exams" and intentionally disregarded the facts, observable classic symptoms, and Williamson's pleas to intentional misdiagnose the injury and avoid necessary – costly treatment. Thus, [CMS] FCM, Ihuoma, and Alie are and were objectively and subjectively knowledgeable of Williamson's serious medical needs by virtue of His several notices and MGs over the period of FCM's contract and CMS is knowledgeable by virtue of same and additionally because of subsequent MGs and the fact that the injury never abated/healed over twenty month period; via the observable facts, classic and elemental symptoms; the failure to heal over twenty months and absence of bone injury; and through Williamson's pain, suffering, and impairment of normal daily functions.

100. Defendants FCM, CMS, Ihuoma, and Alie individually or officially acted with intentional and deliberate indifference to Williamson's known serious medical needs via the following:

   a) By intentionally disregarding observable facts or classic and elemental symptoms that suggested an acute permanent knee injury (i.e. ACL tear) that

30

necessitate appropriate diagnostic testing, surgery, and physical therapy, but
was refused;

b) By intentionally disregarding Williamson's pleas and descriptions of
impairment of normal daily functions and the classic and elemental symptoms
of an ACL tear;

c) By intentionally disregarding resulting residual knee injury/damage that
supported and suggested permanent injury;

d) By employing a policy/custom to capriciously and intentionally deny or cause
an inordinate delay in needed treatment, and/or by exchanging a reasonable
professional judgment based on medical criteria for a "non-exam or non-
diagnostic" to intentionally deny the needed standard treatment based on non-
medical criteria; and

e) By intentionally avoiding and obstructing Williamson's legitimate petitioning
of medical treatment/Medical Grievances.

f) CMS by intentionally creating an inordinate delay in providing an appropriate
and needed knee brace and subsequently providing a belated and known
substandard knee brace as an alternative.

101.The following events support the above claims at items #98 thru #100 and establish
the subjective, objective, and personal involvement components of Defendants CMS, Alie, and
Ihuoma.

102. Williamson experienced an acute injury to His right knee on 7/26/04, where
Williamson, while running at full speed and sliding into third base (playing softball) had struck
an immovable/stationary object. High speed, momentum, and body weight behind it all

31

conspired to cause Williamson's outstretched right leg to hyperextend and buckle backwards and sideways against the knee joint at an acute and unnatural angle. Excruciating pain and massive swelling followed immediately, which His right knee equaled the diameter of Williamson's 21" (approximate) thigh and He could place no weight upon the leg. The swelling lasted albeit diminished about 30 days. DOC staff refused to send Williamson to hospital and directed Him to file a "Sick Call Slip," which Williamson did on 7/26/04.

103. Eight days later (8/03/04), Williamson received an initial medical consultation and an X-ray of the knee.

104. Williamson explained to the X-ray technician that no bones were broken, that an MRI would be the appropriate diagnostic test, but she matter-of-factly stated: "Oh that's not likely to happen – they're too expensive. But you didn't hear me say that."

105. Williamson received an elastic sleeve like knee brace, however, it was inadequate because it was not designed to keep the knee from bending backwards or sideways and Williamson clearly described the instability etc. to Ihuoma who knew or should have known that said sleeve like brace was a less efficacious and inadequate device that exposed Williamson to inevitable future injury.

106. After the known inadequate X-ray was performed, Williamson met with the nurse practitioner Ihuoma who was noticeably inattentive and dismissive of Williamson's recitations of the problem and its effects, and dismissed His still massively swollen knee as normal after eight days. She refused to place any recommendation for an MRI or other appropriate diagnostic testing that would reveal the level of damage and reveal an appropriate and adequate course of treatment. Ihuoma was so indifferent to Williamson's pleas she mistakenly listed his injury as the right –ankle and as occurring six years earlier, which Dr. Hauqu reiterated on 8/30/04.

32

107. Williamson was scheduled for a Chronic–Care Clinic with Dr. Hauqu on 8/30/04 (unrelated visit) and Williamson again recited the acute effects of His knee injury (e.g. pain, grinding, dislocation, popping, instability, etc.) and the doctor ordered an MRI. Williamson was still in acute pain.

108. September 26, 2004, Williamson filed an EMG for his knee injury, which was accepted and forwarded to the health care provider FCM. It outlined the above pertinent facts (MG#7463).

109. On or about 9/28/04, Williamson met with Dr. Alie who promptly overrode Dr. [Hauqu] Hauqu's order for an MRI and totally disregarded the observable facts and classic or essential symptoms of an acute and possibly permanent knee injury. Dr. Alie totally disregarded Williamson's recitation of the pain, of the effects (listed at 99 (a) and (b) above) and of how it impaired His normal daily functions (listed at 99 (b) above) and incredibly stated her judgment was based on her exam. Alie's exam, however, was anything but a reasonable medical exam. For example, knee injuries of this type require a doctor – at the minimum – to perform a Lachman test and a valgus stress test. Both of which are hands-on exams that do not require any special equipment. Plaintiff received neither physical exam from Alie, thus defendant's exam was a "non-exam". Also recommended is the anthrometer test, which is used to measure stability of the injured knee. It too, was not performed. It consisted of Alie poking the still somewhat swollen knee with her index finger, and she asked Williamson to lift and bend His knee of which Williamson was unable to fully perform – it was complete within one to two minutes. Williamson had nearly no range of motion in His knee dome 30-days after the incident, but Alie disregarded all the observable facts and Williamson's descriptions of classic symptoms

33

of ACL tear and her exam was in reality a non-exam and her ostensible judgment was not

supported by these facts, but was actually a calculated preconceived agenda to realize a

custom/policy to deny needed treatment for non-medical reasons.

110. Alie gave effect to a [CMS's] custom/policy that was employed by FCM to realize

[of] cost-avoidance through the above deliberate acts and intentionally misdiagnosed

Williamson's acute knee injury, which is obvious.

111. Williamson attended a grievance hearing for MG #7463 on 10-14-04. Williamson

explained the residual knee damage, Alie's "non-exam" and override of Dr. Hauqu's order for an

MRI to the health care provider representatives. The representatives offered to reschedule

Williamson with Dr. Alie for a comprehensive exam and a follow up monitoring; that Dr. Alie

would provide an exercise and strength training rehabilitation regiment, and that all appropriate

recommendations would be followed. The "recommendation[]" that representative referred to

was the issue Williamson raised via MG about the need for a proper diagnostic MRI test, and

Williamson was led to believe that an appropriate diagnosis would be conducted that would

include an MRI so Williamson accepted the proffered agreement by signing off on the MG. The

MG was "resolved" in Williamson's favor and under IGP 4.4 and or applicable standards all

available administrative remedies were exhausted upon it being "resolved". Resolution ends the

Grievance process.

112. [Their] FCM's agreements proved to be false, however, and were reneged promptly

thereafter absent any medical criteria or any legitimate penological objective.

113. On or about 11/04/04 Williamson was rescheduled with Dr. Alie, but she refused to

order the needed diagnostic test (e.g. MRI) or any diagnostic test that would reveal the true

extent of damage etc. Dr. Alie was hostile and contemptuous toward Williamson; she cut him

off with repeat interruptions and dismissive comments such as "Oh that's nothing" and "It's not serious...it will heal in time." She repeated her perfunctory non-exam and stated that Williamson would be rescheduled back in for a follow up in six months to be sure that the injury was not permanent. Alie gave no instruction to Williamson regarding physical therapy or strength training nor did she order any for Williamson. This was in total conflict with the grievance agreement.

114. No follow up evaluation was ever scheduled and no recommendations were ever given to Williamson in contravention of the grievance agreement and Dr. Alie's statement on 11/04/04 to reschedule Williamson in six months.

115. Williamson stated in his original grievance that he had a twenty year sentence and that he nor the injury were going to disappear just because deliberate indifference prevails in the health care provider's culture, and neither did.

(b) FCM intentionally misled Williamson at the 10-14-04 grievance hearing in a deliberate effort to delay/stall the needed treatment – and or treatment that was clearly suggested by the classic symptoms and known or should have been known – until the expiration of FCM's contract period to realize their custom/policy of cost-avoidance. FCM did in fact avoid providing the needed treatment and Williamson was finally diagnosed with a completely severed ACL on 6-5-06.

116. On or about 7/01/05, CMS secured an emergency no bid contract replacing the previous health care provider –FCM- prior to the completion of their breached contract. It is believed that CMS accepted the prior health care provider's responsibilities and liabilities by virtue of this emergency and unusual contract. CMS continued to employ both Ihuoma and Dr. Alie [ at least up and until December 1st, 2005] and nevertheless is knowledgeable of

35

Williamson's serious medical condition by virtue of his medical file – FCM's records etc. – and a subsequent Nov. 05 MG filed by Williamson and C.C. to CMS.

117. Nevertheless, Ihuoma and Alie have directly acted with deliberate indifference to Williamson's known and obvious serious medical needs.

118. Because the knee injury has never healed or recovered, although [20 months] has passed, Williamson believes he has unnecessarily incurred a permanent injury – that the injury is on-going and continuous – so He gave CMS notice directly via a medical grievance dated 11/29/05. because the injury is continuous, Williamson cannot with assurance state the date of discovery, other than it began on 7/26/04.

119. Williamson's knee injury Medical Grievance to CMS explained all of the above pertinent facts and gave appropriate notice again.

120. Said medical grievance was part of package of grievances that the IGC improperly and unilaterally rejected in violation of IGP 4.4 and Williamson's constitutional right to seek redress of grievances. Williamson incorporates items #73 thru #76 herein; this medical grievance was also subject to the appeal to the Warden and final appeal to the Bureau Chief Officer and thus all administrative remedies have also been exhausted regarding CMS's involvement and/or failure to effect adequate medical treatment for Williamson's known serious medical needs.

121. The IGC has either unilaterally or conspired with CMS to improperly insert itself and deny Williamson meaningful access to the Medical Grievance process and consequently access to the court – absent any legitimate penological objective – and in retaliation for Williamson's Medical Grievance activity.

36

122. Williamson has nevertheless exhausted the administrative grievance process for this matter and provided CMS – Del. Offices with copies of all documents and appeals.

123. CMS still intentionally denies Williamson the needed minimal medical treatment and unnecessary exposes Him to a likely substantial risk of future harm.

124. Williamson experienced a subsequent related fall and injury on 11/25/05 when He collapsed to the floor from the [stops] steps of His Housing Unit, W-1, bldg. His right knee involuntarily bucked out with a sharp, stabbing pain causing the fall. The very same type of residual knee damage Williamson stated on several prior occasions to Alie and again to CMS.

125. Williamson was directed to the following: "I/M will proceed with His requests for medical treatment and complete the Grievance Process." (Note: the grievance process had already been completed once).

126. On 11/29/05 Williamson experienced loss of work due to the 11/25/05 re-injury and filed another MG#        (dated 11/29/05) (See item #120 above).

127. Prophetically, Williamson stated in His 11/29/05 MG that He should not have to experience another likely but avoidable knee injury before He receives the minimal necessary treatment, however, on 4/03/06 Williamson did indeed severely re-injure His right knee while walking back from work.

128. Williamson had stepped off the sidewalk to allow a passing cart by and His right knee buckled backwards, then sideways, out on an acute and unnatural angle. Williamson was wearing the inadequate sleeve-like knee brace, and it proved useless. Williamson collapsed in such severe pain that He thought His leg had broken at the knee joint, but after the incapacitating pain has subsided somewhat, Williamson hobbled back to His housing unit with the aid of another inmate.

37

129. Upon arriving at W-bldg, Williamson's knee had blown up like a balloon and Sgt. Bailey immediately issued a "Pass" to the hospital and also called to alert hospital staff of Williamson's injury and pending arrival.

130. Williamson was examined by Dr. Durst and Durst inquired as to the obvious severe injury. Williamson explained the prior July 2004 knee injury and described the on-going residual knee damages – identical to Williamson's prior descriptions to Alie, grievance hearing reps, and again on the 11/29/05 MG to CMS – as well as the instant 4/03/06 re-injury and Durst immediately stated: "That sounds like a classic case of an ACL tear." "I'm going to order you an MRl and a knee brace," he continued.

131. Williamson replied that the sleeve brace He was originally provided did nothing to guard against the instability of His knee buckling backwards or sideways, and Durst stated:

It wouldn't; it's not designed for this type of injury - that is why I'm ordering you A _____ brace. [Williamson did not know the name/type of the brace Durst ordered.] It will only allow your knee to bend forward, and I want you to wear it at all times. I want to stress to you that you must be extremely careful until you get the brace, because you risk losing entire control of your knee if the ACL severs completely. Hopefully, it isn't severed completely now.

132. Williamson inquired of Durst, "What is the standard treatment for an ACL tear?" Durst replied: "Surgery to reconnect the ligament and sure it up, that is if it isn't completely severed."

133. Williamson questioned whether He would receive another X-ray and Durst stated: "It wouldn't show anything because you haven't fractured the bone."

134. Williamson's July 04 knee injury – that impaired His normal daily functions and exposed Him to likely permanent injury (i.e. complete loss of control of the knee) of which Alie,

38

Ihuoma, FCM, and CMS were aware of or should have been aware, via classic and elemental symptoms and residual knee damage spanning over twenty-months was intentionally untreated and/or given known less efficacious treatment based on non-medical factors (i.e. cost avoidance) and which did cause Williamson to needlessly suffer pain, discomfort etc., and did needlessly expose Williamson to an avoidable set of re-injuries that caused still more pain, suffering, and aggravated the existing damage to His right knee.

135. As of 5-8-06 Williamson had not received Dr. Durst's 4-3-06 ordered knee brace and on 5-9-06 when Williamson attended a subsequent Medical grievance hearing with Debbie Rodweller on 5-9-06 – she provided a knee brace from the cabinet that had been on-site the entire time Williamson had been denied a brace; however, Williamson was knowingly provided a substandard brace. When challenged by Williamson, Debbie attempted to mislead Williamson with an illegitimate justification that the prison had prohibited the necessary type knee braces because they contained metal, but Williamson knew this was a deliberate half truth to conceal CMS's custom/policy of cost-avoidance because

> (a) adequate braces are made with rigid plastic frames and
>
> (b) the prison has not prohibited steel framed wheel chairs or telescopic walking canes, so Debbie's claim is suspect.

Moreover, Dr. Durst subsequently confirmed the existence of an adequate plastic-rigid framework with locking gear/axle – to prevent hyperextensions – as an alternative. Also, Dr. DuShuttle on 6-12-06 confirmed the same, but stated that they cost upwards of a thousand dollars. Debbie intentionally provided a known inadequate brace to realize CMS's custom/policy of cost-avoidance and Williamson continues to be exposed to a likely and substantial risk to His future health.

136. [As of _____ Williamson had not received Dr. Durst's ordered MRI and no follow up has occurred.] On 5-8-06 Williamson received the MRI and on 6-5-06, Dr. Durst informed Williamson that his ACL was completely severed – that immediate emergency surgery would have to occur and that there was no other viable option, however, procedure required an orthopedist recommendation. Dr. Dushuttle – orthopedist specialist – did indeed recommend surgery to reconstruct/replace the severed ACL among other related procedures – and he specifically stated the aforementioned rigid framework type knee brace was absolutely needed.

## COUNT III. DENIAL OF REASONABLY ADEQUATE MEDICAL CARE

137. Defendants CMS, Zimbull, Robinson, Clark, and Jane Doe_____ have either denied, delayed, and/or knowingly provided less efficacious and inadequate medical care with intentional and deliberate indifference to Williamson's known serious medical/dental needs. Defendants engage in a pervasive and continuous pattern of deliberate acts to deny adequate medical/dental care to Williamson that cause Williamson to unnecessarily suffer acute pain, impairment of His normal daily functions, permanent injury, and a likely risk of substantial harm and danger to future health, however, without any legitimate penological objective.

138. Williamson's serious medical/dental condition is known by CMS, Zimbull, Robinson, Clark, and J.Doe_____ under any or all of the following factors;

> a) Acute pain and suffering. Williamson has been diagnosed with periodontal disease, which causes bacterial gum infections, abscesses, and ultimately tooth loss if not treated adequately. An active gum infection and/or abscessed tooth causes severe swelling of the gum and often times face that is accompanied by acute pain and discomfort. In fact, Williamson's acute pain has impaired his

ability to eat, work, and sleep; has lasted ten to twenty days, and has caused his face to swell up so bad that it requires immediate medical attention. This level of severe pain is akin to wedging bamboo shoots under one's fingernails – torture. Any layman can easily discern the incredible pain associated with an active gum infection and/or abscessed tooth. Williamson's prison dental record documents some dozen occurrences of these periodontal gum infections (perio); he has filed countless Dental Sick Call Slips (Dental Slip) outlining the above; filed countless Medical Dental Grievances outlining the same; and has been examined on numerous occasions during active perio outbreaks by Defendants. All defendants are cognizant of Williamson's continuous and re-curing perio outbreaks and the acute pain and discomfort associated with it.

b) Impairment of normal daily functions. Williamson has specifically placed all defendants on notice of the acute pain associated with the perio outbreaks and how this paralyzing pain impairs his ability to eat, work, play, exercise, and sleep.

c) Permanent injury. Williamson has unnecessarily experienced irreparable injury on two separate occasions – both of which are documented in his prison dental records – as a direct and proximate result of Williamson's many untreated and/or knowingly under treated perio outbreaks destroying the bone (i.e. tooth) and ultimately causing permanent tooth loss. All dental defendants are knowledgeable of these facts.

d) Poses a likely substantial threat of harm to future health. The permanent loss of teeth is not merely likely, but is know to be inevitable absent reasonably adequate dental care and prompt and adequate attention upon active perio outbreaks. Also, active perio outbreaks discharge a poisonous puss that is known to cause damage to the heart and/or coronary system. This is well-documented and standard knowledge to dental professionals. Thus, CMS, Zimbull, Robinson, Clark, and Jane Doe are knowledgeable of Williamson's serious medical/dental needs by virtue of his many notices; by virtue of the observable facts – classic and elemental symptoms – by virtue of standard professional knowledge; by documented diagnosis of periodontal disease; and by virtue of easily discernable acute pain, suffering, and actual permanent tooth loss.

139. Defendants CMS, Zimbull, Robinson, Clark, and Jane Doe individually and/or officially acted with intentional deliberate indifference to Williamson's known serious medical needs in any or all of the following:

> a) By employing an unconstitutional policy/custom of denying reasonably adequate of standard dental care, and or greatly limiting the same – arbitrarily and caprieiously – for a policy/custom of extractions only (i.e. cost-avoidance);
>
> b) By disregarding the accepted standard and necessary dental treatment and alternatively knowingly providing inordinately delayed substandard treatment, no treatment at all, and/or no pain medications that either cause unnecessary

42

> recurrence of perio infection, exacerbate perio infections, loss of teeth, of
> cause acute pain;

c) By refusing Williamson's repeated requests for standard dental care;

d) By employing non-medical factors to deny, delay, and/or to knowingly
provide less efficacious dental care that did result in unnecessary pain and
suffering, permanent injury, and did pose a likely substantial risk to
Williamson's future health, however, without any legitimate penological
objective; and

e) By CMS failing to ensure adequate staffing levels to adequately accommodate
the prison population and their needed or emergency dental treatment.

140. The following events support the above listed claims at items # 137-139 and do
establish the subjective and objective components and personal involvement of defendants CMS,
Zimbull, Robinson, Clark, and Jane Doe.

141. First, the events below depict a continuous constitutional violation be CMS over a
period of time that has been affected by various CMS employees and some of the events ectend
back to CMS's earlier contract period (2001-2002), but are nevertheless appropriate due to
"continuous violation" and/or the date of discovery (i.e. Williamson discovered the actual
permanent injury that resulted due to the deliberate indifference to his serious medical/dental
needs). Moreover, CMS continues the same constitutional violations regarding Williamson's
continuing perio infections at the present; and finally, there is a separate and distinct act of
deliberate indifference regarding an emergency tooth.

142. Williamson discovered and incurred permanent injury on 3/4/2005 when dentist Jane Doe informed him that teeth #28 & #29 (believed to be the #'s) had been irreparably damaged and needed to be extracted immediately. Both were extracted on 3/11/2005. Williamson was provided no pain medication or antibiotics in the interim.

143. Williamson's 3/4/05 visit was in response to an active perio infection; which had recurred because the prior perio infection was refused treatment by Jane Doe and no treatment or knowingly belated substandard treatment was provided.

144. In fact, about a year earlier Williamson had several perio outbreaks and despite suffering painful active infections and Jane Doe verifying perio infections via X-ray and a curt visual exam, Jane Doe refused to provide any of the necessary adequate and standard treatments[1] and did, however, unnecessarily delay needed treatment by merely placing Williamson on "the list" for a teeth cleaning. Williamson's active infection required an emergency teeth/gum cleaning or certainly a timely one. This unnecessary delay was not based on medical factors, and did prolong Williamson's acute pain, and did cause the damage to exacerbate and ultimately become irreversible.

145. Williamson's recurring 3/04/05 perio outbreak  - in the same area – was again deliberately denied the needed standard treatment and again Jane Doe reiterated that Williamson was on "the list" for a cleaning – that the "list was very long" and that Williamson had to be "patient."

---

[1] Standard emergency treatment for perio involves a teeth and gum scraping/cleaning, antibiotics and pain meds prescriptions; and chronic conditions require a root canal while standard maintenance requires semi-annual teeth cleanings and anti-bacterial mouth wash

146. The same dentist witnessed a recurring perio infection in the same location on two separate occasions and failed on both to render the minimum standard treatment regardless of Williamson's obvious pain, recurring infections, and continuing and worsening damage to his teeth.

147. Williamson argued to Jane Doe that he had been put on "the list" a year earlier due to the prior perio outbreak, but it had never been realized. "You'll have to be patient, you are not the only one here – besides we don't usually provide cosmetic or routine maintenance work and we are doing you a favor," Jane Doe replied. Williamson retorted, "This is not routine or cosmetic, but a necessary and standard response to my diagnosed and active infections. It's no wonder it is back now because I was never treated for the earlier perio infection." Jane Doe stated "When you are released then you can get it taken care of," But Williamson informed her that he wouldn't be released until 2015 and she replied that Williamson would "just have to be patient."

148. CMS employs a continuing violation be intentionally denying needed – reasonable treatment and alternatively limiting dental procedures to extractions, and/or purposely delaying/denying treatment that is the actual and proximate cause of Williamson's tooth loss, which occurred on 3/11/05. Williamson re-grieved this continuing violation and discovery of permanent injury relative to his chronic and recurring perio infections and their consistent denial of treatment on 11/28/05.

149. Said medical/dental grievance was part of the package of medical grievances that the ICG improperly and unilaterally rejected, however, Williamson Appealed to the Warden and made his final Appeal to the Bureau Chief Officer. The administrative remedies have been

exhausted and the parties have full and adequate notice, but refuse to take adequate corrective action (#73-76 and #120 is incorporated herein).

150. On 12/7/05 Williamson was seen in response to the dental grievance by Zimbull. Zimbull consulted Williamson's dental record and X-rays. He returned stating: "You have periodontal disease – which is essentially a bacterial disease – so the key is to keep the bacteria count down... Because we have to get below the gum line, it will be uncomfortable."

151. Periodontal disease involves pockets below the gum or tooth and merely brushing has little impact on keeping bacteria down. This is why a sub-gum line teeth/gum cleaning is the common treatment (i.e. response) to any perio infection as well as providing antibiotics. Root canals are ordered for recurring infections. Williamson has never received a root canal by CMS.

152. Zimbull consequently affected a sub-gum cleaning that lasted no more than four or five minutes. He did not engage in the standard cleaning techniques that Williamson is familiar with and expected after waiting some 18 total months and unnecessarily experiencing no less than two active painful perio infections. Zimbull conducted a less efficacious cleaning that did not include picking, scraping, flossing, or polishing and did so with full knowledge because when Williamson questioned him, Zimbull stated "There are a lot of to be seen here, but I want to impress upon you to brush in circles." Williamson said, "I do- at least four times a day." Zimbull replied "Brush in smaller circles, because you are just not going to be able to get that kind of attention here."

153. Zimbull knowingly rendered a less efficacious and inordinately delayed an 18-month belated teeth cleaning – in response to a diagnosed and recurring perio infection – not

46

based on valid medical factors but based on non-medical factors (e.g. a lot of people to be seen today) and flatly stated that Williamson was not going to receive the "attention" he required.

154. CMS is responsible to ensure adequate staffing levels to provide adequate and reasonably timely medical/dental care to the inmate population, however, has clearly failed to do so causing Williamson to receive less efficacious and inordinately delayed treatment that has caused him to needlessly suffer acute pain, permanent injury, and exacerbates damages that ensure future injuries.[1]

155. Williamson filed a Dental Slip on 1/08/06 due to a dental emergency and also the emergence of yet another perio infection.

156. Specifically, Williamson's #_____ tooth (bottom jaw, rear left molar ? – used for chewing) had broken in half – facing in – and sheared off down to the gum-line causing him acute pain, an inability to chew his food, or even sleep. Also, Williamson – just over one month after Zimbull's substandard gum cleaning – was in the beginning stages of a perio outbreak involving the entire gum line of his lower front five teeth (broke on 1-8-06).

157. Williamson met with Zimbull on 1/11/06. Zimbull looked into Williamson's mouth, without touching him, and immediately acknowledged the broken tooth. He said, "Yeah, you will need a crown there, but we don't do that. Of course, you could have it removed."

158. Williamson asked about the standard treatment for a broken tooth and Zimbull replied, "A crown, and if you were on the street that is what you would get, but we don't do that here."

---

[1] CMS intentionally employed a policy/custom that fails to address the immediate needs of inmates with serious medical needs

159. Williamson pressed, "If a crown is the standard treatment and you [Zimbull] have acknowledged that that is whet 1 [Williamson] need, I don't understand why you don't provide it?" Zimbull firmly and unequivocally replied "Budgetary, it simply is not in Our budget." Zimbull is giving effect to and referring to CMS's cost avoidance policy/custom that denies reasonably adequate and necessary treatment for inordinately delayed treatment, less efficacious treatment, or outright denial of treatment. Williamson has had to experience all three cost avoidance tools, which was and is a moving force in his continued non-treatment for his recurring perio infections and the resulting permanent injury,[1] arbitrary budgetary restrictions that don't take into account the injury and need is clearly not a decision based on valid medical criteria.

160. Dr. Zimbull continued, "You can have it removed if it is to painful. Is it to much for you?" "Yes it's painful – my tooth is sheared in half and it hurts to chew and brush my teeth in that area," Williamson incredulously replied.

161. Again the recurring modus operandi of CMS appears: deny necessary, adequate, and standard treatment but alternatively offer to extract the tooth.

162. Williamson pointed out the obvious, that He lost three chewing teeth on the right side due to untreated perio infections and could not chew solid food on that side of his mouth. Thus, the obvious pain and discomfort rendered Williamson unable to chew solids on the only other remaining side – the left side – at all.

---

[1] and now regarding the denial of a crown

48

163. Zimbull refused to provide any pain medications and refused to reconsider his denial to repair the damaged tooth with full knowledge that Williamson experienced acute pain and that it rendered him unable to chew solid food.

164. Zimbull replied, "That is why I'm encouraging you to keep that tooth. The discomfort will go away after time, in fact use Sensodine tooth paste to deaden the tooth." Zimbull did not provide any Sensodine toothpaste to Williamson.

165. Zimbull also stated, "You can get it taken care of when you get out." Williamson informed him that he would not be released until 2015. "Well, maybe you can make parole and get out earlier," said Zimbull. CMS's unconstitutional strategy is to routinely deny or delay treatment in the hope that a patient will be released and become somebody else's problem, or eventually facilitate to causing permanent tooth loss, which no longer requires treatment, or frustrate the patient so much that he gives up trying to effect a meaningful remedy.

166. Zimbull dismissed Williamson's active perio infection as a Herpes type virus – knowingly misdiagnosing the perio. Williamson has been diagnosed for some nine years with the chronic perio, his dental file is replete with the information, Zimbull acknowledged same on 12/07/05, and Williamson's obvious symptoms were classic and elemental symptoms of a recurring perio gum infection. Besides Williamson has never in his life had any type of herpes in or around his mouth – ever! Zimbull's finding is not rooted in fact or based on the obvious and visible symptoms or medical factors. Moreover, Zimbull still refused to treat the so-called Herpes viral infection.

167. Williamson had a freshly broken tooth and gum infection, was in acute pain, was unable to eat solid food, sleep, or concentrate, and was standard minimal, necessary treatment

(e.g. crown, pain meds, antibiotics, etc.), and treated by Zimbull as a nuisance – not as a patient who was needlessly suffering.

168. Williamson filed an EMG (#23193) for His broken tooth and Zimbull's subsequent denial of treatment on 1/12/06. The IGC stamped "received" on 1/17/06 and unilaterally rejected the EMG in contravention to IGP 4.4, and also failed to hold any hearing and failed to provide the requisite MG appeal form. The IGC then held the unilaterally rejected EMG #23193 until 3/8/06 at which time Williamson received the improper response and handling of His EMG. Despite the IGC's repeat acts to prohibit Williamson from seeking redress through the grievance process and consequently obstructing Williamson's access to the courts, Williamson nevertheless filed a timely grievance Appeal to the Bureau Chief on 3/10/06, and gave notice to Plante, and provided copies to CMS. The Administrative process has been exhausted.

169. On 2/14/06 Williamson was scheduled in for a routine dental exam that dental assistant Ms. Seacord stated was to comply with an upcoming audit of health services.

170. Williamson again saw Zimbull and He explained to Zimbull that an EMG had been filed due to Zimbull's refusal to treat the broken-painful tooth.

171. Zimbull stated: "I wish they would let us do steel crowns, but they won't." Williamson replied: "Well currently my tooth is repairable with a crown, and you acknowledged that but refuse to provide this needed treatment and when my tooth further disintegrates, 1 will experience a permanent injury."

172. Zimbull replied: "Really it's the only thing that could be done, but I can't do it, they won't let us." Williamson inquired "What do you mean you can't do it?" "1 don't understand if

50

you know that a crown will save the tooth, then why can't you do it?" Zimbull replied, "They won't let us do them – not in the budget."

173. It is clear to Williamson that Zimbull was referring to his employer CMS when using the pronoun "they," and referring to the moving force in his denial of the standard treatment (i.e. CMS's custom to deny needed standard treatment based on non-medical criteria – budget).

174. Williamson probed further and asked: "Not in the budget?" Zimbull became noticeably uncomfortable and began: "Too expensive – lab costs alone are about $300, and the total runs about $1000 dollars. That's not in the budget – they won't let me do it."

175. Zimbull continued, "How much time do you have left?" Williamson's reply was "ten years,"

176. Zimbull then asked if it caused Williamson any pain, and Williamson exploded: "Of course it causes pain! It hurts every time I chew something of substance – like cereal for instance. In fact, you [Zimbull] asked the same ludicrous question the last time I was here in January, but refused to give me any pain medication!"

177. Zimbull ignored Williamson's accusation and stated: "You have partial use of it at least and if I were you, 1 would try to keep it as long possible."

178. No pain medication was dispensed and Zimbull again sent Williamson away without any treatment whatsoever.

179. Williamson was rescheduled in before Zimbull on 2/21/06 due to the notice/complaint letter filed and Zimbull stated: "I just saw you and told you that you need a crown." "Yes," replied Williamson. Zimbull continued, "And I told you we couldn't do that here for you." "That is correct," Williamson

51

176. Zimbull then asked if it caused Williamson any pain and Williamson exploded, "Of course it causes pain! It hurts every time I chew something of substance like cereal for instance. In fact, you [Zimbull] asked me the same ludicrous question the last time I was here in January, but refused to give me any pain medication!"

177. Zimbull ignored Williamson's accusation and stated, "You have partial use of it at least, and if I were you I would try to keep it as long as possible."

178. No pain medication was dispensed and Zimbull again sent Williamson away without any treatment whatsoever.

179. Williamson was rescheduled in before Zimbull on February 12, 2006 due to the notice/complaint letter Williamson filed and Zimbull stated, "I just saw you and told you that you need a crown." Williamson replied, "Yes." Zimbull continued "And I told you we couldn't do that here for you." Williamson replied, "That is correct." Zimbull finished by saying that "Well, I can't do anything for you then."

180. Williamson asked Zimbull why then does he continue to schedule Williamson in if he won't do anything and Zimbull directed assistant Georgina to schedule Williamson in with Dentist Bishop to see if an "oversized composite" could be fashioned but also stated, "But I don't think that it will hold because it is a temporary fix and you said you had ten years to serve."

181. Zimbull admitted the proper and necessary (e.g. crown) refused to provide or even order this treatment and in contrast knowingly ordered a less efficacious

52

and substandard "temporary" treatment that will likely fail and expose
Williamson to needless pain, suffering and substantial future injury.

182.    The morning of February 21, 2006 the hospital/medical personnel were
conducting medical grievance hearings, but Williamson's broken tooth
EMG#23193 was not although EMG's are to be heard within 24 hours unless
deemed not to be an emergency.   Over a month had passed since Williamson
filed his EMG 23193, therefore it had constructively been treated as a non-
emergency and as such CMS failed to adequately respond to emergency or
immediate medical needs of the inmate population, which is also CMS's
custom.

183.    On February 24, 2006 Williamson was seen by Dentist Bishop (forty-one days
after the incident; some thirty-seven days after the first of three prior visits
with Zimbull.) and upon examining Williamson's broken tooth, Dentist
Bishop stated, "Well, I can build it up with composite material, but you will
definitely need to get a crown and a root canal when you get out."

184.    Williamson inquired, "Why a root canal?"  Bishop explained, "The nerve has
been damaged because of being exposed for so long, and you will need a
crown for a more permanent repair – composite material is only temporary
repair."

185.    Because some thirty-seven days had elapsed since Zimbull correctly
diagnosed the broken tooth and acknowledged the minimum standard
treatment, but refused to provide same, Williamson needlessly suffered pain

53

and additional nerve damage to the tooth that now requires additional
treatment that is also being denied for non-medical reasons.

186.    Williamson asked Dentist Bishop\, "I have over ten years left to serve, will it
last that long?" Dentist Bishop unequivocally replied, "No, I am afraid not –
no guarantees there."

187.    Dentist Bishop was the second dentist to acknowledge a "crown" as the
appropriate treatment, while also admitting the composite treatment as a
known less efficacious treatment.

188.    Williamson will most likely re-experience another broken tooth episode and
likely permanent injury, despite several admissions that this is avoidable with
the appropriate treatment, however, is denied same.

189.    Also, the permanent tooth loss that was discovered on March 11, 2005 was the
inevitable result of CMS's custom/policy of cost avoidance that continues to
be employed as a "continuing violation' thus we will begin at the genesis of
the continuing violation to show additional CMS involvement (moving force)
and Robinson's and Clark's personal involvement in perpetuating the custom
that ultimately resulted in permanent tooth loss.

190.    Between December 1, 2001 and May 11, 2001, Williamson experienced five
painful perio infections, however, was refused treatment.  CMS was the same
healthcare provider then as during the periods listed above.

191.    Robinson performed a substandard area specific gum scraping on May 11,
2001 and refused to provide doctor's ordered prescribed antibacterial
mouthwash.

54

192. Williamson filed medial grievances fore the repeat refusals of reasonably adequate treatment, refusal of antibacterial mouthwash and the belated substandard cleaning. The grievances were resolved in Williamson's favor, thus CMS has had adequate notice since May 2001 yet continues to employ the exact same cost avoidance strategies in 2004 – 2005. Administrative remedies are exhausted once again.

193. Specifically, Williamson filed a dental slip on October 16, 2001 for a perio outbreak, but was not seen. On November 10, 2001 awoke with severe facial swelling. Williamson was in acute pain, could not eat or effect meaningful sleep. A nurse renewed an order for the dentist upon examining the severe swelling.

194. Consequently, Robinson saw Williamson on December 4, 2001. She verified the still active perio infection (since October 16, 2001) and stated, "If you was [sic] on the outside, you would have a periodontal specialist…conduct a root canal, but they [sic] could not do that here."

195. Robinson did an area specific gum/teeth scraping around the two teeth (28 & 29 which were extracted March 4, 2005). This was the beginning of several recurring perio infections in this specific area. Williamson had two additional outbreaks that Robinson failed to treat/clean those areas. This only invites subsequent- more severe- future perio infections and likely permanent future injury.

196. Williamson inquired why he could not receive the needed root canal and Robinson replied that all she could do is continue to scrape the area until

Williamson lost these teeth. Her prediction proved accurate. Robinson's clear inference is of a policy/custom to knowingly perform less efficacious treatment that would ultimately result in permanent injury.

197. Williamson experienced, October 16, 2001 and December 4, 2001, acute painful gum infections, and was in such pain that Williamson had to puncture the abscessed gum with a staple to drain out the poisonous pus-11/01/01.

198. Williamson was seen again on January 9, 2002 due to another dental slip of December 28, 2001 and Juanti Clark displayed open hostility and irritation towards Williamson. Clark demanded that Williamson "stop filing grievances against the dental staff; that they [dental staff] could "not continue treating" Williamson's "condition," and that Williamson "had to make a decision; either live and suffer the pain or have the teeth pulled." Again a reference to CMS's preferred permanent injury treatment (i.e. extraction or else).

199. Williamson's condition was treatable at this stage with reasonably adequate semiannual teeth cleanings, root canal and antibacterial mouthwash. He did not need to incur permanent injury on March 4, 2005 but did due to this unconstitutional policy/custom. This is a continuous violation; a pervasive pattern of denial of treatment for a diagnosed disease that will not recover alone but must be treated. It is the driving force behind Williamson's permanent injury and unnecessary pain and suffering.

200. Robinson and Cark made it clear to Williamson that his only option was to have his teeth pulled despite the fact that at this stage they were

repairable/savable and did only become irreparable much later due to CMS's continuing violation (i.e. denial of timely and adequate treatment).

201. June 6, 2002 Williamson again met Robinson and Clark. Robinson informed Williamson that she tried to get him referred for a periodontal specialist, however, CMS Administrator Dr. Ivans Keith overrode and denied the referral. Robinson's act was a pretext because she knew it would be denied.

202. Robinson then asked Williamson if he had experienced any recurring infections and Williamson indicated that he was experiencing a current active perio infection. Clark interrupted in a hostile tone and yelled, "So if you're going to write a grievance don't write one on us!" Williamson ignored Clark and continued to explain the active infection to Robinson.

203. Robinson stated, "Ok, well you'll have to get your pass to return to your unit." Robinson refused to even give Williamson an exam, let alone any treatment for his active infection. Williamson needlessly suffered pain and more irreversible damage.

204. Consequently, June 8, 2002, Williamson's gum and throat swelled up with poisonous infection; throbbing and acute pain, which impaired his ability to eat, work, attend important programs and religious functions, and sleep.

205. Robinson and Clark were the first CMS employees to knowingly employ an unconstitutional policy/custom of cost avoidance (i.e. denial of reasonable adequate treatment) that is based solely on non-medical criteria relevant to Williamson's still (then) repairable teeth 28 and 29, however, the continuous implementation of this policy was the actual and proximate cause of the

57

permanent injury to Williamson which was discovered on March 4, 2005.
Moreover, the is a continuing violation – continued in 2004 with the refusal to
treat and unnecessarily delaying a needed teeth cleaning or root canal for 18
months via Jane Doe; and continues in the present as a evidence by Zimbull's
acts and omissions. There is no legitimate penological objective and this
behavior is shocking.

206. All defendants knew or should have known that their acts or failure to act
violated Williamson's constitutional rights and did cause him intentional harm
and permanent injury.

## STATEMENT OF CLAIMS

### First Cause of Action

207. The culpable actions and/or omissions to act of Defendants CMS inc.,
Malaney, Plante, Bailey and Ihuoma stated in paragraphs 14 through 97;
Defendants CMS Inc., Alie and Ihuoma stated in paragraph 98 through 136;
and Defendants CMS Inc., FCM, Zimbull, Robinson, Clark and Jane Doe
stated in paragraphs 137 through 206 violated Plaintiff Williamson's Eighth
and Fourteenth Amendment Rights to be free from cruel and unusual
punishment and wanton infliction of pain in a manner deliberate, reckless and
grossly negligent when:

a. CMS promulgated policy or custom – whether formal or informal – that
denied Plaintiff timely examination, minimally adequate treatment, pain

*58*

medication and/or access to appropriate diagnostic tests or necessary specialist in deliberate indifference to his known serious medical and dental needs based on non-medical factors or no legitimate factors and/or to intentionally inflict upon Plaintiff.

b. Malaney, Plante, Bailey, Ihoma, Zimbull, Alie, Robinson, Clark and Jane Doe knowingly employed and acquiesced in the unconstitutional policy/custom listed above at (a) in deliberate indifference to Plaintiffs known serious medical needs and/or cause him intentional harm.

c. CMS's failure to provide adequate staffing to ensure timely and adequate examinations, emergency medical treatment and/or needed prescribed treatment and treatment in general.

d. CMS's failure to adequately respond to Plaintiff's EMG, Medical Grievances, notices and/or recurring or known serious medical/dental needs, or emergency.

e. CMS for deliberately failing to failure to take appropriate corrective action despite having clear knowledge of the need to do so – thus intentionally causing the [of] continuous violations; of CC Meds lapses; the; pervasive and systemic procedural breakdowns; in the meds distribution system and or the intentional employment a known failed meds distribution system as a bad faith ruse of corrective action- of which did continue to create needless CC Meds lapses; and by intentionally failing to correct knowingly [ hostile], abusive retaliatory, and

59

deliberately indifferent employees and employee retaliation against Plaintiff's protected rights.

f. CMS promulgating a policy or custom- whether formal or informal – that deliberately causes an inordinate delay to necessary and/or prescribed treatment in deliberate indifference to Plaintiff's serious medical needs

g. Malaney, Plante, Bailey, Ihoma, Zimbull, Alie, Robinson, Clark and Jane Doe knowingly employed and acquiesced in the unconstitutional policy/custom listed a deliberate indifference to Plaintiff's known serious medical needs and/or cause him intentional harm.

h. CMS for employing and/or ratifying defacto gatekeepers who arbitrarily, capriciously and with malice deny, delay or revoke necessary adequate treatment.

i. CMS for employing non-medical criteria or pretexts to realize the above (h).

j. Defendants Malaney, Plante, Bailey, Ihoma, Zimbull, Alie, Robinson, Clark and Jane Doe did provide known less efficacious treatment or denied necessary medical/dental treatment that repeatedly exposed Plaintiff to unnecessary acute pain, discomfort, permanent injury and poses a likely risk of substantial danger of harm to Plaintiff's future health and well being.

k. Defendants Malaney, Plante, Bailey, Ihoma, Zimbull, Alie, Robinson, Clark and Jane Doe did culpably and unnecessarily delay examinations, timely treatment, provided substandard treatment and/or repeatedly failed

60

to administer prescribed chronic care medications or necessary meds exposing Plaintiff to unnecessary acute pain, suffering, discomfort, permanent injury and a likely risk of substantial danger of harm to Plaintiff's future health and well being.

l.   Plaintiff incorporates items listed above at 14 through 16, 98 through 100 and 137 through 139 herein as additional claims under this cause of action.

m.  FCM promulgated policy or custom-whether formal or informal- that denied Plaintiff timely examination, minimally adequate treatment, pain medication and / or access to appropriate diagnostic tests or necessary specialist in deliberate indifference to Williamson's known serious medical (e.g. right knee) needs based on non-medical factors or no legitimate factors and / or to intentionally inflict harm upon Plaintiff.

n.   FCM's failure to adequately respond and Plaintiff's EMG and notices and or the observable classic symptoms of a serious medical need, and or emergency medical need.

o.   FCM for deliberately failing to take appropriate corrective action against Dr. Alie,s known repeat failures and obvious non-exams and having knowledge of the need to take corrective action; and of which acts and failures to act did give effect to a custom/ policy of cost-avoidance (actually denied the needed treatment and pushing the burden off on the next HCP).

Second Cause of Action

[164.]208.    The culpable acts or omission to act of Defendants CMS, Plante and
Ihuoma stated in paragraphs 14 through 97 violated Plaintiff's Eighth and Fourteenth
Amendments rights to be free from cruel and unusual punishment and wanton infliction
of pain; Fifth and Fourteenth Amendment Rights to the due process of law; Eighth
Amendment Right to equal protection of the law; First Amendment Right to freedom of
speech; and the Privilege and Immunities Clause of Article IV of the United States
Constitution in a manner deliberate, reckless, grossly negligent and with actual malice
(by reference Plaintiff incorporates the facts stated above in First Cause of Action to the
point the Second Cause of Action) when:

>    a.    Defendants Ihuoma and Plante deliberately and in violation of U.S.
>        Constitution and subordinate State law did intentionally commit acts of
>        retaliation against and because of Plaintiff's protected right to seek
>        administrative redress of grievances and/or meaningful access to the
>        courts by and through deliberately denying Plaintiff his known and
>        prescribed medical treatment and/or necessary mechanisms (e.g. chronic
>        care clinics) to ensure said treatment as a form of punishment or
>        deterrence to Plaintiff's grievance activity and/or notice of civil litigation.
>
>    b.    CMS with full, timely, and adequate knowledge of employees act listed
>        above at item 164 (a) did knowingly acquiesce, condone, and/or ratify said
>        unconstitutional retaliatory behavior by failing to take appropriate
>        corrective measures and/or failing to appropriately respond to Plaintiff's
>        grievances or notices of same.

## RELIEF REQUESTED

WHEREFORE, Plaintiff Williamson requests that the Court grant the following relief:

A. Issue a declaratory judgment stating:

1. That Defendants CMS, Malaney, Plante, Alie, Ihuoma, Zimbull, Robinson, Clark and Jane Doe knowingly subjected Plaintiff Williamson to cruel and unusual punishment and wanton infliction of pain in a manner deliberate, reckless and grossly negligent by their above articulated acts and/or omissions to act in regard to plaintiffs serious medical and dental needs.

2. That all named Defendants (at A(1)) committed negligence and/or gross negligence and intentional infliction of mental and emotional distress, and/or lost chance of recovery.

3. That CMS's policy custom of cost avoidance strategies listed above were the unconstitutional and non-medical factors and/or driving force behind the deliberate indifference to Plaintiff's known serious medical needs.

4. That Plaintiff's diagnosed thyroid condition that requires chronic care meds, Plaintiff's recurring perio infections, Plaintiff's knee injury, Plaintiff's broken-split tooth and/or four lost teeth are known serious medical conditions.

5.  That Plaintiff's grievance activity is a constitutionally protected right.

6.  That Ihuoma and/or Plante retaliated against and because of Plaintiff's grievance activity (i.e. petitioning of administrative redress).

7.  That Zimbull intentionally inflicted harm upon Plaintiff by refusing to repair broken tooth and/or treat gum infection and/or refusing to provide pain medication for same.

8.  That CMS acquiesced, condoned and/or ratified above listed acts of Defendants at A(5) in violation of Plaintiff's constitutional rights.

9.  That repeat chronic are med lapses, recurring untreated or under treated perio infections and broken tooth pose likely risk of substantial danger to Plaintiff's future health and well being.

10. That repeat chronic care med lapses, recurring untreated or untreated or under treated perio infections, broken tooth, four missing teeth, and or acute knee injury impair Plaintiff's normal daily functions.

11. That CMS has engaged in a continuous violation relevant to Plaintiff's on-going and recurring perio infections and the pervasive pattern of chronic care med lapses.

12. That the date of discovery of Plaintiff's permanent injury (loss of two teeth #29 and #28) is set at March 4, 05.

64

B.    Issue on Injunction Ordering the following:

        1.    That CMS immediately schedule and provide Plaintiff a) semi-annual teeth/gum cleanings, b) anti-bacteria mouthwash on weekly basis as a self administered medication, c) periodontal specialist examination and cleaning, d) crown on broken tooth, e) replacement teeth or dentures for the four lost teeth and any others that are beyond repair, and f) a root canal.

        2.    That CMS refer Plaintiff immediately to visit with a knee specialist for an MRI and comprehensive exploratory exam, and that all reasonably necessary recommendations for treatment, rehabilitation etc. Be followed with the aim of making Plaintiff whole again.

        3.    That CMS provide all 120 doses of thyroid and multivitamins meds to Plaintiff at one time for self medication within final (15) doses of final 30-day card; that Clinics are promptly scheduled and conducted on or about 90-day mark; keep and dispense as necessary stock supplies of said chronic care meds.

        4.    Set a fine in the amount of $50.00 a day for any chronic care med lapse that occurs with Plaintiff's CC meds payable to Plaintiff every quarter year.

C.    Award Compensatory Damages in the following amounts

        1.    $50,000.00 against defendant CMS for physical, mental, and emotional pain and suffering associated with such untreated and/or

*65*

prolonged serious medical and dental needs that resulted due to

CMS's deliberate indifference to Plaintiff's serious medical needs;

$100,000.00. For Plaintiff's loss and/or reduced employment and

enjoyment of life the substantial impairment of his knee which

now disables him from continuing as a certified martial arts

instructor and/or enjoying his life long pursuit of exercise and

health with the marital arts.

2.    $50,000.00 jointly and severally against all remaining named

defendants for physical, mental, and emotional pain…plaintiff's

serious medical need.

3.    $50,000, against Alie for Plaintiff's loss and/or reduced

employment…martial arts.

D.    Award Punitive Damages in the following amounts:

1.    $100,000.00 jointly and severally against defendants CMS, Plante,

Ihuoma, Bailey, for intentionally inflicting harm upon Plaintiff;

and promulgating acts of deliberate indifference with actual malice

against plaintiff.

2.    $100,000 jointly and severally against defendants CMS, Plante,

and Ihuoma for intentional retaliation against and because of

Plaintiff's grievance activity.

E.    Grant any other relief as it may appear that Plaintiff is entitled to.

Respectfully Submitted

*Dave W*                              9-22-06


David W. Williamson, SBI # 00183022

W-1, L-12

1181 Paddock Rd., Smyrna, De. 19977