ORIGINAL

IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE

DAVID W. WILLIAMSON,         )
   Plaintiff,                )
   v.                        )     C.A. 06-379-SLR
CORRECTIONAL MEDICAL SERVICES, Inc, et al,  )
   Defendants.               )

FILED
JAN 12 2007
U.S. DISTRICT COURT
DISTRICT OF DELAWARE

MOTION FOR TEMPORARY RESTRAINING ORDER / PRELIMINARY INJUNCTION

Comes now, pro se, Plaintiff pursuant to Fed. R. Civ. Proc., Rule 65 and all other appropriate Federal Court Rules, Local Rules, and or case authority and requests that the Court issued a temporary restraining order/preliminary injunction directing Defendant Correctional Medical Services, Inc. (CMS), to immediately provide Plaintiff with the below listed medical care.

First, however, Plaintiff seeks pleading leniency as a pro se plaintiff under Haines v. Kerner, 404 U.S. 519 (1972).

### DECLARRATION IN SUPPORT OF PLAINTIFF'S MOTION FOR A TRO/PI

1.    I, David Williamson, am the Plaintiff in the instant action, and Williamson declares under penalty of perjury the following in support of his motion for a temporary restraining order/ preliminary injunction (TRO/PI) requesting needed medical care.

2.    Plaintiff requires medical care –below- for the following:

    a). To avoid the continued and needless pain and suffering;
    b). To avoid the unnecessary impairment of Plaintiff's normal daily functions;
    c). To avoid the substantial likelihood of future serious/permanent injuries; and
    d). To avoid CMS gaining a wind fall through its refusal to provide needed medical care.

#### I. Chronic-care Medication Interruptions

3.    As stated in the complaint, Williamson suffers from a chronic disease (e.g. thyroid disease), that requires continuous daily medications (CC Meds) (e.g. Levothyroxine & multivitamins) to control the dangerous and acute symptoms. (See D.I. 15 at items 14-15).

4.    Interruptions in the CC Meds cause a resurgence of chronic symptoms that:

    a). causes the impairment of Williamson's normal daily functions;
    b). causes chronic fatigue and an inability to concentrate or focus on tasks, etc.;
    c). causes dangerous inflammation in the blood stream and painful swelling of the extremities; and
    d). causes production of cholesterol, etc. among other detrimental effects. These chronic symptoms conspire to cause a marked deterioration of Williamson's general physical health, body (e.g. physical condition and cardiovascular system), mind (e.g. mental acuity/sharpness and ability to work/study, etc.), and also poses a substantial likelihood of causing or promoting heart disease, stroke, or other coronary related event. (See D.I. 15 at items 15(a) – (f).

5.     Indeed, Williamson has suffered a marked increase in his blood pressure and resting heart rate, and a significant reduction in his cardiovascular condition as a result of the repeated resurgence of said symptoms.

6.     Every time Williamson experiences a CC Meds interruption (CCMI), he needlessly experiences a chronic resurgence of said symptoms.

7.     CMS has caused a total of eleven unnecessary CCMI(s) --ten consecutive- from July 2005 to November 2006. (See Exhibit (Ex.) Ex-I.-A Affidavit (Aff't) Medication Distribution Log ( 11-29-06 ).

8.     Indeed, because the CCMI(s) are ongoing and pervasive --causing said resurgence of chronic symptoms- Williamson experiences acute anxiety every month fully expecting CMS to cause yet another needless and avoidable CCMI. This acute anxiety has caused Williamson depression, has impaired his ability to sleep, has caused him mental and emotional distress, and caused him to experience hypertension. Consequently, Williamson has had to seek psychiatric counseling to help him cope with the anxiety, etc.

9.     Williamson has filed repeated medical grievances (MG) to no avail despite CMS offering several empty token promises to correct the ongoing and pervasive CCMI(s).

10.    For example, the most recent MG (# 59170), resulted in the following: (a). CMS directly fabricating medical records of a Chronic-care Clinic (Clinic), which was needed to refill the CC Meds Refill order, but was never actually conducted. This caused an unnecessary CCMI of over twenty days. And (b) CMS flatly refusing to correct the repeat CCMI(s) and flatly refusing Williamson's alternative minimally invasive and reasonable request to simply provide Williamson with all four Self-med cards[1] (i.e. 120 doses ea.). This would effectively limit the potential twelve CCMI(s) down to a maximum three CCMI(s) per year. (See Ex-I.-B Letter (10/05/06) and attached Aff'd (9/27/06) items 2-17).

11.    Consequently, Williamson filed a reprisal grievance (RG) for CMS's adverse action against Williamson for his grievance activity when CMS fabricated the phantom Clinic and caused the resulting unnecessary CCMI. Subsequently, both CMS and DOC willingly violated the Inmate Grievance Procedure 4.4 (IGP) in an effort to shield CMS from Williamson's charges of CMS's reprisal and Williamson has been refused relief for either the ongoing and pervasive CCMI(s) and for CMS's reprisal. (See Ex-I-C Affi'd (10/25/06) at items 2-21).

12.    CMS has utterly failed to provide Williamson with his CC Meds in accord with their own medication distribution policy (MDP); utterly failed to ensure the proper distribution (i.e. non-interruption) required for his thyroid meds; utterly failed to correct the ongoing and pervasive problem (i.e. CCMI(s)), though it could be easily corrected by simply providing Williamson with all four Self-med cards; utterly failed to follow through on several of its own promises to correct the CCMI(s) over these past fifteen months; and CMS and DOC have abused the IGP 4.4 and failed to respect Williamson's constitutional rights.

---

[1] Self-med cards are blister pack medication cards --usually thirty doses per card- which are provided to the patient on a monthly basis, and once the patient receives the med card, he assumes responsibility for taken said meds himself.

13. Therefore, CMS's consistently poor behavior and clear reluctance to correct the CCMI(s) demonstrate that CMS simply cannot be trusted to dispense Williamson's Self-med cards on a monthly basis without creating more unnecessary CCMI(s) and causing Williamson to needlessly experience the resurgence of symptoms, etc. CMS, however, alternatively faces no harm -and it is reasonable- to direct CMS to simply provide Williamson with all four Self-med cards at the beginning of the med distribution cycle, which will limit potential CCMI(s).

14. Indeed, Williamson already receives his Self-med cards (one of each) and there is no medical or penological reason not to simply provide all four CC Med cards.

15. Moreover, continued unabated CCMI(s) are likely to violate Williamson's constitutional rights and it does require immediate corrective action.

16. For these reasons and those set forth in the supporting memorandum, Williamson believes he is entitled to a TRO/P.I. order requiring defendant CMS to provide Williamson with all four Self-med cards (i.e. 120 doses ea, Levothyroxine/multivitamins), at the beginning of each med cycle, and that CMS ensure the automatic scheduling of the Williamson's Clinics on or about every ninety days.

II. Refusal to Provide Adequate ACL Knee Brace and Doctor's Ordered Reconstructive Surgery, etc

17. As stated in the complaint, Williamson suffers a completely severed Anterior Cruciate Ligament (ACL). (See D.I. 15 at items 98-136).

18. Two doctors reviewed the MRI results and also completed comprehensive physical exams. Both confirmed the serious nature of Williamson's permanent injury.

19. On 6/05/06, Dr. Durst characterized the ACL as "completely severed" and that residual damage was continuing to occur to the meniscus discs; that there was water on the bone (i.e. indicative of residual contusions). The latter two injuries are caused by the continuing lack of adequate medical care, and it continues to deteriorate the knee. Thus, Williamson is exposed to tangible future serious/permanent injury.

20. On 6/12/06, Dr. DuShuttle –orthopedic specialists- confirmed Durst's diagnosis. DuShuttle specifically noted a "ruptured" ACL, that it "will not heal on its own and left untreated will only further deteriorate the knee." DuShuttle recommended (a) reconstructive surgery, (b) a special ACL Don Joy knee brace (or an adequate alternative that prevents hyper-extension of the knee), and (c) adequate physical therapy.
(See Ex.-II.-A, DuShuttle's Report 6/12/06 pp. 1-2).

21. A ruptured ACL is both serious and permanent; it requires immediate adequate medical care

  (a) To repair the injury and restore/remove the acute impairment of Williamson's normal daily functions;
  (b) To halt the continued deterioration of the knee (i.e. prevent the complete loss of control of the knee) and the acutely painful effects of damaged meniscus discs; and
  (c) To prevent the likely and substantial risk of future injuries associated with falling down due to the inherent instability of Williamson's knee.

22. Williamson has pleaded for adequate medical care since July 2004, but he was denied on every occasion.

3

23. Consequently, Williamson has needlessly experienced pain and suffering; impairment of his normal daily functions; fall related injuries; and needless further deterioration of his knee joint since July 2004. (See D.I. 15 at items 127-130, and Ex.-II-B Accident/Injury Report 11/25/05).

24. Williamson has instead been intentionally denied adequate medical care by both First Correctional Medical (FCM) and CMS. Indeed, both have demonstrated a clear history of denials through a series of illegitimate tactics:

(a) By offering false promises to provide medical care designed to misled and or appease Williamson, however, while actually denying /creating inordinate delays in providing the needed care (i.e. stalling tactics);
(b) By inserting reckless distortions of the seriousness of Williamson's ACL injury, which is in total conflict with the observable "classic symptoms" and the medical record; and
(c) By providing a known substandard knee brace that fails to protect the unstable knee and exposes Williamson to injury.

25. For example, FCM provided a "non-exam" that deliberately deviated so far from the accepted medical norms and disregarded the "classic symptoms" of an ACL injury that classifying it as a non-exam is conservative. (See D.I. 15 at items 103-110). Also, FCM provided a substandard sleeve-like knee brace that Dr. Durst specifically stated was not designed for an ACL type injury because it did nothing to protect against hyper-extensions, etc. (See D.I. 15 at items 130-131).

26. Williamson filed the first of four medical grievances (MG) (e.g. MG #7463) against FCM for its denials of medical care and FCM consequently employed false promises to misled Williamson, but were never realized. (See D.I. 15 at items 111-115). Indeed, the use of these false promises in response of Williamson's MG supports FCM's malfeasance much like the theory behind say "Flight from the seen of the crime" as it shows intent. Moreover, FCM has since skipped town.

27. Ultimately, FCM did realize an illegitimate cost-avoidance wind fall by denying Williamson his needed care.

28. Since November 2005, CMS has largely employed similar cost-avoidance strategies and also denied Williamson his needed care.

29. First, Williamson has filed three subsequent MG(s) against CMS: MG# _____ (11/29/05), (improperly rejected); MG# 37123 (4/30/06); and MG# 78623 (10/23/06). And like FCM, CMS has responded with false promises that have not been realized, responded with another known substandard knee brace, and responded with reckless distortions of the seriousness of the ACL injury that is in total conflict with the medical record. (See Ex-II.-C, Grievance Appeal 8/08/06 with attachment Affi'd 8/01/06 at items 2-28).

30. CMS made false promises via Altman (CMS Ombudsman), and G. Eller (CMS Nursing Rep. for MG hearings). For example, on 8/01/06, Eller promised to follow up on Durst's surgery referral of June 06; and on 8/16/06 Altman stated that he was working with CMS staff at DCC to coordinate with DuShuttle on getting a suitable alternative ACL knee brace, and once resolved, the surgery would be scheduled.

But on 10-18/06, Dr. VanDusen informed Williamson that the ACL surgery had not been authorized, but alternatively had been "ignored" and that no evidence or notations of any follow up appeared in Williamson's medical file. (See Ex.-II.-D, Affi'd (11/14/06) at items 2-21; and Ex.-II.-E Altman's Letter (8/16/06).

31.   Williamson began this bizarre journey with CMS in November 2005 and by Oct. 2006, felt as though he was experiencing de-ja vu all over again. Williamson filed his final MG#78623 upon gaining VanDusen's information.

32.   In addition to the unrealized promises to follow up, CMS also continues to doggedly employ illegitimate pretexts to deny Williamson an adequate ACL knee brace.

33.   Instead, CMS knowingly provided a substandard neoprene knee brace in May 2006. Both Durst and DuShuttle acknowledged its inadequacy because it failed to protect the damaged and unstable knee from dangerous hyper-extensions. (See Ex.-II. F- 3-4 at 14-23). Also, Durst acknowledged that suitable alternatives existed that employed rigid plastic framework and locking joints that only bend forward, but CMS/Eller refuse to acknowledge said existence and refuse to provide the Don Joy ACL knee brace or any suitable alternative.
(See Ex.-II.-F 3-4  Aff'd at items 13-23).

34.   Consequently, Williamson's knee has deteriorated so much that it now routinely hyper extends, on average, once a week with a sudden sharp pain that results in Williamson falling or collapsing to the floor. And this has happened while wearing both braces (e.g. elastic sleeve and neoprene wrap).

35.   In addition to CMS's stalling tactics and substandard care, CMS has offered outlandish accusations in an effort diminish the seriousness of the ACL injury; however, which is in complete conflict with the medical record and diagnoses of two doctors. (See Ex.-II.-G Williamson's Letter 8/25/06 in response to Altman's 8/16/06 distortions).

36.   Frustrated with the ongoing denial of care and repeated false promises, Williamson requested "Outside Review" for MG# 37123 form the Bureau Chief, P. Howard, but DOC has also refused to ensure any meaningful corrective action despite the obvious and likely violations of Williamson's constitutional rights.
(See Ex.-II.-H Letter 8/25/06).

37.   Some twenty-nine months have passed since Williamson's ACL injury; he is still denied the adequate medical care known to be needed; and his knee continues to deteriorate, which could likely result in permanent disability. (I.e. complete loss of control of the knee).

38.   FCM skipped town without ever providing said care and Williamson is forever foreclosed from having FCM provide the care they denied him because of the prison contractual logistics involved. This is extraordinary to a prisoner, and now CMS engages in a materially similar fashion and it shocks the conscience.

39.   CMS's behavior is absent any legitimate medical/penological factors; however, it does result in tangible/residual injury to Williamson.

40.     For these and the points set forth in the supporting memorandum, Williamson believes he is entitled to a TRO/PI order directing defendant CMS and or its successor to provide the medical care recommended in Dr. DuShuttle's report without further delay. (See paragraph 20, supra).

### III. Refusal to Provide Medically Necessary Dental Care for Chronic-Periodontal Infections

41.     As stated in the complaint, Williamson suffers from chronic periodontal disease infections (perio-infections) that have resulted in two separate episodes of permanent injury. (E.g. loss of four teeth). (See D.I. 15 at items 137-144).

42.     CMS repeatedly denied the standard dental treatment for Williamson's perio-infections and or created an inordinate delay when it did provide treatment that was too little too late, and it did result in irreparable injury and acute pain and suffering. (See D.I. 15 at items 144 and FN 1).

43.     Indeed, despite medical records outlining the chronic perio-infections, and despite the prior loss of two teeth, and despite CMS's own diagnosis of periodontal disease, CMS still refused to provide the minimally needed dental treatment.

43.     For example, rather than provide an immediate teeth scraping/cleaning (scraping), etc, to combat the active perio-infections, CMS merely put Williamson on "the list" for a scrapping and over a year passed before it was actually provided. (See D.I. 15 at items 145-148).

44.     CMS's obscene denials caused Williamson irreparable injury (subsequent loss of two more teeth) and CMS still refuses to (a) provide immediate standard dental care for active perio-infections; (b) provide continuing/consistent anti-perio dental care, which is needed to combat the recurring perio-infections (E.g. semi-annual scrapings); and (c) provide replacement teeth (i.e. dentures).

45.     For example, CMS last provided a belated and substandard scrapping to Williamson on 12/07/05 –after waiting eighteen months- and was explicitly told that he was "just not going to be able to get that kind [consistent scrapings] attention here," by Dr. Zimbull. (See D.I. 15 at items 150-153). (Note that Williamson has received two different spellings for Zimbull from defendant CMS: (1) Zimble and (2) Zimbal, so Williamson will continue to use the above until the correct spelling is confirmed via discovery).

46. Zimbull's telling statement was not based on any legitimate medical factors: it evinced CMS's custom/policy of blanket denials of dental procedures, which was in conflict with Williamson's obvious and diagnosed medical needs.

47.     Since then Williamson experienced still more perio-infections and the cycle of deliberate indifference/gross reckless disregard continued. History shows, however, that the result of either denying the standard minimal treatment/under treating the recurring perio-infections will cause permanent damage, and in the interim it causes needless pain and suffering and impairs Williamson's normal daily functions.

48.     Absent a timely TRO/PI order, Williamson faces a likely and substantial risk of untreated/under treated perio-infections that will cause still more permanent tooth loss.

49. Meanwhile, the contract health care provider (CHCP) –in this case CMS- will realize an ill-gotten cost-avoidance wind fall profit through its custom/policy of denying treatment/providing under treatment.

50. Moreover, once the CMS's contract elapses and it skips town, Williamson will forever be precluded from the ability to gain any type of injunctive relief from the transgressing CMS. And Williamson simply cannot choose another CHCP as in the free world.

51. This dynamic simply is not present in the free world, and absent the TRO/PI, it results is a terrible waste in judicial resources because Williamson must begin anew with the newest CHCP assuming historical trends continue.

52. For example, Williamson sued Prison Health Services (PHS) (e.g. Williamson v Carr, et al, 97-710-SLR) for nearly identical behavior regarding recurring perio-infections, denial of treatment/under treatment, and the loss of two teeth. The litigation continued for nearly four years before PHS conceded its untenable position and settled with Williamson. However, Williamson was precluded from requesting or even forcing PHS to replace the permanently lost teeth because its contract had expired and another CHCP was in place due to said logistics. (EX III-A ORDER 11-26-01).

53. Evidently, these various CHCPs have determined it is more profitable for them to deny needed treatment for non-medical reasons and hazard the occasional –albeit fractional-successful action.

54. Indeed, CMS has employed materially identical behavior as PHS., and it resulted in materially identical irreparable injuries; and absent a timely TRO/PI order providing Williamson with his medically needed and warranted dental care and or replacement dentures, he will suffer identical results in the future: Further perio-infections, further denials of needed care, further pain and suffering and loss of teeth, and further prohibitions of tangible injunctive relief, however, another extended round of protracted litigation.

55. Such logistical realities are extraordinary to the prisoner population, and Williamson still has nearly ten years left to serve, thus these logistics warrant extraordinary action such as a TRO/PI order for the needed semi-annual scrapings, emergency scrapings for active perio-infections, root canal for acute or quickly recurring infections, and dentures to replace the mounting loss of teeth. (See FN 1, supra at 42).

56. In addition to CMS refusing the industry standard dental treatment for periodontal disease, CMS also intentionally denied appropriate care for an emergency dental episode (e.g. tooth broke and sheared in half exposing the raw nerve), and CMS instead provided a known substandard temporary repair some forty-one days later.

### IV. Refusal to Provide Needed Necessary Dental Care for Broken Tooth

57. On 1/08/06 for example, Williamson's tooth sheared in half exposing a raw nerve and causing him acute pain, etc. Dr. Zimbull acknowledged the problem and what the industry standard dental care should be (e.g. a crown), but Zimbull denied it for non-medical reasons. (See D.I. 15 at items 156-178) and (See Ex.-IV-A, Aff'd 1/11/06 items 2-7).

58. Between 1/08/06 and 2/24/06, Zimbull met with Williamson on three separate occasions and denied the needed treatment and or any pain medications on all three visits.

7

59. Zimbull saw Williamson on 1/11/06, and 2/14/06 and he denied the needed crown and he stated non-medical reasons as justifications for the denials. This did reference CMS's custom/policy of cost-avoidance. (See Ex-IV.-B Aff'd 2/22/06 at items 4-12).

60. Again on 2/21/069 –in response to an Emergency Medical Grievance (EMG) #23193, Zimbull saw Williamson, and again he denied the needed treatment. In an attempt to resolve the EMG, though, Zimbull scheduled Williamson to see Dr. Bishop for an admitted substandard dental procedure. (See Ex-IV.-C, Aff'd 3/13/06 items 2-11).

61. On 2/24/06, dentist Bishop provided a temporary composite repair (temp repair) in lieu of the needed crown. (Note that Bishop also stated a root canal was needed). Bishop admitted that it would not last the duration of Williamson's incarceration. (See Ex-IV.-D, Aff'd 3/13/06 at items 2-11). Forty-one days had elapsed –with no pain meds- or treatment of any kind and CMS eventually provided a known substandard temp repair rather than the known medically needed dental procedure. (See D.I. 15 at items 183-188).

62. This substandard repair will admittedly fail sometime during Williamson's incarceration, and it will expose him to another unnecessary acute dental episode. (See D.I. 15 at items 186-187).

63. Indeed, CMS has made it a practice to intentionally provide known substandard temp repairs that do expose the patient to subsequent painful albeit avoidable emergency dental episodes and now CMS knowingly exposes Williamson to the same obscene conditions. (See Ex-IV.-E, Aff'd of Wyant 12/19/06 RE: to C.A. 02-1346-GMS).

64. CMS's is consistent with its denials and is consistent with its substandard care, and this suggests a deliberate indifference and or reckless disregard to their patient's medical needs and health.

65. For example, Jane Doe dentist (defendant believed to be named Kionke); confirmed CMS's blanket policy on 10/31/06, of prohibiting medically needed dental care absent any consideration for the medical condition. This was also in response to EMG 23193. (See Ex-IV-F, Aff'd 11/08/06 at items 2-12).

66. For these and the points set forth in the supporting memorandum, Williamson believes he is entitled to a TRO/PI order directing defendant CMS to provide the medically needed crown to replace the temp repair, and provide a root canal for same as Dr. Bishop recommended.

67. The above is true and Correct according to Williamson's personal experience, observations, and to the best of his knowledge and well reasoned beliefs. Pursuant to 28 U.S.C. 1746, I declare under penalty of perjury that the above is true and correct.

David W——                                           1-907 1-10-07
David Williamson                                     Date
W-1, L-12, SBI #183022
1181 Paddock Rd.
Smyrna, DE 19977

## CERTIFICATE OF SERVICE

I, David Williamson, the pro se plaintiff in C.a. No. 06-379-SLR, do hereby declare under penalty of perjury that I have caused to be delivered a true and correct copy of the following:

1. Motion for Temporary Restraining Order / Preliminary Injunction

2. N/A

By placing same in a U.S. postal receptacle on this 10th day of January 2007.

addressed to the following parties:

Correctional Medical Services, et al
C/O Amy A. Quinlan, Esq.
Morris James LLP
500 Delaware Ave., Suite 1500
Wilmington, DE 19801-1494

First Correctional Medical, Inc.
C/O
205 W. Giaconda Way
Suite 115
Tucson, AZ 85704-4350

David W—
David Williamson
D.C.C.
1181 Paddock Rd.
Smyrna, DE 19977

