ORIGINAL

IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| DAVID W. WILLIAMSON, | ) | |
| Plaintiff, | ) | |
| v. | ) | C.A. 06-379-SLR |
| CORRECTIONAL MEDICAL SERVICES, Inc, et al, | ) | |
| Defendants. | ) | |

FILED

JAN 1 2 2007

DISTRICT OF DELAWARE

MEMORANDUM IN SUPPORT OF TEMPORARY RESTRAINING ORDER / PRELIMINARY INJUNCTION

Statement of the Case

This is a civil rights action brought under 42 U.S.C. sections 1983 and 1997. Plaintiff also invoked pendant

jurisdiction to hear secondary state tort claims under 28 U.S.C. section 1367 and or any other applicable statutes or

Court rules. Plaintiff is a state prisoner and the Court has granted him in forma pauperis status. The Plaintiff seeks a

temporary restraining order and a preliminary injunction (TRO/PI) to ensure that he receives proper medical care.

Statement of Facts

As stated in the declaration submitted with this motion, Plaintiff suffers from several serious medical

diseases/conditions that require adequate and consistent or immediate medical care:

I. Thyroid disease (See I. items 3-16 of Declaration (Decl), of which requires uninterrupted Chronic-care medications (CC Meds);
II. Ruptured Anterior Cruciate Ligament (ACL) (See II items 17-40 of Decl), of which will not heal on its own and requires reconstructive surgery, etc;
III. Periodontal disease (See III. Items 41-56 of Decl), of which requires immediate teeth scrapings for active perio-infections; requires continuing/consistent anti-perio dental care (E.g. semi-annual scrapings); and requires replacement teeth for the four permanently lost teeth (i.e. dentures).
IV. Substandard temporary composite repair to broken tooth (See IV. Items 57-67 of Decl), of which requires a crown and root canal.

I. Thyroid disease: Diagnosed as a chronic disease –will never heal- Plaintiff's hypothyroidism progressively worsens

over time and requires periodic lab work to determine when the CC Meds dosage must be increased in order to manage

Plaintiff's chronic symptoms. Moreover, these CC Meds are of the type that must be taken uninterrupted (i.e. daily and

about the same hour) for them to be effective in managing the disease's common chronic symptoms. Plaintiff

experiences the following chronic symptoms as a direct result of the ongoing and pervasive CC Meds interruptions

(CCMNI):

A. Chronic fatigue (physical and mental);
B. Dangerous cholesterol production;
C. Dangerous and painful inflammation (e.g. in blood stream, face, extremities, etc.);
D. Disfigurement from Alopecia (i.e. unnatural hair loss about head, face, and body);
E. Impairment of normal daily functions (See D.I. 15).

These chronic symptoms could be managed if CMS corrected the CCMI(s), but CMS will not do so.

1

Consequently, Plaintiff has needlessly experienced eleven avoidable CCMI(s) between July 2005 and November 2006. (See Ex-I-A of Decl). They were avoidable because the medication distribution system for "Self Meds" is designed to avoid CCMI(s) providing that it is actually followed.

For example, Plaintiff has received CC Meds for some four years and they are designated "Self Meds," which means that Plaintiff is supposed to be provided CC Med Cards (E.g. 30 doses blister pack card of thyroid and another card for the multivitamins) about every twenty-five days. A chronic-care med cycle normally consists of a Refill order for four additional CC Meds cards on about the ninety day mark (termed a Clinic) and is to continue as such. The Clinics are supposed to be automatically scheduled about every ninety days to ensure no lapse occurs between Clinics/med cycles. (See D.I. items 27). Thus, if CMS wanted to correct the pervasive and ongoing incidence of CCMI(s), then all that it would have to do is to actually employ the med distribution system consistently. CMS has, however, refused to do so, and Plaintiff needlessly experiences a resurgence of chronic symptoms every time CMS cause Plaintiff a CCMI.

Moreover, though the duration and severity of Plaintiff's chronic symptoms correlate with the duration of the CCCMI, several of the chronic symptoms have caused residual/aggregate adverse effects. These residual/aggregate effects do not altogether dissipate after the CC Meds are resumed, but they have continued to build and cause a marked deterioration of Plaintiff's general health and well being: deterioration of cardiovascular system and acute loss of muscle mass, while increasing dangerous fat content and cholesterol; and disfigurement among other listed effects above.

Indeed, because of both a) Plaintiff experiencing the acute anxiety associated with the anticipation of being exposed to a likely CCMI (e.g. historical likelihood greater than 80%), and b) Plaintiff experiencing the acute adverse effects that these resulting chronic symptoms are having upon Plaintiff's mind, body, and emotional well being, Plaintiff also suffers the following:

A. Anxiety,
B. Depression,
C. Mental and Emotional Distress,
D. Humiliation, and
E. Damaged reputation of professional and social standing.

For example, Plaintiff's anxiety is causing dangerous spikes in his blood pressure and all its associated suffering that comes with hypertension. (E.g. frequent debilitating headaches). This physical effect was absolutely foreign to Plaintiff prior to CMS exposing him to said pervasive/ongoing CCMI(s). Also, Plaintiff's anxiety and depression precludes him form realizing any meaningful sleep (e.g. average three hours a night), and it aggravates his chronic fatigue. Moreover, the depression and humiliation has had a profound adverse effect on Plaintiff's personality and habits. Indeed, Plaintiff has mutated from his once full of life and energy demeanor, and his once responsible and caring extrovert personality to

2

a withdrawn, lifeless introvert. Plaintiff, for example, has been forced to limit or even discontinue his long held and important social and civic activates, and or healthy relationships:

A.  50 % reduction in his regularly held attendance at Catholic Mass Services;
B.  50 % reduction in his volunteer work with Saint Vincent DePaul Society (active member 2001-present);
C.  80 % reduction in assisting his peers-in-need with law work, etc;
D.  50 % reduction in maintaining healthy relationships via letter writing, etc;
E.  Withdrew as Lead Trainer with Alternatives to Violence Project (AVP) (Trainer for nearly ten years);
F.  Withdrew name from the limited consideration of coveted HVAC vo-tech class;
G.  Unable to attend all of his family's scheduled visits, though, he considers this most important; and
H.  Generally become withdrawn and unable to nurture healthy social relationships.

Consequently, Plaintiff had to finally admit defeat in trying to single handedly manage all these chronic symptoms and their residual effects, and he has had to seek psychiatric counseling. Plaintiff had already suffered humiliation due to his bizarre disfigurement –teased, mocked, and become the brunt of malicious jibes, etc: (E.g. called psycho-killer, ghost, chemo-patient, and powder), however, having to seek psychiatric help has aggravated Plaintiff's damaged social and professional reputation within the community.

Such are the tangible and residual effects –the facts- directly related to these pervasive/ongoing CCMI(s) that could easily be corrected. CMS, however, refuses to do so.

II. Ruptured Anterior Cruciate Ligament (ACL):

Plaintiff's ACL knee injury was diagnosed in June 2006 by doctors Durst and DuShuttle as a permanent injury, "will not heal on its own and left untreated will only further deteriorate the knee." (I.e. posing a substantial and known risk of further future permanent injury). (See II. 17 - 20 of Decl).

Indeed, the initial acute injury occurred in July 2004, and because it was deliberately untreated/under treated, it progressed until the ACL completely ruptured. For example, Plaintiff's residual damage never healed (e.g. acute instability, grinding, shifting, and hyper-extending of his knee) only got worse and expose Plaintiff to dangerous incident associated with falls and or collapsing as the leg would frequently buckle out at unnatural angle, etc. This progressive damage has caused further damage to Plaintiff's meniscus discs and caused contusions to the bone (i.e. water on the knee), and exposes Plaintiff to a likely substantial risk of permanent disability as he may lose complete control of his knee. (See II. 19 of Decl).

The obscene pattern of deliberate indifference/gross reckless disregard for this obvious serious condition began with FCM's blatant refusal to acknowledge to clear and obvious "classis symptoms" or the non-healing residual injuries. FCM's indifference, etc, was solidified by its refusal to perform the industry standard knee exams (e.g. D.I. 15 at 109); by its false promises –made in response to Plaintiff's medical grievance- which did also result in manipulation of the grievance process; and by its over-ride of the doctor's ordered MRI, which over-ride was in conflict with legitimate medical factors. (See D.I. 15 at 110-115).

Since then FCM skipped town and CMS has since spent the last year employing some of the same tactics to avoid having to provide Plaintiff the medical care known to be needed. Specifically, despite Plaintiff receiving several

promises form CMS –in response to subsequent MG(s) - for corrective/follow up action; CMS has nevertheless

stalled/avoided doing so. There is no legitimate medical reason for this behavior, and CMS's promises appear to have

been made in bad faith. Nevertheless, the inordinate delays and refusals to treat causes Plaintiff to experience further

deterioration of the knee and poses a significant risk of fall related incidents. Also, the obvious impairment of Plaintiff's

normal daily functions aggravates the overall deterioration of his general health and well being as it also precludes any

meaningful exercise, etc. Any layman can infer the obvious need to treat one who is nearly disabled. Note that Plaintiff

is a Certified Tae-kwon-do Martial Arts Instructor with a second degree black belt and he has spent some two decades

zealously staying in shape and perfecting his trade –his love. That has been taken away form Plaintiff these past two

years and it threatens to be an irreversible condition absent timely and adequate medical care.

      III. Periodontal disease:

      Plaintiff suffers form chronic periodontal disease that also will not heal on its own and requires timely

(emergency) and adequate dental care. (See III. 41 - 56 of Decl). Plaintiff was first diagnosed with periodontal disease

in late 1998 under Prison Health Services (PHS) watch. (See Williamson v. Carr, et al, CA 07-971-SLR at __3__ to __4__ )( EX·III-A )

Dental industry standards for the minimum adequate care require the following:

    A.  Immediate teeth cleaning/scraping (teeth cleaning), anti-bacterial mouth wash, anti-biotics, and pain meds;
    B.  Immediate root canal for acute infections or quickly recurring infections;
    C.  Semi-annual teeth cleanings to combat recurring incidence of infections.

PHS refused to provide the needed care and Plaintiff experienced permanent injury as a result. (E.g. loss of two teeth).

Indeed, Plaintiff accurately predicted this likely outcome in a prior TRO/PI filed against PHS in April of 1999.

(See CA 97-710-SLR, D.I. ____ TRO/PI Motion April 10-1999). Unfortunately, Plaintiff was unable to persuade the

Court at that time of the dire nature of this condition.

      PHS's contract expired and CMS took over, but CMS employed nearly identical deliberate indifference/gross

reckless disregard for Plaintiff's known serious condition and CMS also refused to treat subsequent recurring perio-

infections – and understandably the result was also nearly identical (e.g. lost of two more teeth in March 2005). (See

D.I. 15 at 141-153, 189-206). This also resulted in Plaintiff experiencing unnecessary pain and suffering, and

impairment to his normal daily functions.

      Moreover, even after the additional loss of two teeth (total four at present); CMS still refused to treat

subsequent active perio-infections, and refused to clean Plaintiff's teeth for some eighteen months later. (See D.I. 15 at

144-166). When CMS did provide the needed but grossly belated teeth cleaning, it was grossly substandard. For

example, about a month after Zimbull's substandard teeth cleaning, Plaintiff experienced another active perio0infection

on 1/08/06, and Zimbull subsequently refused to provide any further follow up treatment. Thus the cycle of abuse starts

anew. (See D.I. 15 at 150-155). Indeed, Plaintiff has experienced subsequent perio-infections, but with nearly a decade

of both PHS/CMS's consistently deliberate indifference (i.e. refusal to treat), Plaintiff is hopelessly resigned to the

reality of the situation: That absent intervention, he will not receive the needed care and experience a likely and

substantial risk of future permanent injury and pain and suffering. Meanwhile, the damage builds with every untreated/under treated perio-infection, and at some point a line is crossed in which permanent injury occurs and no treatment will save the damaged teeth. Plaintiff faces such a risk and there is absolutely no legitimate medical concern to deny him the minimal standard of needed dental care, especially for one who is known to suffer said periodontal disease.

IV. <u>Substandard Temporary Composite repair to Broken Tooth:</u>

On 2/24/06 CMS provide Plaintiff with an admittedly substandard temporary composite repair (temp repair) for a tooth that had sheared in half leaving an acutely painful exposed raw nerve. (See IV. _57-67_ of Decl).Plaintiff had needlessly endured acute pain and suffering since the emergency dental episode on 1/08/06, and had met Dr. Zimbull on three occasions during the interim, but Zimbull refused to provide any treatment or pain meds whatsoever. (E.g. 1/11/06, 2/14/06, & 2/21/06). Zimbull did, however, admit that the needed treatment consisted of a crown, but refused it based on a non-, medical blanket prohibition set by CMS (e.g. budgetary constraints, etc). (See IV. _59_ of Decl). Plaintiff explained to Zimbull on all three visits his pain and suffering and inability to eat solid food because three of his grinding teeth had been extracted on the right side and the broken tooth was on the opposite side, but Zimbull still refused to provide the admittedly needed care. (See IV. _59_ of Decl).

Over forty days elapsed before Plaintiff received any treatment. When Plaintiff did receive any it was admittedly substandard. Dr. Bishop, for example, also acknowledged a crown was the needed treatment and added that a root canal was also needed, but he too refused to provide said care and instead performed the temp repair procedure. He also admitted the temp repair would not last the duration of Plaintiff's incarceration. (See IV. _61_ of Decl). Thus, Plaintiff can expect a repeat acutely painful dental episode when the temp repair fails; CMS is aware of this, and the cycle will likely begin anew (i.e. another forty days of refusals and pain and suffering despite being seen by CMS's dentist three times).

Moreover, though CMS is the current CHCP (and a named defendant), the relief sought would naturally apply to any successors that may replace CMS, and does apply to the Delaware DOC as it is ultimately responsible for the health and well being of its charges.

ARGUMENT

THE PLAINTIFF IS ENTITLED TO A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

A litigant is entitled to a TRO/PI upon showing the following:

- ➤ That the Plaintiff is in danger of irreparable injury;
- ➤ That the non-moving party will not be unduly harmed;
- ➤ That the Plaintiff has a strong likelihood of success on the merits; and
- ➤ That the TRO/PI is consistent with public interest.

<u>Valentine v. Beyer</u>, 850 F.2d 951, 955 (3d Cir 1988).

Plaintiff easily meets this threshold and offers the following in support:

➢ IRREPARABLE INJURY

1. Plaintiff suffers form several serious medical diseases/conditions that have caused of or do cause any of the following:

      A. Poses a likely and significant risk of causing permanent injury or residual damage;
      B. Causes impairment of normal daily functions; and or
      C. Causes undue acute pain and or suffering.

(Plaintiff incorporates D.I. 15 at 14-206; and all points above at Declaration items 1-67 and at Facts items I.-IV.).

2. For example, all four medical diseases/conditions are objectively serious, which mandates adequate minimal care. (Farmer v. Brennan, 511 U.S. 825, 834, 114 S.Ct. 1970, 128 Led. 2d 811 (1994). Indeed, the acute chronic symptoms/effects of Plaintiff's thyroid and periodontal diseases, and his painful broken tooth and permanent ruptured ACL are so obvious even a lay person could infer the need for adequate medical care. (Foelker v. Outagamie County, 394 F.3d 510-512-13 (7th Cir 2005). Moreover, all four have been diagnosed by a doctor as requiring treatment –thus are- also considered "serious" under this scheme and mandate treatment. (Estelle v. Gamble, 429 U.S. 97, 105, 97 S. Ct. 285, ___, 50 L.Ed.2d 251 (1976).

Consequently, Plaintiff faces a likely and substantial risk of tangible/physical permanent injury due to the very nature of his several diseases/conditions sufficient to meet Valentine. Plaintiff's health and well being is the most important issue to him; however, they are not the only sources of irreparable injury he faces.

3. In addition, Plaintiff alleges that defendant have committed any of –but not limited to- the following violations:

    A.   Denied –intentionally/gross reckless disregard- care for his known serious medical needs;
    B.   Disregarded –intentionally/gross reckless disregard- his known serious medical needs;
    C.   Provided –intentionally/gross reckless disregard- care known to be substandard for non-medical reasons; and
    D.   Created an inordinate delay –intentionally/gross reckless disregard- in providing care known to be needed; none of which was based on any legitimate medical or penological factor.

4.   Accordingly, defendants' conduct is a clear violation of –intentionally/gross reckless disregard-'s Eighth Amendment. (Estelle, supra at 105). Thus, as a matter of law, the continuing deprivation of Plaintiff's constitutional rights does also constitute irreparable harm. Elrod v.Burns, 427 U.S. 347, 373, 96 S. Ct. 2673 (1976). The Elrod Court noted, in addressing person medical malfeasance, that our courts are in agreement that money awards are unthinkable compensation later. (Id). This is particularly true in cases of risk to health and life. Lopez v. Heckler, 713 F.2d 1432, 1437 (9th Cir 1983).

➢     ABSENCE OF HARM TO NON-MOVING PARTY

5. The balance of hardships overwhelmingly favors Plaintiff in this case. Plaintiff has established the following:

A.    That Plaintiff's thyroid disease is a serious/chronic condition, of which a doctor mandates continuous CC Meds, and that absent these needed CC Meds, Plaintiff is exposed to undue suffering and a likely and substantial risk of future harm of residual injury; and impairment of his normal daily functions;

B.     That Plaintiff's ruptured ACL is a serious/permanent injury, of which two doctors agreed that reconstructive surgery, etc was needed, and absent treatment, Plaintiff is exposed to undue suffering and a likely and substantial risk of future harm of residual injury; and impairment of his normal daily functions;

C.     That Plaintiff's periodontal disease is a serious/chronic condition, of which doctors have diagnosed, and of which has caused permanent injuries already. Thus denial of needed treatment causes Plaintiff to be exposed to undue suffering and a likely and substantial risk of future harm of residual injury; and impairment of his normal daily functions; and

D.     That Plaintiff's broken tooth is a serious medical condition –as it is obvious a broken tooth is a permanent injury and an exposed raw nerve is acutely painful- and two dentists admitted the needed treatment was a crown, etc; however. Admittedly a substandard temp repair was provided and this too exposes Plaintiff to undue suffering and a likely and substantial risk of future harm of residual injury; and impairment of his normal daily functions.

6. Consequently, the present suffering of the Plaintiff and the likely substantial risk of permanent/future harm to him is enormous. The "suffering" CMS will experience if the Court grants the order is minimal and nothing more than expected of any CHCP.

A.     For example, providing all four doctor's prescribed Self–med cards (i.e. 120 doses ea) at the beginning of the med cycle as opposed to a single med card every twenty-five days or so (because single cards have proven to be a failure), causes CMS no harm. Also ensuring that the Refill/Clinics are held every ninety days, something CMS is supposed to do and is obligated to do, does not cause any harm.

B.     Providing the doctor's recommended ACL treatments are also something expected of any CHCP and obligated to do for one with such a serious medical condition;

C.     Providing the minimal industry standard for periodontal disease and active perio-infections is also something that any CHCP should do and is obligated to do, because to deny care results in permanent injury and pain and suffering, etc, and causes no harm;

D.     Providing the emergency and minimal industry standard for a painful broken tooth is also something that any CHCP should do is obligated to do, and it too is no harm to CMS.

7. CMS's hardship amounts to nothing more than the very business that it agreed to perform when it contracted with the Delaware DOC. In reality, CMS has no legitimate standing to claim otherwise, and the fact that CMS continues to deny Plaintiff these medically needed procedures established CMS deliberate indifference. Indeed, until CMS faces real hardship (e.g. fines for not providing treatment, etc), it will continue to violate Plaintiff's rights.

   ➢   <u>PLAINTIFF WILL LIKELY SUCCEED ON THE MERITS</u>

8. Plaintiff has a great likelihood of success on the merits, because defendants' shocking acts have been condemned as violations of the Constitution: Deliberate indifference to serious medical needs. Defendants, for example, have engaged in any of but not limited to the following:

    A.    Intentionally interfered with medical treatment that had been prescribed by a doctor, such as by creating the avoidable CCMI(s); by providing the substandard knee brace and or by refusing to provide the ACL reconstructive surgery; (Jackson v. F.C.M.S., 380 F.Supp 387 (D.Del 2005); Spruill v. Gillis, 372 F.3d 218, 236 (2004); and Estelle, supra);

    B.    By creating a continuous pattern of CCMI(s) and or by refusing to correct said CCMI(s) despite the obvious need to do so. Jackson, supra.

    C.    By employing policies that fail to meet the immediate/emergency and obvious needs of Plaintiff, such as during an active perio-infection, broken tooth episode, or acute hyper-extension of ACL, etc, (Natale v. Camden County Corr' Facility, 318 F.3d 575, 583 (3d Cir 2003);

    D.    By denying needed/prescribed medications that resulted in undue pain or suffering or in residual injury, such as those caused by Plaintiff's untreated/under treated thyroid condition, and or his untreated/under treated perio-infections; (Monmouth County Corr. Inst. Inmates v. Fauver, 479 F. Supp 326, 347 (3d Cir 1987); Pace v. Fauver, 479 F. Supp. 456, 458 (D. N.J. 1979));

    E.    By denying treatment that results in permanent injury, such as untreated/under treated perio0infections, ruptured ACL, thyroid condition, and broken tooth; (White v. Napoleon, 897 F.2d 103, 111 (3d Cir 1990); Estelle, supra, Spruill, supra, and Monmouth County, supra.);

    F.    By intentionally employing less efficacious treatments, however, for non-medical factors, such as budgetary restrictions and or a custom/policy of cost-avoidance, which was admitted regarding the temp repair to Plaintiff's tooth, and may also be inferred by CMS's conduct regarding the ACL knee brace and CMS's refusal to conduct teeth cleanings or correct the pervasive CCMI(s). All of which exposed Plaintiff to undue pain and suffering and or permanent injury. West v. Keve, 571 F.2d 158 (3d Cir 1978); Williams v. Vincent, 508 F.2d 541 (2d Cir 1974); Tillery v. Owens, 719 F.Supp 1256, 1287 (W.D. PA 1989) Affirmed 907 F.2d 418 (3d Cir 1990); and Durma v. O'Carroll, 991 F.2d 64, 68-69 (3d Cir 1993));

    G.    By intentionally employing a custom/policy of blanket denials of certain needed treatments for non-medical factors, such as refusal to do teeth cleanings, no crowns, no root canals, and no reconstructive surgery despite the obvious need to do so. (West, supra, Tillery, supra at 1287); and

    H.    By intentionally attempting to inflict harm upon Plaintiff and or by doing so through gross reckless disregard to obvious painful/suffering conditions, which are evinced in the complaint by CMS's various acts of maliciousness, hostility, sadistic, and or retaliatory behavior towards Plaintiff. (Spruill, supra at 231).

Accordingly, Plaintiff has properly alleged and properly supported with facts the essential elements for his claims of deliberate indifference against defendants:

- Serious medical needs, of which were;
- Objectively known by defendants and; however, were
- Subjectively disregarded by defendants (i.e. defendants had personal involvement and a culpable state of mind).

10. Moreover, the above deliberate indifference need not await any actual harm beyond psychological and emotional distress, though; Plaintiff has actually suffered both in addition to his physical permanent injuries, before taking corrective action. (White, supra at 111).

➢  RELIEF SOUGHT WILL SERVE THE PUBLIC INTEREST

11. The public interest is best served when all ill prisoners are granted adequate health care. (White, supra at 111)(Citing Estelle v. Gamble, 429 U.S. 97 (1976) (Prompt medical care is needed to avoid unnecessary and wonton infliction of pain.). Also, the pubic interest is served because it is always in the public interest for defendants/prison officials to obey the law. Duran v. Oakland County Prosecutor's off', 402 F.Supp (p. 1379, 1393 (E.D. Mich 1975) ("the Constitution is the ultimate expression of the public interest.").

•  PLAINTIFF SHOULD NOT BE REQUIRED TO POST SECURITY

12. Plaintiff is an indigent prisoner unable to post security and he requests the Court to exercise its discretion to excuse an impoverished litigant from doing so. In view of the serous medical dangers confronting the Plaintiff, the Court is warranted in granting the relief requested without requiring the posting of security.

CONCLUSION

For the foregoing reasons, the Court is warranted in granting the motion in its entirety.

David Williamson
SBI 183022, W-1, L-12
1181 Paddock Rd
Smyrna, DE 19977

1-10-07

Date

9

IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE

DAVID W. WILLIAMSON,               )
     Plaintiff,                      )
     v.                           )     C.A. 06-379-SLR
CORRECTIONAL MEDICAL SERVICES, Inc, et al,  )
     Defendants.              )

### ORDER TO SHOW CAUSE AND TEMPORARY RESTRAINING ORDER / PRELIMINARY INJUCTION

Upon the supporting affidavit of the Plaintiff and the accompanying memorandum of law, it is ORDERED that defendant Correctional Medical Services, Inc. (CMS) show cause in room _____ of the United States Courthouse, 844 Kind St., Wilmington, DE 19801, on the _____ day of _____ 2007, at _____ o'clock, why a preliminary injunction should not issue pursuant to Rule 65 (a), Fed. R. Civ. P., enjoining said defendant, its successors in office, agents and employees and all other persons acting in concern and participation with CMS, to provide adequate medical care to :

    A.  Correct the incidence of Chronic-care medication interruptions and restore Plaintiff's normal daily functions;

    B.  Provide adequate ACL knee brace, reconstructive surgery, and physical therapy designed to restore and maintain the full function of Plaintiff's right knee and prevent any further permanent injuries;

    C.  Provide semi-annual teeth cleanings, and or provide as needed teeth cleaning and root canals for and based on periodontal infections, which are designed to prevent incidence of active infections and permanent injury;

    D.  Replace the temporary composite repair to Plaintiff's broken tooth with a more permanent crown; and

    E.  Provide replacement dentures for the four teeth lost to the periodontal infections, and or any others that may require extraction, which is designed to restore Plaintiff's full function and disfigurement.

IT IS FURTHER ORDERED that effective immediately, pending the hearing and determination of this order to show cause, defendant CMS shall arrange for the following: Plaintiff to be provided with all four CC Med Cards at beginning of medication cycle; provide subsequent Clinics every ninety days; provide an adequate ACL knee brace; and provide the reconstructive surgery for said ACL injury.

 IT IS FURTHER ORDERED that this order to show cause, and all other papers attached to this application, shall be served on defendant CMS by _____ 2007, and the U.S. Marshal Service is hereby directed to effectuate such service.

_____             _____

Honorable Judge Sue L. Robinson