
ORIGINAL

IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| DAVID W. WILLIAMSON, | ) |
| | ) |
| v. | ) C.A. 06-379-SLR |
| CORRECTIONAL MEDICAL SERVICES, Inc, et al, | ) |
| Defendants. | ) |

FILED
JAN 22 2007
DISTRICT OF DELAWARE

### MEMORANDUM FOR THE APPOINTMENT OF COUNSEL

Statement of the Case:

This is a civil rights case filed under 42 U.S.C. sections 1983 and 1997, by a state prisoner and he asserts claims that defendants committed several distinct acts of deliberate indifference to Williamson's objectively known serious medical needs in violation of his constitutional rights: specifically the Eighth and Fourteenth Amendment's ban on cruel and unusual punishment clause; deliberate retaliation against Williamson for his exercise of his protected rights in violation of the Fifth and Fourteenth Amendment's due process clause; and violations of the First Amendment's freedom of speech clause. Williamson seeks damages as to all his claims, declaratory judgment, and injunctive relief for the needed medical care he requires.

Statement of Facts:

As stated in the complaint, Williamson suffers from several serious medical diseases/conditions that require adequate and consistent or immediate medical care:

I. Thyroid disease, of which will not heal on its own and requires uninterrupted Chronic-care medications (CC Meds) (See D.l. 15 at 14-97);
II. Ruptured Anterior Cruciate Ligament (ACL), of which will not heal on its own and requires reconstructive surgery, physical therapy, and a special ACL knee brace, (Id at 98-136);
III. Periodontal disease, of which requires immediate teeth scrapings for active perio-infections; requires continuing/consistent anti-perio dental care (e.g. semi-annual scrapings); and requires replacement teeth for the four permanently lost teeth (i.e. dentures) (Id at 137-154, and 189-206); and
IV. Substandard temporary composite repair to broken tooth, of which requires a crown and root canal (Id at 155-188). (D.l. 15 is incorporated herein).

I. Thyroid disease: Diagnosed by a doctor as a chronic disease and it will never heal. Williamson's hypothyroidism progressively worsens over time and requires periodic lab work to determine when the CC Meds dosage must be increased in order to manage his chronic symptoms. Moreover, these CC Meds are of the type that must be taken uninterrupted (i.e. daily and about the same hour) for them to be effective in managing the disease's common chronic symptoms. Williamson experiences the following common chronic symptoms as a direct result of the ongoing and pervasive CC Meds interruptions (CCMI):

   A. Chronic fatigue (physical and mental);
   B. Dangerous cholesterol production;
   C. Dangerous and painful inflammation (e.g. in blood stream, face, extremities, etc.);
   D. Disfigurement from Alopecia (i.e. unnatural hair loss about head, face, and body);
   E. Impairment of normal daily functions.

These chronic symptoms could be managed if CMS corrected the CCMI(s), but CMS refuses to do so despite the obvious need to correct a pervasive and ongoing problem of which causes Williamson to needlessly suffer. Consequently, CMS has established a clear pattern of intentionally denying (i.e interfering with) Williamson's prescribed CC Meds.

For example, CMS has caused Williamson to needlessly experience eleven avoidable CCMI(s) between July 2005 and November 2006. (See Ex-I-A Aff'd of Medication Distribution Log). They were avoidable because the medication distribution system for "Self Meds" is designed to avoid CCMI(s) providing that it is actually followed; however, CMS refuses to do so.

Williamson has received CC Meds for some four years and they are designated "Self Meds," which means that he is supposed to be provided CC Med Cards (e.g. 30 doses blister pack card of thyroid and another card for the multivitamins) about every twenty-five days. A chronic-care med cycle normally consists of a Refill order for four CC Meds cards on about every ninety days (termed a Clinic) and is to continue automatically. Indeed, the Clinics are supposed to be automatically scheduled about every ninety days to ensure no lapse occurs between Clinics/med cycles. Thus, if CMS wanted to actually correct these pervasive and ongoing incidence of CCMI(s), then all that needs to be done, is to actually employ the med distribution system consistently. CMS has, however, refused to do so despite an obvious need to and despite several promises to correct the CCMI(s). Consequently, Williamson needlessly experiences a resurgence of chronic symptoms each and every time CMS causes him a CCMI. CMS is aware of Williamson's objectively serious medical needs/condition by virtue of Williamson's diagnosis with a chronic disease and by Williamson's repeated notice of impairment of his normal daily functions, etc.

Moreover, though the duration and severity of Williamson's chronic symptoms correlate with the duration of the CCMI, several of the chronic symptoms have caused residual/aggregate adverse effects. These residual/aggregate effects do not altogether dissipate after the CC Meds are resumed, but rather they have continued to build up and cause a marked deterioration of Williamson's general health and well being: deterioration of cardiovascular system and acute loss of muscle mass, while increasing dangerous fat content and cholesterol; and disfigurement among other listed effects in the claim.

Indeed, due to (a) Williamson's acute anxiety associated with the anticipation of being exposed to a likely CCMI (e.g. historical likelihood greater than 80%), and (b) Williamson experiencing the acute adverse effects that these resulting chronic symptoms have upon his mind, body, and emotional well being, Williamson also suffers the following:

      A.  Anxiety,
      B.  Depression,
      C.  Mental and Emotional Distress,
      D.  Humiliation, and
      E.  Damaged reputation or professional and social standing.

For example, Williamson's anxiety is causing dangerous spikes in his blood pressure and all its associated suffering that comes with hypertension. (e.g. frequent debilitating headaches). This physical effect was absolutely foreign to Williamson prior to CMS exposing him to these pervasive/ongoing CCMI(s). Also, Williamson's anxiety and depression precludes him from realizing any meaningful sleep (e.g. average three to four hours a night), and it aggravates his chronic fatigue. Moreover, the depression and humiliation has had a profound adverse effect on Williamson's personality and habits. Indeed, Williamson has mutated from his once energetic and full of life demeanor, and his once responsible and caring extrovert personality; to a withdrawn, lifeless introvert. Williamson, for example, has been forced to limit or even discontinue his long held and important social and civic activates, and or healthy relationships:

- A. 50 % reduction in his regularly held attendance at Catholic Mass Services;
- B. 50 % reduction in his volunteer work with Saint Vincent DePaul Society (active member 2001-present);
- C. 80 % reduction in assisting his peers in need with law work, etc;
- D. 50 % reduction in maintaining healthy relationships via letter writing, etc;
- E. Withdrew as Lead Trainer with Alternatives to Violence Project (AVP) (Trainer for nearly ten years);
- F. Withdrew name from the limited consideration of coveted HVAC vo-tech class;
- G. Unable to attend all of his family's scheduled visits, though, he considers this most important;
- H. Generally become withdrawn and unable to nurture healthy social relationships; and
- I. Withdrew from a Spanish (second language) class he had eagerly joined.

Consequently, Williamson had to finally admit defeat -in his attempt to single handedly manage all these chronic symptoms and their residual effects, and he has had to seek psychiatric counseling. Williamson had already suffered humiliation due to his bizarre disfigurement --teased, mocked, and become the brunt of malicious jibes, etc (e.g. called psycho-killer, ghost, chemo-patient, and powder), however, having to seek psychiatric help has aggravated Williamson's damaged social and professional reputation within the community.

II. Ruptured Anterior Cruciate Ligament (ACL):

Williamson's ACL knee injury was diagnosed in June 2006 by doctors Durst and DuShuttle as a permanent injury, "will not heal on its own and left untreated will only further deteriorate the knee." (i.e. poses a substantial and likely known risk of further future permanent injury).

Indeed, the initial acute injury occurred in July 2004, and because it was deliberately untreated/under treated, it progressed until the ACL completely ruptured. For example, Williamson's residual damage never healed (e.g. acute instability, grinding, shifting, and hyper-extension of his knee), only got worse and exposed Williamson to dangerous falls and or collapsing incidents, because the injured knee/leg would frequently buckle-out at an unnatural angle, etc. This progressive damage has caused further damage to Williamson's meniscus discs and causes contusions to the bone (i.e. water on the knee), and it exposes Williamson to a likely substantial risk of permanent disability as he may lose complete control of his knee.

The obscene pattern of deliberate indifference/gross reckless disregard for this obvious serious condition began with FCM's blatant refusal to acknowledge the clear and obvious "classis symptoms" or Williamson's non-healing acute residual injuries. FCM's indifference, etc, was also solidified by its refusal to perform the medical industry standard knee exams; by its false promises –made in response to Williamson's medical grievance- which did also result in manipulation of the grievance process; and by its countermand of the doctor's ordered MRI, of which countermand was in conflict with legitimate medical factors. All FCM's acts required a conscious decision and it suggests a deliberate/subjective denial of needed medical care. Indeed, any layman could infer the need for medical care.

Subsequently, FCM's contract was cancelled and CMS has since spent the last year employing some of the same tactics to avoid having to provide Williamson the medical care known to be needed. Specifically, despite Williamson receiving several promises from CMS –in response to subsequent MG(s) - for corrective/follow up action; CMS has nevertheless stalled and or avoided doing so. There is no legitimate medical reason for this behavior, and CMS's promises appear to have been made in bad faith. Nevertheless, the inordinate delays and refusals to treat causes Williamson to experience further deterioration of the knee and poses a significant risk of fall related incidents. Also, the obvious impairment of Williamson's normal daily functions aggravates the overall deterioration of his general health and well being as it also precludes any meaningful exercise, etc. Any layman can infer the obvious need to treat one who is nearly disabled. [Note that Williamson is a Certified Tae-kwon-do Martial Arts Instructor with a second degree black belt and he has spent some two decades zealously staying in shape and perfecting his trade –his love.] That has been taken away form Williamson these past two years and it threatens to be an irreversible condition absent timely and adequate medical care.

III. Periodontal disease:

Williamson suffers form chronic periodontal disease that also will not heal on its own and requires timely (emergency) and adequate dental care. Williamson was first diagnosed with periodontal disease in late 1998 under Prison Health Services (PHS) watch. (See Williamson v. Carr, et al, CA 07-971-SLR, D.I. ____ at pp 3 to 4). Dental industry standards for the minimum adequate care require the following:

    A. Immediate teeth cleaning/scraping (teeth cleaning), anti-bacterial mouth wash, anti-biotics, and pain meds;
    B. Immediate root canal for acute infections or quickly recurring infections; and
    C. Semi-annual teeth cleanings to combat recurring incidence of infections and prevent permanent injury.

PHS's contract expired and CMS took over, but CMS employed nearly identical deliberate indifference/gross reckless disregard for Williamson's known serious condition and CMS also refused to treat subsequent recurring perio-infections – understandably the result was also nearly identical (e.g. lost of two more teeth in March 2005). This also resulted in Williamson experiencing unnecessary pain and suffering during the interim, and it impaired his normal daily functions (e.g. inability to eat, sleep, and exercise of socialize).

Moreover, even after the additional loss of two teeth (total four at present); CMS still refused to treat subsequent active perio-infections, and refused to clean Williamson's teeth for some eighteen months later. When CMS did provide the needed but acutely belated teeth cleaning, it was grossly substandard. For example, Zimbull affected a teeth cleaning that lasted no more than four or five minutes. He did not engage in the standard teeth cleaning techniques that Williamson is familiar with and expected after waiting eighteen months; expected and or was certainly needed after experiencing no less than two prior perio-infections. Nevertheless, Zimbull intentionally conducted a less efficacious teeth cleaning that did not include or reflect any known dental standard. When Williamson questioned Zimbull, he stated: "There are a lot of [people] to be seen here...." Thus he admitted that the substandard care was because he had such a heavy patient load, and therefore his decision did not include Williamson's medical factors. Moreover, eighteen months is three times the recommended time for regular teeth cleanings for individuals who have trouble free teeth, but CMS not only deviated from the standard normal semi-annual teeth cleanings, it also disregarded Williamson's objective serious medical condition (i.e. active perio-infections, etc.) and refused to provide needed emergency dental care. Not surprisingly, about a month after Zimbull's substandard teeth cleaning, Williamson suffered another perio-infection on 1/08/06, and even then Zimbull refused to provide any further follow up treatment. Thus the cycle of abuse starts anew. Meanwhile, the damage builds with each and every untreated/under treated perio-infection and at some point a line is crossed in which the permanent injury occurs and no treatment will save the damaged teeth. (i.e. Williamson faces a substantial and likely risk of future permanent injury and pain and suffering.) Williamson faces this substantial and known risk, and there is absolutely no legitimate medical concern to deny him the minimal standard of needed dental care.

IV. Substandard Temporary Composite repair to Broken Tooth:

On 2/24/06 CMS provide Williamson with an admittedly substandard temporary composite repair (temp repair) for a tooth that had sheared in half leaving an acutely painful exposed raw nerve. Williamson had needlessly endured acute pain and suffering since the emergency dental episode on 1/08/06, and had met Dr. Zimbull on three occasions during the interim, but Zimbull refused to provide any treatment or pain meds whatsoever. (e.g. 1/11/06, 2/14/06, & 2/21/06). Zimbull did, however, admit that the needed treatment consisted of a crown, but refused it based on a non medical blanket prohibition set by CMS (e.g. budgetary constraints, etc). On all three visits, Williamson explained to Zimbull the acute pain and suffering he endured, and his inability to eat solid food because three of his grinding teeth had been extracted on the right side and the broken tooth was on the opposite side, which obviously impaires Williamson's ability to chew on either side of his mouth. Zimbull, however, still refused to provide the admittedly needed care or even pain meds.

Indeed, over forty days elapsed before Williamson received any treatment whatsoever. When Williamson did receive any, it was admittedly substandard. Dr. Bishop, for example, also acknowledged a crown was the needed

treatment and added that a root canal was also required, but he too refused to provide said care. Instead Bishop performed the admittedly substandard temp repair procedure to accommodate CMS's custom/policy. He also admitted the temp repair would not last the duration of Williamson's incarceration. Thus, Williamson can expect a repeat acutely painful dental episode when the temp repair fails; CMS is aware of this, and the cycle will likely begin anew (e.g. Another painful dental episode with another forty days of refusals and pain and suffering despite being seen by CMS's dentist three times).

VI. <u>Retaliation Against Williamson in Direct Response to His Exercise of Protected Right to Seek Redress:</u>

Also, certain defendants (CMS current employees), engaged in blatant retaliation against Williamson in direct response to Williamson's efforts to seek redress through the grievance process (e.g. grieved CMS's custom/policy of deliberate denial of Williamson's CC Meds, and or by refusing to correct the ongoing and pervasive pattern of CCMI(s)). (See <u>D.I. 15</u> at 62-80, incorporated herein). Specifically, defendant Ihuoma arbitrarily and capriciously refused to provide Williamson his needed Chronic-care Clinic (Clinic), which was required to Refill his CC Meds order and to avoid yet another unnecessary CCMI. Ihuoma denied the clinic despite the substantial likelihood that it would create another unnecessary CCMI –something that Williamson had already grieved and something that CMS promised to correct. Consequently, Williamson grieved Ihuoma's denial of his Clinic, and shortly thereafter Williamson was rescheduled for another Clinic, but was again denied it –this time however, it appears that Ihuoma had a nurse tell both Williamson and the correctional officer present that there was nobody there to conduct the Clinic for Williamson on that day.

However, this was a bald faced fabrication because Williamson witnessed Ihuoma and her supervisor, D. Plante, "there." Consequently, Williamson filed an addendum to MG 21201 and added this clear retaliation, but the MG was improperly rejected. Williamson experienced his fifth consecutive and longest CCMI (12/07/05 to 1/04/06) as a direct result of Ihuoma's repeated denials to conduct Williamson's needed Clinic.

Said MG was belatedly re-opened by Deputy Warden Pierce due to the improper rejection in violation of Inmate Grievance Procedure 4.4 (IGP), but nearly a year had passed. (See <u>Ex II-A</u> Pierce re-opens MG #21201) and (See <u>Ex II-B</u> Final Appeal package of # 21201, 12/27/06).

However, during the interim, CMS continued to deny Williamson his prescribed CC Meds, and despite the obvious need to correct said CCMI(s), and despite the obvious need to correct the repeat acts of retaliation, CMS permitted the retaliation to exacerbate.

Indeed, CMS was aware of and acquiesced in Ihuoma's blatant retaliation regarding MG #21201, which caused the fifth consecutive and longest CCMI to date, and the act did violate CMS's prior promises to correct the CCMI(s) (e.g. made for MG #15453). Moreover, when Williamson filed subsequent grievances (e.g. 59170 & 72883), which sought redress for the continuing denied Clinics, CCMI(s); and retaliation. CMS retaliated by

fabricating Williamson's medical records to cover CMS's malfeasance regarding the denied Clinics. This act was in direct response to Williamson's grievance activity. (See Ex II-C Final Appeal package MG 59170 at pp 1-8 incorporated herein) and (See Ex II-D Grievance package #72883 at pp 1-8 also incorporated herein). Accordingly, the fabricated medical records was definitively proven as a false entry by Williamson's work attendance record (Id at 8) –because he could not have attended any Clinic while he was present at work all day- and also because the faked Clinic had to eventually be rescheduled and actually conducted in order to Refill Williamson's CC Meds. Something CMS forgot to do in its haste to fabricate said medical record. (See Ex II-E Aff't 10/25/06 at items 2-7; incorporated herein).

Finally, instead of correcting the ongoing CCMI(s) and acts of retaliation, which are both obvious violations of Williamson's rights and of which mandate immediate corrective action, CMS busied itself with circling the wagons and attempting to stall with still more bad faith offers. For example, CMS offered to permit Williamson to access his medical records by written appointment in response to one of the grievances and Williamson complied with CMS's directions; however, CMS then refused to give Williamson the promised access and even refused to reply to Williamson's written request.

### I. Argument

THE COURT SHOULD APPOINT COUNSEL FOR THE PLAINTIFF.

### II. Standard of Review

Granted, a plaintiff has no constitutional or statutory right to the appointment of counsel in a civil case. See Parham v. Johnson, 126 F.3d 454, 456-57 (3d Cir. 1997); Tabron v. Grace, 6 F.3d 147, 153-54 (3d Cir. 1993). However, under certain circumstances, the court may in its discretion appoint an attorney to represent an indigent civil litigant. See 28 U.S.C. section 1915(e)(1). In deciding whether to appoint counsel for an indigent pro se plaintiff, the third Circuit articulated the standard for evaluation as follows:

1. Whether the claim has some arguable merit in fact and law. Parham, supra, at 457 (citing Tabron, 6 F.3d at 157);
2. Whether the plaintiff has the ability to present his own case;
3. Whether the legal issues are too complex for a pro se plaintiff;
4. Whether the testimony of an expert witness will be necessary;
5. Whether extensive factual investigation is necessary to effectively litigate the case and plaintiff's ability to pursue such an investigation;
6. Whether and to what degree the case will turn on credibility;
7. Whether plaintiff can attain and afford counsel on his own behalf. See Parham, supra, at 457-58 (citing Tabron, 6 F.3d at 155-56, and 157 n. 5).

This list is illustrative and not exhaustive. Id at 458. Accordingly, Williamson has additional factors that warrant the Court's consideration:

8. Whether settlement negotiations are viable and likely to resolve the litigation and whether plaintiff requires counsel's assistance to realize meaningful settlement negotiations; and

9. Whether IFP plaintiff faces prejudice for failure to prosecute due to an inability to realize service of process on all named defendants.

### III. Application of the Case Facts to the Parham Factors

1. Williamson's complaint contains factual and legal merit: His allegations, if proved, would clearly establish a constitutional violation.

First, for a plaintiff to state a violation of the Eighth Amendment's right to adequate health care, plaintiff "must allege acts or omissions sufficiently harmful to evince deliberate indifference to serious medical needs." See Estelle v. Gamble, 429 U.S. 97, 106 (1976); accord White v. Napoleon, 897 F.2d 103, 109 (3d Cir. 1990). A plaintiff must demonstrate: (1) that he/she had an objectively serious medical need, and (2) that defendants were aware of this need (i.e. subjective knowledge), but were deliberately indifferent to it. See West v. Keve, 571 F.2d 158, 161 (3d Cir. 1978); Also, Boring v. Kozakiewicz, 833 F.2d 468, 473 (3d Cir. 1987).

As to the first prong –objectively serious medical need- Williamson has pleaded facts that sufficiently establish several objective serious medical needs.

For example, see the following:

A. As pleaded, Williamson's thyroid disease is a serious/chronic condition, of which a doctor mandated continuous Chronic-care Meds (CC Meds), and absent these needed/prescribed CC Meds, Williamson is exposed to undue suffering and a likely and substantial risk of future harm/ residual injury; and impairs his normal daily functions;

B. As pleaded, Williamson's ruptured ACL is a serious/permanent injury, of which two doctors agreed that reconstructive surgery, physical therapy, and a special ACL knee brace was needed, and absent treatment, Williamson is exposed to undue suffering and a likely and substantial risk of future harm/ residual injury; and impairs his normal daily functions;

C. As pleaded, Williamson's periodontal disease is a serious/chronic condition, of which doctors have diagnosed, and which has already caused permanent injuries. Thus denial of needed treatment causes Williamson to be exposed to undue suffering and a likely and substantial risk of future harm/ residual injury; and impairs his normal daily functions; and

D.  As pleaded, Williamson's broken tooth is a serious medical condition –as it is obvious a broken tooth is a permanent injury and an exposed raw nerve is acutely painful- and two dentists admitted the needed treatment was a crown, etc. However, both doctors admitted that the temporary composite repair was substandard, would not last, and that a crown was required, but that they would not provide it due to CMS's blanket policy/custom prohibitt0ng crowns. The substandard repair exposes Williamson to a repeat painful dental episode; undue suffering and a likely and substantial risk of future harm/ residual injury; and the impairment of his normal daily functions.

Indeed, all four Williamson's diseases/conditions are objectively serious; thus mandate the minimally adequate medical care. See Farmer v. Brennan, 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed. 2d 811 (1994). Moreover, Williamson alleged that his acute chronic symptoms and real residual injuries/effects from his thyroid and periodontal diseases, and his permanently ruptured ACL; and his painful broken tooth that was denied any treatment whatsoever for over forty days, were and are so obviously serious that even a lay person could infer the need for adequate medical care. See Foelker v. Outagamie County, 394 F.3d 510-512 & 513 (7th Cir. 2005). Also, Williamson pleaded that all four had been diagnosed by a doctor as requiring medical care –thus are also considered objectively serious medical needs under this alternate legal theory. See Estelle, supra, 429 U.S. at 105. Additionally, Williamson pleaded that he faces a likely and substantial risk of both current and future tangible physical permanent injury due to the nature of his several serious medical diseases/conditions. See Valentine v. Beyer, 850 F.2d 951, 955 (3d Cir 1988).

As to the second prong: that defendants were subjectively aware of Williamson's needs, but that they were deliberately indifferent to them and or that they disregarded them with gross recklessness. Williamson's complaint equally satisfies this prong also. For example, Williamson establishes facts that defendants intentionally and or with gross reckless disregard committed -but not limited to- the following acts:

A.  Intentionally interfered with medical treatment that had been prescribed by a doctor, such as by creating the avoidable CCMI(s); by providing the substandard knee brace and or by refusing to provide the ACL reconstructive surgery; (Jackson v. F.C.M.S., 380 F.Supp 387 (D. Del 2005); Spruill v. Gillis, 372 F.3d 218, 236 (2004); and Estelle, supra);

B.  By creating a continuous pattern of CCMI(s) and or by refusing to correct said CCMI(s) despite the obvious need to do so. Jackson, supra.

C.  By employing policies that fail to meet the immediate/emergency and obvious needs of Williamson, such as during an active perio-infection, broken tooth episode, or acute hyper-extension of ACL, etc, See Natale v. Camden County Corr' Facility, 318 F.3d 575, 583 (3d Cir 2003); See also Martin v. Tyson, 845 F.2d 1451, 1457 (7th Cir. 1988) (lengthy delay in providing dental care or one that results in serious

pain or permanent damage violates constitution). And <u>Ramos v. Lamm</u>, 639 F.2d 559, 576 (10 th Cir. 1980) (inordinate delay causing "infections and abscesses leading to continued and unnecessary loss of teeth" states cause of action).

D. By denying needed/prescribed medications that resulted in undue pain or suffering or in residual injury, such as those caused by Williamson's untreated/under treated thyroid condition, and or his untreated/under treated perio-infections; See <u>Monmouth County Corr. Inst. Inmates v. Fauver</u>, 479 F. Supp 326, 347 (3d Cir 1987); <u>Pace v. Fauver</u>, 479 F. Supp. 456, 458 (D. N.J. 1979);

E. By denying treatment that results in permanent injury, such as untreated/under treated perio-infections, ruptured ACL, thyroid condition, and broken tooth; See <u>White v. Napoleon</u>, 897 F.2d 103, 111 (3d Cir 1990); <u>Estelle</u>, supra, <u>Spruill</u>; supra,; <u>Monmouth County</u>, supra; and <u>Martin</u>, supra;

F. By intentionally employing less efficacious treatments, however, for non-medical factors, such as budgetary restrictions and or a custom/policy of cost-avoidance, which was admitted regarding the temp repair to Williamson's tooth, and may also be inferred by CMS's conduct regarding the ACL knee brace and CMS's refusal to conduct teeth cleanings or correct the pervasive CCMI(s). All of which exposed Williamson to undue pain and suffering and or permanent injury. <u>West v. Keve</u>, 571 F.2d 158 (3d Cir 1978); <u>Williams v. Vincent</u>, 508 F.2d 541 (2d Cir 1974); <u>Tillery v. Owens</u>, 719 F.Supp 1256, 1287 (W.D. PA 1989) Affirmed 907 F.2d 418 (3d Cir 1990); and <u>Durma v. O'Carroll</u>, 991 F.2d 64, 68-69 (3d Cir 1993); See also <u>Fields v. Gander</u>, 734 F.2d 1313, 1315 (8th Cir. 1984) (three-week delay accompanied by swelling and pain states a cause of action).

G. By intentionally employing a custom/policy of blanket denials of certain needed treatments for non-medical factors, such as refusal to provide emergency/routine teeth cleanings, refusing to provide crowns, refusing to provide root canals, and refusing to provide and or creating an inordinate delay in providing reconstructive surgery despite the obvious need to do so. (<u>West</u>, supra, <u>Tillery</u>, supra at 1287); and

H. By intentionally attempting to inflict harm upon Williamson and or by doing so through gross reckless disregard to obvious painful/suffering conditions, which CMS was placed on repeated and adequate notice, and is evinced -in the complaint- by CMS's various acts of malicious, hostile, sadistic, and or retaliatory behavior towards Williamson. (<u>Spruill</u>, supra at 231).

Consequently, Williamson has properly alleged and properly supported with facts the essential elements of an Eighth Amendment claim for deliberate indifference against defendants: therefore, Williamson's claim has merit in both fact and law and he has satisfied the threshold question of Parham. It is appropriate for the Court to consider the remaining Parham factors.

2. Williamson's ability to present his case is greatly impaired by his medical conditions, and it is further impeded by a gross lack of meaningful access to the Law Library.

First, it is admitted that Williamson is fairly articulate, has a fair idea of the deliberate indifference standard, and he has a fair idea of how to assemble a motion, etc. However, being fairly articulate and knowledgeable does not necessarily equate to having a sufficient ability to present his own case without facing prejudice due to other compelling impairments.

For example, Williamson's thyroid disease causes him to suffer the following chronic symptoms:

a) Acute chronic fatigue, which impairs his physical and mental facilities (e.g. low energy & difficulty with concentration and focus);

b) Acute mental and emotional distress; and

c) Acute depression and anxiety, etc. (See Affidavit in support of appointment of counsel (Aff't) above at 4); Also (Statement of Facts (Facts) at I. Thyroid disease).

Consequently, Williamson's chronic-fatigue has adversely effected his work and academic performance. The former earned Williamson his first ever Counseling Report and poor Worker's Evaluation due to an abrupt increase in clerical errors. (See Ex-III A-1 Counselor's Report 7/25/05 and Ex-III A-2 Evaluation 12/06/05). The latter nearly resulted in Williamson failing to earn his college degree and breach his contract with the college. (See Ex-III A-3 Notice "beyond …allotted time…" 7/11/06 and III-Ex A-4 Williamson's Request for an Extension 8/03/06). These embarrassing incidents were a shock to Williamson because he had always enjoyed a reputation for being sharp and considered as having an above average intelligence and drive. These incidents were a blow to Williamson's professional and social reputation, and they were a blow to Williamson's self image. Indeed, the resurgence of symptoms and theresulting mental and emotional distress, depression, anxiety, and fatigue, etc, all conspire to aggravate Williamson's chronic-fatigue and or they impair his ability to present his case (i.e. suppresses motivation, desire, and causes him difficulty with concentration and organization of thoughts…). For example, Williamson's depression and anxiety are so severe that it is common for him to feel absolutely overwhelmed as he approaches any task –let alone the challenging tasks associated with this complex/extensive case. Indeed, Williamson was paralyzed with inaction from depression and anxiety for some three-four days when it came time to tackle his TRO/PI, which is a motion Williamson places the greatest importance on. Moreover, once Williamson overcame his paralization, he spent no less than five hours a day for twelve days to wrestle with an inability to concentrate/organize his thoughts enough to draft the TRO/PI in a timely manner. Several drafts and some sixty hours later, said motion was complete (does not include the initial three-four days of utter paralyzation). Meanwhile, for this near three week period, Williamson was rendered physically, mentally, and emotionally bankrupt and was virtually unable to be of any use in any other aspect of his life.

Additionally, the initial TRO/PI filing –like most initial filings- is not subject to time/pressure constraints, but is basically filed at the litigant's leisure. Williamson, however, simply cannot sustain the physical and mental demand of prosecuting his meritorious case while experiencing these medical impairments –impairments that the defendants have themselves caused by creating an ongoing and pervasive denial of Williamson's Chronic-care medications and by causing him needless pain and suffering, etc. Accordingly, if the Court denies Williamson's request for appointment of counsel,

then defendants will capitalize and gain an unfair advantage due to a situation that they created with dirty hands. It is appropriate to level the playing field and appoint counsel.

In addition, Williamson's ability to prosecute his case is impaired by woefully insufficient access to the Compound's Law Library. For example, inmate workers/programmers only have access to the Law Library on, at best, two sessions per week (scheduled 7:00pm to 8:40 pm) however, in reality it works out to, at best, 1 ½ hours per session for a total of three hours a week. Even then it is not uncommon to be bumped from one of the sessions due to space shortages. Thus, Williamson can hope to receive no more than a total three hours per week of access to legal materials. (See Ex-III B-1 Insufficient Law Library Access Complaint Letter 10/18/06). Absent this three hours maximum access to legal research materials, etc. Williamson is limited to his personal legal materials (e.g. a Black's Legal Dictionary). DCC prison does not provide any mail ordering system or photocopies of legal materials/cases/ rules etc. for compound inmates (Williamson is both a worker and compound resident). Thus if one needs to brief a court case, he must spend his limited and valuable 1 ½ hours of Law Library time –per session- taking long hand notes. No member of the bar could be expected to prosecute a complicated civil case with a mere three hours a week access to legal materials -except for a Black's Dictionary- and what little personal materials he may have in his one cardboard box (e.g. past court orders, etc.). Williamson, however, is not a member of the bar but a pro se litigant, and he certainly cannot be expected to do more than a member of the bar could do. Indeed, Williamson should not be forced to experience likely prejudice in his case before action is taken. He does not wish to experience unnecessary litigation (e.g. appeals, etc), and he is not interested in filing additional claims against the Department of Corrections for any denial of access to the courts that will likely arise when Williamson experiences prejudice as a result of being impeded from prosecuting his meritorious case. Williamson only wishes for a level playing field.

Moreover, if opposing counsel is so confident that three hours a week of access to legal materials is sufficient, including computer and type writer access and delayed photocopies, then Williamson expects that opposing counsel will stipulate to adhere to the same conditions. Otherwise, Williamson expects opposing counsel to agree as to these facts. See also Rayes v. Johnson, 969 F. 2d 700, 703-04 (8th Cir. 1992) (citing lack of ready access to a law library as a factor supporting appointment of counsel).

Even if Williamson did not experience chronic fatigue and mental and emotional distress, he could not hope to present his own case in any meaningful manner under such conditions. Consequently, both sets of conditions greatly impair/impede Williamson's ability to adequately present his own meritorious case.

3. Williamson's case is uncommonly complicated. (See above Aff't at 5 (a)-(g). It is clear after considering these facts that Williamson's case is not factually simple and or a legally straight forward deliberate indifference claim.

Indeed, our Sister Circuit recently held that counsel was warranted for a pro se deliberate indifference claim, though, plaintiff "Greeno" faced less variety and less a complex issue than Williamson has presented here. For example, the Greeno Court disagreed with the lower district court's assessment that Greeno's case was

> [F]actually simple and legally straight forward [,] because [a]s Greeno points out, his
> medical records, letters, health services requests, and inmate complaints span over two
> years. His case is also legally more complicated than a typical failure to treat claim,

> [and] because it requires an assessment of the adequacy of the treatment that Greeno did receive, a question that will likely require expert testimony. See Greeno v. Daley, 414 F.3d 645, 658 (7th Cir. 2005).

At a minimum, Williamson's case facts are not only substantially similar –but are actually more involved and complex than Greeno's. For instance, like Greeno, Williamson's medical conditions/complaints span over two years, but unlike Greeno's single medical condition (e.g. bleeding ulcer), Williamson's claims involve four serious medical conditions –three of which meet of exceed two years as a continuing violation. Thus, they also involve questions of statute of limitations. Inherently, all involve the voluminous red tape, complaints, and documentation in excess of Greeno's case. In addition, like Greeno, Williamson's claims will likely require an assessment of the adequacy of treatment regarding (1) thyroid meds/interruptions, (2) FCM & CMS's treatment or lack thereof of Williamson's ruptured ACL injury, (3) the periodontal treatment rendered, and (4) the temp composite repair of his broken tooth. Indeed, Williamson claims that both FCM and CMS intentionally provided him less efficacious medical care and such claims require an assessment of the adequacy of said care –questions that will require expert testimony.

Additionally, Williamson claims that two defendant corporations engaged in a custom/policy to deny him care and or a pattern of gross reckless disregard or denial that equated to deliberate indifference. Courts have held that the " 'difficult and subtle question' of state of mind required for deliberate indifference is too complex for pro se plaintiff[s] to understand and present to a jury." Id at 658 (citing Swofford v. Mondrell, 969 F. 2d 547, 552 (7th Cir. 1992).

This can only become more complicateed when it involves --as here- two defendant corporations.

Consequently, Williamson's case is uncommonly complicated and counsel is required to sort and present the multiple complex issues and personal involvement.

4. Williamson's case requires the testimony of a medical expert. Plaintiff incorporates Ex-III C-1 "…motion for expert witness" at items 4-11).

5. Williamson's case requires extensive discovery and though he has already attempted t secure his medical records, etc, he has been rebuffed by CMS and lied to by CMS regarding same. (See Ex-III D-1 CMS Medical Records request 5/10/06, and Ex-II D 1-8 above #72883 Grievance Package.) Also, please see above Aff't at items 7 (a) –(c). In addition, discovery is required to determine the identity of Jane Doe defendant and or to identify multiple witnesses –both current and past employees of corporate defendants; secure medical records, and cross-check with multiple sources because CMS has intentionally introduced fabricated medical entries into Williamson's medical file; and, research corporate contracts, responsibility, holdings, past/current consent decrees of other similar litigation and grievances; and or subpoena and depose corporate policy decision makers.

Consequently, Williamson's several claims, several individual defendants, and several corporate defendants will require extensive discovery –and not merely written because Williamson does not intend to forego arguably the most valued discovery device available to a litigant: verbal/taped depositions –especially for cooperating past-employee defendants. See Tucker v. Dickey, 613 F. Supp 1124, 1133-34 (W.D. Wis 1985).

6. Williamson's facts will be strongly disputed and credibility will be a "key" issue in this case. (See above Aff't at item 8; and item VI above "Retaliation... "with exhibits for an example of CMS's conflicting and strongly opposing position. Moreover, deliberate indifference involves a defendant's subjective state of mind and this inherently thrusts their credibility into a contest with Williamson's claims.

Credibility issues support appointment of counsel. Gatson v. Coughlin, 679 F. Supp. 270, 273 (W.D.N.Y. 1988).

7. Williamson is unable to afford counsel, though he has unsuccessfully attempted to solicit counsel on nine occasions. (See Ex-III E-1-7 ). For example, Williamson wrote the following law firms, but was unsuccessful at gaining their services:

(i) Brandt & Dalton 12/01/06; Outcome: Returned to sender;
(ii) Hudson Bruce L. Esq. 12/01/06; Outcome: NO reply;
(iii) Benson Joseph W. Esq. 12/01/06; Outcome:Rejected;
(iv) Bifferato Bifferato & Gentilotti 12/01/06; Outcome:No reply;
(v) Ramunno Lee 12/01/06; Outcome: Rejected;
(vi) Connoly Bove Lodge & Hutz May 06; Outcome: No reply;
(vii) Marshall, Dennehey, Warner, Coleman & Goggin 12/31/06 Outcome: No reply;
(viii) Hampton Stephen A. May 06; Outcome: rejected; and
(ix) Neuberger Thomas S. Esq. May 06; Outcome: NO reply.

Naturally, Williamson is indigent as demonstrated by his in forma pauperis motion.

8. Williamson requires counsel to effect meaningful, good faith settlement negotiations with multiple past employee defendants: D. Plante, C. Mahanely, S. Alie, and or M. Robinson. Williamson believes these past employee defendants will cooperate with Williamson by providing him with truthful testimony regarding corporate defendant's custom/policy to deny needed medical care, because Williamson will offer to waive all claims against them in exchange for said cooperation. Williamson is a prisoner and logistics impede his ability to effectively negotiate, contract, and subsequently examine and cross-examine and depose any cooperating defendant witnesses. Counsel is warranted to dispose of these claims and defendants.

9. Williamson requires counsel to assist him realize service of process on several hard to find defendants and to avoid unnecessary prejudice. For example, defendants Plante, Malaney, Robinson, and Alie and a Jane Doe defendant have not been located for Williamson to effect service. Williamson is threatened with prejudice for lack of prosecution if he is unable to serve these defendants. Indeed, Warren Wyant –another pros se litigant- actually experienced this very prejudice when he was unable to locate a hidden defendant: Michelle Robinson (same defendant that Williamson is also looking for). Michelle Robinson eluded service in Wyant's case and he was prejudiced. (Please see Wyant v. CMS, et al, C.A. No. 02-1346-GMS at D.1. 96 Order dismissing Michelle Robinson for failure to effect service).

## CONCLUSSION

For the foregoing reasons, the Court should grant Williamson's motion and appoint counsel in this case.

_David V_____    _1-17-07_
David Williamson                Date
183022
DCC
1181 Paddock Rd.
Smyrna, DE 19977