

IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE

DAVID W. WILLIAMSON, )
Plaintiff, )
)
v. ) C.A. 06-379-SLR
)
CORRECTIONAL MEDICAL SERVICES, Inc, et al, )
Defendants. )

PLAINTIFF'S FIRST SET OF REQUESTS FOR ADMISSIONS DIRECTED TO FIRST CORRECTIONAL MEDICAL, INC.

COMES NOW, plaintiff, Williamson pursuant to the appropriate Fed. R. Civ. P., Local Rule, and or case authority. Williamson attests that the instant discovery request is made in good faith, not meant to harass, inconvenience, or be overly burdensome to defendants or to delay these proceedings in any manner. Williamson requests defendants First Correctional Medical, Inc. (FCM), to make the following admissions, where required under the applicable rules, under oath, within thirty-days of the date of service.

ADMISSIONS

1. Williamson experienced an easily observable serious knee injury on or about 7-26-04 to his right knee in which a severe hyper-extension of the knee joint (e.g. backwards and sideways at an acute and unnatural angle, which was accompanied with a sharp and sudden pain and popping sound) caused Williamson acute pain and suffering, massive abnormal swelling, and abnormal impairment in range of motion. (See also #7 below).

2. Williamson immediately filed (e.g. 7-26-04) a formal request for medical care and he described the serious knee injury and its acute symptoms in sufficient detail to establish the need for immediate emergency care.

3. FCM by and through its agents refused Williamson immediate emergency and or adequate access to the needed medical care, and or physical exam by any qualified medical personnel despite his notice establishing a serious medical emergency.

4. FCM refused to schedule any exam or initial consultation for Williamson's serious medical emergency for some eight days, which was in conflict with the observable and articulated medical factors and devoid of any reasonable exercise of professional judgment.

5. FCM by and through its agents did with gross reckless disregard and or deliberately schedule a grossly belated initial consultation of Williamson's serious knee injury on or about 8-03-04 and it was aggravated as the personnel (e.g. Chuks Ihuoma) was both unqualified to provide an appropriate exam and who was deliberately indifferent to Williamson's still massively swollen and painful knee regardless of her lack of qualification as she blocked timely access for Williamson to see qualified personnel.

6. Ihuoma did with gross reckless disregard and or deliberately ignored Williamson's still observable serious knee injury, ignored Williamson's explanations of his residual acute symptoms, and did refuse him access to a qualified doctor and did deliberately provide a grossly substandard elastic sleeve-like knee brace.

7. Williamson noted the acute residual symptoms to Ihuoma (e.g. abnormal impairment of range of motion, still abnormal swelling of the knee, acute pain, instability of the knee joint and or too much play in the knee, popping and grinding of the joint, and involuntary buckling and or hyper-extension at acute and unnatural angles), which had not healed or otherwise dissipated over this intervening eight days. Also, Williamson noted that these residual symptoms were not present before the injury.

8. Thus Williamson described in detail an objective serious medical condition that required immediate and emergency care as well as required certain specific ACL exam, treatment, and medical devices (e.g. Don joy ACL knee brace, etc).

9. Said elastic knee brace was not designed for the severe type of knee injury that Williamson's acute abnormal and residual symptoms mandated (e.g. listed at #7); it contained no bracing to limit or protect against the instability and hyper-extensions, and it was in fact a known less efficacious alternative.

10. Indeed, Ihuoma employed FCM's custom/policy of cost avoidance by denying Williamson the more expensive and appropriate type of knee brace that his medical condition called for, and the decision was devoid of legitimate medical factors and devoid any professional medical judgment. As a result, Williamson was knowingly and needlessly exposed to pain and suffering, and a tangible and substantial likely risk of future permanent injury through the use of said less efficacious elastic knee brace.

11. The residual symptoms noted by Williamson in #7 above are Classic and elemental symptoms of a severe knee injury indicative of a serious Anterior Cruciate Ligament (ACL) injury and they constitute legitimate and undisputable medical factors that establish a serious medical emergency (i.e. serious ACL injury).

12. The type of severe hyper-extension/injury that Williamson noted at the 8-03-04 initial consultation (listed at # 1) is also a Classic and elemental severe knee injury indicative of a serious ACL injury.

13. Indeed, Williamson repeatedly described the classic residual symptoms and classic hyper-extension knee injury indicative of a serious ACL injury (e.g. 7-26-04 Medical request; 8-03-04 Initial Consultation; 9-26-04 Emergency Medical Grievance, EMG # 7463; 9-28-04 Alie Mock exam; and the 11-04-04 Alie Mock Re-exam), but on every occasion FCM by and through its agents/personnel did with gross reckless disregard and or deliberately ignore these classic and elemental symptoms/injury and denied Williamson the generally accepted medical care mandated for such a serious ACL injury.

14. Minimally and generally accepted medical care mandated for such a serious ACL injury is as follows:

   (a) Test for abnormal range of motion;
   (b) Observe for abnormal and or sustained swelling;
   (c) Employ a "Lachman" test (i.e. tests for forward movement of tibia and suggests ACL tear); and
   (d) Employ a "valgus stress" test (i.e. tests side to side looseness and suggests an MCL tear).

15. Additional diagnostic tests used to confirm any ACL or MCL diagnosis include the following:

   (a) An "arthronmeter" test (i.e. measures knee stability);
   (b) An X-ray; and
   (c) A Magnetic resonance Imagining (MRI) (i.e. tests which provides an inside view of the soft tissue).

16. Williamson's observable acute abnormal motion (both impaired range and instability) and acute sustained swelling, as well as his description of the classic injury and classic residual symptoms combined to all but assure a serious ACL injury; however, they were all, with gross reckless disregard and or deliberately repeatedly ignored by FCM's personnel absent any legitimate medical factors and devoid of any legitimate professional medical judgment. (e.g. FCM intentionally refused to note or provide any of the generally accepted medical procedures required for such an easily observable serious ACL injury (listed above at # 13 & # 14).

17. For example, Williamson noted both the classic ACL injury and classic ACL residual symptoms at the following: Ihuoma's Initial Consultation on 8-03-04 about eight days after the injury; Alie's 9-28-04 Mock exam some two months after the injury; and Alie's Mock re-exam on 11-04-04 nearly four months after the injury, but none of these exams entailed the above listed (e.g. #14 & #15) medically necessary procedures. These exams were actually a pretext (i.e. mock exams) that were employed by FCM with gross reckless disregard and or deliberately to realize FCM's custom/policy of cost-avoidance and otherwise deny Williamson his needed care without any exercise of professional medical judgment.

18. Indeed, the FCM's X-ray technician referenced FCM's custom/policy of non-medical factor (e.g. cost-avoidance) at Williamson's 8-03-04 X-ray when she observed that his knee injury required an "MRI" test but stated: "Oh that's not likely to happen –they're too expensive. But you didn't hear me say that." (The X-ray tech was a different staff member from Ihuoma).

19. FCM aggravated the denials by countermanding a doctor's order for an MRI on Williamson's knee.

20. For example, between Ihuoma's mock initial consultation of 8-03-04 and Alie's mock exam of 9-28-04, Williamson was scheduled in for an unrelated Chronic-care Clinic with doctor Hauqui (spelling ?), on or about 8-30-04, and Williamson took the opportunity to show the doctor his still abnormally swollen knee and Williamson noted the classic injury and classic residual symptoms to the doctor.

21. The doctor performed a physical exam and immediately recognized the serious potential ACL injury and placed an Order/recommendation for Williamson to receive a MRI.

22. Dr. Hauqui disregarded FCM's non-medical custom/policy of cost avoidance by doing so; however, FCM rescheduled Williamson in with the more compliant Dr. Alie (i.e. shopped around for a doctor to realize FCM's custom/policy of cost-avoidance) and Alie promptly countermanded/cancelled the prior doctor's order/recommendation for an MRI.

23. During the interim Williamson filed a Emergency Medical Grievance (EMG # 7463) on 9-26-04 and noted the classic injury and the classic residual symptoms therein. Adequate notice was thus provided to FCM of the nature of the serious injury and FCM was provided an opportunity to resolve the matter by providing the needed and mandated care to Williamson.

24. FCM was the contracted health care provider (CHCP) at the time Williamson experienced the injury and throughout the resolution of his EMG # 7463.

25. The CHCP is ultimately responsible for the proper handling, answer, and resolution of any medical grievance.

26. FCM did with gross reckless disregard and or deliberately refused to provide emergency medical care –which is mandated by IGP 4.4 regulations- and also offered bad faith promises to Williamson.

27. First, on or about 9-28-04 FCM did with gross reckless disregard and or deliberately schedule Williamson in with Alie for the purpose of countermanding the prior doctor's ordered/recommended MRI and to realize FCM's custom/policy of cost avoidance by performing a mock exam that was so totally devoid of the generally accepted professional medical standards and where she ignored the all the classic residual symptoms and classic injuries noted by Williamson; that is was actually designed to manifest an intentional misdiagnosis.

28. Alie's decision/mock exam of 9-28-04 was devoid of both legitimate medical factors and professional medical judgment.

29. Alie refused to perform the medically mandated physical exams (e.g. Lachman and valgus tests, etc.).

30. Indeed, said tests do not even require any special equipment but merely require hands-on manipulation of the knee, and there was no legitimate excuse or exercise of professional medical judgment in refusing to perform medically necessary exams.

31. It was clear that any layman could infer the serious injury to Williamson's knee and that it required medical care –something more than an elastic knee brace that did nothing to protect the knee joint from the instability and further hyper-extensions.

32. Subsequently, FCM conducted the Formal Grievance Hearing, for EMG #7463 (second and final hearing) on or about _____, for the purpose of "Resolving" Williamson's EMG against them.

33. However, FCM did with gross reckless disregard and or deliberately offer bad faith promises and did intentionally mislead Williamson into believing FCM would perform an adequate and "comprehensive" knee exam; would perform the requested MRI; and would provide an exercise and strength training rehabilitation regiment in order to secure a "Resolution" of said EMG.

34. FCM never provided any of the promises made to Williamson; FCM did with gross reckless disregard and or deliberately breached the agreement.

35. IGP 4.4 provides for two grievance hearings and a final appeal assuming no agreement is reached that would resolve the matter.

36. In the event an agreement is reached then the grievant is precluded from filing an appeal and there exists no further available administrative remedies, (indeed there is nothing to appeal and to do otherwise would usurp the act of encouraging agreements to resolve any grievance). (i.e. Would defeat resolving the matter at the administrative level, defeat one of the primary purposes of the establishing act).

37. Williamson –in good faith- resolved his EMG # 7463 against FCM for its deliberate indifference contingent upon FCM's promises to provide him the needed treatment; FCM received adequate and full notice of the matter and Williamson consequently exhausted all available administrative remedies upon doing so.

38. FCM did with gross reckless disregard and or deliberately employ its bad faith promises to Williamson at said EMG hearing to further create a denial and or inordinate delay in providing the needed medical care for his serious ACL injury. (i.e. Stall Williamson until FCM's contract lapsed with DDOC, and the could skip town without ever providing him the promised treatment.

39. FCM established a clear patter of employing a custom/policy of denying and or creating an inordinate delay in providing needed medical care for non-medical factors (e.g. cost-avoidance), and did with gross reckless disregard and or deliberately expose Williamson to unnecessary pain and suffering, acute impairment of Williamson's normal daily functions, and did expose and actually cause Williamson future permanent injury to his right knee/ACL joint.

40. Moreover, the deliberate indifference was aggravated because both Dr. Alie and Ihuoma did with gross reckless disregard and or deliberately direct hostility, contempt, and did treat Williamson as a nuisance as opposed to a patient who made reasonable requests for easily observable medical care.

41. FCM knew of, encouraged, and refused to correct the obscene acts, listed above, of Alie and Ihuoma; acts that were so likely to violate Williamson's constitutional rights that is demanded immediate corrective action; acts that continued for over six months and violated FCM's promises made at EMG #7463.

42. FCM staged and conducted the mock exams and did with gross reckless disregard and or deliberately rescind and or deny Williamson the needed MRI in order to create and intentional misdiagnosis and thus deny Williamson his needed medical care; however, this was devoid of any professional medical judgments and legitimate medical factors.

43. FCM was aware of and did with gross reckless disregard and or deliberately disregard the permanent and acutely painful nature of Williamson's serious ACL injury, and which did result in the actual and proximate permanent injury to his ACL (e.g. ruptured ACL, which was finally diagnosed in May 2006 and does require reconstructive surgery).

44. FCM's intentional refusals to provide Williamson the generally medically accepted and or adequate medical care known to be needed did cause Williamson a substantial and likely risk to future harm, and did cause him to lose the ability to continue his earning capacity as a certified martial arts instructor and or enjoyment of life.

_David W_____        2-1-07
David Williamson, SBI # 183022         Date
1181 Paddock Rd.
Smyrna, DE 19977

4

## AFFIDAVIT OF MAILING

I David Williamson, pro se plaintiff, do swear that I have caused the following documents to be placed in a U.S. Mail Receptacle on ____1____ day of ___Feb.___ 200_7_ :

1. ___Admissions on FCM  &___

2. ___N/A Combined Set of Interrogatories & Production of Documents on FCM___

3. ___N/A___

4. ___N/A___

These originals/true copies were addressed to the following parties:

1. FCM, Inc.
   205 W. Giaconda Way
   Suite 115
   Tucson, AZ 85704-4350

2. Amy A. Quinlan, Esq
   500 Del. Ave.
   Suite 1500
   Wilm., DE 19801-1494

3. N/A

4. N/A

The above is signed under penalty of perjury.

_Dave W_
David Williamson

I/M David Williamson
SBI# 183022  UNIT W.1, L-12
DELAWARE CORRECTIONAL CENTER
1181 PADDOCK ROAD
SMYRNA, DELAWARE 19977



U.S. District Court
Attn. Clerk of Court
844 North King St.
Lock box 18
Wilm., DE 19801

