IN THE U.S. DISTRICT COURT FOR THE DISTRICT OF DELAWARE

WILLIAMSON, )
 )  C.A. No. 06-379-SLR
v. )
 )
CORRECTIONAL MEDICAL SERVICES, et al, )
    Defendants. )



PLAINTIFF'S REPLY TO DEFENDANT FIRST CORRECTIONAL MEDICAL'S
MOTION TO DISMISS

  Plaintiff, Williamson, submits that first Correctional Medical's (FCM) motion to dismiss is made in bad faith; it is factually and legally frivolous and misrepresents material facts to this Court. It is also inexcusably belatedly filed.

  1. FCM's motion was filed on or about 1-31-07; however, the time for FCM to file an answer or defense was on or about 1-05-07. FCM did not file any extension of time to file a motion to dismiss late. FCM did not ask the Court's leave to file late, nor did FCM even deign to explain any excusable cause for its grossly belated filing. Consequently, Williamson filed a motion for default on or about 1-10-07 due to FCM's failure to answer. Court rules clearly mandate that any motion in defense shall be mad before the time for a pleading/answer, but FCM did not do so. F.R.Civ. Proc. 12 (b). FCM filed its motion to dismiss on 1-31-07 well after the time for it to answer (e.g. 60 days after signing waiver of service: 1-05-07), and offers nothing for its lapse. FCM's belated filing should be struck accordingly for its impertinency. Moreover, FCM's motion is scandalous and made in bad faith. Williamson does not waive his objection; however, will nevertheless reply to FCM's frivolous motion for the benefit of the Court.

  2. FCM's belated motion is made in bad faith and appears calculated to dupe Williamson and the Court with misrepresentations. For example, FCM appears to claim that Williamson has mistaken its identity: "it did not provide, nor did it contract to provide, health care to inmates in the State of Delaware…." FCM's claims are false. The exhibit FCM attached demonstrates this fact. For instance, it clearly names First Correctional Medical, Inc., in paragraph three: "WHEREAS,… FCM's sole member (First Correctional Medical, Inc.) submitted a proposal … and its proposal was accepted by the DOC;…." And also at paragraph five: "NOW THEREFORE…. 'First Correctional Medical, Inc.,'… was the successful bidder."

Also, the Delaware News Journal and Associated Press ran stories either quoting DOC Commissioner Stan Taylor and or referencing first Correctional Medical of Tucson, Arizona, as the health care provider that was replaced recently by CMS, etc.

    a. "… CMS replaced [FCM] of Tucson, Ariz…(See Ex-A, p 2)(1);

    b. "…[FCM], the Tucson, Ariz., firm providing care for Delaware inmates from 2002 through most of July 2005…." (See Ex-B(1), p. 3);

    c. "… Commissioner Stan Taylor…[a]sked whether he was satisfied with First Correctional Medical, Inc., …[t]he privately held company, based in Arizona…." (See B-2(1), p. 1);

It appears that only FCM is unsure about its contract and or its identity. Perhaps it is more likely that FCM is attempting to avoid liability for its malfeasance through some type of corporate slight-of-hand, and it is not surprising because FCM is a defendant in some "40 lawsuits" (See B-2, p.1). Indeed, attorney ken Richmond is currently representing the estate of Chance in a suit against FCM for wrongful death. (See Ex-B-3(1), p. 1). If this suit is filed with the District Court, then it would be a matter of Court records that FCM of Tucson, Arizona is indeed the parent company responsible and the appropriate defendant in Williamson's case also. If so, the Court is warranted in imposing sanctions against FCM for its bad faith filing.

WHEREFORE, Williamson requests this Court to take judicial notice that FCM, Inc. of Tucson, Arizona is the appropriate defendant –strike its bad faith motion- and or deny it and permit Williamson to make discovery and or subpoena Delaware DOC records in order to satisfy the Court of FCM's identity.

*David W* (signature)  
*Dave W* (signature)  
David Williamson  
SBI #183022  
1181 Paddock Rd.  
Smyrna, DE 19977

2-15-07  
Date

---

(1) Prison Law Library refused to copy these exhibits. (See Denial marked A-1) They may be referenced at the following:

Ex. A  http://www.delawareonline.com/apps/pdcs.dll/article?AID=/20070103/NEWS/70103026/0     1-26-07

Ex. B  " " " article? Date=20050925 & Category=NEWS & …   2/6/2007

Ex. B2  http://www.aegis.com/News/ap/2005/AP050831.html     2/5/2007

Ex. B3  http://www.wboc.com/global/story.asp?s=3770786&ClientType=Printable

CERTIFICATE OF SERVICE

I, David Williamson, plaintiff in CA No. 06-379-SLR do swear under penalty of perjury that I have served a true and correct copy of Plaintiff's Reply to FCM's motion to dismiss by placing same in a U.S. Mail receptacle on __15__ date of February 2007 addressed to the following:

Amy A. Quinlan, Esq.
Counsel for CMS, et al
500 Delaware Ave., Suite 1500
Wilmington, DE 19801-1494 and

Dana S. Monzo, Esq.
Counsel for FCM
1225 market St., Suite 1100
P.O. box 397
Wilmington, De 19899-0397

*/s/ David W.*

# EXHIBIT A

Welcome to The News Journal, Wilmington, Del.                    Customer Service | Subscribe Now | To advertise | Place an ad | Contact Us



DELAWAREONLINE | WEATHER | ENTERTAINMENT | JOBS | CARS | HOMES | APARTMENTS | CLASSIFIEDS | SHOPPING | VIDEO

Try our new search!    Search Delaware   All   [Go]   sponsored by: She said...


Find monkey-free employers!

TOOLBAR ON/OFF

SPECIAL REPORT

Subscribe
Email Story
Print Story
Discuss Story

In Depth



Delaware's Deadly Prisons

Online Extras

- Danberg gets nod to be next prison chief
- Danberg named to head state prisons
- Cost of prison agreement may hurt budget
- Danberg unanimously OK'd as prison chief
- Death of inmate, 24, astounds his family
- Prison chief admits not eyeing care
- Danberg confirmed by Senate to head state prison system
- Inmate's body returned to family; death still a mystery
- Inmate had been ill for a month, but cause of death is a mystery
- Meningitis feared in inmate's death
- Meningitis ruled out, but inmate's death a mystery
- Inmate found dead in prison infirmary may have had meningitis

Top StoryChat

- Car passes school bus on sidewalk, striking two children - 95 Comments

HOME > LOCAL

# Timeline of prison troubles

Problems brought to light in 2005 series in The News Journal

*The News Journal*
Posted Wednesday, January 3, 2007 at 4:23 pm

For six months in 2005, The News Journal examined conditions of care within the state's prisons. In late September 2005, the newspaper published a series of stories highlighting AIDS-related inmate deaths and suicides over the past four years; allegations by inmates of poor medical treatment for cancer, meningitis and hepatitis; and a no-bid $25.9 million contract awarded to St. Louis-based Correctional Medical Services to manage health care in the state's prisons.

In the series:

• Dr. Janet Kramer, of Wilmington, an expert in prison health care, said inmates should be screened for hepatitis C and HIV. But pretrial and convicted inmates in Delaware are not routinely screened when they are sent to prison or when they leave. Delaware prisons have become incubators for new strains of the AIDS virus, creating a public health crisis, experts say.

• Former prison doctor Ramesh Vemulapalli says a private medical company ordered him to treat inmates for HIV or hepatitis C, but not both. Delaware led the country in two of the past four years in the rate of inmates dying of AIDS.

• Inmates in Delaware kill themselves at twice the national rate. Dr. Carol A. Tavani, a neuropsychiatrist and executive director of Christiana Psychiatric Services, said new inmates should be counseled in person about suicidal tendencies, not simply given a "contract" to sign promising not to kill themselves.

• Unlike Pennsylvania and other states, Delaware does not have a medically trained state employee overseeing contract health providers. Maryland has its own statewide correctional accrediting agency, Delaware does not.

• The prison's grievance system is overseen by the medical vendor, not prison officials or an independent medical professional.

• Correction Commissioner Stan Taylor awarded the current $25.9 million medical contract – signed this year with Correctional Medical Systems of St. Louis – without putting the contract out for bid. Gov. Ruth Ann Minner approved the decision, but insisted it


Advertisement                  Ad Feedback »
Cardio
jazzercise


HOW TO SAY
APPLY NOW
Get a decision in 60 seconds.


Featured Job Videos powered by
View All
Confidential
011707a
Finch Services, Inc.
011207b
Horizon Blue Cross Blue Shield of New Jersey
011207i
Confidential
011207g
Confidential
011207e
Confidential
011207d
Confidential
66010707
AAA
88010707
Confidential
011207f
Waste Management
77010707

- 'an opportunity' - 41 Comments
- Glitz, glitches mark casino opening - 44 Comments
- Day 2: Men drift in blackness - 46 Comments
- Day 1: A thud, and water came pouring in - 36 Comments

News Choices

 Get Published
 Webcasts
 Wireless
 Text Alerts
 E-Newsletter
 RSS Feeds
 News Archive

was a contract extension even though CMS replaced First Correctional Medical of Tucson, Ariz., a different company.

- The state occasionally discharges convicted inmates early so neither the state nor its prison health care contractor has to pay medical costs, leaving the payments to families or the federal Medicaid program. Neither federal prison regulators nor the public is told about inmates who die after such discharges.

- The state does not routinely conduct autopsies on inmates who die in prison or those hospitalized at the time of their death, a policy the president of the National Association of Medical Examiners believes prevents evaluation of the quality of prison medical treatment. And if it does conduct autopsies, the results are sent to the medical vendor – not the prison.

- Dr. Robert Cohen, an expert in prison health care whom state and federal courts have appointed to monitor prisons in five states, said the state should investigate medical malpractice claims. Instead, the state's medical board occasionally takes complaints from inmates and their families about prison health care professionals, but it is only an advisory panel. The board's findings are confidential and given to the private medical vendor.



### 9/25/2005

The News Journal publishes the first of a four-day series on prison health care in Delaware. The report exposes how AIDS, hepatitis, flesh-eating bacteria and other communicable diseases percolate in prison and how inmates in their 20s and 30s are dying from diseases that people outside prison routinely survive.

- In 2003, Delaware had the nation's highest rate of AIDS-related prison deaths, 87 per 100,000 inmates, according to the U.S. Bureau of Justice Statistics report on HIV in state facilities. The 2003 score marks the second time in four years that Delaware's rate for AIDS-related deaths in prison was the nation's highest.

- The state's inmate death rate is higher than actually reported because some gravely ill inmates are quietly released days before they die, the newspaper's investigation shows. Because those inmates did not die in custody, their deaths go unreported to prison regulators.

- Delaware's prisoner suicide rate for 2001 and 2002 was double the national average of 14 per 100,000 inmates, according to the U.S. Bureau of Justice Statistics. According to the state Department of Correction, nine inmates have killed themselves since January 2000 - most by hanging.

- Like other states, Delaware has turned over health care inside its prisons to private companies specializing in inmate medical care.

- Whether they have been convicted or are awaiting trial, inmates in Delaware depend on the state for medical care. In states with county and city jails, care in smaller facilities usually is provided through a local hospital or physicians' group.

- National experts say most states employ a medically trained staff to monitor the medical vendors. Delaware does not. Here, the medical vendors oversee death investigations, regulate access to care, and control any complaints that arise over their work.

- Delaware's care of one inmate, a convicted child molester with a serious heart ailment, was so bad a Superior Court judge ordered him released early so he could get care at a private hospital.

- Inadequate care in the state's prisons poses a growing public health danger to communities outside those prisons. Inmates moving through cycles of confinement, release and arrest are developing new strains of the HIV virus, and those strains are passed to family members and sexual partners.

### 9/28/2005

FROM: DELAWARE CORRECTIONAL CENTER MAIN LAW LIBRARY

TO: David Williamson

S.B.I. NUMBER 183092   HOUSING UNIT: W-1

DATE YOUR REQUEST WAS RECEIVED 2-13-07

THE REQUEST THAT YOU SUBMITTED CANNOT BE PROCESSED BECAUSE:

\_\_\_\_ TUESDAY WEDNESDAY & THURSDAY EVENING APPOINTMENTS ARE FOR PAID WORKERS ONLY.

\_\_\_\_ YOU CANNOT REQUEST APPOINTMENTS FOR MORE THAN SEVEN DAYS IN ADVANCE.

\_\_\_\_ SIGNATURE, S.B.I. NUMBER OR HOUSING UNIT IS REQUIRED.

\_\_\_\_ A SIGNED PAY TO SLIP IS REQUIRED TO OBTAIN COPIES OF YOUR LEGAL DOCUMENTS. MADE PAYABLE TO THE DELAWARE STATE TREASURER

\_\_\_\_ THE PAPERS THAT YOU SUBMITTED FOR COPYING WILL NOT BE COPIED BECAUSE THERE IS NO SUPPORTING DOCUMENTATION.

\_\_\_\_ YOUR REQUEST IS ILLEGIBLE.

\_\_\_\_ RECEIVED TOO LATE TO SCHEDULE YOU FOR THE WEEK YOU REQUESTED.

\_\_\_\_ PLEASE COMPLETE THE ENCLOSED FORM(S) AND RETURN IT TO THE MAIN LAW LIBRARY AND YOUR REQUEST WILL BE PROCESSED.

XX OTHER: The Law Library does not photocopy Articles from the internet or newspapers, these can be referenced by the date and Publisher. You can send them to the DCC business office with a pay-to.

T. Martin

THANK YOU FOR YOUR COOPERATION.

A-1

# EXHIBIT B

**do delaware**

PRINT FORMAT
SPONSORED BY  **Homescape**

# Odds against inmates in grievances

By LEE WILLIAMS and ESTEBAN PARRA, The News Journal
Posted Sunday, September 25, 2005

Delaware's inmates file an average of 500 complaints a month over the quality of health care they get.

It begins when they're denied permission to see someone in the infirmary. At that point, an inmate can file a complaint.

All complaints go directly to Correctional Medical Services, the state's medical vendor, said Department of Correction Commissioner Stan Taylor, "so they can be handled at the local level."

Drewry Fennell, executive director of the American Civil Liberties Union of Delaware, said it can take months -- in some cases years -- for complaints to be resolved. Even when inmates are struggling with an illness, they must exhaust the prison's medical grievance process before taking the matter to court.

"I don't think the system is intentionally set up that way, but, yes, the odds are stacked against [the inmates]," said Gouri Bhat, a staff attorney with the ACLU's National Prison Project, a national organization that files lawsuits on behalf of inmates.

Representatives for Correctional Medical Services, which has a $25.9 million annual state contract, first investigate the grievance. If they determine the grievance is not valid, inmates can appeal to prison guards. The guards, who lack medical training, ask CMS for advice. The final decision rests with two senior Department of Correction officials, who also turn to CMS for advice on medical issues.

The paper trail is monitored by The Delaware Center for Justice, an inmate advocacy organization, which is paid $12,000 annually by the state for its services.

"Our level of intervention is to monitor the grievance process, and we do that," said DCJ's Executive Director Janet Leban. "But no, we don't add any medical expertise. You don't need a medical background to see what medical has recommended in terms of treatment or use of medication. Even with medical training, unless a doctor actually went in and examined someone, how would they know the person had the issues they're claiming to have? You just can't do that. That would be nuts."

Leban didn't know if any inmates had died waiting for their grievances to be resolved.

"It's certainly possible," she said.

Leban refused to release statistics about the grievance process or a copy of her state contract. The state rejected The News Journal's public records request for more grievance information, citing federal health privacy laws.

Taylor said he is searching for money to pay someone with medical training -- independent of the medical vendor -- to oversee the grievance process.

"I'm not completely satisfied with the grievance process," he said.

The ACLU's Fennell said changes need to be made.

"They've placed the administrative process in the hands of the defendant [medical vendor]," Fennell said. "It fails the basic test of administrative oversight. The system is broken."

### Circular process

Richard Siefert is the deputy bureau chief of prisons, the second highest-ranking official to oversee the grievance process. Inmates can appeal to Siefert and his boss, Paul Howard, chief of the bureau of prisons. Siefert has an MBA. Howard has a master's degree in counseling. Neither has medical training.

Last month, attorney Stephen Hampton deposed both men for two lawsuits he has filed against the state on behalf of families of inmates who died in prison. Siefert acknowledged that medical grievances and questions are referred back to the medical vendor, but he didn't consider that a conflict of interest.

In a sworn deposition, Siefert and Howard testified they had never considered that the medical vendor might delay or deny medical care to save money. Neither considered investigating whether an inmate had not received adequate care, nor did they ask others below them to investigate inmates' claims.

The Department of Correction, Siefert said, doesn't need to oversee the hundreds of medical complaints filed each month because it trusts the process used to select medical vendors.

"Every vendor, medical vendor that we have chosen has met that criteria," Siefert said in the deposition. "Part of that is not only do they have to have the certification, in order to get the certifications they have to have by history proven that they provide these services within medical industry acceptable best practices. So from my perspective, the selection of the vendor is the guarantee that these people are capable of delivering those things that they say they can."

Hampton, however, sees it differently. "What he's saying is, 'They're a good vendor, because if they weren't a good vendor, the state wouldn't have hired them,'" Hampton said. "It's absolutely crazy."

### Going to court

Courts are usually reluctant to interfere in the inmate grievance process, particularly federal courts, where judges often cite a 1995 Supreme Court decision that sets a high standard for complaints.

If an inmate sues for civil rights violations because of poor medical care, he must prove deliberate indifference -- reckless disregard for the consequences of one's acts or omissions. That's a higher standard than medical malpractice, said Jules Epstein, an associate professor at Widener University law school.

"It's really a heavy dereliction -- worse than dropping the ball," Epstein said. "The facts in evidence needed to show deliberate indifference to a serious medical need."

Epstein's law firm successfully sued Philadelphia over substandard jail conditions, but it took more than a decade and hundreds of thousands of dollars.

It's unusual, though, for lawyers to take up the cause of inmates. Most inmates don't have enough money to hire an attorney, so they represent themselves, a practice known as pro se. Documents are frequently handwritten and in layman's English; the courts allow pro se complaints to follow less stringent standards.

As an example, in a 2003 suit filed in U.S. District Court in Wilmington, inmate Jon R. Murphy wrote: "I have a herniated disk in my spine. I have tried to get a bottom bunk ... but have been denied, despite having X-rays and confirmation of the existence of the problem. I am 46 years old. This is not getting better or going away. I hope we can come to an understanding before further action is required."

Murphy did not get his bottom bunk. Judge Sue L. Robinson issued a 10-page ruling dismissing the defendants -- the Sussex Correctional Institution, the warden, CMS and two of its employees.

**Dismissed lawsuits**

In Delaware, CMS is named many times with other defendants, including the Department of Correction; its commissioner, Stan Taylor; and the medical provider's doctors and nurses. The suits are filed mostly by inmates representing themselves.

Most of the 114 prison health care-related lawsuits filed in U.S. District Court in Wilmington since 1988 -- including some naming First Correctional Medical, the Tuscon, Ariz., firm providing care for Delaware inmates from 2002 through most of July 2005 -- have been dismissed. Reasons given include improper addresses or the court's inability to locate the inmates, who are often moved to different facilities.

"It is certainly very hard for prisoners alone," said Bhat, of ACLU's National Prison Project, explaining that a 1996 federal law imposes filing fees on inmates, even if they don't have money. It also allows the court to review previous lawsuits for legitimacy before a new lawsuit can move forward. In addition, the law imposes limits on the amount recoverable if an inmate wins a claim.

Yet the U.S. Supreme Court has ruled that prisons must establish adequate law libraries for inmates or provide them with legal help.

Inmate George Robinson used one of those libraries to file numerous federal and state lawsuits alleging religious violations and unauthorized release of medical information, among other charges.

Each time he filed suit, he paid a $150 filing fee. He saved money by writing out the duplicates, instead of using the prison copy machine. Robinson said the work made him feel useful.

"The only recourse, other than violence, is to bring outside interference," said Robinson, who was released in March after serving nearly 30 years for arson, auto theft, robbery and assault. "If you don't have someone from the outside interfering, conditions are going to get worse and worse and worse."

**Copyright © 2007, The News Journal.** Use of this site signifies your agreement to the Terms of Service and Privacy Policy (updated 10/3/2005) Use of this site signifies your agreement to the Terms of Service and Privacy Policy (updated 10/3/2005)

B-2

[VIEW IN FRAME]

**Important note:** Information in this article was accurate in 2005. The state of the art may have changed since the publication date.







PRINT THIS ARTICLE

## Families Say Delaware Inmates Not Getting Adequate Care

*Associated Press - August 30, 2005*

DOVER, Del. - Louis Chance Jr., serving six months behind bars for his fourth drunken driving conviction but hoping to start a new life when he got out, was only a few weeks away from his release date when he began suffering severe headaches.

The headaches grew so agonizing that Chance became disoriented and incoherent, but his family says his pleas for help from prison medical workers went mostly unheeded. Instead, according to a lawsuit the family filed in federal court, Chance was deemed uncooperative and hostile and accused of trying to overdose on pain medication.

At one point, a doctor at Gander Hill prison in Wilmington prescribed "Tylenol and one cup of coffee per day," according to the lawsuit.

More than two weeks after he first reported feeling sick in September 2003, Chance, 37, lapsed into a coma and was sent to a Wilmington hospital. He died of cryptococcal meningitis, an infection and swelling of the membranes surrounding the brain that is one of the opportunistic infections associated with HIV.

Chance's family and other critics say too many inmates with HIV- and AIDS-related illnesses are dying because prison medical providers are more concerned about holding down costs than providing adequate medical care.

Department of Correction Commissioner Stan Taylor declined to comment on individual inmates' cases. Asked whether he was satisfied with First Correctional Medical Inc., the system's medical provider when Chance died, Taylor said noted the company maintained Delaware's National Commission on Correctional Health Care accreditation.

"They were a small regional operation and may not have fully understood all of the factors involved in a statewide contract," he added. Officials with First Correctional Medical did not return repeated telephone calls seeking comment.

The privately held company, based in Arizona, operates in a handful of other states. Its six-year contract with Delaware was worth more than $17 million a year.

In June, First Correctional Medical pulled out of the contract, forcing the department to sign a $25.7 million-a-year, no-bid contract with its previous medical services provider, Correctional Medical Services of St. Louis.

Ken Richmond, a lawyer suing First Correctional Medical and two of its doctors on behalf of the Chance family, said Chance's condition could have been diagnosed and treated had the contractor's doctors scheduled a CT or MRI brain scan.

"It's our belief that the death of Chance resulted from cost-containment polices," Richmond said. In its successful bid proposal to the Department of Correction in 2002, the company said it "fully intends to minimize offsite transports of inmates for any health care services ... not only are offsite visits expensive for the medical provider, but also for the Department of Correction that must incur high security expenses."

The end of First Correctional Medical's contract came after DOC officials requested an inspection earlier this year by the National Commission on Correctional Health Care. Taylor said both the NCCHC and the DOC's medical review committee had identified "some issues," but he declined to provide details.

In winning the contract, First Correctional Medical boasted of its "very low number of lawsuits ... and an overall positive record in carrying out every contract ever awarded."

Since coming to Delaware, a move that more than doubled the number of inmates for whom the company was responsible, First Correctional Medical has been the target of more than 40 lawsuits, the vast majority filed by Delaware inmates. Several have been dismissed for a variety of reasons - including the fact that inmates must go through an internal grievance process before they can seek relief in the courts.

Moreover, inmates claiming a violation of their constitutional rights must demonstrate their medical care was not just substandard or negligent, but the result of "deliberate indifference."

Since January 2000, 87 Delaware prison inmates have died while in custody, many, according to DOC press releases, "after a lengthy illness."

"That's what they put on everybody's," said Charlotte Waite of Milford, who said her 37-year-old son, Ronald Trotman, died in March from respiratory failure associated with AIDS. Trotman's family is trying to learn what happened in the days leading up to his being taken to Kent General Hospital with a collapsed lung.

"He was so skinny that he looked like the people from Ethiopia," said Waite, whose family was told by other inmates that Trotman was emaciated and had to use a wheelchair, but said prison officials assured them just days before he died that he was fine.

According to the medical examiner's office, Trotman weighed about 145 pounds when he died. His mother said that was about 30 pounds less than what he should have weighed. His death certificate states that he had AIDS and bilateral pneumocystis carinii pneumonia. However, prison officials told Trotman's family there was no information about HIV or AIDS in his medical records.

"(T)he physician records indicate that there had not been a diagnosis of HIV or AIDS ... , or any presentation that this illness might be present," Taylor wrote Trotman's sister, Rolanda, late last month. "All intake screenings, physicals and infirmary visits revealed no indication of HIV or AIDS."

Since no autopsy was performed, the cause of death, and the fact that he had AIDS, would have been determined from medical records, either those kept by First Correctional Medical or those made at the hospital, said Dr. Richard Callery, the state's chief medical examiner.

"There's got to be some sort of data out there with HIV," Callery said. Relatives of both Chance and Trotman said they did not know the inmates were HIV-positive, and that the inmates themselves may not have known.

Delaware, unlike some other states, does not require HIV testing for inmates.

"Their parents are not being notified that they're even sick," Waite said.

050830
AP050831

Copyright © 2005 - Associated Press. Reproduction of this article (other than one copy for personal reference) must be cleared through the AP Permissions Desk.

AEGiS is made possible through unrestricted grants from Boehringer Ingelheim, Bridgestone/Firestone Charitable Trust, Bristol-Myers Squibb Company, Elton John AIDS Foundation, the National Library of Medicine, and donations from users like you. Always watch for outdated information. This article first appeared in 2005. This material is designed to support, not replace, the relationship that exists between you and your doctor.

AEGiS presents published material, reprinted with permission and neither endorses nor opposes any material. All information contained on this website, including information relating to health conditions, products, and treatments, is for informational purposes only. It is often presented in summary or aggregate form. It is not meant to be a substitute for the advice provided by your own physician or other medical professionals. Always discuss treatment options with a doctor who specializes in treating HIV.

Copyright ©1980, 2005. AEGiS. All materials appearing on AEGiS are protected by copyright as a collective work or compilation under U.S. copyright and other laws and are the property of AEGiS, or the party credited as the provider of the content. comments@aegis.org.

B-3

<<Back

**WBOC 16 DELMARVA'S NEWS LEADER FOX 21 DELMARVA**

### Families Say Delaware Inmates Not Getting Adequate Care

**DOVER**, Del. (AP)- Louis Chance Jr., serving six months behind bars for his fourth drunken driving conviction but hoping to start a new life when he got out, was only a few weeks away from his release date when he began suffering severe headaches.

The headaches grew so agonizing that Chance became disoriented and incoherent, but his family says his pleas for help from prison medical workers went mostly unheeded. Instead, according to a lawsuit the family filed in federal court, Chance was deemed uncooperative and hostile and accused of trying to overdose on pain medication.

At one point, a doctor at Gander Hill prison in Wilmington prescribed "Tylenol and one cup of coffee per day," according to the lawsuit.

More than two weeks after he first reported feeling sick in September 2003, Chance, 37, lapsed into a coma and was sent to a Wilmington hospital. He died of cryptococcal meningitis, an infection and swelling of the membranes surrounding the brain that is one of the opportunistic infections associated with HIV.

Chance's family and other critics say too many inmates with HIV- and AIDS-related illnesses are dying because prison medical providers are more concerned about holding down costs than providing adequate medical care.

Department of Correction Commissioner Stan Taylor declined to comment on individual inmates' cases. Asked whether he was satisfied with First Correctional Medical Inc., the system's medical provider when Chance died, Taylor said noted the company maintained Delaware's National Commission on Correctional Health Care accreditation.

"They were a small regional operation and may not have fully understood all of the factors involved in a statewide contract," he added. Officials with First Correctional Medical did not return repeated telephone calls seeking comment.

The privately held company, based in Arizona, operates in a handful of other states. Its six-year contract with Delaware was worth more than $17 million a year.

In June, First Correctional Medical pulled out of the contract, forcing the department to sign a $25.7 million-a-year, no-bid contract with its previous medical services provider, Correctional Medical Services of St. Louis.

Ken Richmond, a lawyer suing First Correctional Medical and two of its doctors on behalf of the Chance family, said Chance's condition could have been diagnosed and treated had the contractor's doctors scheduled a CT or MRI brain scan.

"It's our belief that the death of Chance resulted from cost-containment polices," Richmond said. In its successful bid proposal to the Department of Correction in 2002, the company said it "fully intends to minimize offsite transports of inmates for any health care services ... not only are offsite visits expensive for the medical provider, but also for the Department of Correction that must incur high security expenses."

The end of First Correctional Medical's contract came after DOC officials requested an inspection earlier this year by the National Commission on Correctional Health Care. Taylor said both the NCCHC and the DOC's medical review committee had identified "some issues," but he declined to

provide details.

In winning the contract, First Correctional Medical boasted of its "very low number of lawsuits ... and an overall positive record in carrying out every contract ever awarded."

Since coming to Delaware, a move that more than doubled the number of inmates for whom the company was responsible, First Correctional Medical has been the target of more than 40 lawsuits, the vast majority filed by Delaware inmates. Several have been dismissed for a variety of reasons - including the fact that inmates must go through an internal grievance process before they can seek relief in the courts.

Moreover, inmates claiming a violation of their constitutional rights must demonstrate their medical care was not just substandard or negligent, but the result of "deliberate indifference."

Since January 2000, 87 Delaware prison inmates have died while in custody, many, according to DOC press releases, "after a lengthy illness."

"That's what they put on everybody's," said Charlotte Waite of Milford, who said her 37-year-old son, Ronald Trotman, died in March from respiratory failure associated with AIDS. Trotman's family is trying to learn what happened in the days leading up to his being taken to Kent General Hospital with a collapsed lung.

"He was so skinny that he looked like the people from Ethiopia," said Waite, whose family was told by other inmates that Trotman was emaciated and had to use a wheelchair, but said prison officials assured them just days before he died that he was fine.

According to the medical examiner's office, Trotman weighed about 145 pounds when he died. His mother said that was about 30 pounds less than what he should have weighed. His death certificate states that he had AIDS and bilateral pneumocystis carinii pneumonia. However, prison officials told Trotman's family there was no information about HIV or AIDS in his medical records.

"(T)he physician records indicate that there had not been a diagnosis of HIV or AIDS ... , or any presentation that this illness might be present," Taylor wrote Trotman's sister, Rolanda, late last month. "All intake screenings, physicals and infirmary visits revealed no indication of HIV or AIDS."

Since no autopsy was performed, the cause of death, and the fact that he had AIDS, would have been determined from medical records, either those kept by First Correctional Medical or those made at the hospital, said Dr. Richard Callery, the state's chief medical examiner.

"There's got to be some sort of data out there with HIV," Callery said. Relatives of both Chance and Trotman said they did not know the inmates were HIV-positive, and that the inmates themselves may not have known.

Delaware, unlike some other states, does not require HIV testing for inmates.

"Their parents are not being notified that they're even sick," Waite said.



WorldNow

All content © Copyright 2000 - 2007, WorldNow and WBOC. All Rights Reserved.
For more information on this site, please read our Privacy Policy and Terms of Service.
Send questions or comments about this web site to wboc@wboc.com.