ORIGINAL

IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE

DAVID W. WILLIAMSON, )
    Plaintiff, )
    v. )  C.A. 06-379-SLR
CORRECTIONAL MEDICAL SERVICES, Inc, et al, )
    Defendants. )

FILED
MAR 1 2 2007
U.S. DISTRICT COURT
DISTRICT OF DELAWARE

## PLAINTIFF'S THIRD SET OF REQUESTS FOR ADMISSIONS DIRECTED TO CORRECTIONAL MEDICAL SERVICES, INC

COMES NOW, plaintiff, Williamson pursuant to the appropriate Fed. R. Civ. P., Local Rule, and or case authority. Williamson attests that the instant discovery request is made in good faith, not meant to harass, inconvenience, or be overly burdensome to defendants or to delay these proceedings in any manner. Williamson requests defendants Correctional Medical Services, Inc. (CMS), to make the following admissions, where required under the applicable rules, under oath, within thirty-days of the date of service. (All definitions employed in Plaintiff's combined second set of requests for interrogatories and production of documents directed to Correctional Medical Services, Inc." (CMS) is incorporated herein).

### THIRD SET OF ADMISSIONS

1. An ACL injury in which the ligament is ruptured, the meniscus discs are deteriorating, and contusions to the upper and lower leg bones are occurring (instant ACL injury hereafter) is an objective serious medical condition.
2. The instant ACL injury significantly impairs one's normal daily functions.
3. The instant ACL injury –left untreated for an extended period (i.e. a year or more) causes significant further deterioration and injury to the knee.
4. The instant ACL injury –including the highly unstable nature and proneness to hyperextensions of the knee- causes significant and likely risk of falling/collapsing incidents.
5. The instant ACL injury –including the highly unstable nature and proneness to hyperextensions of the knee- requires the use of a rigid framed knee brace to protect against the inherent incidence of hyper-extensions and instability of the knee.
6. The instant ACL injury –including the highly unstable nature and proneness to hyperextensions of the knee- is known to cause significant pain and suffering.
7. CMS/medical staff failed to consult Dr. DuShuttle relating to the Don Joy ACL knee brace and or any suitable alternative knee brace for Williamson as late as October 2006.
8. CMS/medical staff failed to consult DDOC/DCC Security Staff relating to the Don Joy ACL knee brace and or any suitable alternative knee brace for Williamson as late as October 2006.
9. CMS was fully aware of Williamson's instant ACL injury as of June 2006 (circa), -including that it required a special ACL knee brace (e.g. Don Joy ACL or suitable alternative with rigid plastic frame, etc).
10. There was no legitimate or penological factors for delaying Williamson's needed reconstructive knee surgery for some seven months.
11. There was no legitimate medical or penological factors for denying Williamson the needed Don Joy ACL and or suitable rigid plastic framed alternative knee brace.
12. A seven month delay in providing said needed reconstructive surgery for Williamson's instant ACL injury exposed Williamson to the following:
    a) Unnecessary pain and suffering;
    b) Unnecessary permanent injuries;
    c) Unnecessary and significant impairment of his normal daily functions;

    d) Unnecessary and significant risk or future injury –including falling/collapsing incidents;
    e) Unnecessary loss of enjoyment of life;
    f) Unnecessary and significant further deterioration of the knee and its related parts, which may be permanent; and
    g) Unnecessary loss of earning capacity due to impairment of Williamson's ability to perform his profession as a martial arts instructor.

13. Williamson exhausted all available administrative remedies relating to MG # 37123 & 78623, of which related to CMS's deliberate indifference to Williamson's objective serious knee injury, inordinate delay in providing the known and needed reconstructive surgery, and denial of a suitable knee brace, and that CMS knowing provided a substandard knee brace that unnecessarily exposed Williamson to further injury.

14. Durst and or DuShuttle admitted that the Dynamic Pull Wrap knee brace that CMS supplied for Williamson's instant ACL injury was substandard and failed to protect the unstable knee from dangerous hyper-extensions and or inherent falling/collapsing incidents.

15. Seven month delay in providing reconstructive knee surgery for Williamson's instant ACL injury is an unnecessary and inordinate delay that is in conflict with legitimate medical criteria/recommendations.

16. Currently at DCC are inmate patients who have been provided medical devices that contain metal –including telescopic tubular metal canes and or mechanical devices, etc.

17. Knee braces exist that are constructed primarily with rigid frames of plastic or like materials that have minimal metal fastenings that offer suitable protection –including superior protection to a Dynamic knee wrap made of neoprene and Velcro- that protects an injured knee with the instant ACL injury.

18. Such a knee brace –at 17- would be a marked improvement to the Dynamic knee wrap, which was provided to Williamson.

19. Dental care for active periodontal infections (perio infections) includes the following:

    a) Antibiotics;
    b) Teeth/gum cleaning/scrapings;
    c) Antibacterial mouth wash;
    d) Root canal for recurring/chronic cases; and
    e) Pain medications.

20. Recurring perio infections require a minimum of semi-annual teeth/gum cleanings/scrapings.

21. Active perio infections cause a significant and serious threat to health –including possible heart damage from infection spreading in the blood stream/circulatory system.

22. Active perio infections are considered medical emergencies under the Inmate Grievance Procedure 4.4. (IGP).

23. Standard/recommended dental care for active and or recurring perio infections is not considered cosmetic dental care, but required medical care.

24. Active perio infections require immediate standard dental care (e.g. teeth/gum cleanings, etc.), and in chronic outbreaks immediate antibiotics and or root canal.

25. A year delay in providing the standard perio infection dental care –including teeth/gum cleanings/scrapings- following a perio infection incident is an inordinate delay.

26. The inordinate delay described in 25 above is likely to cause the following:

    a) Recurring perio infections;
    b) Permanent injury and tooth loss;
    c) Unnecessary pain and suffering; and
    d) Irreparable injury to teeth or gums.

27. CMS employs a blanket prohibition against providing root canals despite the medical needs of a patient.

28. CMS failed to provide needed emergency dental care to Williamson for his repeat periodontal infections.

29. Williamson experienced permanent tooth loss on 3-11-05 related to his recurring perio infections, which were under treated.

30. A broken tooth –that has sheared in half down to the gum line and is exposing a raw nerve (Williamson's dental emergency hereafter), is clearly an objective serious medical condition and is known to cause acute pain and suffering.

31. Williamson's dental emergency is a clear emergency medical condition under the IGP.

32. Williamson filed a request on 01-08-06 for dental care for said dental emergency.

33. Zimble denied any dental care for Williamson's dental emergency on each and every date in which Zimble saw Williamson –including a denial of pain meds.

34. Zimble's repeat denials of needed emergency dental care for said dental emergency were not the product of (a) any legitimate medical factors or (b) any exercise of professional medical judgment.

35. Zimble admitted that Williamson's dental emergency medically required a "crown."

36. Zimble admitted and or announced to Williamson that Zimble was prohibited from providing the needed crown by CMS custom/policy (e.g. "Budgetary, it simply is not in our Budget.").

37. Williamson's dental emergency caused him the following:
   (a) Unnecessary pain and suffering for some forty days;
   (b) Unnecessary permanent injury;
   (c) Unnecessary and acute loss of enjoyment of life while he was denied the needed treatment;
   (d) Unnecessary loss of sleep;
   (e) Unnecessary loss of work/school; and
   (f) Unnecessary impairment of ability to eat solid food for some forty day.

38. Zimble inquired of Williamson whether the broken tooth was painful and Williamson emphatically affirmed that it was very painful, but Zimble denied to provide any dental care or any pain meds whatsoever despite the obvious need.

39. Williamson fully exhausted all available administrative remedies relating to Williamson's dental emergency and CMS's deliberate indifference to it.

40. Zimble admitted that a composite repair was (a) clearly substandard, (b) temporary in nature, and (c) likely to fail.

41. Zimble announced that the only alternative -in view of CMS custom/policy prohibiting crowns- was to extract the broken tooth.

42. CMS failed to (a) provide the needed immediate emergency dental care for Williamson's dental emergency, (b) failed to provide immediate care relating to Williamson's EMG # 23193 dated 01-12-06; failed to provide the minimal standard dental care: a crown; (d) admittedly provided a substandard temporary composite repair; and (e) created an unnecessary and inordinate delay in providing even the substandard dental care; and (f) unnecessarily exposes Williamson to a likely repeat dental emergency episode when the temporary repair fails.

43. CMS/medical staff had repeat notice/knowledge of Williamson's dental emergency but maliciously and or with gross disregard caused Williamson to suffer unnecessarily for some forty days; however, absent legitimate medical factors.

44. CMS constructively determined that Williamson's dental emergency –listed in EMG #23193- was not an emergency when it failed to render immediate dental care within the mandated 24 hours pursuant to IGP, and as such violated IGP.

45. Bishop admitted on 02-24-06, that Williamson's dental emergency required a crown and also added that because the nerve was exposed for so long and damaged, Williamson's dental needs now required a root canal, too.

46. Bishop admitted that the composite repair was temporary in nature that it would not last the duration of Williamson's sentience (i.e. nine years).

47. CMS -via its blanket policy/custom prohibiting crowns despite medical needs- and or through admittedly providing a temporary repair does expose Williamson to a substantial and likely risk of future dental emergency episode when the temporary composite fails.

48. CMS has a history of providing temporary repairs (e.g. fillings, etc), that have repeatedly failed.

49. Repeat acute perio infections in the same area/teeth eventually destroy the tooth's roots and bone and subsequently cause tooth loss if left untreated and or under treated.

50. On 10-31-06 dentist Kinoke also outlined CMS's blanket custom/policy prohibition against needed crowns despite medical needs in response to EMG #23193.

51. Between December 2001 and May 2001, Williamson experienced multiple acute perio infections –including several in the same area- which ultimately caused Williamson's tooth loss of March 11, 2005.

52. Robinson accurately diagnosed Williamson with recurring active and acute perio infections on or about 12-04-2001, and stated Williamson's infections required a root canal, but refused to provide it due to CMS's custom/policy of prohibiting same.

53. Robinson even notified Williamson that he could likely expect to experience tooth loss as a result of the recurring perio infections. (i.e. under treated perio infections).

54. Williamson's tooth loss of March 11, 2005, was a direct and proximate result of said recurring perio infections, which were untreated/under treated.

55. Williamson's permanent injury was avoidable had it not been for CMS's custom/policy of not treating/under treating his perio infections.

56. Date of discovery of Williamson's permanent tooth loss is the date that he was informed that they could no longer be saved and would have to be extracted (e.g. 03-04-05).

57. CMS/medical staff did not provide a Clinic and or any medical care/visit to Williamson on 08-31-06 despite claims by Eller on 09-27-06 at the grievance hearing (# 59170) of doing so.

58. Eller's notice/claims of providing a Clinic in August 2006 was false.

59. Eller's false claim was in response to Williamson's grievance activity.

60. CMS manipulated and or attempted to deny Williamson meaningful and timely access and or attempted to deny access to the grievance process by falsifying the Clinic in response to grievance # 59170.

61. Williamson nevertheless exhausted the administrative grievance process via his extraordinary efforts.

62. CMS's acts in # 58-60 equate to an effort to deny Williamson meaningful access to the courts relating to Williamson's claims of retaliation against Williamson for his grievance activity.

_/s/ David W_____         3-9-07
David Williamson, SBI #183022            Date
1181 Paddock Rd.
Smyrna, DE 19977

## AFFIDAVIT OF MAILING

I David Williamson, pro se plaintiff, do swear that I have caused the following documents to be placed in a U.S. Mail Receptacle on ___9___ day of ___March___ 200_7_ :

1. Plaintiff's Combined Third Set of Requests for Interrogatories & Production of Documents Directed to Correctional Medical Services, Inc.

2. Plaintiff's Second Set of Requests for Admissions Directed to Correctional Medical Services, Inc.

3. Plaintiff's Third Set of Requests for Admissions Directed to Correctional Medical Services, Inc.

4. N/A

These originals/true copies were addressed to the following parties:

1. Amy A. Quinlan, Esq.
(Counsel for CMS, CLARK, CHUKS, LOVE & Zimble) 500 Delaware Ave.
Suite 1500, P.O. Box 2306
Wilm., DE 19899-2306

2. Dana S. Monzo, Esq.
(Counsel for FCM)
1225 N. King St.
Suite 1100, P.O. Box 397
Wilm., DE 19899-0397

3. N/A

4. N/A

The above is signed under penalty of perjury.

/s/ David W.

David Williamson

/s/ David W.