ORIGINAL

IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| DAVID W. WILLIAMSON, | ) |
| Plaintiff, | ) |
| v. | ) C.A. 06-379-SLR |
| CORRECTIONAL MEDICAL SERVICES, Inc, et al, | ) |
| Defendants. | |

PLAINTIFF'S SECOND SET OF REQUESTS FOR ADMISSIONS DIRECTED TO CORRECTIONAL MEDICAL SERVICES, INC

COMES NOW, plaintiff, Williamson pursuant to the appropriate Fed. R. Civ. P., Local Rule, and or case authority. Williamson attests that the instant discovery request is made in good faith, not meant to harass, inconvenience, or be overly burdensome to defendants or to delay these proceedings in any manner. Williamson requests defendants Correctional Medical Services, Inc. (CMS), to make the following admissions, where required under the applicable rules, under oath, within thirty-days of the date of service. (All definitions employed in Plaintiff's combined second set of requests for interrogatories and production of documents directed to Correctional Medical Services, Inc." (CMS) is incorporated herein).

SECOND SET OF ADMISSIONS

1. Defendants C. Malaney, D. Plante, S. Alie, and M. Robinson were employed by CMS in some capacity for part or all of the relevant time periods of Williamson's claims.

2. CMS is a private-for-profit company in the business of providing healthcare in the institutional/correctional setting.

3. CMS has over twenty-five years experience as a healthcare provider (HCP) within the correctional setting.

4. CMS claims to be the "nations leading provider of correctional healthcare..." in its web site.

5. The distribution of medications for Self Meds is a routine function of CMS.

6. Chronic diseases are the equivalent of an objective serious medical condition.

7. Williamson is a chronic-care patient the chronic-care condition of hypothyroidism, and has been throughout CMS's active service period with DDOC.

8. Hypothyroidism requires medication (e.g. Levothyroxine or Synthroid and vitamins) (CC Meds) to be taken at about the same time daily and uninterrupted to effectively manage the disease's chronic symptoms and or its residual/aggregate effects.

9. Notable serious chronic symptoms or hypothyroidism include:

   a) Chronic fatigue (physical and mental);

   b) Mental impairment (i.e. confusion or difficulty in organizing thoughts);

   c) Dangerous inflammation;

   d) Marked increase in weight gain and or obesity;

   e) Marked increase in cholesterol;

   f) Clinical depression;

   g) Aloepecia (partial or total hair loss about head and or body); and or

   h) Slow or reduced bowel movements.



FILED
MAR 12 2007
U.S. DISTRICT COURT
DISTRICT OF DELAWARE
BP Scanned

10. Interruptions in the CC Meds' daily regiment causes one to suffer any or all of the above chronic symptoms at # 9 (i.e. resurgence of symptoms).

11. Chronic fatigue and or acute lack of energy are known to impair one's normal daily functions. (e.g. enjoyment of life, ability to promote good health via exercise, etc.).

12. Long-term effects (e.g. over a year for instance), of interruptions of CC Meds that cause said resurgence of chronic symptoms of hypothyroidism (e.g. marked weight gain and cholesterol production, and chronic fatigue and inflammation in blood stream, etc) poses a significant and likely threat to future health.
13. Long-term effects ( #9 -12) are is likely to damage the coronary and or cardiovascular system.
14. Long-term effects ( #9 -12) pose a significant and likely threat of end organ damage –including hearth damage, etc.
15. Williamson has experienced twelve CC Meds interruptions (CCMI) from July 2005 thru February 2007.
16. The CCMI(s) were unnecessary and easily avoidable.
17. Nine of the twelve CCMI(s) were aggravated because the CMS on-site pharmacy actually possessed the lapsed CC Meds during the CCMI, but failed to dispense them to Williamson in a timely fashion.
18. Williamson provides CMS medical staff with adequate notice/requests for CC Meds before all twelve CCMI(s).
19. Williamson provided CMS and its medical staff with several notice/complaints that he was unnecessarily suffering the resurgence of chronic symptoms due to the CCMI(s).
20. Williamson provided CMS and its medical staff with several notice/complaints that he was unnecessarily suffering the significant impairment of his normal daily functions as a result of the resurgence of chronic symptoms due to the CCMI(s).
21. Williamson provided CMS and its medical staff with several notice/complaints that he was unnecessarily suffering the significant acute emotional and mental distress, anxiety, frustration, and depression as a result of the resurgence of chronic symptoms due to the CCMI(s).
22. Williamson's clinical depression was and is a direct and proximate result of the CCMI(s), of which equates to the under treatment of his chronic disease.
23. The CCMI(s) described at # 15 are indicative of a pervasive and systemic breakdown in healthcare services.
24. Systemic breakdowns in healthcare services that relate to –including repeat interruptions in care- for chronic diseases is a failure that obviously mandates immediate corrective action.
26. Williamson fully and adequately exhausted the administrative remedies available relating to the (1) CCMI(s) and or (2) denial of Clinics, and or (3) retaliation or adverse acts relating to 1 and 2.
27. Several of the CCMI(s) were unnecessarily caused and or aggravated because CMS medical staff denied or refused to conduct a timely Clinic for Williamson.
28. There were no legitimate medical or penological factors involved with failing to conduct timely Clinics for Williamson.
29. Williamson –as early as November 2005- provided full and adequate notice of items 27 and 28 to CMS Delaware offices.
30. CMS failed to correct the denials or untimely Clinics and said acts continued as late as September and October 2006.
31. Williamson's CC Meds are designated Self Meds, which means that they are supposed to be provided to him in thirty dose cords/lots. ( CC Med Cards)
32. Williamson's CC Med cycle normally consists of 120 total doses (i.e. four thirty dose cards/lots).
33. The medication administration distribution system (MADS) is designed to ensure uninterrupted service of CC Meds by providing subsequent med cards within and prior to the final five or so doses lapsing.
34. The MADS also is designed to ensure uninterrupted service of CC Meds by providing subsequent Clinics on or around the ninety-day mark of the preceding Clinic.
35. Employed as designed, the MADS would limit the opportunity for CCMI(s) significantly.
36. CMS intentionally fails to employ the MADS as designed and or fails to employ a meaningful alternative MADS.
37. CMS with gross reckless disregard operates a knowingly failed and or significantly impaired MADS.
38. CMS medical staff normally places a 120 dose order/prescription for Williamson's CC Meds at a Clinic.
39. CMS employs a "Fax and Fill' system for its prescription drugs, which normally results in the prescriptions being filled within 24 hours, but normally not longer than 48 hours –absent supply problems and or inclement weather.
40. There is no legitimate medical or other reason –absent supply problems and or inclement weather, for an ordered prescription medication to exceed a lapse of four days.
41. CMS employs a log (Med Log) that records what type and the amount of Self Meds –including when a patient picks them up- at its on-site pharmacy and or hospital at DCC.
42. Said Med Log enables CMS to easily calculate when the next Self Med card would be due for disbursement.
43. In regards to items # 41 & 42, CMS medical staff require no actual notice or request from any Self Med patient to determine when a replacement CC Med card is due to avoid any CCMI.
44. In regards to subsequent Clinics, CMS medical staff require no actual notice or request from any chronic care patient to determine when ninety-days has elapsed and thus schedule/provide the next needed Clinic.
45. Despite CMS possessing said Med Log, it still causes Williamson unnecessary and avoidable CCMI(s).
46. Despite CMS possessing the Med Log, it still employs arbitrarily and unnecessary procedures that actually hinder and or obstruct the orderly administration of CC Meds: That a chronic-care patient must alert staff at about his five final doses and request his next available Self Med card.
47. Despite CMS possessing the Med Log, its employment of arbitrary and unnecessary procedures at # 46 serve as a pretext to cause and or rationalize the CCMI(s) with illegitimate excuses.
48. Despite knowing the date of previous Clinics, CMS still refused to conduct several subsequent needed Clinics for Williamson, which contributed to the cause of CCMI(s).

49. CMS possessed an alternative supply of Levothyroxine and or Synthroid in its Stock Supplies –at its on-site pharmacy- and could have corrected several of Williamson's CCMI(s) but failed to do so until doctor Burns provided stock supplies to Williamson in January 2006.
50. An interruption/denial of prescribed care (i.e. CC Meds) for a chronic-care patient constructively equates to a medical emergency that requires immediate corrective action.
51. CMS's contractual duties include responsibility for any and all medical and or emergency medical grievances (MG or EMG)–including hearing, processing, and or resolving them.
52. Relating to MG/EMG, CMS as the HCP is ultimately responsible for them.
53. Any logistical or clerical assistance that DDOC provides CMS that relates to MG/EMG does not diminish or absolve CMS's legal duty/responsibility for said MG/EMG –including managing or resolving them in a timely and effective manner.
54. By accepting DDOC's logistical or clerical assistance relating to MG/EMG, CMS constructively accepts DDOC staff as agents in this respect.
55. Inmate Grievance Procedure 4.4. (IGP) relating to "Emergency Grievance" mandates the following: a) "Issues that concern substantial risk of personal, physical, or psychological inmate injury shall be addressed immediately by the Warder/Warden's Designee" ([W/WD]) ... b) ...[W/WD] shall respond within one calendar day..." and c) If the [W/WD] should determine that the grievance does not meet the emergency criteria, the grievance shall be returned... for ...normal IGP process steps."
56. The Warden's Designee relating to medical emergency –via an EMG- is accordingly the HCP –who is CMS at the time.
57. CMS employs no active means of screening or determining emergencies that relate to EMG(s) or whether any actual emergency exists within the meaning of IGP –including the one calendar day determination and or immediate response.
58. The Third Circuit Court of Appeals in Spruill v. Gillis, 372 F.3d 218 (3d Cir. 2004) (held –in part- (2) procedural default component of the PLRA administrative exhaustion requirement is governed by the applicable state prison grievance system).
59. The Spruill holding governs and applies to the DDOC grievance procedure IGP 4.4.
60. Relating to applicable grievance procedures, the Spruill Court found that it is " a matter of statutory construction-it turns on the interpretation of the Grievance System Policy..." and that it is necessary to "look to the rules governing the prison's grievance system to ascertain... what 'shall,' 'should,' and 'may' be included in a grievance...."
61. It is a natural consequence of Spruill that if any of the DDOC's IGP rules establish and or mandate certain actions or duties on a party to the grievance, than it is binding and controlling on that party, and or the failure to perform will likely create a default.
62. Because the PLRA mandates an inmate to exhaust all available administrative remedies or face dismissal of his federal claims, any impediment or denial of the administrative process –not attributable to the inmate grievant- that has the effect of precluding a grievant from completing said exhaustion is a defacto denial of meaningful access to the courts.
63. Williamson filed EMG # 15453 on or about 7-15-05 for the denial /interruption of his CC Meds.
64. CMS processed EMG # 15453 as normal, thus CMS's act is a constructive decision that no emergency existed.
65. EMG # 15453, however, was not actually screened by CMS for the presence of any emergency in violation of IGP.
66. CMS held the first informal grievance hearing for EMG # 15453 on 7-28-05 –thirteen days after it was filed.
67. Because a CCMI causes Williamson to suffer a resurgence of chronic symptoms, of which include creating a substantial and likely risk of future personal injury and or psychological injury, any CCMI of his CC Meds constitutes an emergency pursuant to IGP.
68. CMS has failed to establish policies or procedures to address EMG(s) pursuant to IGP.
69. CMS has failed to establish policies or procedures to address the ongoing incidence of CCMI(s) (i.e. emergencies).
70. Williamson filed no less than four MG(s) relating to the CCMI(s) against CMS of which spanned from July 2005 thru July 2006.
71. On all four occasions (e.g. EMG # 15453, MG # 17197, MG# 21201 and MG # 59170), CMS failed to respond "immediately" within the meaning of IGP.
72. On 11-11-05 Chuks denied to provide Williamson with his Clinic, which was needed to place a Refill order for CC Meds.
73. There were no legitimate medical or penological factors involved in Chuks denial of said Clinic, and CMS staff was responsible for Williamson's tardiness by failing to place his name on the "Offender Activity Schedule" that day.
74. Alternatively, Chuks refused to place a Refill order for Williamson's CC Meds also on 11-11-05.
75. Williamson filed MG # 21201 on 11-14-05 due to Chuks's denial of the 11-11-05 Clinic and noted that said denial would likely cause an unnecessary CCMI, which would violate agreements made by CMS relating to MG # 15453
76. Chuks and Plante were scheduled and present at the DCC hospital on 11-29-05.
77. Williamson was re-scheduled for a Clinic on 11-29-05.
78. Williamson was again denied his needed Clinic on 11-29-05.
79. No refill order was placed for Williamson's CC Meds on 11-29-05.
80. Refusal to conduct either of the 11-11-05 and or the 11-29-05 Clinics and or place a refill order for Williamson's CC Meds caused a CCMI of 28 days (e.g. 12-07-05 until 1-04-06).
81. Williamson filed an Addendum t MG # 21201 dated 11-30-05 raising claims of prohibited retaliation by Chuks for the 11-29-05 Clinic denial, which occurred shortly after his filing of MG # 21201, and CMS offices received a copy.

82. CMS failed t conduct any hearing relating to MG # 21201 until 11-14-06 circa.
83. CMS continued t fail to conduct timely Clinics for Williamson, which resulted in additional CCMI(s), after the filing of MG # 21201.
84. MG # 59170 was filed on 7-30-06 and it complained of the tenth consecutive CCMI.
85. MG # 59170 also involved the denial and or failure to conduct a timely Clinic over the Aug/Sept. 2006 period.
86. In response to MG # 59170, CMS representative Gail Eller claimed that a Clinic had been held on 8-31-06.
87. Eller even disclosed a fictitious conversation that allegedly occurred between medical staff and Williamson on the 8-31-06 fabricated Clinic.
88. CMS never provided any Clinic to Williamson on 8-31-06 –nor was a Clinic provided until 10-18-06.
89. Williamson worked all day –uninterrupted- at his work site at Bldg. # 15 on 8-31-06.
90. No refill for Williamson's CC Meds was ever placed on 8-31-06, which would have occurred had CMS actually conducted a Clinic as claimed by Eller at the grievance hearing.
91. The events claimed/disclosed by Eller relating to MG # 59170 (i.e. fictitious Clinic, etc.), is a fabricated entry in Williamson's medical file.
92. Fabricating medical entries/records in response to a MG is an adverse action prohibited under IGP.
93. Williamson filed a reprisal grievance RG # 72883 (dated _____), for the adverse acts disclosed/perpetrated that referred to MG # 59170.
94. CMS conducted the first hearing for RG # 72883 on 10-18-06 with CMS representative D. Rodweller.
95. CMS offered –via Rodweller- to permit Williamson to inspect his medical records referring to RG # 72883, but CMS's offer turned out to be a bad faith offer, because to date CMS never honored it.
96. Though, Williamson completed –in writing- on 10-20-06 a request to inspect and copy said medical records, CMS never complied to date.
97. CMS held the second hearing for RG # 72883 on 11-14-06 and provided Williamson with the Formal Final Appeal form.
98. Williamson completed and filed a timely Final Appeal for RG # 72883 and forwarded copies to Deputy Warden Pierce and the Bureau Chief on or about 11-17-06.
99. Williamson has complied with all IGP requisites and available procedures relating to RG # 72883; however, he has been denied any final decision.
100. Facts above at 97-99 act to improperly preclude and or deny Williamson timely and effective access to the administrative grievance process (AGP).
101. Facts above at 97-100 constitute a defacto denial of meaningful access to the courts for Williamson.
102. CMS's failure to provide Williamson with a timely Aug/Sept. 2006 Clinic –not actually providing one until 10-18-06- caused an unnecessary nineteen day CCMI (from 10-05-06 thru 10-25-06).
103. Denial of timely Clinics referred to in 59107 and 72883 is a recurring act that is substantially similar to denials listed in MG # 21201.
104. Facts of # 103 constitute a systemic breakdown in the chronic care services, of which have aggravated the CCMI(s).
105. The so-called "new medication distribution system" referenced by S. Altman in his 4-25-06 memo is/was in fact substantially similar to the prior MADS that CMS employed in its prior contract with DDOC.
106. The so-called "new medication distribution system" referenced by S. Altman in his 4-25-06 memo is/was in fact substantially similar to the in place on 7-28-05 which was referenced by Mr. Linton. (e.g. MG # 15453).
107. The MADS referenced by CMS as being new in June/July 2006 is not materially different from the one employed throughout 2005 by CMS.
108. Employing a Tickle/calendar scheduling system for the scheduling of Clinics (e.g. every ninety days), would likely reduce the incidence of CCMI(s).
109. Employing a Tickler/calendar scheduling system for the distribution of CC Meds (e.g. automatically distribute CC Meds within final five doses), would likely reduce the incidence of CCMI(s).
110. CMS already possesses all the information necessary to establish a Tickler/calendar order and or scheduling system for both Clinics and or CC Meds refills.

_David W_____    3-9-07_
David Williamson, SBI #183022          Date
1181 Paddock Rd.
Smyrna, DE 19977

## AFFIDAVIT OF MAILING

I David Williamson, pro se plaintiff, do swear that I have caused the following documents to be placed in a U.S. Mail Receptacle on ___9___ day of __March__ 200_7_:

1. _Plaintiff's Combined Third Set of Requests for Interrogatories & Production of Documents Directed to Correctional Medical Services, Inc._

2. _Plaintiff's Second Set of Requests for Admissions Directed to Correctional Medical Services, Inc._

3. _Plaintiff's Third Set of Requests for Admissions Directed to Correctional Medical Services, Inc._

4. _N/A_

These originals/true copies were addressed to the following parties:

1. Amy A. Quinlan, Esq.
(Counsel for CMS, CLARK, CHUKS, LOVE & Zimble) 500 Delaware Ave.
Suite 1500, P.O. Box 2306
Wilm., DE 19899-2306

2. Dana S. Monzo, Esq.
(Counsel for FCM)
1225 N. King St.
Suite 1100, P.O. Box 397
Wilm., DE 19899-0397

3. N/A

4. N/A

The above is signed under penalty of perjury.

_David W_____

David Williamson

_David W_____

I/M David Williamson
SBI# 183022   UNIT W-1, L-12
DELAWARE CORRECTIONAL CENTER
1181 PADDOCK ROAD
SMYRNA, DELAWARE 19977





Clerk of the U.S. District Court
844 North King St.
Lock box 18
Wilm., DE
      19801