IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| DAVID W. WILLIAMSON, )<br>   Plaintiff, )<br>v. )   C.A. 06-379-SLR<br>CORRECTIONAL MEDICAL SERVICES, Inc, et al, )<br>   Defendants. | |

PLAINTIFF'S FIRST SET OF REQUESTS FOR ADMISSIONS DIRECTED TO DEFENDANT ALAN ZIMBAL

COMES NOW, plaintiff, Williamson pursuant to the appropriate Fed. R. Civ. P., Local Rule, and or case authority. Williamson attests that the instant discovery request is made in good faith, not meant to harass, inconvenience, or be overly burdensome to defendants or to delay these proceedings in any manner. Williamson requests defendant Alan Zimbal (Zimbal) to make the following admissions, where required under the applicable rules, under oath, within thirty-days of the date of service. (All definitions and directions employed in Zimbal's first set of requests for interrogatories directed to plaintiff Williamson are incorporated herein). Added to Zimbal's definitions and directions are the following:

DEFIITIONS

1. "Generally accepted professional standards" means those industry standards accepted by a significant majority of professionals in the relevant field, and reflected in the standards of care such as those published by the National Commission on Correctional Health Care (NCCHC) for sentenced inmates.
2. The terms "adequate," "appropriate," and "sufficient" refer to standards established by clinical guidelines promulgated by professional organizations in the relevant field.
3. "Include" or "including" means "include, but not limited to" or "including, but not limited to."
4. "Medical staff" means medical professional, nursing, certified medical assistant, and or pharmacy staff.
5. CMS shall mean defendant Correctional Medical Services, Inc, and include the entity's owners, principals, officers, subsidiaries, and/or partners.
6. DDOC shall mean Delaware Department of Correction.
7. DCC shall mean Delaware Correctional Center.

FISRT SET OF ADMISSIONS



1. On 12-07-05 Zimbal reviewed Williamson's dental records and acknowledged Williamson's periodontal disease.
2. As of 12-7-05 Williamson had not been provided any prior periodontal teeth/gum cleaning in over eighteen months.
3. Generally accepted professional standards for persistent and or chronic periodontal disease include the following:
    a. Below gum-line teeth/gum cleaning; b. Antibiotics for active infections; c. Semi-annual teeth/gum cleaning; d. Antibacterial mouthwash; and e. Root canal for acute or frequently recurring cases of perio-infections.
4. On 12-7-05, despite acknowledging Williamson's periodontal disease, Zimbal failed to provide items b-e above.
5. On 12-7-05, Zimbal administered a teeth/gum cleaning for Williamson that failed to provide any picking, scraping, polishing, or flossing.
6. On 12-7-05, Zimbal's teeth cleaning at item 5 above lasted no longer than five minutes.
7. On 12-7-05, Zimbal's teeth cleaning at item 5 above was not recognized under the generally accepted professional standards expected for a chronic periodontal disease patient.
8. Repeat chronic periodontal infections –that result in tooth loss- are an objective and or obvious serious medical condition.
9. Active periodontal infections, in which the tooth or teeth become abscessed, are known to be acutely painful.
10. Repeat chronic periodontal infections –that result in tooth or teeth loss- are believed to involve the following health risks:

a. Heart or coronary infections; b. Heart attacks or strokes; and c. Tooth or teeth and or bone loss.

11. Repeat or chronic periodontal infections are known and or associated with significant tangible residual health risks if untreated and or under treated.

12. Williamson filed a dental sick-call slip on 1-08-06 due to his tooth shearing in half down to the gum-line and exposing a raw nerve. (emergency dental episode).

13. On 1-11-06, Zimbal examined Williamson's emergency dental episode and readily diagnosed it as requiring a crown.

14. On 1-11-06, Zimbal explained to Williamson that he was not permitted to provide the necessary care (i.e. crown), but could extract the tooth instead.

15. Generally accepted professional standards for the type of emergency dental episode described above at item 12 includes (a) repair with a crown, and or (b) perform a root canal.

16. Zimbal failed to perform any dental care whatsoever for Williamson's emergency dental episode on 1-11-06.

17. Zimbal's failure to provide any care for Williamson's emergency dental episode on 1-11-06 was contrary to legitimate medical factors and or contrary to the obvious need for care.

18. Failure to provide the generally accepted professional care for the type of emergency dental episode describe above at item12 would likely result in permanent injury (i.e. tooth loss).

19. Zimbal inquired of Williamson on 1-11-06 whether his broken tooth was painful and Williamson explicitly affirmed that it was acutely painful to him.

20. Williamson also pointed out to Zimbal that because Williamson suffered the loss of three of his grinding/chewing teeth on the right lower jaw, the current broken tooth on the left side of the jaw precluded him from chewing solid food.

21. The fact above at item 20, was and or would be obvious to any dentist who examined Williamson on 1-11-06.

22. Zimbal claimed that "They won't let us" provide crowns on 1-11-06 and 2-14-06.

23. Zimbal continued on 2-14-06 after Williamson questioned him that: "They won't let us do them – not in the budget."

24. On 2-21-06 Zimbal met with Williamson again in response to the EMG (filed on 1-12-06), and again failed to provide any care whatsoever despite the obvious need to.

25. Applicable Inmate Grievance Procedure (IGP) (as of 2-14-06), mandates that all medical emergencies "shall be addressed immediately by the Warden/Warden's Designee [(W/WD)] ... The [W/WD] shall respond within one calendar day. However, if the [W/WD] should determine that the grievance does not meet the emergency criteria, the grievance shall be returned... through normal IGP procedures."

26. Williamson's EMG was filed on 1-12-06 and no action was taken until 2-14-06, thus a constructive determination was made that no emergency existed under the IGP criteria.

27. Mutually applicable IGP (as of 2-14-06) the following:

> All medical grievances must be submitted to the [IGC]... [who then forwards] it to the Medical services contractual staff [(e.g. CMS medical staff)] for action. The appropriate medical staff [(e.g. Williamson's EMG)], will review the grievance and demote actions taken....

28. Considering the applicable IGP requisites, Williamson's EMG regarding his emergency medical episode was forwarded to CMS medical staff (i.e. Zimbal), and Zimbal on 2-14-06 failed to any treatment whatsoever for the emergency dental episode.

29. Applicable IGP for EMG defines (2-14-06) an emergency as: "Issues that concern substantial risk to personal, physical, or psychological inmate injury...."

30. Under the broad IGP definition of an emergency, Williamson's acutely painful and permanently broken tooth would be an obvious emergency (i.e. substantial risk of personal, physical, or psychological inmate injury.).

_David W_____    _7-16-07_
David Williamson                     Date