ORIGINAL

IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE

DAVID W. WILLIAMSON,                              )
          Plaintiff,                             )
     v.                                          )     C.A. 06-379-SLR
CORRECTIONAL MEDICAL SERVICES, Inc, et al,       )
          Defendants.                            )

FILED

JUL 26 2007

U.S. DISTRICT COURT
DISTRICT OF DELAWARE

BRIEF IN SUPPORT OF MOTION TO COMPEL DISCOVERY

BD Scanned

Statement of Case: This is a civil rights case filed under 42 U.S.C. section 1983 and 1997, by a state prisoner and he asserts claims that defendants committed several distinct acts of deliberate indifference to Williamson's objectively known serious medical needs in violation of his constitutional rights: specifically the Eighth and Fourteenth Amendments' ban on cruel and unusual punishment clause; intentional retaliation against Williamson for his exercise of his protected rights in violation of the Fifth and Fourteenth Amendments' due process clause; and violation of his First Amendment's freedom of speech clause. Williamson seeks damages as to all claims, declaratory judgment, and injunctive relief for the needed medical care.

Statement of Facts: On 3-09-07 Williamson directed his second and third sets of admissions on CMS pursuant to the Fed. R. Civ. Proc., rule36, etc and any applicable Delaware Local Rules. CMS filed responses/objections (e.g. D.I. 103 and 102 respectively). As set forth in Williamson's Affidavit, CMS's responses/objections ran afoul of discovery rules: The majority of which were false, evasive, incomplete, and/or without merit. Williamson sought to correct the discovery dispute with CMS but CMS failed to correct its frivolous responses/objections and ignored Williamson's reasonable attempts.

This motion to compel follows:

## ARGUMENT

Williamson comes now in good faith to resolve the dispute regarding CMS's answers (D.I. 103 & D.I. 102) to Plaintiff's second and third requests for admissions. CMS's answers do run afoul of discovery rules (e.g. 36 (a), 26 (b), 37(a) (3), etc). Indeed, CMS recited a familiar litany of objections, however, the vast majority of them are blatantly false, evasive, incomplete, and/or without merit.

For example, one of CMS's oft repeated erroneous objections is that "Defendant objects that the request calls for an expert opinion and after a reasonable inquiry, the information known to or readily obtainable by defendants is insufficient to enable it to admit or deny this request." (emphasis added) (CMS's objection 1). CMS employed this objection eleven times in response to Williamson's second set of admissions (second set) and some twenty-eight times in response to Williamson's third set of admissions (third set). On its face, CMS appears to satisfy discovery rules, rule 36 (a) by stating that it made a "reasonable inquiry," but discovery rules do not permit bad faith objections that are only supported by mere rhetorical statements and which lack factual foundation. Nor do they permit stonewalling with dubious claims of the need for an expert opinion. At best CMS's oft repeated objections are evasive, and at worst, they are outrageously false.

I. For example, the following admissions –in no way- require an expert opinion and/or CMS's claim that it made a "reasonable inquire" is false.

1. "Hypothyroidism requires medication… to be taken at about the same time daily and uninterrupted to effectively manage the disease's chronic symptoms…." (See Second set at 8). Here CMS's claim to have made a reasonable inquiry and

- 1 -

that an expert opinion is required is without merit. First, had CMS merely reviewed Williamson's medical records –which are in the possession and control of CMS- it would have been alerted that several of its employee doctors had treated Williamson's Thyroid condition. (e.g. Burns, M.D., VanDusen, M.D., Durst, M.D., etc). These doctors are licensed physicians with much experience, and they are qualified to admit, deny, or elaborate on this admission. Moreover, hypothyroidism is a well known disease and any comparable physician's desk reference would contain this information. Clearly, CMS failed to make a reasonable inquiry. (Williamson's point equally applies t items 6, 9-14, of second set; and items 1, 9, 10, 12, 14, 15, 17-22, 24, 28-30, 34, & 49 of third set).

2. "Williamson's clinical depression was and is a direct and proximate result of the CCMI's [chronic-care med interruptions]…." (See second set at item 22). This time CMS's objection 1 is blatantly false. Had CMS reviewed Williamson's medical records it would have found that CMS psychiatrist, Anthony Cannuli, had specifically diagnosed Williamson with clinical depression due to secondary general medical condition. (i.e. Hypothyroidism that is aggravated by the CCMI's). Clearly, CMS failed to make a reasonable inquiry into the readily available records or of the resident expert. (Williamson's point equally applies to item 50 of second set).

3. "Because a CCMI causes Williamson to suffer a resurgence of chronic symptoms of which include creating a substantial and likely risk of future personal injury and/or psychological injury [See 2 above], any CCMI constitutes an emergency pursuant to IGP." [Inmate Grievance Procedure]. (See second set at item 67). Here CMS's objection 1 is both false and is in irreconcilable conflict with another of CMS's concurrent admissions. For instance, CMS admitted the following:

"Emergency Grievance mandates the following: a) "Issues that concern substantial risk of personal, physical, or psychological inmate injury shall be addressed immediately by the Warden/Warden's Designee (W/WD)… b) … [W/WD] shall respond within one colander day….. (See D.I. 103 at 55).

Thus, CMS admitted emergency medical issues are issues that concern substantial risk of personal, physical, or psychological inmate injury. Furthermore, CMS admitted under IGP that this criteria required "immediate" response within one calendar day. The IGP is the governing standard. Moreover, it is a fact that Williamson was diagnosed and is being treated for clinical depression in direct relation to his thyroid condition. Fed. R. Civ. Proc., rule 36 (a) provides that request may be made to admit any matters… that relate to statements of opinions of fact or of the application of law to fact. See McSparren v. Hanigan, 225 F. Supp. 628 (E.D. Pa. 1963). CMS only needed to apply the readily known facts to the admitted IGP standard. Clearly no expert was required nor did CMS actually conduct a reasonable inquiry. (Williamson's point equally applies to items 24, 50 of second set; and items 22, 30, 31, 34, 42, & 44 of third set).

4. "An ACL injury in which the ligament is ruptured, the meniscus discs are deteriorating, and contusions to the upper and lower leg bones are occurring… is an objective serious medical condition." (See item 1 of third set). Again CMS's objection 1 is false and evasive. First, CMS's doctor, Durst, M.D., specifically diagnosed Williamson with these very symptoms and ordered an MRI and a referral to an orthopedic specialist in May/June of 2006. (i.e. DuShuttle, M.D.). Then DuShuttle's specialized finding was that Williamson's ruptured ACL would not heal on its own and it required reconstructive surgery, etc. Thus, had CMS actually made a reasonable inquiry of Williamson's medical records, and applied the facts to the known legal standard then CMS would have been able to answer properly. (See 36 (a) above at item 3) Clearly, CMS did neither despite its rhetorical claims. (Williamson's point equally applies to items 9-12 of third set).

II. Another of CMS's oft repeated, but erroneous objections is that "Denied. By way of further answer, this request for admission is a conclusion of law upon which the plaintiff bears the burden of proof at trial." (See D.I. 103 at item 26). (CMS objection 2). CMS dubiously employed this objection some forty-eight times regarding the second set and some ten times regarding the third set. It too is without merit. For example, the following admissions –in no way shape or form- required a conclusion of law or shield a defendant from having to answer truthfully.

1. "Williamson fully and adequately exhausted the administrative remedies available relating to the (1) CCMI(s), (2) denial of Clinics, and or (3) retaliation or adverse acts relating to 1 and 2." (See item 26 of second set). Here CMS's reliance on objection 2 is wholly frivolous. First, the IGP 4.4 lists the available administrative steps available to any grievant. The process is exhausted once the Bureau Chief renders a final appeal decision. Thus, it is a simple factual matter of making a reasonable inquiry into whether Williamson's relevant medical grievances received a final appeal decision from the Bureau Chief –and nothing more than that is required. Also, CMS is confused as to who has the burden of proof. Consequently, Williamson need not prove exhaustion, because it is an affirmative defense and the burden begins with a defendant. Moreover, CMS's claim appears to be in conflict with its other admissions. For instance, CMS admitted that Williamson filed "no less than four medical grievances" (MG) relating to the CCMI(s). (See D.I. 103 at 70 and 63). CMS admitted that Williamson's MG #59170 related to denial of clinics (Id at 84-85), and admitted Williamson's grievances claiming reprisal. (Id at 81 and 93). Thus, CMS admitted Williamson filed grievances related to the CCMI(s), denial of Clinics, and reprisal; admitted to knowledge of their respective filing numbers, but failed to make a reasonable inquiry into any final decision of the Bureau Chief. This would unquestionably provide the necessary information to allow CMS to answer this admission. Also, the information is readily available by defendant because it is stored in the DDOC/DCC DACS data base and CMS has access to same. Discovery rules do not permit CMS to substitute its duty to provide complete and truthful responses with frivolous objections. (Williamson's point equally applies to items 13, 39, & 44 of third set).

2. "CMS processed EMG #15453 as normal, thus CMS's act is a constructive decision that no emergency existed." (See item 64 at second set). Here too CMS's objection 2 is false and incomplete. It is also in conflict with CMS's admission that emergency grievances "shall be addressed immediately" within one calendar day" and EMGs that do "not meet the emergency criteria" shall be returned... for ... normal IGP process steps." (See D.I. 103 at item 55). Consequently, there is no question of law in determining whether an EMG was addressed immediately within one calendar day or whether it was not. (i.e. processed pursuant to normal IGP steps). If an EMG was not addressed within one calendar day, than CMS clearly determined that it did not meet the emergency criteria. (i.e. constructive determination that no emergency existed). Based on the known and admitted standard, this is but a logical inference- and it is not dependant upon a conclusion of law as CMS falsely claims. (Williamson's point equally applies to items 65, 68, 69, 71, 82, 85-88, 90, 97-99 of second set; and item 44 of third set).

3. "Said Med Log enables CMS to easily calculate when the next Self Med card [(i.e. KOP)] would be due for disbursements." (See item 42 of second set). Here CMS's objection 2 is so egregiously false that it shocks the conscience that professional counsel would actually present it and sign off on it. It is a fact that CMS records the amount of and the date that KOP meds are distributed, thus it is a simple matter of applying this knowledge to a calendar and then merely calculating when a subsequent KOP med card would be due. Clearly, this is a factual matter that does not require a conclusion of law. (Williamson's point equally applies to items 16-18, 27-30, 40, 43, 45, 48, 58-60, 62, 65, 69, 71, 73, 75, 80, 82, 92, 95, 100-105 & 107-110 of second set; and items 42, 57-59 of third

set). CMS could have easily determined the above factual questions with a reasonable inquiry, but chose instead to offer frivolous objections.

III. Another oft repeated but meritless objection is that "After a reasonable inquiry, the information known to or readily obtainable by defendant is insufficient to enable it to admit or deny this request." (See D.I. 103 at item 49). (CMS objection 3) CMS erroneously employed this objection some ten times regarding the second set and some fourteen times regarding the third set. Again, on its face, CMS provides the illusion of complying with discovery rules with the rote statement that it made a "reasonable inquiry." However, if one only considers the admissions relative to readily accessible knowledge and/or knowledge that is in CMS actual possession, then it becomes clear that CMS' objection is made in bad faith. For example, CMS could have easily provided complete and accurate admissions/denials to the following because the relevant information was easily obtained or in possession of CMS.

1. "CMS possessed an alternative supply of Levothyroxine... in its Stock Supplies... and could have corrected several of Williamson's CCMI(s) but failed to do so until doctor Burns provided stock supplies to Williamson in January 2006." (See item 49 of second set). It is a fact that on 1-04-06 Williamson was not scheduled to pick up his thyroid KOP meds. Indeed, Williamson was experiencing a CCMI specifically because no prior Clinic had been conducted, nor was there an Order placed during the previous 90 days. Williamson was contacted at work - called in due to Deputy Warden Pierce's intervention- and an unscheduled clinic was conducted by Burns, M.D. Burns consequently produced Levothyroxine (0.088 MG) from stock. They were dated 03-19-05, thus they were present between late March 2005 and Jan. 2006. Therefore, these stock meds could have been utilized to correct prior CCMI(s). CMS maintains its own drug records (e.g. invoices, BOL, etc), and it is also knowledgeable of when any Clinics/med orders were last placed/conducted for Williamson. Thus, CMS falsely claimed to have made a reasonable inquiry.

2. "Chuks and Plante were scheduled and present at the DCC Hospital on 11-29-05." (See item 76 of second set). Here CMS proposes the absurd, because it is disingenuous to claim that after making a reasonable inquiry that CMS was unable to determine if CMS employees were scheduled for work at a CMS work-site. (Williamson's point equally applies to items 83, 86-87, 90, 94 & 96-98 of second set; and items 35-36, 40, 45, 46, 48, 50-56, & 61 of third set).

IV. Another oft repeated objection that CMS employed in its campaign of evasiveness and bad faith is that "Defendant objects that this request is vague and incapable of being admitted or denied." (See D.I. 103 at 78). Here CMS exhibits its shameless use of unsupported conclusory allegations that runs afoul of common sense. CMS employed this (CMS objection 4) some twelve times. For example, the following admissions are in no way vague simply because CMS declares them so. "Williamson was denied his needed Clinic on 11-29-05." (See item 78 of second set). Either a clinic was provided on 11-29-05 or it was not, there is nothing vague about this admission. Either the clinic was needed to reorder Williamson's chronic care meds or it was not. Indeed, said clinic was rescheduled for the second time and Williamson experienced a CCMI that exceeded twenty days. CMS objection 4 is preposterous and defies common sense. (Williamson's point equally applies to items 3, 4, 21, 31, 52, 57, 56, & 74 of second set; and items 16 of the third set).

V. An equally erroneous version of the vague objection is employed in bad faith by CMS too. Here CMS chooses a term or word to claim makes the admission too vague to answer. For instance, "Defendant objects that the use of the term "healthcare provider" renders this request vague...." (See D.I. 103 at item 3). However, CMS again

is in clear conflict with prior admissions. For example, CMS admits the "CMS is a private for profit company in the business of <u>providing healthcare</u> in the institutional/correctional setting." (emphasis added) (See item 2 of D.I. 103). Thus, it is disingenuous to admit to being a company "providing healthcare," but then object to the term "healthcare provider." (Williamson's point equally applies to items 4, 21, 31, 52, 57, 74, 78 of second set.

      VI. Lastly, CMS falsely claims an inability to answer due to "undefined" terms. (See D.I. 103 at item 5 and "Self Meds" and item 7 "chronic-care."). CMS blatantly misrepresents the facts because Williamson incorporated the definitions listed in his combined second set of interrogatories and production of documents….. (D.I. _____ ), which were directed to CMS previously and defined said terms.

STIPULATIONS

Williamson also offered stipulations to strike the following objectionable terms, so that CMS would answer them:

    a)  "normally" (item 32 of second set);
    b)  "is designed to" and replace with "is to" (item 33 Id.);
    c)  "also" and "designed" (item 34 Id.);
    d)  "normally" (item 38 and at 39 Id.);
    e)  "pharmacy and/or" (item 41 Id.); and
    f)  "refused" and replace with "failed" (item 74 Id.).

Consequently, CMS also failed to respond to these admissions.

Accordingly, CMS's blatantly erroneous responses/objections act to waste judicial resources and to frustrate the orderly progression of this litigation. The admissions Williamson sought either concern relevant background information and/or direct relevant information, of which there are no legitimate grounds for dispute. These particular matters need not go before a jury; need not squander judicial resources.

CONCLUSION

      For the foregoing reasons, the court should grant Williamson's motion to compel and provide the following relief/sanctions:

    a)  Hold that CMS's dubious and frivolous responses/objections equate to a failure to respond, rule 37(a)(3) (See <u>Cone Mills Corp. v Joseph Bancroft & Sons</u>, 33 F.R.D.318 (D. Del 1963); and
    b)  Hold that said responses/objections are deemed admitted; and/or
    c)  Hold a hearing to determine the sufficiency of CMS's unjustified responses/objections pursuant to rules 36…and 37…, and
    d)  Levy any other sanctions that the Court deems appropriate.

Respectfully,

_David Williamson_, SBI #183022
W-1, L-12
1181 Paddock Rd.
Smyrna, DE 19977

7-23-07
Date

IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| DAVID W. WILLIAMSON, | ) | |
| Plaintiff, | ) | |
| v. | ) | C.A. 06-379-SLR |
| CORRECTIONAL MEDICAL SERVICES, Inc, et al, | ) | |
| Defendants. | | |

| | | |
|---|---|---|
| AFFIDAVIT IN SUPPORT OF MOTION TO COMPEL | ) | |
| STATE OF DELAWARE | ) | |
| County of New Castle | ) | SS# 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 |

I, David Williamson, being duly sworn, deposes and states:

1. I, David Williamson, am the Affiant listed above and the plaintiff in this action. Affiant provides this Affidavit in support of his motion to compel discovery.

2. On 3-09-07, Affiant directed his second and third sets of admissions upon defendant Correction Medical Services (CMS). (See Ex-A).

3. CMS responded to Affiant's second set (D.I. 103) and the third set on 6-15-07 (D.I. 102). '

4. CMS's two responses/objections; however, ran afoul of discovery rules because various responses/objections were false, evasive, incomplete, and/or without merit.

5. On 7-08-07, Affiant filed a "Notice of Noncompliance with Discovery…," and requested CMS to correct the specified objectionable responses/objections regarding both sets. (See Ex-C).

6. As of 7-20-07, CMS has refused to correct its false, evasive, incomplete, and/or mertless responses/objections, and has ignored Affiant's attempt to resolve this valid discovery dispute.

7. The above is true and correct to the best of Affiant's knowledge.

WHEREFOR, Williamson requests the Court to grant his motion in all respects.

Sworn and Subscribed before me this ___/8___ day of ___July___, 2007.

David W.

David Williamson

Notary Public

## CERTIFICATE OF SERVICE

I, David Williamson, Plaintiff, do swear that I have caused to be delivered upon the defendants listed

below the following true and correct documents:

1. _Brief in support of motion to compel [cms] discovery_

2. ~~NHA~~ " _Plaintiff's motion to strike cms's Lotter requesting the Court to condone its impertency_ "

By placing same in a U.S. Mail receptacle on the _24_ day of _July_ 200 _7_.

Megan T. Matzavinos, Esq.
(Counsel for Chuks, Clark, et al)
913 N. Market St. Suite 800
Wilmington, DE 19801

Daniel McKently, Esq.
(Counsel for FCM, Inc.)
1225 N. King St., Suite 1100
Wilmington, DE 19809-0397

James E. Drnec, Esq
711 N. King St.
Wilmington, DE 19801
(Counsel for Dr. A. Zimble)

Patrick Rock, Esq.
(Counsel for CMS, Inc.)
913 Market St., #800
Wilmington, DE 19801

_N/A_

David W
David Williamson, SBI #183022
1181 Paddock Rd., W-1, L-12
Smyrna, DE 19977

Dave U

Signed as original

IM David Williamson
SBI# 183022    UNIT W-1
DELAWARE CORRECTIONAL CENTER
1181 PADDOCK ROAD
SMYRNA, DELAWARE 19977

UNITED STATES POSTAGE

02 1A    $ 02.50⁰
0004808975    JUL 25 2007
MAILED FROM ZIPCODE 19977

U.S. District Court
844 King St.
Lockbox 18
Wilmington, DE 19801-3570

# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE

DAVID W. WILLIAMSON,                                    )
    Plaintiff,                                            )
    v.                                                    )    C.A. 06-379-SLR
CORRECTIONAL MEDICAL SERVICES, Inc, et al,             )
    Defendants.

## PLAINTIFF'S SECOND SET OF REQUESTS FOR ADMISSIONS DIRECTED TO CORRECTIONAL MEDICAL SERVICES, INC

COMES NOW, plaintiff, Williamson pursuant to the appropriate Fed. R. Civ. P., Local Rule, and or case authority. Williamson attests that the instant discovery request is made in good faith, not meant to harass, inconvenience, or be overly burdensome to defendants or to delay these proceedings in any manner. Williamson requests defendants Correctional Medical Services, Inc. (CMS), to make the following admissions, where required under the applicable rules, under oath, within thirty-days of the date of service. (All definitions employed in Plaintiff's combined second set of requests for interrogatories and production of documents directed to Correctional Medical Services, Inc." (CMS) is incorporated herein).

## SECOND SET OF ADMISSIONS

1. Defendants C. Malaney, D. Plante, S. Alie, and M. Robinson were employed by CMS in some capacity for part or all of the relevant time periods of Williamson's claims.

2. CMS is a private-for-profit company in the business of providing healthcare in the institutional/correctional setting.

3. CMS has over twenty-five years experience as a healthcare provider (HCP) within the correctional setting.

4. CMS claims to be the "nations leading provider of correctional healthcare..." in its web site.

5. The distribution of medications for Self Meds is a routine function of CMS.

6. Chronic diseases are the equivalent of an objective serious medical condition.

7. Williamson is a chronic-care patient the chronic-care condition of hypothyroidism, and has been throughout CMS's active service period with DDOC.

8. Hypothyroidism requires medication (e.g. Levothyroxine or Synthroid and vitamins) (CC Meds) to be taken at about the same time daily and uninterrupted to effectively manage the disease's chronic symptoms and or its residual/aggregate effects.

9. Notable serious chronic symptoms or hypothyroidism include:

    a) Chronic fatigue (physical and mental);

    b) Mental impairment (i.e. confusion or difficulty in organizing thoughts);

    c) Dangerous inflammation;

    d) Marked increase in weight gain and or obesity;

    e) Marked increase in cholesterol;

    f) Clinical depression;

    g) Aloepecia (partial or total hair loss about head and or body); and or

    h) Slow or reduced bowel movements.

10. Interruptions in the CC Meds' daily regiment causes one to suffer any or all of the above chronic symptoms at # 9 (i.e. resurgence of symptoms).

11. Chronic fatigue and or acute lack of energy are known to impair one's normal daily functions. (e.g. enjoyment of life, ability to promote good health via exercise, etc.).

12. Long-term effects (e.g. over a year for instance), of interruptions of CC Meds that cause said resurgence of chronic symptoms of hypothyroidism (e.g. marked weight gain and cholesterol production, and chronic fatigue and inflammation in blood stream, etc) poses a significant and likely threat to future health.

13. Long-term effects ( #9 -12) are is likely to damage the coronary and or cardiovascular system.

14. Long-term effects ( #9 -12) pose a significant and likely threat of end organ damage –including hearth damage, etc.

15. Williamson has experienced twelve CC Meds interruptions (CCMI) from July 2005 thru February 2007.

16. The CCMI(s) were unnecessary and easily avoidable.

17. Nine of the twelve CCMI(s) were aggravated because the CMS on-site pharmacy actually possessed the lapsed CC Meds during the CCMI, but failed to dispense them to Williamson in a timely fashion.

18. Williamson provides CMS medical staff with adequate notice/requests for CC Meds before all twelve CCMI(s).

19. Williamson provided CMS and its medical staff with several notice/complaints that he was unnecessarily suffering the resurgence of chronic symptoms due to the CCMI(s).

20. Williamson provided CMS and its medical staff with several notice/complaints that he was unnecessarily suffering the significant impairment of his normal daily functions as a result of the resurgence of chronic symptoms due to the CCMI(s).

21. Williamson provided CMS and its medical staff with several notice/complaints that he was unnecessarily suffering the significant acute emotional and mental distress, anxiety, frustration, and depression as a result of the resurgence of chronic symptoms due to the CCMI(s).

22. Williamson's clinical depression was and is a direct and proximate result of the CCMI(s), of which equates to the under treatment of his chronic disease.

23. The CCMI(s) described at # 15 are indicative of a pervasive and systemic breakdown in healthcare services.

24. Systemic breakdowns in healthcare services that relate to –including repeat interruptions in care- for chronic diseases is a failure that obviously mandates immediate corrective action.

26. Williamson fully and adequately exhausted the administrative remedies available relating to the (1) CCMI(s) and or (2) denial of Clinics, and or (3) retaliation or adverse acts relating to 1 and 2.

27. Several of the CCMI(s) were unnecessarily caused and or aggravated because CMS medical staff denied or refused to conduct a timely Clinic for Williamson.

28. There were no legitimate medical or penological factors involved with failing to conduct timely Clinics for Williamson.

29. Williamson –as early as November 2005- provided full and adequate notice of items 27 and 28 to CMS Delaware offices.

30. CMS failed to correct the denials or untimely Clinics and said acts continued as late as September and October 2006.

31. Williamson's CC Meds are designated Self Meds, which means that they are supposed to be provided to him in thirty dose cords/lots. ( CC Med Cards)

32. Williamson's CC Med cycle normally consists of 120 total doses (i.e. four thirty dose cards/lots).

33. The medication administration distribution system (MADS) is designed to ensure uninterrupted service of CC Meds by providing subsequent med cards within and prior to the final five or so doses lapsing.

34. The MADS also is designed to ensure uninterrupted service of CC Meds by providing subsequent Clinics on or around the ninety-day mark of the preceding Clinic.

35. Employed as designed, the MADS would limit the opportunity for CCMI(s) significantly.

36. CMS intentionally fails to employ the MADS as designed and or fails to employ a meaningful alternative MADS.

37. CMS with gross reckless disregard operates a knowingly failed and or significantly impaired MADS.

38. CMS medical staff normally places a 120 dose order/prescription for Williamson's CC Meds at a Clinic.

39. CMS employs a "Fax and Fill" system for its prescription drugs, which normally results in the prescriptions being filled within 24 hours, but normally not longer than 48 hours –absent supply problems and or inclement weather.

40. There is no legitimate medical or other reason –absent supply problems and or inclement weather, for an ordered prescription medication to exceed a lapse of four days.

41. CMS employs a log (Med Log) that records what type and the amount of Self Meds –including when a patient picks them up- at its on-site pharmacy and or hospital at DCC.

42. Said Med Log enables CMS to easily calculate when the next Self Med card would be due for disbursement.

43. In regards to items # 41 & 42, CMS medical staff require no actual notice or request from any Self Med patient to determine when a replacement CC Med card is due to avoid any CCMI.

44. In regards to subsequent Clinics, CMS medical staff require no actual notice or request from any chronic care patient to determine when ninety-days has elapsed and thus schedule/provide the next needed Clinic.

45. Despite CMS possessing said Med Log, it still causes Williamson unnecessary and avoidable CCMI(s).

46. Despite CMS possessing the Med Log, it still employs arbitrarily and unnecessary procedures that actually hinder and or obstruct the orderly administration of CC Meds: That a chronic-care patient must alert staff at about his five final doses and request his next available Self Med card.

47. Despite CMS possessing the Med Log, its employment of arbitrary and unnecessary procedures at # 46 serve as a pretext to cause and or rationalize the CCMI(s) with illegitimate excuses.

48. Despite knowing the date of previous Clinics, CMS still refused to conduct several subsequent needed Clinics for Williamson, which contributed to the cause of CCMI(s).

49. CMS possessed an alternative supply of Levothyroxine and or Synthroid in its Stock Supplies –at its on-site pharmacy- and could have corrected several of Williamson's CCMI(s) but failed to do so until doctor Burns provided stock supplies to Williamson in January 2006.

50. An interruption/denial of prescribed care (i.e. CC Meds) for a chronic-care patient constructively equates to a medical emergency that requires immediate corrective action.

51. CMS's contractual duties include responsibility for any and all medical and or emergency medical grievances (MG or EMG)–including hearing, processing, and or resolving them.

52. Relating to MG/EMG, CMS as the HCP is ultimately responsible for them.

53. Any logistical or clerical assistance that DDOC provides CMS that relates to MG/EMG does not diminish or absolve CMS's legal duty/responsibility for said MG/EMG –including managing or resolving them in a timely and effective manner.

54. By accepting DDOC's logistical or clerical assistance relating to MG/EMG, CMS constructively accepts DDOC staff as agents in this respect.

55. Inmate Grievance Procedure 4.4. (IGP) relating to "Emergency Grievance" mandates the following: a) "Issues that concern substantial risk of personal, physical, or psychological inmate injury shall be addressed immediately by the Warder/Warden's Designee" ([W/WD]) … b) …[W/WD] shall respond within one calendar day…" and c) If the [W/WD] should determine that the grievance does not meet the emergency criteria, the grievance shall be returned… for …normal IGP process steps."

56. The Warden's Designee relating to medical emergency –via an EMG- is accordingly the HCP –who is CMS at the time.

57. CMS employs no active means of screening or determining emergencies that relate to EMG(s) or whether any actual emergency exists within the meaning of IGP –including the one calendar day determination and or immediate response.

58. The Third Circuit Court of Appeals in Spruill v. Gillis, 372 F.3d 218 (3d Cir. 2004) (held –in part- (2) procedural default component of the PLRA administrative exhaustion requirement is governed by the applicable state prison grievance system).

59. The Spruill holding governs and applies to the DDOC grievance procedure IGP 4.4.

60. Relating to applicable grievance procedures, the Spruill Court found that it is " a matter of statutory construction-it turns on the interpretation of the Grievance System Policy…" and that it is necessary to "look to the rules governing the prison's grievance system to ascertain… what 'shall,' 'should,' and 'may' be included in a grievance…."

61. It is a natural consequence of Spruill that if any of the DDOC's IGP rules establish and or mandate certain actions or duties on a party to the grievance, than it is binding and controlling on that party, and or the failure to perform will likely create a default.

62. Because the PLRA mandates an inmate to exhaust all available administrative remedies or face dismissal of his federal claims, any impediment or denial of the administrative process –not attributable to the inmate grievant- that has the effect of precluding a grievant from completing said exhaustion is a defacto denial of meaningful access to the courts.

63. Williamson filed EMG # 15453 on or about 7-15-05 for the denial /interruption of his CC Meds.

64. CMS processed EMG # 15453 as normal, thus CMS's act is a constructive decision that no emergency existed.

65. EMG # 15453, however, was not actually screened by CMS for the presence of any emergency in violation of IGP.

66. CMS held the first informal grievance hearing for EMG # 15453 on 7-28-05 –thirteen days after it was filed.

67. Because a CCMI causes Williamson to suffer a resurgence of chronic symptoms, of which include creating a substantial and likely risk of future personal injury and or psychological injury, any CCMI of his CC Meds constitutes an emergency pursuant to IGP.

68. CMS has failed to establish policies or procedures to address EMG(s) pursuant to IGP.

69. CMS has failed to establish policies or procedures to address the ongoing incidence of CCMI(s) (i.e. emergencies).

70. Williamson filed no less than four MG(s) relating to the CCMI(s) against CMS of which spanned from July 2005 thru July 2006.

71. On all four occasions (e.g. EMG # 15453, MG # 17197, MG# 21201 and MG # 59170), CMS failed to respond "immediately" within the meaning of IGP.

72. On 11-11-05 Chuks denied to provide Williamson with his Clinic, which was needed to place a Refill order for CC Meds.

73. There were no legitimate medical or penological factors involved in Chuks denial of said Clinic, and CMS staff was responsible for Williamson's tardiness by failing to place his name on the "Offender Activity Schedule" that day.

74. Alternatively, Chuks refused to place a Refill order for Williamson's CC Meds also on 11-11-05.

75. Williamson filed MG # 21201 on 11-14-05 due to Chuks's denial of the 11-11-05 Clinic and noted that said denial would likely cause an unnecessary CCMI, which would violate agreements made by CMS relating to MG # 15453

76. Chuks and Plante were scheduled and present at the DCC hospital on 11-29-05.

77. Williamson was re-scheduled for a Clinic on 11-29-05.

78. Williamson was again denied his needed Clinic on 11-29-05.

79. No refill order was placed for Williamson's CC Meds on 11-29-05.

80. Refusal to conduct either of the 11-11-05 and or the 11-29-05 Clinics and or place a refill order for Williamson's CC Meds caused a CCMI of 28 days (e.g. 12-07-05 until 1-04-06).

81. Williamson filed an Addendum t MG # 21201 dated 11-30-05 raising claims of prohibited retaliation by Chuks for the 11-29-05 Clinic denial, which occurred shortly after his filing of MG # 21201, and CMS offices received a copy.

2

82. CMS failed t conduct any hearing relating to MG # 21201 until 11-14-06 circa.

83. CMS continued t fail to conduct timely Clinics for Williamson, which resulted in additional CCMI(s), after the filing of MG # 21201.

84. MG # 59170 was filed on 7-30-06 and it complained of the tenth consecutive CCMI.

85. MG # 59170 also involved the denial and or failure to conduct a timely Clinic over the Aug/Sept. 2006 period.

86. In response to MG # 59170, CMS representative Gail Eller claimed that a Clinic had been held on 8-31-06.

87. Eller even disclosed a fictitious conversation that allegedly occurred between medical staff and Williamson on the 8-31-06 fabricated Clinic.

88. CMS never provided any Clinic to Williamson on 8-31-06 –nor was a Clinic provided until 10-18-06.

89. Williamson worked all day –uninterrupted- at his work site at Bldg. # 15 on 8-31-06.

90. No refill for Williamson's CC Meds was ever placed on 8-31-06, which would have occurred had CMS actually conducted a Clinic as claimed by Eller at the grievance hearing.

91. The events claimed/disclosed by Eller relating to MG # 59170 (i.e. fictitious Clinic, etc.), is a fabricated entry in Williamson's medical file.

92. Fabricating medical entries/records in response to a MG is an adverse action prohibited under IGP.

93. Williamson filed a reprisal grievance RG # 72883 (dated _____), for the adverse acts disclosed/perpetrated that referred to MG # 59170.

94. CMS conducted the first hearing for RG # 72883 on 10-18-06 with CMS representative D. Rodweller.

95. CMS offered –via Rodweller- to permit Williamson to inspect his medical records referring to RG # 72883, but CMS's offer turned out to be a bad faith offer, because to date CMS never honored it.

96. Though, Williamson completed –in writing- on 10-20-06 a request to inspect and copy said medical records, CMS never complied to date.

97. CMS held the second hearing for RG # 72883 on 11-14-06 and provided Williamson with the Formal Final Appeal form.

98. Williamson completed and filed a timely Final Appeal for RG # 72883 and forwarded copies to Deputy Warden Pierce and the Bureau Chief on or about 11-17-06.

99. Williamson has complied with all IGP requisites and available procedures relating to RG # 72883; however, he has been denied any final decision.

100. Facts above at 97-99 act to improperly preclude and or deny Williamson timely and effective access to the administrative grievance process (AGP).

101. Facts above at 97-100 constitute a defacto denial of meaningful access to the courts for Williamson.

102. CMS's failure to provide Williamson with a timely Aug/Sept. 2006 Clinic –not actually providing one until 10-18-06-caused an unnecessary nineteen day CCMI (from 10-05-06 thru 10-25-06).

103. Denial of timely Clinics referred to in 59107 and 72883 is a recurring act that is substantially similar to denials listed in MG # 21201.

104. Facts of # 103 constitute a systemic breakdown in the chronic care services, of which have aggravated the CCMI(s).

105. The so-called "new medication distribution system" referenced by S. Altman in his 4-25-06 memo is/was in fact substantially similar to the prior MADS that CMS employed in its prior contract with DDOC.

106. The so-called "new medication distribution system" referenced by S. Altman in his 4-25-06 memo is/was in fact substantially similar to the in place on 7-28-05 which was referenced by Mr. Linton. (e.g. MG # 15453).

107. The MADS referenced by CMS as being new in June/July 2006 is not materially different from the one employed throughout 2005 by CMS.

108. Employing a Tickle/calendar scheduling system for the scheduling of Clinics (e.g. every ninety days), would likely reduce the incidence of CCMI(s).

109. Employing a Tickler/calendar scheduling system for the distribution of CC Meds (e.g. automatically distribute CC Meds within final five doses), would likely reduce the incidence of CCMI(s).

110. CMS already possesses all the information necessary to establish a Tickler/calendar order and or scheduling system for both Clinics and or CC Meds refills.

David W ~~~

David Williamson, SBI #183022
1181 Paddock Rd.
Smyrna, DE 19977

3-9-07
Date

4

AFFIDAVIT OF MAILING

I David Williamson, pro se plaintiff, do swear that I have caused the following documents to be
placed in a U.S. Mail Receptacle on ___9___ day of __March__ 200 7 :

1. _Plaintiff's Combined Third Set of Requests for Interrogatories &_
   _Production of Documents Directed to Correctional Medical Services, Inc._

2. _Plaintiff's Second Set of Requests for Admissions Directed to_
   _Correctional Medical Services, Inc._

3. _Plaintiff's Third Set of Requests for Admissions Directed to_
   _Correctional Medical Services, Inc._

4. _N/A_

These originals/true copies were addressed to the following parties:

1. _Amy A. Quinlan, Esq._           2. _Dana S. Monzo, Esq._
   _(Counsel for CMS, CLARK, CHURS, LOVE &_     _(Counsel for FCM)_
   _Zimble)  500 Delaware Ave._     _1225 N. King St._
   _Suite 1500, P.O. Box 2306_      _Suite 1100, P.O. Box 397_
   _Wilm., DE 19899-2306_           _Wilm., DE 19899-0397_

3. _N/A_                            4. _N/A_

The above is signed under penalty of perjury.

David W—

David Williamson

IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE

DAVID W. WILLIAMSON,                         )
     Plaintiff,                              )
v.                                           )    C.A. 06-379-SLR
CORRECTIONAL MEDICAL SERVICES, Inc, et al,   )
     Defendants.

PLAINTIFF'S THIRD SET OF REQUESTS FOR ADMISSIONS DIRECTED TO CORRECTIONAL MEDICAL SERVICES, INC

COMES NOW, plaintiff, Williamson pursuant to the appropriate Fed. R. Civ. P., Local Rule, and or case authority. Williamson attests that the instant discovery request is made in good faith, not meant to harass, inconvenience, or be overly burdensome to defendants or to delay these proceedings in any manner. Williamson requests defendants Correctional Medical Services, Inc. (CMS), to make the following admissions, where required under the applicable rules, under oath, within thirty-days of the date of service. (All definitions employed in Plaintiff's combined second set of requests for interrogatories and production of documents directed to Correctional Medical Services, Inc." (CMS) is incorporated herein).

### THIRD SET OF ADMISSIONS

1. An ACL injury in which the ligament is ruptured, the meniscus discs are deteriorating, and contusions to the upper and lower leg bones are occurring (instant ACL injury hereafter) is an objective serious medical condition.

2. The instant ACL injury significantly impairs one's normal daily functions.

3. The instant ACL injury –left untreated for an extended period (i.e. a year or more) causes significant further deterioration and injury to the knee.

4. The instant ACL injury –including the highly unstable nature and proneness to hyperextensions of the knee- causes significant and likely risk of falling/collapsing incidents.

5. The instant ACL injury –including the highly unstable nature and proneness to hyperextensions of the knee- requires the use of a rigid framed knee brace to protect against the inherent incidence of hyper-extensions and instability of the knee.

6. The instant ACL injury –including the highly unstable nature and proneness to hyperextensions of the knee- is known to cause significant pain and suffering.

7. CMS/medical staff failed to consult Dr. DuShuttle relating to the Don Joy ACL knee brace and or any suitable alternative knee brace for Williamson as late as October 2006.

8. CMS/medical staff failed to consult DDOC/DCC Security Staff relating to the Don Joy ACL knee brace and or any suitable alternative knee brace for Williamson as late as October 2006.

9. CMS was fully aware of Williamson's instant ACL injury as of June 2006 (circa), -including that it required a special ACL knee brace (e.g. Don Joy ACL or suitable alternative with rigid plastic frame, etc).

10. There was no legitimate or penological factors for delaying Williamson's needed reconstructive knee surgery for some seven months.

11. There was no legitimate medical or penological factors for denying Williamson the needed Don Joy ACL and or suitable rigid plastic framed alternative knee brace.

12. A seven month delay in providing said needed reconstructive surgery for Williamson's instant ACL injury exposed Williamson to the following:

      a) Unnecessary pain and suffering;
      b) Unnecessary permanent injuries;
      c) Unnecessary and significant impairment of his normal daily functions;

d) Unnecessary and significant risk or future injury –including falling/collapsing incidents;

e) Unnecessary loss of enjoyment of life;

f) Unnecessary and significant further deterioration of the knee and its related parts, which may be permanent; and

g) Unnecessary loss of earning capacity due to impairment of Williamson's ability to perform his profession as a martial arts instructor.

13. Williamson exhausted all available administrative remedies relating to MG # 37123 & 78623, of which related to CMS's deliberate indifference to Williamson's objective serious knee injury, inordinate delay in providing the known and needed reconstructive surgery, and denial of a suitable knee brace, and that CMS knowing provided a substandard knee brace that unnecessarily exposed Williamson to further injury.

14. Durst and or DuShuttle admitted that the Dynamic Pull Wrap knee brace that CMS supplied for Williamson's instant ACL injury was substandard and failed to protect the unstable knee from dangerous hyper-extensions and or inherent falling/collapsing incidents.

15. Seven month delay in providing reconstructive knee surgery for Williamson's instant ACL injury is an unnecessary and inordinate delay that is in conflict with legitimate medical criteria/recommendations.

16. Currently at DCC are inmate patients who have been provided medical devices that contain metal –including telescopic tubular metal canes and or mechanical devices, etc.

17. Knee braces exist that are constructed primarily with rigid frames of plastic or like materials that have minimal metal fastenings that offer suitable protection –including superior protection to a Dynamic knee wrap made of neoprene and Velcro- that protects an injured knee with the instant ACL injury .

18. Such a knee brace –at 17- would be a marked improvement to the Dynamic knee wrap, which was provided to Williamson.

19. Dental care for active periodontal infections (perio infections) includes the following:

a) Antibiotics;

b) Teeth/gum cleaning/scrapings;

c) Antibacterial mouth wash;

d) Root canal for recurring/chronic cases; and

e) Pain medications.

20. Recurring perio infections require a minimum of semi-annual teeth/gum cleanings/scrapings.

21. Active perio infections cause a significant and serious threat to health –including possible heart damage from infection spreading in the blood stream/circulatory system.

22. Active perio infections are considered medical emergencies under the Inmate Grievance Procedure 4.4. (IGP).

23. Standard/recommended dental care for active and or recurring perio infections is not considered cosmetic dental care, but required medical care.

24. Active perio infections require immediate standard dental care (e.g. teeth/gum cleanings, etc.), and in chronic outbreaks immediate antibiotics and or root canal.

25. A year delay in providing the standard perio infection dental care –including teeth/gum cleanings/scrapings- following a perio infection incident is an inordinate delay.

26. The inordinate delay described in 25 above is likely to cause the following:

a) Recurring perio infections;

b) Permanent injury and tooth loss;

c) Unnecessary pain and suffering; and

d) Irreparable injury to teeth or gums.

27. CMS employs a blanket prohibition against providing root canals despite the medical needs of a patient.

28. CMS failed to provide needed emergency dental care to Williamson for his repeat periodontal infections.

29. Williamson experienced permanent tooth loss on 3-11-05 related to his recurring perio infections, which were under treated.

30. A broken tooth –that has sheared in half down to the gum line and is exposing a raw nerve (Williamson's dental emergency hereafter), is clearly an objective serious medical condition and is known to cause acute pain and suffering.

31. Williamson's dental emergency is a clear emergency medical condition under the IGP.

32. Williamson filed a request on 01-08-06 for dental care for said dental emergency.

33. Zimble denied any dental care for Williamson's dental emergency on each and every date in which Zimble saw Williamson –including a denial of pain meds.

34. Zimble's repeat denials of needed emergency dental care for said dental emergency were not the product of (a) any legitimate medical factors or (b) any exercise of professional medical judgment.

35. Zimble admitted that Williamson's dental emergency medically required a "crown."

36. Zimble admitted and or announced to Williamson that Zimble was prohibited from providing the needed crown by CMS custom/policy (e.g. "Budgetary, it simply is not in our Budget.").

37. Williamson's dental emergency caused him the following:

        (a) Unnecessary pain and suffering for some forty days;
        (b) Unnecessary permanent injury;
        (c) Unnecessary and acute loss of enjoyment of life while he was denied the needed treatment;
        (d) Unnecessary loss of sleep;
        (e) Unnecessary loss of work/school; and
        (f) Unnecessary impairment of ability to eat solid food for some forty day.

38. Zimble inquired of Williamson whether the broken tooth was painful and Williamson emphatically affirmed that it was very painful, but Zimble denied to provide any dental care or any pain meds whatsoever despite the obvious need.

39. Williamson fully exhausted all available administrative remedies relating to Williamson's dental emergency and CMS's deliberate indifference to it.

40. Zimble admitted that a composite repair was (a) clearly substandard, (b) temporary in nature, and (c) likely to fail.

41. Zimble announced that the only alternative -in view of CMS custom/policy prohibiting crowns- was to extract the broken tooth.

42. CMS failed to (a) provide the needed immediate emergency dental care for Williamson's dental emergency, (b) failed to provide immediate care relating to Williamson's EMG # 23193 dated 01-12-06; failed to provide the minimal standard dental care: a crown; (d) admittedly provided a substandard temporary composite repair; and (e) created an unnecessary and inordinate delay in providing even the substandard dental care; and (f) unnecessarily exposes Williamson to a likely repeat dental emergency episode when the temporary repair fails.

43. CMS/medical staff had repeat notice/knowledge of Williamson's dental emergency but maliciously and or with gross disregard caused Williamson to suffer unnecessarily for some forty days; however, absent legitimate medical factors.

44. CMS constructively determined that Williamson's dental emergency –listed in EMG #23193- was not an emergency when it failed to render immediate dental care within the mandated 24 hours pursuant to IGP, and as such violated IGP.

45. Bishop admitted on 02-24-06, that Williamson's dental emergency required a crown and also added that because the nerve was exposed for so long and damaged, Williamson's dental needs now required a root canal, too.

46. Bishop admitted that the composite repair was temporary in nature that it would not last the duration of Williamson's sentience (i.e. nine years).

47. CMS -via its blanket policy/custom prohibiting crowns despite medical needs- and or through admittedly providing a temporary repair does expose Williamson to a substantial and likely risk of future dental emergency episode when the temporary composite fails.

48. CMS has a history of providing temporary repairs (e.g. fillings, etc), that have repeatedly failed.

49. Repeat acute perio infections in the same area/teeth eventually destroy the tooth's roots and bone and subsequently cause tooth loss if left untreated and or under treated.

50. On 10-31-06 dentist Kinoke also outlined CMS's blanket custom/policy prohibition against needed crowns despite medical needs in response to EMG #23193.

51. Between December 2001 and May 2001, Williamson experienced multiple acute perio infections –including several in the same area- which ultimately caused Williamson's tooth loss of March 11, 2005.

52. Robinson accurately diagnosed Williamson with recurring active and acute perio infections on or about 12-04-2001, and stated Williamson's infections required a root canal, but refused to provide it due to CMS's custom/policy of prohibiting same.

53. Robinson even notified Williamson that he could likely expect to experience tooth loss as a result of the recurring perio infections. (i.e. under treated perio infections).

54. Williamson's tooth loss of March 11, 2005, was a direct and proximate result of said recurring perio infections, which were untreated/under treated.

55. Williamson's permanent injury was avoidable had it not been for CMS's custom/policy of not treating/under treating his perio infections.

56. Date of discovery of Williamson's permanent tooth loss is the date that he was informed that they could no longer be saved and would have to be extracted (e.g. 03-04-05).

57. CMS/medical staff did not provide a Clinic and or any medical care/visit to Williamson on 08-31-06 despite claims by Eller on 09-27-06 at the grievance hearing (# 59170) of doing so.

58. Eller's notice/claims of providing a Clinic in August 2006 was false.

59. Eller's false claim was in response to Williamson's grievance activity.

60. CMS manipulated and or attempted to deny Williamson meaningful and timely access and or attempted to deny access to the grievance process by falsifying the Clinic in response to grievance # 59170.

61. Williamson nevertheless exhausted the administrative grievance process via his extraordinary efforts.

62. CMS's acts in # 58-60 equate to an effort to deny Williamson meaningful access to the courts relating to Williamson's claims of retaliation against Williamson for his grievance activity.

David Williamson, SBI #183022
1181 Paddock Rd.
Smyrna, DE 19977

3-9-07
Date

# Exhibit-C

David W. Williamson
SBI #183022, W-1, L-12
1181 Paddock Rd.
Smyrna, DE 19977

Megan T. Mantzavinos, Esq. (Counsel for CMS, et al)

Re: Notice of CMS's Noncompliance With Discovery in Williamson v. CMS, et al, 06-379-SLR

Mrs. Mantzavinos, Esq.:

Williamson comes now in good faith to resolve the dispute regarding CMS's answers (D.I. 103 & D.I. 102) to Plaintiff's second and third requests for admissions. CMS's answers do run afoul of discovery rules (e.g. 36 (a), 26 (b), 37(a) (3), etc). Indeed, CMS recited a familiar litany of objections, however, the vast majority of them are blatantly false, evasive, incomplete, and/or without merit.

For example, one of CMS's oft repeated erroneous objections is that "Defendant objects that the request calls for an expert opinion and after a reasonable inquiry, the information known to or readily obtainable by defendants is insufficient to enable it to admit or deny this request." (emphasis added) (CMS's objection 1). CMS employed this objection eleven times in response to Williamson's second set of admissions (second set) and some twenty-eight times in response to Williamson's third set of admissions (third set). On its face, CMS appears to satisfy discovery rules, rule 36 (a) by stating that it made a "reasonable inquiry," but discovery rules do not permit bad faith objections that are only supported by mere rhetorical statements and which lack factual foundation. Nor do they permit stonewalling with dubious claims of the need for an expert opinion. At best CMS's oft repeated objections are evasive, and at worst, they are outrageously false.

I. For example, the following admissions –in no way- require an expert opinion and/or CMS's claim that it made a "reasonable inquire" is false.

1. "Hypothyroidism requires medication… to be taken at about the same time daily and uninterrupted to effectively manage the disease's chronic symptoms…." (See Second set at 8). Here CMS's claim to have made a reasonable inquiry and that an expert opinion is required is without merit. First, had CMS merely reviewed Williamson's medical records –which are in the possession and control of CMS- it would have been alerted that several of its employee doctors had treated Williamson's Thyroid condition. (e.g. Burns, M.D., VanDusen, M.D., Durst, M.D., etc). These doctors are licensed physicians with much experience, and they are qualified to admit, deny, or elaborate on this admission. Moreover, hypothyroidism is a well known disease and any comparable physician's desk reference would contain this information. Clearly, CMS failed to make a reasonable inquiry. (Williamson's point equally applies t items 6, 9-14, of second set; and items 1, 9, 10, 12, 14, 15, 17-22, 24, 28-30, 34, & 49 of third set).

2. "Williamson's clinical depression was and is a direct and proximate result of the CCMI's [chronic-care med interruptions]…." (See second set at item 22). This time CMS's objection 1 is blatantly false. Had CMS reviewed Williamson's medical records it would have found that CMS psychiatrist, Anthony Cannuli, had specifically diagnosed Williamson with clinical depression due to secondary general medical condition. (i.e. Hypothyroidism that is aggravated by the CCMIs). Clearly, CMS failed to make a reasonable inquiry of the readily available records or of the resident expert. (Williamson's point equally applies to item 50 of second set).

3. "Because a CCMI causes Williamson to suffer a resurgence of chronic symptoms of which include creating a substantial and likely risk of future personal injury and/or psychological injury [See 2 above], any CCMI constitutes an emergency pursuant to IGP." [Inmate Grievance Procedure]. (See second set at item 67). Here CMS's objection 1 is both false and is in irreconcilable conflict with another admission.

For instance, CMS admitted the following:

1

"Emergency Grievance mandates the following: a) "Issues that concern substantial risk of personal, physical, or psychological inmate injury shall be addressed immediately by the Warden/Warden's Designee (W/WD)...

b) ... [W/WD] shall respond within one calendar day..... (See D.I. 103 at 55).

Thus, CMS admitted emergency medical issues are issues that concern substantial risk of personal, physical, or psychological inmate injury. Furthermore, CMS admitted under IGP that this criteria required "immediate" response within one calendar day. The IGP is the governing standard. Moreover, it is a fact that Williamson was diagnosed and is being treated for clinical depression in direct relation to his thyroid condition. Fed. R. Civ. Proc., rule 36 (a) provides that request may be made to admit any matters... that relate to statements of opinions of fact or of the application of law to fact. See McSparren v. Hanigan, 225 F. Supp. 628 (E.D. Pa. 1963). CMS only needed to apply the readily known facts to the admitted IGP standard. Clearly no expert was required nor was any reasonable inquiry conducted. (Williamson's point equally applies to items 24, 50 of second set; and items 22, 30, 31, 34, 42, & 44 of third set).

4. "An ACL injury in which the ligament is ruptured, the meniscus discs and deteriorating, and contusions to the upper and lower leg bones are occurring... is an objective serious medical condition." (See item 1 of third set). Again CMS's objection 1 is false and evasive. First, CMS's doctor, Durst, M.D., specifically diagnosed Williamson with these very symptoms and ordered an MRI and a referral to an orthopedic specialist in May/June of 2006. (e.g. DuShuttle, M.D.). Then DuShuttle's specialized finding was that Williamson's ruptured ACL would not heal on its own and it required reconstructive surgery, etc. Thus, had CMS actually made a reasonable inquiry of Williamson's records and applied the facts to the known legal standard -- See 36 (a) above at item 3- then CMS would have been able to answer properly. Clearly, CMS did neither despite its rhetorical claims. (Williamson's point equally applies to items 9-12 of third set).

II. Another of CMS's oft repeated, but erroneous objections is that "Denied. By way of further answer, this request for admission is a conclusion of law upon which the plaintiff bears the burden of proof at trial." (See D.I. 103 at item 26). (CMS objection 2). CMS dubiously employed this objection some forty-eight times regarding the second set and some ten times regarding the third set. It too is without merit. For example, the following admissions –in no way-require a conclusion of law or shield a defendant from having to answer truthfully.

1. "Williamson fully and adequately exhausted the administrative remedies available relating to the (1) CCMI9s), (2) denial of Clinics, and or (3) retaliation or adverse acts relating to 1 and 2." (See item 26 of second set). Here CMS's reliance on objection 2 is wholly frivolous. First, the IGP 4.4 lists the available administrative steps available to any grievant. The process is exhausted once the Bureau Chief renders a final appeal decision. Thus, it is a simple factual matter of making a reasonable inquiry into whether Williamson's relevant medical grievances received a final appeal decision from the Bureau Chief –and nothing more than that is required. Also, CMS is confused as to who has the burden of proof. Consequently, Williamson need not prove exhaustion, because it is an affirmative defense and the burden begins with a defendant. Moreover, CMS's claim appears to be in conflict with its other admissions. For instance, CMS admitted that Williamson filed "no less than four medical grievances" (MG) relating to the CCMI(s). (See D.I. 103 at 70 and 63). CMS admitted that Williamson's MG #59170 related to denial of clinics (Id at 84-85), and admitted Williamson's grievances claiming reprisal. (Id at 81 and 93). Thus, CMS admitted Williamson filed grievances related to the CCMI(s), denial of Clinics, and reprisal; admitted to knowledge of their respective filing numbers, but failed to make a reasonable inquiry into any final decision of the Bureau Chief. This would unquestionably provide the necessary information to allow CMS to answer this admission. Also, the information is readily available by defendant because it is stored in the DDOC/DCC DACS data base and CMS has access to same. Discovery rules do not permit CMS to substitute its duty to provide complete and truthful responses with frivolous objections. (Williamson's point equally applies to items 13, 39, & 44 of third set).

2. "CMS processed EMG #15453 as normal, thus CMS's act is a constructive decision that no emergency existed." (See item 64 at second set). Here too CMS's objection 2 is false and incomplete. It is also in conflict with CMS's admission that emergency grievances "shall be addressed immediately" within one calendar day" and EMGs that do "not meet the emergency criteria" shall be returned... for ... normal IGP process steps." (See D.I. 103 at item 55). Consequently, there is no question of law in determining whether an EMG was addressed immediately within one calendar day or whether it was not. (i.e. processed pursuant to normal IGP steps). If an EMG was not addressed within one calendar day, than CMS clearly determined that it did not meet the emergency criteria. (i.e. constructive determination that no emergency existed). Based on the known and admitted standard, this is but a logical inference- and it is not dependant upon a conclusion of law as CMS falsely claims. (Williamson's point equally applies to items 65, 68, 69, 71, 82, 85-88, 90, 97-99 of second set; and item 44 of third set).

3. "Said Med Log enables CMS to easily calculate when the next Self Med card [(i.e. KOP)] would be due for disbursements." (See item 42 of second set). Here CMS's objection 2 is so egregiously false that it shocks the conscience that professional counsel would actually present it and sign off on it. It is a fact that CMS records the amount of and the date that KOP meds are distributed, this it is a simple matter of applying this knowledge to a calendar and easily calculate when a subsequent KOP med card would be due. Clearly, this is a factual matter that does not require a conclusion of law. (Williamson's point equally applies to items 16-18, 27-30, 40, 43, 45, 48, 58-60, 62, 65, 69, 71, 73, 75, 80, 82, 92, 95, 100-105 & 107-110 of second set; and items 42, 57-59 of third set). CMS could have easily determined the above factual questions with a reasonable inquiry, but chose instead to offer frivolous objections.

III. Another oft repeated but merit less objection is that "After a reasonable inquiry, the information known to or readily obtainable by defendant is insufficient to enable it to admit or deny this request." (See D.I. 103 at item 49). (CMS objection 3) CMS erroneously employed this objection some ten times regarding the second set and some fourteen times regarding the third set. Again, on its face, CMS provides the illusion of complying with discovery rules with the rote statement that it made a "reasonable inquiry." However, if one only considers the admissions relative to readily accessible knowledge and/or knowledge that are in CMS actual possession, then it becomes clear that CMS' objection is made in bad faith.

For example, CMS could have easily provided complete and accurate admissions/denials to the following because the relevant information was easily obtained or in possession of CMS.

1. "CMS possessed an alternative supply of Levothyroxine... in its Stock Supplies... and could have corrected several of Williamson's CCMI(s) but failed to do so until doctor Burns provided stock supplies to Williamson in January 2006." (See item 49 of second set). It is a fact that on 1-04-06 Williamson was not scheduled to pick up his thyroid KOP meds. Indeed, Williamson was experiencing a CCMI specifically because no prior Clinic had been conducted, nor was there an Order placed during the previous 90 days. Williamson was contacted at work, called in due to Deputy Warden Pierce's intervention, and an unscheduled clinic was conducted by Burns, M.D. Burns consequently produced Levothyroxine (0.088 MG) from stock. They were dated 03-19-05, thus they were present between late March 2005 and Jan. 2006. Therefore, these stock meds could have been utilized to correct prior CCMI(s). CMS maintains its own drug records (e.g. invoices, BOL, etc), and it is also knowledgeable of when any Clinics/med orders were last placed/conducted for Williamson. Thus, CMS falsely claimed to have made a reasonable inquiry.

2. "Chuks and Plante were scheduled and present at the DCC Hospital on 11-29-05." (See item 76 of second set). Here CMS proposes the absurd, because it is disingenuous to claim that after making a reasonable inquiry that CMS was unable to determine if CMS employees were scheduled for work at a CMS work-site. (Williamson's point equally applies to items 83, 86-87, 90, 94 & 96-98 of second set; and items 35-36, 40, 45, 46, 48, 50-56, & 61 of third set).

3

IV. Another oft repeated objection that CMS employed in its campaign of evasiveness and bad faith is that "Defendant objects that this request is vague and incapable of being admitted or denied." (See D.I. 103 at 78). Here CMS exhibits its shameless use of unsupported conclusory allegations that run afoul of common sense. CMS employed this (CMS objection4) some twelve times. For example, the following admissions are in no way vague simply because CMS declares them so. "Williamson was denied his needed Clinic on 11-29-05." (See item 78 of second set). Either a clinic was provided on 11-29-05 or it was not, there is nothing vague about this admission. Either the clinic was needed to reorder Williamson's chronic care meds or it was not. Indeed, said clinic was rescheduled for the second time and Williamson experienced a CCMI that exceeded twenty days. CMS objection 4 is preposterous and defies common sense. (Williamson's point equally applies to items 3, 4, 21, 31, 52, 57, 56, & 74 of second set; and items 16 of the third set).

V. An equally erroneous version of the vague objection is employed in bad faith by CMS too. Here CMS chooses a term or word to claim makes the admission too vague to answer. For instance, "Defendant objects that the use of the term "healthcare provider" renders this request vague...." (See D.I. 103 at item 3). However, CMS again is in clear conflict with prior admissions. For example, CMS admits the "CMS is a private for profit company in the business of providing healthcare in the institutional/correctional setting." (emphasis added) (See item 2 of D.I. 103). Thus, it is disingenuous to admit to being a company "providing healthcare," but then object to the term "healthcare provider." (Williamson's point equally applies to items 4, 21, 31, 52, 57, 74, 78 of second set.

VI. Lastly, CMS falsely claims an inability to answer due to "undefined" terms. (See D.I. 103 at item 5 and "Self Meds" and item 7 "chronic-care."). CMS blatantly misrepresents the facts because Williamson incorporated the definitions listed in his combined second set of interrogatories and production of documents..... (D.I. _____ ), which were directed to CMS previously and defined said terms.

## STIPULATIONS

Williamson stipulates to strike the following objectionable terms:

a) "normally" (item 32 of second set);
b) "is designed to" and replace with "is to" (item 33 Id.);
c) "also" and "designed" (item 34 Id.);
d) "normally" (item 38 and at 39 Id.);
e) "pharmacy and/or" (item 41 Id.); and
f) "refused" and replace with "failed" (item 74 Id.).

Consequently, Williamson stipulates to strike objectionable terms and thus CMS is expected to provide responses to these admissions.

In conclusion, the party who has requested admissions may move to determine the sufficiency of the answers or objections and if the court determines an objection is not justified, the matter may be deemed admitted or amended and other sanctions may be forthcoming. In the event that CMS fails its duty to complete the incomplete answers, or correct the false or evasive answers within ten days of receipt of this notice, then Williamson will move for a motion to compel and/or a sufficiency hearing pursuant to 36 (a), 37 and or 26 (e) (1), and any other applicable rules. Williamson is hopeful that CMS will correct its acutely deficient answers in D.I. 102 & 103.

Respectfully,

David Williamson

7-8-07

Date

4