IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| DAVID W. WILLIAMSON, | ) | |
| Plaintiff, | ) | |
| v. | ) | C.A. 06-379-SLR |
| CORRECTIONAL MEDICAL SERVICES, Inc, et al, | ) | |
| Defendants. | ) | |

FILED

AUG - 6 2007

U.S. DISTRICT COURT
DISTRICT OF DELAWARE

BD scanned

MEMORANDUM AND POINTS OF AUTHORITY IN SUPPORT OF PLAINTIFF'S MOTION FOR REARGUMENT
OR MOTION FOR RELIEF FROM JUDGMENT

Plaintiff, Williamson, pro se, hereby respectfully requests, pursuant to Local Rule of Civil Practice of the United States District Court for the District of Delaware 7.1.5, that the Court grant Williamson's Motion for Reargument in order to revisit its ___7-17·07___, 2007 Memorandum Order denying Williamson's request for medical care via a TRO/PI or alternatively provide relief form judgment pursuant to Fed. R. Civ. Proc. 60 (b). The following is offered in support:

* Note: Incorporated herein are the following: Williamson's TRO/PI and exhibits (DI 38) (e.g. Medication Distribution Log at I. A of TRO/PI, etc. ), Plaintiff's Reply and or Motion to Strike Defendants' CMS ... Response to Plaintiff's ... TRO/PI (DI ___) (e.g. Aff't "Log of Notices 2-05-07 at Ex- A of Williamson's Response, etc.) and Williamson's Addendum to TRO/PI (DI ___). Williamson is pro se and seeks pleading leniency pursuant to Haines v. Kerner, 404 U.S. 519 (1972). Williamson offers the following in support:

CMS asks this Honorable Court to deny Williamson's reasonable request for medical care for two reasons: Williamson "has failed to state a claim pursuant to 42 U.S.C. section 1983 because he cannot show that the defendants have been deliberately indifferent to a serious medical need," and that "defendants have addressed his concerns." (CMS response D.I. ___ at Argument section I.).

1. Both of CMS's averments are unsupported and belied by the record. Moreover, Williamson clearly established all of the requisite elements for his claims that Defendants violated his constitutional rights through their deliberate indifference to Williamson's serious medical needs (i.e. a prima facie case). Williamson also provided direct and circumstantial evidence sufficient to support same. Indeed, sufficient to withstand any motion for summery judgment had defendants filed one. Also, CMS exposes the frivolity of its averments, because it did not file any defense by motion (i.e. 12 (b) failure to state a claim) against Williamson's constitutional claims. Alternatively, CMS's reply to the TRO/PI

- Failed to dispute the elements considered for a TRO/PI;
- Failed to refute a single material fact, though if evidence existed it would have been in CMS's possession;
- Failed to support its own sparse and dubious averments with any sufficiency;
- Failed to refute or even challenge Williamson's claims of CMS's on going and pervasive bad faith efforts, which do provide a reasonable inference of defendants' subjective deliberate indifference; and
- CMS actually continues its bad faith with frivolous and scandalous materials.

In short, CMS failed to challenge or refute a single claim that Williamson suffers several serious medical conditions or that defendants were aware of same. Alternatively, CMS claims that Williamson "cannot show that defendants have been deliberately indifferent...."

First, CMS mistakes the nature and stage of the proceedings. Williamson need not prove his claims at this stage. Williamson need only show a likelihood of success on the merits. Williamson has done that.

For example, even at this early stage –and even absent discovery- Williamson provided direct and circumstantial evidence regarding defendants' subjective behavior:

- Defendants' engaged in a continuous and pervasive custom/policy t deny Williamson needed care and/or created an inordinate delay in providing said care –both for non-medical reasons;
- Defendants' employed bad faith, which did aggravate the denials and/or inordinate delays, and they repeatedly refused to take affirmative action even though there was a clear need to do so because the likelihood that Williamson's constitutional rights would be violate is great.

Ironically, CMS is painfully aware of the fact that Williamson's constitutional claims –if taking as true and correct- are sufficient enough that a reasonable juror would find for Williamson. The affidavits, logs, notices, memos, and correspondences Williamson provided were largely uncontested by CMS in any meaningful manner. The little bit that CMS did contest; it did so with scandalous and irrelevant material, and/ or with unsupported claims. It is not surprising that CMS chose not to file a defense motion or summary judgment.

Second, regarding defendants' deliberate indifference and whether Williamson can demonstrate a likelihood of success on the only element CMS disputed in their reply to Williamson's TRO/PI, Williamson has compiled an affidavit that underscores defendants' clear pattern of bad faith, deception, and aggravating factors. These factors provide a reasonable juror with a solid inference of defendants' deliberate indifference. (Please see Ex-A Affidavit). The affidavit outlines and supports repeat bad faith acts and strategies that defendants have employed over the relevant period. Also, it shows a progressive escalation of said bad faith. For instance, the following:

- By generating preposterous conclusions in conflict with the well established record and / or devoid of any reasonable support;
- By generating outlandish fabrications that were/are easily proven false;
- By generating fictitious policies that were concurrently proven false and malicious, and
- By generating false medical entries in Williamson's medical file and/or at grievance hearings.

(See Ex-A) Accordingly, defendants' –especially CMS's- bad faith is clear, unmistakable, and damning.

Williamson adequately and specifically addressed the frivolous claims CMS made in Williamson's response / motion to strike CMS's reply to Plaintiff's TRO/PI at items 1. and 2; however, he now adds the following in support of the instant motion:

2. CMS claims that it has made attempts to insure proper medication distribution to Williamson via a "new" corrective medication administration policy, and because of its attempts, CMS et al cannot be shown to have been deliberately indifferent. Consequently, CMS claims that it is merely negligent in this regard. CMS et al presented to the Court in support of its claim Exhibit "A" (policy), which purportedly represents its efforts; however, the Exhibit CMS offers is both irrelevant and a factual misrepresentation. Alternatively, it regards the Nurse's single dose dispensed medications –not Williamson's self- med blister pack cards- and CMS's exhibit simply does not in any way, shape, or form pertain to Williamson's issue or claims. Thus, CMS et al attempts to dupe the Court with immaterial and scandalous matter. CMS's bad faith response renders its theory of defense frivolous.

Moreover, said policy fails to make any reference to any material issue regarding Williamson's claims, such as:

- The procedure for scheduling Doctor's Refill Clinics (i.e. every 90 days?);
- The procedure for Self-med Card refills and or the duration (120 days?);

- 2 -

- The procedure for notifying the patient of Self-med card refills;
- The procedure for when Clinics are not scheduled on time;
- The procedure for failing to provide subsequent Self-med cards during the med cycle;
- The procedure for insuring that the doctor's orders are carried out;
- The procedure for providing Stock Supplies in the event of an CCMI; and
- The procedure for establishing Stock Supplies, etc.?

It is incredible that CMS would attempt to continue its charade and attempt to dupe the Court with an immaterial and scandalous misrepresentation of fact, but this behavior is not surprising because CMS has a history of bad faith misrepresentations. For example, Altman also claimed a "new" corrective medication distribution policy back in April 2006, but this too proved false: Proved to be a pretext. (Ex- A at items 30-63). Indeed, CMS has claimed no less than three such new corrective policies over the relevant period, but CMS asks Williamson/Court to believe this time it is real.

Contrary, to CMS's assertions of attempting corrective measure, CMS actually spent its energy on entirely different and aggravating acts than what it represents to this Court:

- Conducted a sham investigation and erroneously concluded that Williamson's claims were somehow "without merit" (See Ex-A at items 11-26). This was despite the fact that CMS had already conceded the merit of Williamson's claims at two prior grievance hearings;
- CMS maliciously refused to conduct necessary Refill Clinics: once in retaliation to his grievance activity (Re: MG 21201 and its Addendum). On the other occasion CMS aggravated the denial by falsifying medical records to give the appearance that it had provided the denied Clinic. (See Ex-C Aff't 10-25-06 at 2-13 of Williamson's Response /Motion to Strike). Both denials caused egregious CCMI.
- CMS treated Williamson with contempt, hostility, scorn, and as a nuisance rather than a patient at several of his relative grievance hearings. (id);
- CMS sent several letters to Williamson that were so erroneous and or contrary to the established record that they insulted his intelligence and showed a gross negligent disregard for his known serious medical needs. (See Ex –A at 11-26, 30-62, 64-79 and 120-136).

The above underscores the true nature of CMS's mock attempts to provide Williamson his doctor's prescribed CC Meds in a timely manner.

Moreover, CMS's assertions are in irreconcilable conflict with the record. CMS, for instance, claims that "Plaintiff is currently receiving his medications in a timely and consistent manner." (CMS's response at B). This is a bald misrepresentation and it is in conflict with the uncontested record. It is factually erroneous and misleading. For example, Williamson submitted an affidavit that outlined eleven CCMI between July 2005 and November 2006 with his TRO/PI (See TRO/PI Memorandum at Ex-I –A-1 at 8 (a) - (c)). Indeed, CMS characterizes these facts as "alleged lapses," however, CMS does not even attempt to refute a single episode in which Williamson claimed CMS unnecessarily denied him his needed and doctor's prescribed medications. CMS does, however, record each and every medication distribution and there are also ordering invoices, etc. in CMS's control. Thus, if Williamson's allegations were incorrect, then it is in CMS's control to refute them.

It is not surprising that CMS failed to refute even a single episode, because absent falsifying yet more medical records, CMS simply cannot do so. It is well settled that when a party fails to produce evidence that is in its control, it may be inferred that the evidence would be unfavorable to them. (See McCrary-El v. Shaw, 992 F.2d 809, 812-13 (8th Cir 1993).

Indeed, both the record and the ongoing episodes of CCMI clearly belie CMS's preposterous claims of "timely and consistent" medication distribution. For example, the uncontested record shows eleven unnecessary and easily avoidable CCMI(s) since July 05. During the interim –since filing his TRO/PI, CMS caused Williamson a twelfth CCMI from 1-17-07 to 1-22-07 and the thirteenth from 4-14-07 to 4-25-07. (See Williamson's Addendum to TRO/PI item 8). CMS simply refuses to take any real and meaningful action to correct the pervasive and continuous pattern of unnecessary CCMI(s). And like the majority of the CCMI(s), this too was aggravated because the on-site pharmacy actually possessed the already lapsed CC Meds but withheld them. Indeed, eight of eleven of the CCMI(s) were grossly aggravated –unnecessarily- by CMS's onsite pharmacy because it actually possessed the lapsed CC Meds and CMS did not refute or contest this assertion either. (See TRO/PI Memorandum Ex-I-A 1 at 41 and 8 (a) –(c)). We now know it actually involves thirteen episodes and that nine were aggravated. And they persisted unabated and uncorrected –despite CMS's erroneous allegations of making "attempts…"; and despite Williamson filing numerous requests, notices, and grievances.

During the thirteen continuous and pervasive CCMI(s), Williamson provided CMS with no less than twenty-five forms of written notice and filed no less than four medical grievances. (See Log of Notices at EX-A of Williamson's Response /Motion to Strike).

Consequently, the claims of CMS that "Williamson is currently receiving his medications as prescribed" and that the "record evidences attempts by defendants to timely deliver his medications: are in irreconcilable conflict with the uncontested record. Moreover, CMS's claims are further exposed as misrepresentations through its attempt to support said claims in bad faith and mislead the Court with irrelevant and scandalous material.

CMS's lone theory of negligence is also frivolous. Contrary to CMS's conclusory allegations and unsupported assertions, Williamson enjoys a likelihood of success on the merits. Williamson did not claim CMS was merely negligent in failing to provide his CC Meds. Alternatively, Williamson's claims are substantially similar to those in Jackson v. First Correctional Medical Services, 380 F. Supp. 2d 387, 391-392 (D. Del 2005). In Jackson this Court held that the inmate plaintiff stated a cause of action for deliberate indifference to his serious medical needs when the plaintiff alleged the following:

- That a custom/policy existed that failed to address the immediate needs of inmates with serious medical needs;
- That a custom/policy resulted in a continuous pattern of his medical treatment being delayed for non-medical needs; and
- That the absence of a policy to correct defects is tantamount to alleging physicians are unable to exercise professional judgment.

Williamson claimed the above and supported it with sufficiency. Also, he claimed intentional and or aggravated interference with his CC Meds along the lines of White v. Napoleon, 897 F.2d 103, 109-110 (3d Cir. 1990). In the spirit of brevity, however, Williamson will refrain from a full briefing on the issue. Unless, of course, the Court directs otherwise. Williamson has established a substantial likelihood of success on the merits regarding this matter, and for the purpose of his injunction, Defendants have failed to show good cause to deny it.

3. CMS again presents misrepresentations of fact and attempts to mislead the Court in its claim that Williamson's request for medical care for his serious knee injury is moot.

For example, in May 2006, Dr. Durst diagnosed Williamson with a "completely severed" anterior cruciate ligament (ACL) Durst also admitted that the neoprene knee wrap Williamson was provided was not designed for an ACL injury and could not protect the inherent instability of the knee. Thus it was admitted to be wholly inadequate and CMS was aware of same as early as May 2006. CMS did not dispute this fact. Durst did, however, concede that suitable alternatives existed that were made of rigid plastic frames designed to protect against instability and hyperextensions (i.e. protect against further injuries and falls). (See Declaration in Support of TRO/PI (Decl.), at 33-34). Durst indicated then that he would (a) follow up on the suitable alternative knee brace and (b) pre-file Williamson's surgery referral, but that procedure would nevertheless require a recommendation of a specialist.

Orthopedic specialist, Dr. DuShuttle, confirmed the torn ACL in June 2006, and recommended the following:

- Provide reconstructive surgery,
- Provide a Don Joy ACL knee brace, and
- Provide physical therapy.

DuShuttle's report outlined the permanent and deteriorating nature of Williamson's serious knee injury, and it underscored his opinion –evidently based on experience- that CMS would not provide the medically necessary knee brace due to high cost and would not provide the physical therapy. (Note that CMS was silent as to any physical therapy in its response). DuShuttle stressed the crucial nature of post-op physical therapy as essential to success of the operation. (See Aff't dated 7-06-06 at 3-9 of TRO/PI at Ex-E). DuShuttle also concurred with Durst regarding the acute inadequacy of the neoprene knee wrap.

Eight months have passed since the orthopedic specialist made his recommendations; however, CMS had refused to provide a single medically needed recommendation whatsoever until March 14, 2007, and then it was only provided due to Williamson's TRO/PI filing. CMS created an inordinate delay that exposed Williamson to unnecessary suffering, deterioration, and a substantial likelihood of future injury via falling incidents, etc. Moreover, contrary to CMS's claims of attempting to follow-up and of holding communications with DuShuttle "over the next few months," the record reflects that as late as 10-18-06, Durst's surgery referral had been ignored and that no indication of follow-up appeared in Williamson's medical file as illuminated by Dr. VanDusen. (Id. TRO/PI Decl. at 30). Vandusen's 10-18-06 revelation also demonstrates the falsity of CMS's other prior promises to "follow-up" that were made by CMS representatives Gail Eller and S. Altman (8-01-06 and 8-16-06 respectively). (See TRO/PI Decl. at 30-31). Indeed, CMS has demonstrated a history of making false promises and of making misrepresentations. Not only is CMS's claim of holding communications over the next few months in irreconcilable conflict with the record, but any alleged communications with DuShuttle and or any alleged failure to reach a compromise with DuShuttle is extremely dubious. Indeed, no affidavit or report was produced of any alleged communications. When were they conducted? This is material to CMS's claims of taking "extraordinary arrangements" and of "attempting to follow-up." What was the substance of these alleged communications? We do not know the answers to these pertinent questions, because CMS asks this Court and Williamson to simply accept its unsupported and dubious claims of faith. And how is it that no compromise was made regarding a suitable alternative knee brace? Are we to believe that a professional doctor chose to accept the least adequate knee wrap and alternatively opt to forgo any type of upgraded knee brace simply because he could not acquire for Williamson the most favored Don Joy ACL knee brace –like some petulant child who refuses to play because he cannot get his way? This is absurd and CMS's unsupported claims are highly suspect. Clearly any alleged communications are in the control of CMS and it can be inferred had CMS disclosed the actual communications that the evidence would be unfavorable to them. (See McCrary-El v. Shaw, at 812-813). Also, there is not evidence that the Department of Correction has actually prohibited the Don Joy ACL knee brace or whether it was actually privy to the matter, or whether a medical device needed to prevent permanent injury trumps the alleged security concern. In

any event it is irrelevant and illegitimate because there are suitable alternatives. CMS actually offers a pretext to cover its malfeasance and inordinate delay and or denials.

Indeed, whether or not CMS/defendants took reasonable efforts to (a) follow up on surgery or (b) follow up on the Don Joy brace, and (c) when and if DDOC actually ever weighed in on the medical matter and/or actually prohibited the Don Joy brace as claimed by CMS is key to any deliberate indifference claim. If CMS delayed for non-medical reasons or created a pretext, then such acts suggest mal-intent (i.e. defendants' subjective deliberate indifference). (See Durmer v. O'Carroll, 991 F.2d 64, at 68-69 (3rd Cir. 1993). Also, this very type of factual question was raised in Taylor v. Plousis, 101 F.Supp 2d 255, at 265 (D. NJ 2000). (See 265 and holding item 3). "Whether Dr. [defendants] actually sought to obtain prosthesis for plaintiff and, if so, what efforts she made on his behalf...." (Id at 265) raised issue of material fact that precluded summary judgment. In Taylor, the defendants denied plaintiff needed pain killers, new stomp socks, and they forced him to walk on a broken prosthesis for seven months. (emphasis added). For seven months defendants in Taylor caused plaintiff needless pain and suffering, and the Court noted the Third Circuit's ruling when it declared "that a medical condition which threatens a plaintiff's ability to walk, even on a non-permanent basis.... [is] a 'serious medical need.'" (Id. at 262) (citing Lanzaro v. Mommouth County Corr't, 834 F2d 326, 347 (3d Cir. 1987).

Consequently, CMS claimed that it took "extraordinary arrangements" and of "attempting to follow up" regarding Williamson's needed surgery, Don Joy brace, etc. Williamson specifically challenged CMS's unsupported claims as preposterous. (See Williamson's Response/motion to Strike at item 3). CMS refused to offer any evidence of any extraordinary arrangements, of any attempts to follow up, and of any communications regarding the Don Joy brace. Alternatively, CMS, quickly and quietly sent Williamson out to be fitted for the Don Joy brace –rather than support its false claims- and CMS appears to have abandoned its pretexts for lack of veracity. If CMS had actually performed as it claimed, then it would have evidence of same in its possession and it could have refuted Williamson's claims and his documentation. CMS did not do so. It is well settled that when a party fails to produce evidence in its control, it may be inferred that the evidence would be unfavorable to them. (McCrary-El v. Shaw, supra at 8125-813)

Lastly, it must be noted that CMS never contested Williamson's claims that his knee is a serious permanent injury that significantly impairs his normal daily functions and that the inordinate delay/denial of providing an appropriate knee brace and doctor's recommended surgery exposes Williamson to a significant and likely risk of future permanent injury via continued deterioration and or inherent dangerous falling/collapsing incidents. CMS was forced to provide the surgery and the Don Joy brace, but as yet two months has passed since the surgery and no physical therapy has been provided. (see Ex-A at 93-119 for further evidence of CMS's pattern of bad faith regarding Williamson's serious knee injury please). DuShuttle predicted this eventuality and the issue is not moot as CMS claims.

4. Williamson overcame CMS's frivolous and scandalous claims regarding his periodontal disease and broken tooth in his Response/Motion to Strike and need not re-brief the issue here. (See Response/Motion to Strike at items 3-4).

WHEREFORE, the Court is warranted in reconsidering any denial of the TRO/PI or providing relief from the judgment.

David Williamson, SBI # 183022, 1181 Paddock Rd, Smyrna, DE 19977

8·3·07
Date

## CERTIFICATE OF SERVICE

I, David Williamson, the pro se plaintiff in C.A. No. 06-379-SLR, do hereby declare under penalty of perjury that I have caused to be delivered a true and correct copy of the following documents:

1. _Plaintiff's Motion for Reargument or Motion for Relief From Judgment._

2. _*/*# Affidavit of David Williamson: (Court's Orders, D.I 122, 121, 119, 120 Refused & Returned by DCC Mailroom)_

By placing same in a U.S. postal receptacle on this _3_ day of _August_ 200 _7_, and

Addressed to the following parties:

Amy A. Quinlan, Esq.
Morris James LLP
Counsel for Correctional Medical Services, Inc.
500 Delaware Ave., Suite 1500
Wilmington, DE 19801-1494

Patrick Rock, Esq.
(Counsel for CMS, Inc.)
913 Market St., #800
Wilmington, DE 19801

Daniel McKently, Esq.      , Inc.
(Counsel for FCM, Inc.)
1225 N. King St., Suite 1100
Wilmington, DE 19809-0397

James E. Drnec, Esq.
(Counsel for Zimbal)
711 N. King St.
Wilmington, DE 19801

_N/A_

_N/A_

David Williamson, SBI #183022
DCC
1181 Paddock Rd.
Smyrna, DE 19977

DAVID Williamson
183022 W.1
Delaware Correctional Center
1181 Paddock Rd
Smyrna, DE 19977



U.S. District Court
844 King St.
Lockbox 18
Wilmington, DE 19801-3570

Legal Mail

# ATTACHMENTS FOR SECTION I.

## (A-K)

A.    .Medication Distribution Log    .    .    .    .    (Marked A-1-4 ¢ ) EX. AA.1-11).

B.    Affidavit 9/19/05    .    .    .    .    .    (Marked B-1- B-2)

C.    Medical Grievance (MG) #15453 Report Package    .    (Marked C-0 –C-7)

D.    Affiant's Notice 2/09/06    .    .    .    .    .    (Marked D-1)

E.    Altman's [Sham Investigation] Letter 3/09/06    .    .    (Marked E-1)

F.    Affiant's Notice of Continuing CCMI 3/13/06    .    .    (Marked F-1)

G.    Affiant's [Challenge] 3/15/06    .    .    .    .    (Marked G-1)

H.    Altman's [reverse Course] Letter 3/22/06    .    .    (Marked H-1)

I.    Affiant's continuing CCMI'(s) 3/21/06    .    .    .    (Marked I-1)

J.    Affiant's [Challenge] 4/19/06    .    .    .    .    (Marked J-1)

K.    Altman's [Thorough Investigation] Letter 4/25/06    .    (Marked K-1).

*Medication Distribution Log Via the*

## AFFIDAVIT OF DAVID WILLIAMSON

1. I, David Williamson, am the Affiant listed above and do depose and state the following in support of C.A. 06-379-SLR:

2. CMS caused Affiant to experience eleven needless and avoidable Chronic-care Medication Interruptions (CCMI) between July 2005 and November 2006.

3. These eleven CCMI(s) are summarized below at (e.g. Summary... 8 (a-c)), and detailed (e.g. Details... 9 - 41), but first Affiant must describe the relative terms of the medication distribution system as it pertains to Chronic-care patients (below Background 4 – 7).

4. BACKGROUND: First, Chronic-care patients (CC Patients) receive Chronic-care Clinics (Clinics), which are scheduled automatically about every ninety days, for the purpose of ordering a "Refill" of the next lot of Chronic-care medications (CC Meds). Typically, a Refill order comprises four (thirty dose) blister pack cards (Med Cards) totaling 120 doses if a CC Patient is on "Self Meds." The additional thirty doses are supposed to act as a buffer between the ninety day Clinics to ensure that no medication interruptions occur.

5. Affiant is on Self Meds and receives two Med Cards: one is Levothyroxine (i.e. thyroid medication) and Multivitamins (Mtv) that acts to supplement the thyroid meds and assist in converting food to useful energy.

6. CMS's medication distribution system (Med System) employs a "Fax and Fill" ordering method in which a Clinic's Refill order is placed with the drug distributor and the CMS on-site pharmacy (pharmacy) in turn receives the ordered meds as fast as "twenty-four hours" but no later than "four days." This was verified by CMS representative Mr. Linton at Affiant's Grievance hearing (MG # 15453). Moreover, once the Refill is realized at said Clinic, the pharmacy is to automatically provide the subsequent Med Cards (i.e. second, third, and fourth cards) within the final five doses of any prior card to eliminate CCMI(s). In theory it works, and if followed it works, but in practice it is an utter failure.

7. The pharmacy processes the meds and notifies the CC Patient to retrieve them by listing his name on a Medication Pick-up List (MPL). Typically, the listing continues for five consecutive days, if the CC Patient fails to retrieve his meds- and thereafter is removed from the MPL.

8. SUMMARY OF CCMI(s):

(a). The first lot of CC Meds (i.e. 120 doses ea) were ordered to run form 7/18/05 through 11/15/05, but it was stretched out until 1/06/06 instead due to CMS causing four consecutive CCMI(s):

I. CCMI from 7/15/05 to 7/27/05 (12 days) (pharmacy possessed them since 7/22/05 but withheld them);

II. Consecutive CCMI from 8/27/05 to 9/05/05 (9 days);

III. Consecutive CCMI from 10/04/05 to 10/06/05 (2 days) (pharmacy also failed to post MPL): and

IV. Consecutive CCMI from 11/05/05 to 11/09/05 (4 days) (pharmacy possessed them since 11/05/05 but withheld them);

(b). The second lot of CC Meds (i.e. 120 doses ea) should have been Refilled around 10/18/05 (i.e. within ninety days of the first Clinic date of 7/18/05), but CMS failed to correct the CCMI(s) and belatedly ordered this lot to run from 1/06/06 to 05/05/06:

V. Consecutive CCMI from 12/07/06 to 1/04/06 (28 days) (pharmacy possessed alternative "Stock" supplies but withheld them);

I. A

VI. Consecutive CCMI from 02/11/06 to 02/13/06 (2 days) (pharmacy possessed them on either 02/09 or 02/10/06, but withheld them); and
VII. Consecutive CCMI from 03/13/06 to 03/28/06 (15 days) (pharmacy possessed them since 03/22/06, but withheld them);

*Note that only three Med Cards were supplied with this lot, thus it is actually a 90-dose lot with the next lot beginning thereafter.

(c). The third lot of CC Meds (i.e. 120 doses ea) should have been Refilled around 01/18/06 (i.e. within 180 days of the first Clinic date of 7/18/05), but CMS failed to correct the CCMI(s). Nevertheless, adjusting for the belated second 01/06/06 Clinic Refill order, this third lot should have been Refilled around 04/06/06, but CMS failed to correct the CCMI(s) and belatedly ordered this lot to run from 05/05/06 through 09/02/06 and causing still more CCMI(s):
VIII. Consecutive CCMI from 04/27/06 to 05/09/06 (12 days) (pharmacy also failed to post MPL):
IX. Consecutive CCMI from 06/08/06 to 06/29/06 (22 days) (pharmacy possessed them since 06/21/06, but withheld them);
X. Consecutive CCMI from 07/30/06 to 08/06/06 (8 days); and
XI. CCMI from 10/05/06 to 10/25/06 (19 days) (pharmacy possessed them since 10/21/06, but withheld them).

9. DETAILS OF CCMI: On 07/01/05 Affiant was scheduled for a Clinic, but it was cancelled and CMS caused the first of eleven unnecessary CCMI(s).

10. On 07/18/06 (circa) Dr. Alie placed a Refill order for 120 doses of Affiant's CC Meds (begin 0n 07/18/05 through 11/15/05), in lieu of providing said Clinic. This was in response to complaint Affiant filed on 07/11/05 regarding the cancelled 07/01/05 Clinic, which Affiant predicted would cause an avoidable CCMI.

11. On 07/15/05 CMS caused a CCMI of twelve days (7/15 to 7/27); however, the pharmacy actually possessed these lapsed CC Meds on 07/22/05 but refused to dispense them to Affiant until 07/27/05. (See Ex. AA-1).

12. Based on Alie's 07/18/05 Refill order, Affiant's second set of Med Cards should have been provided before 08/18/05, but CMS refused to correct the CCMI and did not dispense them until 09/05/05.

13. For example, on 08/27/05 CMS caused the second consecutive CCMI of nine days (08/27 to 09/05) and also failed to provide the doctor's ordered Multivitamin (Mtv). (See AA-2).

14. Adjusting for the second CCMI, Affiant's third set of Med Cards should have been provided before 10/04/05, but CMS still refused to correct the CCMI and did not dispense them until 10/06/05.

15. For example, on 10/04/05 CMS caused the third consecutive CCMI of two days (10/04 to 10/06), however, the pharmacy had no intent even then to provided the CC Meds because it failed to notify Affiant via the MPL and Affiant only received them because he attended a medical grievance hearing at the hospital on 10/06/05 for the very issue. (See AA-3).

16. Adjusting for the third CCMI, Affiant's fourth and final set of Med Cards should have been provided before 11/05/05, but CMS still refused to correct the CCMI and did not dispense them until 11/08 or 11/09/05.

17. For example, on 11/05/05 <u>CMS caused the fourth consecutive CCMI of four days</u> (11/05 to 11/09); however, the pharmacy actually possessed these lapsed CC Meds on 11/05. (See AA-4).

18. During the interim, a ninety day Clinic should have been automatically scheduled around 10/18/05 (based on the previous/known 07/18/05 Clinic) in order to Refill the nest 120 dose lot, but CMS still refused to correct the CCMI and did not schedule the Clinic until 11/11/05, and, however, did not actually conduct a Clinic until 1/04/06.

19. For example, on 11/11/05 affiant was sent to a Clinic forty-five minutes tardy, however, this was due to the hospital failing to post Affiant's name on the "Offender activity Schedule" (not his fault or responsibility), and Nurse practitioner Ihuoma refused to conduct the necessary Clinic and refused to otherwise complete the "Refill" order (as Alie had done on 07/18/05).

20. Affiant filed a medical grievance (second regarding CCMI) on 11/14/05 specifically against Ihuoma for her refusal to conduct the Clinic, and provided the deficient "Offender Activity Schedule," and accurately predicted that it would cause another unnecessary CCMI.

21. On 11/29/05, Affiant was again scheduled with Ihuoma for the belated Clinic but she again refused to conduct it or complete the Refill intentionally causing the fifth Consecutive CCMI.

22. Adjusting for the fourth CCMI of 11/05/05, Affiant should have been provided the first Med Card of the second 120 dose lot before 12/08/05, but CMS still refused to correct the CCMI and did not dispense them until an egregious 01/04/06.

23. For example, on 12/07/05 <u>CMS caused the fifth consecutive CCMI of twenty-eight days</u> (12/05 to 01/05/06) and CMS refused to provide any Mtv. in violation of the doctor's order. Indeed, Affiant only received any CC Meds on 01/04/06 because Dr. Burns –who finally conducted the Clinic and who placed the next lot to run from 1/06/06 to 05/05/06- had produced an alternative supply from the pharmacy's "Stock" supplies, which had been there all along (dated since 03/19/05).

24. For example, on 01/11/06 Affiant received his first Med Card (absent the Mtv) and experienced his fifth unnecessary CCMI (See AA-5).

25. Adjusting for the fifth CCMI (based on receiving the 1/11/06 Card), Affiant should have been provided his second set of Med Cards before 02/11/06, but CMS still refused to correct the CCMI and did not dispense them until 02/13/06.

26. For example, on 02/11/06 <u>CMS caused the sixth consecutive CCMI of three days</u> (2/11 to 2/13), however, the pharmacy actually possessed the lapsed CC Meds on either 2/09 or 2/10 but refused to dispense the lapsed CC Meds to Affiant until 2/13/06. (See AA-6).

27. Adjusting for the sixth CCMI of 2/11/06, Affiant should have been provided his third set of Med Cards before 3/12/06, but CMS still refused to correct the CCMI and did not dispense them until an egregious 3/28/06.

28. For example, on 3/13/06 <u>CMS caused the seventh consecutive CCMI of fifteen days</u> (3/13/06 to 3/28/03); however, it is asserted that the pharmacy actually possessed the lapsed CC Meds since 03/22/06 but refused to dispense them until 3/28/06. (See AA-7) and (                    ).

29. Adjusting for the seventh CCMI of 03/13/06, Affiant should have been provided the fourth set of his CC Meds before 04/27/06, but CMS still refused to correct the CCMI and did not dispense them until 05/09/06. *Note that the fourth set was not actually provided as a third lot of 120 doses began in its place, thus this lot was in fact a ninety dose lot instead of a 120 dose lot.

I·A

30. During the interim the ninety day Clinic should have been provided around 4/06/06 (adjusted for the last known/documented Clinic of 1/06/06 by Dr. Burns) in order to Refill Affiant's CC Meds and avoid another unnecessary CCMI, but CMS still refused to correct the CCMI and did not provide the necessary Clinic until 05/08/06. (Clinic held Refill ordered to run from 05/05/06 to 9/02/06).

31. For example, on 4/27/06 CMS <u>caused the eighth consecutive CCMI of twelve days</u> (4/27/06 to 5/09/06). (See A·8).

32. Adjusting for the eighth CCMI of 4/27/06, Affiant should have been provided his second set of Med Cards before 6/08/06, but CMS still refused to correct the CCMI and did not dispense them until 6/26/06.

33. For example, on 6/08/06 CMS caused the ninth consecutive CCMI of an egregious twenty-two days (6/08/06 to 6/29/06), and even then the pharmacy did not intend to provide them because it refused to list Affiant on the MPL. Affiant was called in at 7:30 pm due to the Deputy Warden's intervention. (See A·9).

34. Again the pharmacy actually possessed the lapsed CC Meds earlier on 6/21/06, but refused to dispense them to Affiant until 6/29/06. (See Altman's 7/19/06 Letter at II·8·1      ).

35. Adjusted for the ninth CCMI or 6/08/06, Affiant should have been provided his third set of Med Cards before 7/29/06, but CMS still refused to correct the CCMI and did not dispense them until 8/08/06.

36. For example, on 7/30/06 CMS <u>caused the tenth consecutive CCMI of eight days</u> (7/30/06 to 8/08/06). (See A·10).

37. Adjusted for the tenth CCMI the fourth set of Med Cards was due before 9/07/06, and for the first time since July 05, Affiant received this set in a timely manner. Accordingly, the first set of the nest 120 dose lot should have been provided before 10/07/06, but CMS still reverted back to its custom/policy of creating unnecessary CCMI and did not dispense them until an egregious 10/24/06.

38. But first, during the interim, a ninety day Clinic should have been provided around 8/5/06 (adjusted for the last known/documented Clinic of 05/05/06), but CMS refused to conduct the necessary Clinic until an outrageous 10/18/06, and that was only realized after Affiant filed an Emergency Medical Grievance and went to the first hearing.

39. It appears the CMS's one and only instance of providing Affiant his CC Meds in a timely fashion was merely anomaly.

40. For example, on 10/05/06 CMS <u>caused the eleventh CCMI of an egregious nineteen days</u> (10/05/06 to 10/24/06); however, the pharmacy actually possessed the lapsed CC Meds since 10/21/06, but refused to dispense the lapsed CC Meds until 10/24/06 (even then the pharmacy did not notify Affiant via the MPL or provide Affiant his Mtv.). (See A·11).

41. Indeed, eight of the eleven CCMI(s) were grossly aggravated –unnecessarily- because the pharmacy either actually possessed the lapsed CC Meds but refused to dispense them or refused to otherwise notify Affiant via the MPL. Moreover, this outrageous behavior persisted despite Affiant providing adequate notice before and after each and every CCMI, and despite Affiant filing three related medical grievances.

42. The above is True and Correct based on Affiant's personal experience, observaton, and to the best of his knowledge.

Sworn and Subscribed before me this __29__ day of _November_ ,2006.

_Davd W_
David Williamson

Brian D. Engrem
Notary Public, State of Delaware
My Commission Expires June 14, 2008

_Brian D Engrem_
Notary Public

The First 120 dose Lot of CC Meds [1] was ordered by Dr. Alie to run from 7/18/05 to 11/15/05 (i.e. four blister pack cards [2] of thirty-dose each) to run consecutively. Below are photocopies and relevant history of CMS's mismanagement of CC Meds distribution. **FIRST LOT: 1 of 4 CC Med Cards**



Levothroxine (Levo.)  Start: 7/18/05  Processed by Pharmacy: 7/22/05    Dispensed: 7/27/05

Result: Unnecessary CCMI form 7/15/05 to 7/27/05



Multivitamin (Mtv.)    Same as above.

[1] Affiant's CC Meds consist of Levothyroxine for his chronic thyroid condition, of which must be taken daily –at the same time- and uninterrupted to ensure their effectiveness; and consists of Multivitamins to supplement the former and assist in converting food to useable energy.

[2] CC Meds come in thirty dose blister packs and normally contain the following information: (1) type and dosage of drug, (2) prescribing physician, (3) the date range (i.e. "Start," Dispense "Disp," and "Stop" dates), and it lists the remaining Refills "RFL" (e.g. after the first of four cards it would read as RFL: 3, which indicates that three thirty dose cards remain to be dispensed). Note that around the Ninety day mark a Clinic is to be held for the purpose of ordering a subsequent "Refill" of the next 120 dose Lot.

The First 120 dose Lot of CC Meds (7/18/05 to 11/15/05): **FIRST LOT: 2 of 4 CC Med Cards**



Levo: Based on the known/documented 7/18/05 Start date, this Card should have been dispensed before
8/15/05, but CMS chose not to correct the Chronic-care Medication Interruption (CCMI). 
Adjusted for the prior 7/27/05 CCMI, this Card should have been dispensed before 8/27/05, but
CMS again chose not to correct the CCMI. Alternatively, CMS did not dispense the lapsed CC
Meds to Affiant until 9/05/05. Result: Unnecessary CCMI form 8/27/05 to 9/05/05.



Mtv:

The First 120 dose Lot of CC Meds (7/18/05 to 11/15/05) **FIRST LOT: 3 of 4 CC Med Cards**



Levo. Based on the known/documented 7/18/05 Start date, this Card should have been dispensed before 9/15/05, but CMS chose not to correct the CCMI. Adjusted for the prior known/documented 9/05/05 CCMI, this Card should have been dispensed before 10/05/05, but CMS again chose not to correct the CCMI. Alternatively, CMS did not provide these lapsed CC Meds to Affiant until 10/0605. Also, the pharmacy did not intend to dispense the lapsed CC Meds, because it refused to notify Affiant via the Medication Pick up List (MPL); Affiant only received them on 10/06/05 because he attended a Medical grievance hearing (# 15453) at the hospital that day.
Result: Unnecessary CCMI form 10/04/05 to 10/06/05.



Mtv:    Same as above.

A A-3

The First 120 dose Lot of CC Meds (7/18/05 to 11/15/05) **FIRST LOT: 4 of 4 CC Med Cards**



Levo.  Based on the known/documented 7/18/05 Start date, this Card should have been dispensed before
10/15/05, but CMS chose not to correct the CCMI. Adjusted for the prior known/documented
10/06/05 CCMI, this Card should have been dispensed before 11/06/05, but CMS again chose
not to correct the CCMI. Alternatively, CMS did not dispense these lapsed CC Meds to Affiant
until 11/09/05. Also, the pharmacy aggravated the CCMI because it actually possessed the CC
Meds by at least 11/05/05, but withheld them.

Result: Unnecessary CCMI form 11/05/05 to 11/09/05.



Mtv.

Mtv. Same as above.

A  A-4

The Second 120 dose Lot of CC Meds was ordered by Dr. Burns to run from 1/06/06 to 5/06/06, however, Affiant's prior -known/documented- Clinic of 7/18/05 required the subsequent Clinic to be provided around 10/18/05 (i.e. around the ninety day mark), and it required this Lot to begin before 11/15/05, but CMS chose not to correct the continuous CCMI (s). **SECOND LOT: 1 of 4 CC Med Cards**



Levo: Start: 1/06/06, but <u>adjusted</u> for the prior known/documented 11/09/05 CCMI, this <u>Card should have been dispensed before 12/08/05</u>; CMS still chose not to correct the (CCMI. Alternatively <u>CMS did not dispense these egregiously lapsed CC Meds to Affiant until 1/11/06</u>. This also violated Dr. Burns' Refill order, which was to begin on 1/06/06.

Result: Unnecessary CCMI form 1/04/06 to 1/11/06.



NOT PROVIDED

Mtv: was withheld from Affiant in violation of Dr. Burns' 1/06/06 Refill order.

* Note: This Lot actually consisted of only 90 doses (i.e. three cards) and the fourth was skipped as this next Lot began.

The Second 90 dose Lot of CC Meds (1/06/06 to 5/6/06): <u>SECOND LOT: 2 of 3 CC Med Cards</u>



Levo.  Based on the known/documented 1/06/06 Start date, this <u>Card should have been dispensed before</u>
<u>2/06/06,</u> but CMS chose not to correct the CCMI. Also, the pharmacy aggravated the CCMI
because it actually possessed the CC Meds on either 2/09 or 2/10/06, but <u>withheld the lapsed CC</u>
<u>Meds until 2/13/06.</u>

Result: Unnecessary CCMI form 2/11/06 to 2/13/06.



Mtv. was withheld from Affiant in violation of Dr. Burns' 1/06/06 CC Med order.

The Second 90 dose Lot of CC Meds (1/06/06 to 5/6/06): **SECOND LOT: 3 of 3 CC Med Cards**



Levo.  Based on the known/documented Start date of 1/06/06, this Card should have been dispensed
before 3/06/06, but CMS chose not to correct the CCMI. Adjusted for the 2/13/06 CCMI, this
Card should have been provided before 3/13/06, but CMS again chose not to correct the repeated
CCMI(s). Alternatively, CMS did not dispense the lapsed CC Meds to Affiant until an egregious
3/28/06. Also, once again the pharmacy aggravated the CCMI, because it possessed the lapsed
CC Meds as early as 3/22/06 but withheld them. Result: Unnecessary CCMI 3/13/06 to 3/28/06.



Mtv.  Same as above.

* Note: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

The Third 120 dose Lot of CC Meds was ordered by Nurse Practitioner Ihuoma to run from 5/05/06 to 9/02/06, however, Affiant's prior -known/documented- prior Med Card of 3/28/06 (adjusted for the CCMI) required the this Lot to begin before 4/28/06. **THIRD LOT: 1 of 4 CC Med Cards**



Levo: Start: 5/05/06, but underlined adjusted for the prior known/documented 3/28/06 CCMI, this Card should have

been dispensed before 4/28/06; CMS chose not to correct the CCMI. Alternatively CMS did not

dispense these egregiously lapsed CC Meds to Affiant until 5/09/06.This also violated Ihuoma's

Refill order, which was to begin on 05/05/06.

Result: Unnecessary CCMI form 4/27/06 to 5/09/06.



Mtv: Same as above.

I · A A

The Third 120 dose Lot of CC Meds (5/05/06 to 9/02/06) **THIRD LOT: 2 of 4 CC Med Cards**



Levo. Based on the known/documented Start date of 5/05/06, this Card should have been dispensed before 6/05/06, but CMS chose not to correct the CCMI. Adjusted for the 5/09/06 CCMI, this Card should have been provided before 6/09/06, but CMS again chose not to correct the repeated CCMI(s). Alternatively, CMS did not dispense the lapsed CC Meds to Affiant until an egregious 6/29/06. Also, once again the pharmacy aggravated the CCMI, because it possessed the lapsed CC Meds as early as 6/21/06 (according to Altman's 7/19/06 letter (See II-B-1), but withheld them. Result: Unnecessary CCMI 6/08/06 to 6/29/06.



Mtv. Same as above.

The Third 120 dose Lot of CC Meds (5/05/06 to 9/02/06) **THIRD LOT: 3 of 4 CC Med Cards**



Levo.  Based on the known/documented Start date of 5/05/06, this Card should have been dispensed

before 7/05/06, but CMS chose not to correct the CCMI. Adjusted for the egregious 6/29/06

CCMI, this Card should have been provided before 7/29/06, but CMS again chose not to correct

the repeated CCMI(s). Alternatively, CMS did not dispense the lapsed CC Meds to Affiant until

an egregious 8/08/06. Result: Unnecessary CCMI 7/30/06 to 8/08/06.



Mtv. Same as above.

*NOTE: The final card (4 of4) was actually provided before another CCMI occurred. This was the first
such instance –after ten consecutive CCMI(s) - that CC Meds were timely provided; however, CMS
quickly restored its custom/policy of creating CCMI(s) on the very next opportunity. And CMS did so in
spectacular fashion.

A **A-10**

The Fourth 120 dose Lot of CC Meds was belatedly ordered by Dr. VanDusen to run from 10/20/06 to 2/17/07, however, Affiant's prior -known/documented- Clinic of 5/05/06 required the a subsequent Clinic to occur around 8/05/06, but of course it did not. **FOURTH LOT: 1 of 4 CC Med Cards**



Levo: Start: 10/20/06, but based on the known/documented "Stop" date of the prior Lot 9/02/06, this
Card should have been dispensed before 10/02/06, but CMS chose not to correct the CCMI.
Alternatively CMS did not dispense these egregiously lapsed CC Meds to Affiant until 10/25/06.
Moreover, this belated Clinic was the very same Clinic that CMS had falsified in response to
Affiant's grievance activity (phantom Clinic of 8/31/06), and CMS had to concede by actually
conducting the Clinic on 10/18/06. (See Section $VI-A-2 \, \dot{e} \, 3$, items $5-17 \, (9-27-06)$ ).
Result: Unnecessary CCMI form 10/05/06 to 10/25/06.



**NOT PROVIDED**

Mtv: Was mistakenly not ordered.

AFFIDAVIT OF DAVID WILLIAMSON

1. I David Williamson am the Affiant above and do depose and state the following:

2. Affiant has unnecessarily experienced repeat interruptions in receiving his prescribed "chronic-care" medications (meds) as a direct result of Correctional Medical Services (CMS) and its personnel's deliberate indifference to Affiant's known serious medical needs.

3. For example, from 7-15-05 to 7-27-05 Affiant was denied his chronic-care meds (e.g. Lovothyroxine, i.e. Synthroid); however, Affiant notified CMS personnel, Dr. Alie on 7-11-05 via letter that said meds would run out on 7-15-05.

4. No meds were issued on 7-15-05 and Affiant filed an Emergency Medical Grievance (EMG) directly with CMS by placing same in their "Sick Call" lock box, of which CMS personnel collects on a daily basis.

5. Affiant subsequently placed CMS on further "Notice" via letter of complaint on 7-22-05, because CMS failed to issue said meds and disregarded the prior letter and EMG.

6. On prior occasions when interruptions occurred and the health care provider failed to issue chronic-care meds and failed to head notice, Affiant was forced to have his family members call a complaint in to the Warden's Office, and consequently, the health care provider issued "Stock Supplies" of said meds. (Note the Affiant takes 50 mics, though stock supplies were 80 mics, so these doses were broken in half and given to Affiant with directions to take one half dose until his standard 30-day med-card was received). This has occurred on at least two prior occasions, both of which the Warden's Office had to force the health care provider to issue meds that they already had in stock supplies, but had refused to dispense Affiant, who is a Chronic-care patient.

7. Despite three forms of notice addressing the 7-15-05 to 7-27-05 interruption; and despite prior grievances addressing these repeat interruptions, and despite prior grievance agreements to correct this repeat behavior, and despite CMS keeping stock supplies of said meds, CMS refused to issue Affiant his chronic-care meds, which evinces a deliberate indifference to Affiant's known serious medical needs.

8. Affiant belatedly received his meds on 7-27-05 –twelve days elapsed- and noted that said meds had been received by CMS's on-site pharmacy on 7-22-05, however, despite CMS actually possessing Affiant's meds on 7-22-05, they refused to issue the already past due meds until five days later.

9. Affiant attended a Level One Grievance hearing on 7-28-05 the following day with CMS personnel Larry Linton.

10. Mr. Linton acknowledged the on-going problem as unacceptable and assured Affiant that every effort would be effected to correct the problem, however, when Affiant pointed out that he placed CMS on notice prior to and after the interruptions of his meds and that CMS had received the meds on 7-22-05 but refused to issue them to Affiant until five days later, and that this behavior evinces a deliberate indifference to Affiant's serious medical needs, Mr. Linton could not offer an explanation and agreed that the behavior was troubling.

11. Mr. Linton gave Affiant the names of two CMS high level personnel to contact if the problem persisted: Mrs. D. Plante and Mrs. Chris Malaney, however, he refused to disclose the name of the CMS personnel responsible for determining that Affiant's EMG was not worthy the 24 hour response normally afforded EMGs. (Note that EMG procedure calls for 24 hour attention unless it is determined by the appropriate personnel not to constitute an emergency, in which case it proceeds through the normal medical grievance channels).

12. Affiant filed an EMG on 7-22-05 due to the seven day interruption in receiving his chronic-care medication, a med that was proscribed for a chronic condition (i.e. serious medical condition), and which is adversely affected by interruptions, however, no action was taken and the EMG was not heard until 7-28-05 thus it was determined to not constitute an emergency.

13. As stated, Affiant belatedly received his chronic-care meds on 7-27-05 (30-day supply), via the standard posting of all meds, and no further Doctor's "Refill" order was needed because the order was effective until November 05. CMS is to automatically renew any 30 day supply card of chronic-care meds within the final five days of the existing 30 day card, which in Affiant's case was due to run out on 8-27-05.

14. Affiant waited patiently until 8-26-05 and because he was **again** not scheduled to pick up his new 30day supply, he notified Mrs. D. Plante and Mrs. C. Mahaney to inform them that Affiant faced another interruption with his chronic-care meds.

8-27-05 ⒶⓌ

15. Affiant took his last dose on 8-28-05, and as of today's date ___9-5-05___, has not been issued said meds.

16. Affiant filed another EMG on 8-31-05 directly to the parties listed in item #14 via their "box."

17. Affiant was scheduled in for a Chronic-care visit on 8-31-05 with Nurses Assistant Maggie _Bailey_, which was unnecessary because his meds were refilled in July and good until November 05.

18. Affiant informed Mrs. Maggie _Bailey_ that the meds were refilled until November, however, that he had not received his 30-day card yet and was currently out since 8-27-05 despite writing D. Plante and C. Malaney.

19. Maggie _Bailey_ stated that Affiant would have to wait until his name appeared on the Med Pick-up List, however, Affiant stated that that would be "unacceptable" and that CMS kept stock supplies of which there was no reason to continue to deny Affiant his chronic-care meds.

20. Affiant accompanied Mrs. Maggie _Bailey_ to the on-site pharmacy; however, she emerged and stated that "You can't have them." Affiant asked: "You mean that you don't have any in stock," and she stated: "Yes we have them, but they are 80 mics and you take 50 mics, I'm not going to give you 80!" Affiant explained that in the past he was given the 80 mic doses, however broken in half and directed to take a half dose until his standard 30 day card arrived.

21. Mrs. Maggie exploded with: "It's not my problem, you'll have to wait!" and stormed off.

22. Affiant was again denied his prescribed chronic-care meds despite having placed CMS on notice (D. Planely, C. Malaney, and Nurses Assistant Maggie _Bailey_, despite filing a second EMG, and despite CMS actually having these meds in stock supplies; and has in fact, been deliberately denied these necessary meds on two separate, yet back-to-back occasions.

23. CMS and its personnel (especially the inherited personnel) are fully aware of these repeat interruptions, fully aware of Affiant's serious medical condition, of which is aggravated by any interruptions in taking medication; and despite this knowledge, and despite actually having the meds or a suitable substitute on hand, they have consciously and maliciously refused to issue Affiant's chronic-care meds to him.

24. Lastly, CMS utilizes the "Fax and Fill" method to refill its inventory of meds, which normally requires less than 48 hours for them to receive their ordered medications, and even if CMS were out of stock supplies there is still no excuse other than deliberate indifference to Affiant's serious medical needs, to disregard his pleas for needed medication.

25. Affiant swears that the aforementioned is true and correct to the best of his knowledge.

SWORN and SUBSCRIBED on this _19th_ day of September 2005 before

Notary Public

David Williamson, Affiant

**DEPARTMENT OF CORRECTION**
**Bureau of Prisons**
**245 McKee Road**
**Dover, Delaware 19904**

April 17, 2006

**Inmate WILLIAMSON DAVID W**    $W$  $L-12$
**SBI # 00183022**
**DCC  Delaware Correctional Center**
**SMYRNA DE, 19977**

Dear DAVID WILLIAMSON:

We have reviewed your Grievance Case # 15453 dated 07/15/2005.

Based upon the documentation presented for our review, we deny your appeal request.

Accordingly, there is no further issue to mediate nor Outside Review necessary as provided by
BOP Procedure 4.4 entitled "Inmate Grievance Procedure", Level III appeals.

Sincerely,

Paul W. Howard
Bureau Chief

DCC  Delaware Correctional Center
Smyrna Landing Road
SMYRNA DE, 19977
Phone No. 302-653-9261

Date: 04/17/2006    I-C

# GRIEVANCE REPORT

## OFFENDER GRIEVANCE INFORMATION

| | | |
|---|---|---|
| **Offender Name :** WILLIAMSON, DAVID W | **SBI#** : 00183022 | **Institution** : DCC |
| **Grievance #** : 15453 | **Grievance Date** : 07/15/2005 | **Category** : Individual |
| **Status** : Resolved | **Resolution Status :** Level 3 | **Resol. Date** : 04/17/2006 |
| **Grievance Type:** Health Issue (Medical) | **Incident Date** : 07/01/2005 | **Incident Time :** |
| **IGC** : Merson, Lise M | **Housing Location :** Bldg W1, Tier L, Cell 12, Single | |

## OFFENDER GRIEVANCE DETAILS

**Description of Complaint:** Inmate claims there was an agreement via grievance concerning refilling of chronic medications. He claims he was not provided with a 120 day supply of chronic care meds or scheduled within 90 days for a doctors refill approval and thus face yet another interruption. Inmate claims on 7-1-05 he was on the list for chronic care appt but it was cancelled and that he was not given the 120 day supply of meds. Inmate claims he wrote chronic care but still did not receive meds.

**Remedy Requested** : Provide new card or stock supplies of Levoxyl and accompanying multiv. and correct this repeat behavior as per agreement.

## INDIVIDUALS INVOLVED

| Type | SBI # | Name |
|---|---|---|
| | | |

## ADDITIONAL GRIEVANCE INFORMATION

**Medical Grievance :** YES                    **Date Received by Medical Unit :** 07/22/2005

**Investigation Sent** : 07/22/2005          **Investigation Sent To** : Dunn, Lee Anne

**Grievance Amount :**

DCC  Delaware Correctional Center
Smyrna Landing Road
SMYRNA DE, 19977
Phone No. 302-653-9261

Date:04/17/2006    I-C

## INFORMAL RESOLUTION

| OFFENDER GRIEVANCE INFORMATION | | | |
|---|---|---|---|
| **Offender Name :** WILLIAMSON, DAVID W | **SBI#** : 00183022 | **Institution** : DCC | |
| **Grievance #** : 15453 | **Grievance Date** : 07/15/2005 | **Category** : Individual | |
| **Status** : Resolved | **Resolution Status:** Level 3 | **Inmate Status :** | |
| **Grievance Type:** Health Issue (Medical) | **Incident Date** : 07/01/2005 | **Incident Time :** | |
| **IGC** : Merson, Lise M | **Housing Location :**Bldg W1, Tier L, Cell 12, Single | | |

| INFORMAL RESOLUTION | |
|---|---|
| **Investigator Name** : Dunn, Lee Anne | **Date of Report** 07/22/2005 |

**Investigation Report :** received med on 7/7
refuse to sign
unresolved

**Reason for Referring:**

Offender's Signature:_____

Date        :_____

Witness (Officer)    :_____

DCC  Delaware Correctional Center
Smyrna Landing Road
SMYRNA DE, 19977
Phone No. 302-653-9261

## GRIEVANCE INFORMATION - IGC

### OFFENDER GRIEVANCE INFORMATION

| | |
|---|---|
| **Offender Name :** WILLIAMSON, DAVID W | **SBI#**          : 00183022 |
| **Grievance #** : 15453 | **Grievance Date** : 07/15/2005 |
| **Status**       : Resolved | **Resolution Status** : Level 3 |
| **Grievance Type:** Health Issue (Medical) | **Incident Date**   : 07/01/2005 |
| **IGC**          : Merson, Lise M | **Housing Location :** Bldg W1, Tier L, Cell 12, Single |

| | |
|---|---|
| **Institution** : DCC |
| **Category** : Individual |
| **Inmate Status :** |
| **Incident Time :** |

### IGC

**Medical Provider:**                    **Date Assigned**

**Comments:**

[x] **Forward to MGC**          [ ] **Warden Notified**

[ ] **Forward to RGC**          **Date Forwarded to RGC/MGC :** 08/04/2005

[x] **Offender Signature Captured**      **Date Offender Signed**     :

DCC Delaware Correctional Center
Smyrna Landing Road
SMYRNA DE, 19977
Phone No. 302-653-9261

Date: 04/17/2006   I-C

# GRIEVANCE INFORMATION - Appeal

## OFFENDER GRIEVANCE INFORMATION

| | | | |
|---|---|---|---|
| **Offender Name :** WILLIAMSON, DAVID W | **SBI#** : 00183022 | **Institution** : DCC | |
| **Grievance #** : 15453 | **Grievance Date** : 07/15/2005 | **Category** : Individual | |
| **Status** : Resolved | **Resolution Status :** Level 3 | **Inmate Status :** | |
| **Grievance Type:** Health Issue (Medical) | **Incident Date** : 07/01/2005 | **Incident Time :** | |
| **IGC** : Merson, Lise M | **Housing Location :** Bldg W1, Tier L, Cell 12, Single | | |

## APPEAL REQUEST

This timely appeal follows a level two CMS- Medical grievance hearing (CMS-MGH, hereafter). The grievance cited both current and on-going-repeat interruptions in receiving prescribed chronic care medications (RIRPCCM, hereafter). Remedy requested was two-fold: (i) provide grievant with the meds, and (ii) "Correct this repeat behavior..." CMS failed to address the problem of EIEPCCM and abused the grievance process.

At the CMS-MGH, CMS representative (   ) (i) Explicitly refused to address Grievant?s legitimate and on-going problem of RIRPCCM, and instead "toyed" with grievant namely by playing games with semantics, which was employed to support their untenable, narrow reading of the grievance; (ii) CMS representative, however, conveniently disregarded material issues, namely: a) grievance itself; (b) finding by it's own representative at the first informal hearing; (c) determination by grievance chairperson who dismissed a subsequent grievance as "Duplicate" of the instant grievance 15453; and (d) subsequent RIRPCCM, of which has occurred over the past three consecutive months; and finally, (iii) CMS, in it's corporate entity, and through it's personnel have explicitly engaged in customs and procedures, and encouraged a culture and attitudinal approach that evinces deliberate indifference to Grievant?s serious medical needs.

Grievant will now specifically address the three points made above in support of the instant appeal:

i. Explicitly refused to address Grievant?s legitimate and on-going problem of RIRPCCM: Grievant specifically articulated in his grievance repeated interruptions with receiving his prescribed chronic care meds of which are of an on-going nature. Grievant specifically requested, in part, that CMS "Correct this repeat behavior." the fact that grievant also requested that he be supplied the meds to cure the immediate medication interruption does not absolve CMS from having to correct the problem of repeat interruptions. Con't

## REMEDY REQUEST

In fact, the July 05, interruption was simply the most recent episode of an on-going problem, and the effective date of CMS accepting the contract to provide "adequate" health care to grievant and others.

subsequently, Grievant pulled out his documentation and proceeded to outline the three consecutive medication interruptions - actually Grievant never did receive one of the two prescribed meds on two of these occasions - but Grievant was immediately "silenced" by CMS representative (   ) and explicitly stated that the board would not consider any other med interruptions subsequent to the July 05, episode. With much condescension, she proceeded to read the grievance report version of the grievance, however, highlighting the request for the 30 day cards (i.e. meds) but disregarding the overall request to correct the repeat behavior (i.e. RIRPCCM)

Note: Appeal is 13 pages long. IGC Merson is forwarding copy to BGO via State Mail. Sent 10-12-2005.

DCC  Delaware Correctional Center
Smyrna Landing Road
SMYRNA DE, 19977
Phone No. 302-653-9261

## GRIEVANCE INFORMATION - BGO

| OFFENDER GRIEVANCE INFORMATION | | |
|---|---|---|
| **Offender Name** : WILLIAMSON, DAVID W | **SBI#** : 00183022 | **Institution** : DCC |
| **Grievance #** : 15453 | **Grievance Date** : 07/15/2005 | **Category** : Individual |
| **Status** : Resolved | **Resolution Status** : Level 3 | **Inmate Status** : |
| **Grievance Type:** Health Issue (Medical) | **Incident Date** : 07/01/2005 | **Incident Time** : |
| **IGC** : Merson, Lise M | **Housing Location** : Bldg W1, Tier L, Cell 12, Single | |

| REFERRED TO | | |
|---|---|---|
| **Due Date :** 03/08/2006 | **Referred to:** Person | **Name:** Welch, James |

**Type of Information Requested :**

Grievant continues to experience meds "stock out" issues.

| DECISION | | |
|---|---|---|

**Date Received :** 10/12/2005

**Decision Date** : 03/02/2006        **Vote** : Deny

**Comments** :

CMS has determined that the Grievant will be placed on "pill call" and no longer issued blister packs for self medication.

**DCC  Delaware Correctional Center**
**Smyrna Landing Road**
**SMYRNA DE, 19977**
**Phone No. 302-653-9261**

Date: 04/17/2006    I-C

# GRIEVANCE INFORMATION - Bureau Chief

| OFFENDER GRIEVANCE INFORMATION | | |
|---|---|---|
| **Offender Name :** WILLIAMSON, DAVID W | **SBI#** : 00183022 | **Institution** : DCC |
| **Grievance #** : 15453 | **Grievance Date** : 07/15/2005 | **Category** : Individual |
| **Status** : Resolved | **Resolution Status :** Level 3 | **Inmate Status :** |
| **Grievance Type:** Health Issue (Medical) | **Incident Date** : 07/01/2005 | **Incident Time :** |
| **IGC** : Merson, Lise M | **Housing Location :** Bldg W1, Tier L, Cell 12, Single | |

| DECISION | |
|---|---|
| **Decision Date:** 04/11/2006 | **Vote :** Deny |

**Comments  :**

DCC Delaware Correctional Center
**Smyrna Landing Road**
**SMYRNA DE, 19977**
**Phone No. 302-653-9261**

## GRIEVANCE INFORMATION - MGC

### OFFENDER GRIEVANCE INFORMATION

**Offender Name** : WILLIAMSON, DAVID W     **SBI#**    : 00183022     **Institution**    : DCC

**Grievance #**   : 15453      **Grievance Date** : 07/15/2005     **Category**    : Individual

**Status**     : Resolved      **Resolution Status:** Level 3     **Inmate Status :**

**Grievance Type:** Health Issue (Medical)     **Incident Date**    : 07/01/2005     **Incident Time :**

**IGC**      : Merson, Lise M     **Housing Location :** Bldg W1, Tier L, Cell 12, Single

### MGC

**Date Received** : 08/04/2005      **Date of Recommendation:** 10/12/2005

### GRIEVANCE COMMITTEE MEMBERS

| Person Type | SBI# | Name | Vote |
|---|---|---|---|
| Staff | | Dunn, Lee Anne | Uphold |
| Staff | | Wright, Matthalina | Uphold |
| Staff | | McCreanor, Michael | Abstain |

### VOTE COUNT

**Uphold :** 2      **Deny :** 0      **Abstain :** 1

### TIE BREAKER

| Person Type | SBI# | Name | Vote |
|---|---|---|---|
| | | | |

### RECOMMENDATION

Hearing held 10-6-2005
Uphold
Inmate will be placed on pill call to prevent missed medication.

D Plante RN - uphold

David Williamson
SBI #183022, W-1, L-12
1181 Paddock Rd.
Smyrna, DE 19977
February  9 , 2006

Correctional Medical Services, Dover, DE Offices
245 Mckee Rd.
DOC
Dover, DE 19904-01

Re: Continuing Chronic Care Medication Interruptions

Dear Sir/Madam:

Greetings, I am writing to inform you of yet another Chronic-care medication lapse (the
sixth consecutive interruption since July 2005). I received a Doctor's refill order for 120
day/doses in December 05 and my first 30 day cards on 1-10-06. Though, as of  2/9/06 ,
I have not been placed on the medication pick-up list. This matter has been grieved all the
way through the administrative process and I repeatedly received perfunctory token
assurances that this on-going problem would be corrected, however, the lapses continue.
These offices have been notified of this pervasive and systemic problem, yet have utterly
failed to correct it.

Moreover, the lapses are inexcusable because the on-site pharmacy has alternate Stock
Supplies available though refuses to dispense them altogether and or in a timely fashion.
This is a continuous and willful disregard for my documented serious medical needs;
needs that if not met do cause me to needlessly suffer impairment of my normal daily
functions and quality of life, and threaten my future health.

Lastly, I respectfully request corrective action with this matter.

Sincerely,

David Williamson

c.c.  C Malanely &  D. Plante
c.c.  Bureau Chief Officer, for Grievance Appeal # /5453

エ・モ



David Williamson
SBI # 183022, W-1, L-12
1181 Paddock Rd.
Smyrna, DE 19977

9 March 2006

Dear Mr. Williamson,

I received your letter expressing your concerns about lapses in your medical care dated February 9 2006.   This letter was received in our regional office on 16 February 2006.

I have investigated your concern and, unfortunately, <u>find it to be without merit</u>.  I reviewed your personal medication administration record and the document shows that you signed for your medications on 11 January 2006 and 12 February 2006.  The medications you received are exactly what have been prescribed according to your medical chart.

Correctional Medical Services is committed to providing the highest level of care to everyone in our institutions.   I apologize for the problems you have had in the past and encourage you to help us meet everyone's healthcare needs by helping us identify problems and concerns with the delivery of healthcare in the prisons.

Should you experience any further lapses in care, please discuss your concerns with the nursing staff at your institution that can help you promptly resolve these matters or refer the matter to me.

Once again, thank you for bringing this matter to my attention.

Your Partner in Healthcare,

Scott S. Altman
Delaware Ombudsman
Correctional Medical Services

CC:  Warden Thomas Carroll
       Medical Record

A-2

David Williamson
SBI #183022, W-1.L-12
1181 Paddock Rd.
Smyrna, DE 19977
March 13, 2006

Correctional Medical Services, Dover, DE Offices
245 McKee Rd.
DOC
Dover, DE 19904-01

Re: Continuing Chronic Care Medications Interruptions

Dear Sir/Madam:

Greetings, I am writing to inform you of yet another Chronic Care medication lapse (the seventh consecutive interruption since July 2005). I received a Doctor's refill order for 120 day/doses in December 05 and my first 30 day cards on 1-10-06. I received the second cards belatedly on 2-13-06, and as of today 3-13-06 I have not been placed on the med pick up list as promised at two different Medical Grievance Hearings regarding this on-going matter. It is clear that these assurances were perfunctory empty promises in view of CMS's failure to adhere to the chronic care medication system. These offices have been notified of this pervasive and systemic problem, yet have utterly failed to correct it.

Moreover, these lapses are inexcusable because the on-site pharmacy normally carries alternate stock supplies, however, refuses to dispense them altogether and or in a timely fashion. This is a continuous and willful disregard for my documented serious medical needs; needs that if not met do cause me to suffer impairment of my normal daily functions and quality of life, and threaten my future health.

Lastly, I respectfully request corrective action with this matter.

Sincerely,

David Williamson

c.c. D. Plante,
    Bureau Chief Officer, for Medical Grievance Appeal # 15453,
    CMS, Dover Offices

David Williamson
SBI #183022
W-1, L-12, 1181 Paddock Rd.
Smyrna, DE 19977

To: Federal Department of Justice

Re: Federal Prison Medical Probe (Continuous and Systemic Failure to Provide Adequate Care)

Dear Sir/Madam:

Greetings, I am a prisoner at DCC and have needlessly suffered impairment of my normal daily functions and a likely threat to my future health as a result of CMS's deliberate indifference to my diagnosed serious medical condition (chronic care patient) that requires uninterrupted medication. For example, I have needlessly experienced seven consecutive chronic care medication lapses (CCML) since July 2005. These CCMLs were unnecessary because CMS had a suitable alternate medication (Stock Supply) in its on-site pharmacy, however refused to dispense them, and or actually had logged and possessed the interrupted meds but failed to dispense them in a timely fashion. I completed the Medical Grievance process (two hearings) and an Appeal is still pending. My **claims were never challenged**, though I did receive token empty promises at both grievance hearings that the med lapses would be corrected. In addition, at the second hearing, I was treated with scorn and contempt. (See attached A-  thru A-  ). I sent several letters of Notice throughout this time period outlining the on-going problem of CCMLs and as a result my needless suffering, however, to date I still experience the CCMLs. (See B-  thru B-  ).

In fact, more recently I submitted another complaint to the CMS Offices (and pertinent personnel) of this continuing problem and received an insulting and erroneous reply from a so-called Ombudsman, Mr. Altman (evidently a CMS employee). (See attached C-   thru C-   ). Mr. Altman stated: "I have investigated your concern and, unfortunately, find it to be without merit." This finding is, however, wholly erroneous and unsupported. By his own admission I picked up meds (30 day card) on January 11, 06 (I had been out since Dec. 07, 05, which is a lapse of over thirty days!), and allegedly received another card on February 12, 05. First, the chronic care meds come in thirty day allotments and when I received the belated Jan. 11, 06, card I had to take a dosage that day. A refill would have to be filled no later than Feb 10, 06, in order to avoid another lapse, which is why I had filed the Notice/complaint just prior to the impending interruption. I did not receive a refill on Feb. 10, 06, however. Nor did I receive them on Feb. 12, 06, as Mr. Altman incorrectly states (**which by the way still constitutes a med lapse**), because the twelfth was a Sunday and no meds are distributed on Sundays. I did sign and receive these lapsed meds on Feb. 13, 06, and what is disturbing is that CMS's on-site pharmacy had logged these meds in on Feb. 09, 06, (My complaint letter was submitted on the day before these meds were logged in and one day before the CCML), but CMS failed to dispense them to me in a timely fashion. The CCML was unnecessary and preventable! Once again CMS had the meds but refused to dispense them despite making repeated empty assurances to correct the interruptions, and now CMS offers a **sham investigation** in a clear effort to avoid responsibility by faking ignorance and or negligence of the problem. This was the sixth consecutive CCML and as of today's date I am again experiencing another unnecessary CCML. I have not received the refill cards which ran out on March 13, 06. (Seventh consecutive lapse to date). Mr. Altman states that I received the meds that were prescribed as if that was the issue; however, he completely avoids the stated issue of the continuing med lapses and erroneously and incredibly states that my claim is without merit. All the lapses occurred and continue to occur.

Moreover, this behavior is troubling because, CMS chooses to waste time and resources by employing underhanded and insulting strategies (sham investigations) to avoid acknowledging this and other well documented and continuous problems. CMS's malintent is exposed, because this sham investigation has no basis in fact, is fictitious, and is belied by the very facts acknowledged by Mr. Altman. As such, it is clear that this strategy is evidence of an intentional, willful, and malicious course of action designed not to identify and correct real problems, but attempts to discredit them and pretend that they do not exist. CMS actively attempts to avoid its contractual and moral duty to provide adequate care. I would respectfully encourage your department to investigate the validity of these continuing lapses, the resulting sham investigation, and any others that have been generated by CMS.

Respectfully,

David Williamson, March 15, 2006                                    C.c. CMS Dover Offices



David Williamson
SBI # 183022, W-1, L-12
1181 Paddock Rd.
Smyrna, DE 19977

22 March 2006

Dear Mr. Williamson,

I received your letter expressing your concerns about lapses in your medical care dated March 13, 2006. This letter was received in our regional office on 21 March 2006

I have investigated your concern and find it to be with merit. I met with the pharmacy staff on 22 March 2006 and directed them to place an emergency order with our local pharmacy for your medications. This was accomplished and they are available for you to pick up.

I am concerned with the accuracy of information in your letters to the Bureau Chief Officer for Medical Grievance Appeal. You stated that this is the seventh time we have missed your medications. I discussed your case with the nursing staff at DCC and they showed me documentation of you picking up your medications on 20 April, 19 May, 17 June, 27 July, 5 September, 6 October, 8 November, 2005 as well as on 11 January and 12 February 2006. You have been seen in our Chronic Care clinics in March and August of 2005 as well as January 2006. Your care has been appropriate and well managed.

Correctional Medical Services is committed to providing the highest level of care to everyone in our institutions. I encourage you to help us meet everyone's healthcare needs by helping us identify problems and concerns with the delivery of healthcare in the prisons.

Once again, thank you for bringing this matter to my attention.

Your Partner in Healthcare,

Scott S. Altman
Delaware Ombudsman
Correctional Medical Services

CC:  Warden Thomas Carroll
       James Welch, R.N.
       Medical Record

Received   3-26-06

I . I .

Correctional Medical Services, Dover, DE Offices
245 McKee Rd. DOC
Dover, DE 19904-01

Re: Continuing Chronic Care Medications Interruptions

Dear Sir/Madam:

Greetings, this is my second Notice to inform you of a continuing Chronic Care medication lapse (the seventh consecutive interruption since July 2005). On or about 3/13/06 I filed a notice of said chronic care medication lapse; however, to date the lapse has not been corrected. Despite CMS's assurances at two different Medical Grievance Hearings that the problem would be corrected, CMS has refused to correct the problem; has refused to issue alternate Stock Supplies from the on-site pharmacy, which would easily solve the problem; and, refused to dispense the belated/interrupted meds upon receipt and logging in at the pharmacy, but capriciously and willfully delays issuing them to Williamson. CMS is aware of these continuous med lapses and more recently issued a statement (through its Ombudsman) that my concerns in their eyes were without merit. This statement is incredible in view of the two medical grievance hearings where none of my claims were debated or challenged and all of the facts clearly evince the claimed lapses. My concerns were about the on-going med lapses, and every month since July 05, I have needlessly experienced a chronic care med lapse and needlessly suffered the inherent resurgent symptoms associated with my chronic disease. Any lapse in the first instance represent misfeasance, but these continuing lapses represent malfeasance and gross negligence. Moreover, the problems are aggravated when notice has been received of a lapse, and the meds are subsequently received and logged in at the on-site pharmacy and or there are suitable alternate Stock Supplies, however, neither are subsequently issued in a timely manner (of which both have occurred several times), this is malfeasance and a willful and deliberate indifference to my known serious medical condition.

Nevertheless, the med interruptions did occur, are still occurring, is currently occurring, and will likely occur again. This is a continuous and willful disregard for my documented serious medical needs; needs that if not met do cause me to suffer impairment of my normal daily functions and quality of life, and threaten my future health.

Lastly, I respectfully request the current lapse be corrected and that future meds be issued in a timely manner.

David W

David Williamson, 183022
W-1, L-12
1181 PADDOCK RD
SMYRNA, DE 19977
MARCH 21, 2006

c.c. Bureau Chief Officer, Med Grievance #/5543
c.c. 0. PLANTE

I                         I

SBI #183022, W-1, L-12
1181 Paddock Rd.
Smyrna, DE 19977
*April 19, 06*

CMS, Dover, DE Offices

Re: Chronic Care Medication Interruptions/ Mr. Altman's Follow Up

Dear Sir/Madam:

Greetings, I am in receipt of a letter from your Ombudsman, Mr. Altman (dated 3/22/06). I find it offensive for a couple of reasons: it discounts and belittles my serious medical concerns and Mr. Altman calls into question my integrity via an indirect and reckless accusation about the accuracy of my claims.

First, Mr. Altman states that my claim "is with merit," however, he then proceeds to discount my meritorious medical concern by stating that he is "concerned about the accuracy of the information" (i.e. statement in which I claim to have experienced seven consecutive chronic care medication interruptions/lapses since July 05). (See Attached A-1). In fact, the March 22, correspondence was the second regarding this on-going problem and the earlier March letter insulted me by stating that my claim was "without merit" despite the fact that I have then and now currently experience an interruption/lapse in receiving my doctor prescribed chronic care medications. (See attached A-2). These related letters/statements discount and belittle my serious medical needs/concerns.

Moreover, these statements are not based in fact but fiction, and I am concerned with Mr. Altman's ability to comprehend the complaint as well as his ability to employ the basic skills of arithmetic and its application to the relevant calendar dates. For example, Mr. Altman listed several dates on which I was dispensed said meds, but the April and May dates are prior to my July 05 claim and are irrelevant. The relevant dates, however, do not sequentially cover the months from July 05, to the present and current March 06, lapse. The dates that are provided, however, do indeed support my complaint of an interruption in my medication regiment. For example, because the medication cards that are dispensed to me only cover a thirty day period, any time I do not receive a replacement card within said thirty days constitutes an interruption/lapse in receiving those meds. I presume that Mr. Altman reviewed the dates he provided (relative to my claim) and can only conclude that either his definition of an interruption and or lapse is different from the generally accepted definition, and or he is unable to calculate the date when a thirty day card has run out and another card is required to ensure that no lapse occurs (i.e. due date). Webster's II New College Dictionary offers the following definition: **_Interrupt_** (v) 1. To break the harmony or continuity of. 2. To impede or stop by breaking in on.... *Interruption* is its noun form. p. 580, 1995. (I employ interruption and lapse interchangeably in my many letters of complain/notice.) Since July 05, the continuity of my medication regiment has been broken and or impeded exactly seven times, and this is despite the two empty token promises made by CMS to correct this very problem (made at Medical Grievance hearings in regard to MG (# 15453 ). Thus I have indeed experienced seven medication lapses to date.

Furthermore, it is troubling that several of these interruptions were aggravated because CMS's on-site pharmacy actually possessed my lapsed meds –with the full knowledge of this fact- however, refused to dispense them directly. This caused an even greater, unnecessary lapse and this deliberate indifference to my known serious medical needs is inexcusable. In fact, Mr. Altman claims in his March 22, 06 letter that, as of the same date, my meds are in and I can "pick them up." This is very interesting, because as of March 27, 2006, (an interruption of fourteen days), I have not been placed on the Medication Pick up List, and absent that or my Housing Unit receiving a call from the hospital requesting that I be given a "Pass" to the hospital, I simply cannot pick them up. Assuming that they are in, as Mr. Altman claims, then one would question why these meds have not been dispensed to me?

Lastly, Mr. Altman incredibly characterizes the handling of my chronic care meds as "well managed." This preposterous statement is a contradictory to my claim having "merit," and it discounts and belittles my meritorious claims. Of course, all this appears to indicate gross incompetence, but because it is difficult to believe that CMS would employ an ombudsman that has difficulty with the basic skills of reading and arithmetic, and because Mr. Altman was in contact with the on-site pharmacy regarding this recent lapse, I must conversely conclude that Mr. Altman is indeed competent, however, attempting to obfuscate the problem and its history, and that my other claims of "reprisal" by some CMS staff is supported by the continuing refusal to dispense my lapsed medications.

In closing, I would appreciate corrective action on all points raised herein.

DAVID Williamson, *March 24, 06*

c.c. Bureau Chief Officer (MG # *15453* )
*April 19, 06*

I. K.



David Williamson
SBI # 183022, W-1, L-12
1181 Paddock Rd.
Smyrna, DE 19977

25 April 2006

Dear Mr. Williamson,

I have received your most recent correspondence regarding the interruption in your chronic care meds. After a thorough investigation, I now find this matter to be a valid concern. After your initial response, I have investigated this matter and noted the following:

- There was a 10 day interruption of medications from 17 to 27 July 2005
- There was a 3 day interruption of medications from 5 to 8 Nov 2005
- There was a 27 day interruption of medications from 9 Dec 2005 through 3 January 2006
- There was a 14 day interruption of medication from 21-28 March 2006

Your identification of the flaws in this internal process led us to revamp our medication distribution and ordering system for the Delaware Correctional Center. As of 27 April 2006, a new process has been put in place, which should prevent any further lapses in medications for **all** patients with a chronic medical condition who use medication to control their symptoms. Please submit a sick call slip when you are down to 5 days of medication remaining so we can ensure your needs are met during the new process implementation.

Correctional Medical Services is committed to providing appropriate and timely care to everyone in our institutions. I apologize for the problems you have had in the past and thank you for bringing this matter to my attention.

Your Partner in Healthcare,

Scott S. Altman
Delaware Ombudsman
Correctional Medical Services

CC:  Warden Thomas Carroll
     Medical Record

A - J

# ATTACHMENTS FOR SECTION II.

## (A-J)

A. Affiant's [Identification of Recycled System] Letter 5/03/06   .   (Marked A-1)

B. Altman's [Apology for Failures] Letter 7/19/06   .   .   .   (Marked B-1)

C. Affiant's Sick-call Slip (SLS) 06/01/06   .   .   .   .   (Marked C-1)

D. Affiant's Ongoing CCMI Notice 06/06/06   .   .   .   (Marked D-1)

E. Affiant's Failure to Correct Notice 06/19/06   .   .   .   (Marked E-1)

F. A.C.L.U., et al Intentional Denial of CC Meds 07/01/06   .   .   (Marked F-1 –F-2)

G. Affiant's [Notice/Questionnaire] Letter 07/06/06 .   .   .   (Marked G-1)

H. Affiant's [Refill Request] 07/21/06   .   .   .   .   (Marked H-1)

I. Affiant's Continuous CCMI(s) Letter 07/30/06   .   .   .   (Marked I-1)

J. Affiant's Emergency Medical Grievance/Questionnaire Letter   .   (Marked J-1).

II.A

David Williamson
SBI #183022, W-1, L-12
1181 Paddock Rd.
Smyrna, DE 19977
May 3 , 2006

Re: New Medication Distribution System
Mr. Tom Carroll, Warden of DCC

Warden Carroll:

Greetings, I am in receipt of a correspondence from Mr. Altman, CMS Ombudsman dated 4-25-06 , which speaks of an ostensible "new" corrective medication distribution system that is to take effect 4/27/06. (See A-1) Though, I appreciate is effort to reply, I must challenge CMS's actions as highly suspect and as a mere ruse.

For example, the "new" procedure is identical to a system that CMS already tested and employed during its prior contract period with Del. DOC (i.e. the patient submits a Sick Call Slip to initiate a medication refill when he is down to his final five doses), and which was abandoned -in exchange for the most recent failed system- due to its systemic-wide failure and the resulting deluge of medical grievances. In fact, I was one of the grieving parties then too who needlessly suffered repeat chronic-care med interruptions, just as I am now. (See MG # 0208005 ). Interestingly the subsequent replacement med distribution system procedures –which discontinued the patient request via Sick Call Slip submissions for an automatic scheduling by CMS personnel- was touted then as the "corrective" measure; though of course, we know now it too experienced systemic-wide failure and is now to be replaced with the same failed system that it replaced. This is absurd.

CMS has the experience and knowledge with both failed systems; nevertheless, CMS intentionally rotates from one failed process to the other –like some insane musical chairs- and incredibly claims to implement a corrective measure. It is clear to me, having observed this behavior first-hand and needlessly suffered because of it, that CMS has no intent to actually correct the continuous med interruptions, but in contrast, intentionally employs a ruse with the full knowledge of its systemic-wide failures in order to maintain the status quo. (E.g. strategy of cost-avoidance by and through shorting patients their needed and doctored prescribed
Chronic-care meds).

In fact, I gave notice prior to my most recent chronic-care med interruption (eighth consecutive lapse since July 05) ;                                    ; however, as of     5-3-06     I am still experiencing an unnecessary med interruption. (See attach. A-2         ). Moreover, I also gave notice of CMS's failure to conduct the necessary Chronic-care Clinic within the requisite 90 days of the med cycle to reorder my chronic-care meds and that too has failed to be realized. (See  A-3).This failure will surely create another needless (ninth consecutive) med interruption.

In reality CMS's systemic and continuous failures are due to their failure to adequately implement, follow up, and enforce a given medication procedure. In closing, I would request that my lapsed chronic-care meds be provided or replaced with a suitable substitute from Stock supplies, and that the reorder be placed since the Clinic has not been realized. Also, I would respectfully encourage that your office scrutinize this ostensible corrective procedure.

David W.
David Williamson
C.c. Mr. Altman, CMS Ombudsman & CMS Dover, De office

II . B



**CMS**
DEDICATED PEOPLE
MAKING A DIFFERENCE
Correctional Medical Services

David Williamson
SBI # 183022, W-1, L-12
1181 Paddock Road
Smyrna, DE 19977

19 Jul 2006

Dear Mr. Williamson,

I received your letter dated 6 July 2006. I once again must apologize for my delays in responding to you but I wished to give you a detailed response. The medication problem that we hoped was corrected did indeed fail you another time. We have instituted specialized policies and procedures in an attempt to ensure this does not happen again. The management team at DCC is aware of this problem and working diligently with our national program experts in an attempt to prevent any further lapses in your care.

The medication card did indeed arrive in our pharmacy on 6/21/06 and you were on the medication pick up list from 6/21/through 6/24. I cannot determine why you were not notified that these medications were in; we are examining the distribution system to ensure that this also does not happen again. The reason for the difference in the known and actual distribution dates is that your medication was not automatically ordered and a manual order had to be completed.

We are making advances in our medication distribution process and I hope that these lapses in care will cease staring this month. Please continue to submit the sick call slips as requested so we can ensure your needs are met.

Once again, I apologize.

Your Partner in Healthcare,

Scott S. Altman
Quality Assurance Monitor
Correctional Medical Services

CC: Warden Thomas Carroll
    Medical Record

II·C

# DELAWARE DEPARTMENT OF CORRECTIONS
# REQUEST FOR MEDICAL/DENTAL SICK CALL SERVICES
# FACILITY: DELAWARE CORRECTIONAL CENTER
### This request is for (circle one): MEDICAL ~~DENTAL MENTAL HEALTH~~

*Medication Pick-Up - Forward to the Pharmacy*

David Williamson                          W·1, L-12
_____          _____
Name (Print)                             Housing Location

5-12-66 (DOB)        00183022             6-1-06
_____        _____        _____
Date                                      

```
WILLIAMSON, DAVID          QTY: 30     WILLIAMSON, DAVID          QTY: 30
MULTIVITAMIN TABS          183022      LEVOTHYROXINE SOD 0.1 MG TABS 183022
6362-   Stop: 09/02/06  RX# 11910331   6362-   Stop: 09/02/06  RX# 11910316
```
Complaint (Wh

I was directed by CMS Omsbudsman, Mr. Altman to submit my chronic care
medication stickers prior to running out of meds to alert the "Pharmacy"
of the need for a refill. I'm down to my final seven doses & I have
three refil cards left. Please place me on the med "Pick-up List."

David W                              6-1-06
_____      _____
Inmate Signature                     Date

### The below area is for medical use only. Please do not write any further.

S: I do not require a Sick-call visit — just require my
chronic-care meds. Do not schedule a sick-call visit. ✓

O:  Temp:_____  Pulse: _____  Resp: _____  B/P: _____  WT: _____

A: N/A

P: N/A

E: N/A

_____      _____
Provider Signature & Title            Date & Time

3/1/99 DE01
FORM#:
MED
263

II. D

David Williamson
183022, W.1, L-12
1181 Paddock Rd
Smyrna, DE 19977
June 06, 06

Director of Nursing
Re: On-going Chronic-care Medication Interruptions

Dear Sir / Madam:

Greetings, I have experienced eight consequtive chronic-care med interruptions since July 05, and I am again facing yet another needless impending med interruption. In fact, as directed by Ombudsman Mr. Altman, I filed a "Sick-call" with the med "stickers" (from my current cards) and requested the next set of cards which is only the second of four sets on or about 5-31-06 (May) when I still had seven doses left.

To date I have not received the next set and I will take my last dose on June 7, 06. I unnecessarily suffer a resurgence of symptoms every time I experience these med interruptions that do adversely impair my normal daily functions. Therefore, I emplore you to see to it that this problem — that has continued some ten months without abatement — is corrected.

Thank you for your time and consideration with this urgent matter.

David W

c.c. Mr. Altman, CMS Del. Regional Offices

David Williamson                    II·E
SBI #183022, W-1, L-12
1181 Paddock Rd.
Smyrna, DE 19977
June __19__ , 2006

CMS Ombudsman, Mr. Altman
RE: CMS's Failure to Correct a Known & Pervasive Problem (e.g. On-going Chronic-care Meds Interruptions)

Mr. Altman:

Greetings, I am currently experiencing my ninth consecutive (since July 05), yet unnecessary, Chronic-care medication interruption (CCMI). In fact, I experienced a twelve-day lapse April 27 thru March 9, 06, and my current twelve-day CCMI June 8 thru June __19th__ , 06. As a result , I am needlessly experiencing a resurgence of symptoms that adversely affect my normal daily function (e.g. chronic fatigue, which creates an inability to concentrate, work, study, or promote good health via meaningful exercise; painful swelling of my extremities; and loss of hair about head and body ect.).

CMS is wholly aware of this chronic and continuous problem, however, refuses to correct it. CMS merely offers token assurances, however, absent any intent to actually follow through; and or CMS offers known failed or inadequate replacement systems/procedures that are designed –not to correct- but maintain the status quo. For example, CMS Ombudsman, Mr. Altman articulated one such recycled failed system as an ostensible corrective measure (See A-1 April 25, 06 Letter) in response to my prior CCMI. However, this was merely a recycled failed procedure and I subsequently challenged its use as suspect in a May 3, 06 Letter (A-2). My claims in the May 3, 06 letter, incidentally, have come to pass.

I followed Mr. Altman's directions, for example, and submitted a "Sick call slip when [I] was down to 5 days of medication remaining. (A-3). Actually, I gave seven days notice just in case, however, to no avail. I filed another notice on June 6, 06, of the impending CCMI. And on June 08, 06, I began my ninth consecutive, yet avoidable and unnecessary CCMI. Thus, CMS is acutely aware of this continuous and pervasive problem, however, refuses to realize any meaningful corrective action despite a clear need for corrective action. As such CMS continues a custom/policy to withhold (short) needed medications from me and others of the Chronic-care population in order to realize their cost-avoidance custom/policy.

In closing, I have completed the grievance procedure and CMS made token assurances, and I followed Mr. Altman's directions, however, I am still (currently) experiencing needless CCMI. I request the following: the names of your on-site DCC Director of Nursing and Administrator (for more direct correspondence); that my CC meds be supplied directly (or alternate Stock Supply); and that I be provided all 120 doses (four cards) to limit the CCMI down to a only a possible three per year. Thank you for time and consideration with this matter.

David Williamson
C.C. Bureau Chief for Monitoring of Medical Grievance # __15453__
    Warden/Warden's Designee

*Mailed  6-26-06*

II·F

David Williamson
183022, W-1, L-12
1181 Paddock Rd.
Smyrna, DE 19977
July  $\underline{1}$ , 2006

American Civil Liberties Union
Re: Continuous, Pervasive, & Intentional Denial of Chronic Care Medication

To Whom It May Concern:

Greetings, I am writing your organization to alert you to a pervasive problem that has continued unabated for some twelve months despite adequate notice to both CMS and every level of the DOC administration. I am hopeful that some corrective action will result.

First, I have experienced nine consecutive Chronic-care medication lapses (CCML) between July 05 and June 06. For instance, the longest lapse of 28 days occurred in January 06 and the second longest at 23 days, and still counting, is currently running as of June 29, 06.

Second, I began the grievance process in July 05, and met with CMS representative Mr. Linton on 7-28-05 for the first grievance hearing. Mr. Linton promised in writing that CMS would correct the CCML, but I nevertheless experienced eight unnecessary CCML thereafter. CMS's promise has proved false. The grievance procedure has been completed but to no avail. Moreover, Mr. Linton explained that CMS employs a "Fax and Fill" medication refill system that normally results in the on-site pharmacy receiving the ordered med within 48 hours or at the latest four days.

Third, CMS Ombudsman, Mr. Altman wrote me a reply regarding my March 06, CCML notice/complaint, and stated that CMS had identified flaws in their internal process and revamped the medication ordering distribution system. Altman then described a system that had been employed by CMS during a prior contract period; however, that was found to be equally defective. The prior failed system was replaced with the current failed system, and now the current failed system is again being replaced with the prior failed system, of which CMS incredibly claims to be a "corrective" action!

I immediately recognized CMS's ostensible corrective action as a charade -that merely recycles one known failed system for another known failed system- of which CMS employs to mask its intention to maintain the status quo. I specifically challenged the ostensible corrective action in a letter to Warden Tom Carroll (c.c. CMS Office, Altman) dated May 3, 06.

Prophetically, my claim was substantiated thereafter and I experienced a subsequent CCML form June 8th to June 28, 06 (second longest lapse of 23 days). Moreover, CMS received a seven days notice prior to my CCML, a second notice shortly before the lapse began, another notice dated 6-19-06 during the lapse, and my mother contacted Deputy Warden Pierce's office regarding the extended CCML on or about 6-16-06, 6-22-06, and 6-28-06; however, as of 6-28-06 I have not received my doctor's prescribed and needed chronic-care medications. Recall that Mr. Linton stated the fax and fill system required a maximum of four days to fill a

medication order, yet 23 days have elapsed since the CCML began, and if we count the seven day prior notice CMS has had 30 days notice to ensure the medication is filled but has failed to do so.

In fact, CMS's behavior cannot be dismissed as a mere mistake or negligence. Clearly, these acts evince an intentional deprivation of prescribed chronic care meds. Moreover, CMS has deprived me of just over 30 percent of my thyroid meds and 50 percent of the accompanying multivitamin (cumulative aggregate of the nine CCML). I suspect that this is likely representative across the chronic care population. Nevertheless, this behavior is unconscionable and unacceptable. It is a human rights abuse!

Unfortunately, all my reasonable efforts to realize a remedy have failed: the administrative grievance procedure has failed to remedy it; the DCC administration via the Warden/Deputy Warden has failed to remedy it; the Delaware Center of Justice has failed to remedy it; the Bureau Chief and Commissioner of Corrections, Stan Taylor have failed to remedy it; the prospect of a federal investigation has failed to remedy it; and my recent filing of a civil suit against CMS has failed to remedy this continuous and pervasive problem.

CMS consciously ignores its duty and these all measures to persuade it to follow through with its duty in order to achieve its morally reprehensible yet wholly rational pursuit of profit. CMS has over a decade of experience in the prison health care field and it is absurd to believe that it has not, as yet, mastered the simple task of ordering, receiving, and distributing medications. It is more likely that CMS is rationally pursuing a custom/policy of profit maximization. A fundamental fact of business is that no private company survives by being incompetent or inefficient, so they make every effort to be highly productive and or efficient unless; of course, as is the instant case, it is advantageous for the company to fend incompetence. Evidently it is more cost efficient for CMS to deprive a disorganized and marginalized population of needed meds over the course of its contract period and alternatively combat this group (who suffer a disproportionately low litigation success rate-assuming they have they wherewithal to pursue litigation) with professional attorneys. In fact, an analysis of CMS litigation history regarding just this matter is telling. And simply based on CMS's extensive (medication deprivation) litigation history, one would have to grow suspect as to how and why CMS -over the course of its corporate history- still continues to make the same ostensible "mistakes" that it has perpetrated since its genesis? By their nature "mistakes" at times benefit and at other times prove to be detrimental, however, when so-called "mistakes" consistently benefit a for profit company, they cannot possibly be considered mistakes. This is a policy/custom that masquerades as mistake/negligence.

In closing, I would appreciate any assistance that your organization may be able to provide. I look forward to contact regarding this matter and I thank you in advance.

Respectfully,

David Williamson

c.c. Commissioner of Corrections, Mr. Stanley Taylor
     Bureau Chief (monitoring of medical grievance #15435),
     CMS, Mr. Altman

David Williamson
SBI #183022, W-1, L-12
1181 Paddock Rd.
Smyrna, DE 19977
July __6__, 2006

11-G

CMS Ombudsman, Mr. Altman
Re: Chronic Care Medications

Mr. Altman;

Greetings, on 6-29-06 I was finally distributed my belated Chronic Care Medications (CCM) after a 22 day interruption (ninth consecutive interruption since July 05). There are several troubling issues, however:

1.       My meds (120 doses -four 30 day cards), were to have begun on 5/5/06, however, actually began belated on 5/8/06. Counting from the actually date of receipt (5/8/06) a second 30 day card should have begun on 6/08/06. It did not, and this was despite the fact that I submitted a 'Sick call' slip with my med label stickers affixed some seven days prior to running out (5/31/06) as you directed in your April correspondence outlining an ostensible new med distribution system.

2.       Moreover, when I received my second 30 day card belatedly on 6/29/06, I noted that it had a computer generated distribution date of 6/21/06–some nine days before I actually received them! Why did this card have a distribution date of 6/21/06 when the first 30 day card ran out on 6/08/06? Why did I not receive my needed chronic care meds on 6/08/06 in accord with my notice and in accord with the already known original distribution date? Also, why was I not provided these needed meds-at the very least- on or about 6/21/06, which is when the CMS on-site pharmacy took possession of them but refused to distribute them to me? Why is there a distribution date manually plugged in that differs from the known date of needed subsequent cards (within the 120 doses allotted via a doctor's order)? The pharmacy is aware of the doctor's order, the start date, and the amount of a single med card, so clearly it also knows the consequent dates of refills.

3.       Also, I noted upon receiving said belated meds that the medication 'label stickers' had been removed by the on-site pharmacy. How am I to make the next request for my third card if the stickers have been removed prior to dispensing them to me? Has the so called new system been abandoned already, and if so, what is the new procedure?

In closing, I hope to avoid yet another unnecessary chronic care medication interruption and a timely investigation and response to this recent matter is appreciated. This is a pervasive and on-going problem and I expect a reply to my relevant and valid inquiries. Thank you for your time and consideration in this matter.

David Williamson

C.c.  Bureau Chief (MG # 15453), Deputy Warden Pierce's Office

David Williamson                    II-H

183022, W-1, L-12

July 21, 2006

Re: Chronic-care Meds - Require Next Set of Cards

To Whom it May Concern:

      I am down to my final eight doses of my chronic-care meds: Levothyroxine & Multivitamins and I have two Refills remaining. I had received my second-current med cards— on 6-30-06 after a 22 day interuption (ninth consecutive lapse since July 05) and the med sticker/lables had been removed, thus I cannot provide said med stickers. Please provide my next requisite set of chronic-care meds in a timely fashion. I hope to avoid yet another unnecessary med interruption.

      Thank you.

Respectfully

David W

David Williamson

c.c. Mr. Altman

David Williamson
SBI #183022, W-1, L-12
1181 Paddock Rd.
Smyrna, DE 19977
July _30_ , 2006

Mr. S. Altman, CMS Ombudsman
Re: Continuous and Pervasive Pattern of Chronic-care Medication Interruptions

Dear Sir:

Greetings, in April 06 (circa) you assured me that a "new" corrective medication distribution system was being employed. I challenged this assertion, because I recognized its description as a known inadequate distribution system of which had been employed by CMS during its prior contract period with the DOC. Prophetically, I subsequently experienced my eighth and ninth consecutive chronic-care meds interruptions. In fact, the June 06 interruption exceeded twenty days and was the second longest of the ten prior consecutive interruptions between July 05 and July 06.

Moreover, upon finally receiving my lapsed and belated chronic-care meds (June 30, 06) I noticed that (a) the med label-stickers had been removed and (b) that the July 06 card, the second of four thirty-day med cards, had a distribution date that well exceeded the first thirty-day card. I immediately brought this to both your attention and the on-site DCC hospital Staff's attention. I inquired as to how I was supposed to make my subsequent request for my next -third of four cards- without the requisite label-sticker? Staff here failed to even reply. Nevertheless, I provided adequate notice/request for the third card. I took my final dose on 7/30/06 and once again CMS has refused to provide my prescribed chronic-care meds, and failed to correct this ongoing and serious problem despite knowledge thereof and opportunity. This is outrageous.

Indeed, any subsequent distribution date that exceeds a prior thirty-day card knowingly creates an interruption. Also, it is inexcusable because I had followed the med procedure, as described by you, and gave a seven day notice (actually two additional days) in June and at least five days in July 06 to provide said second and third cards respectively. In reality, however, there is no legitimate reason for CMS to require any notice at all in view of the facts: (a) a 120 dose regiment is prescribed at a time; (b) the cards are knowingly thirty doses (or of a known allotment) and knowingly given on a particular date; thus (c) CMS is well aware of when subsequent cards would be required to avoid any interruption yet acts as if it is unable to get a handle on this problem. CMS's behavior is suspect.

Consequently, I am a chronic-care patient, who is prescribed and requires chronic-care meds. The effectiveness of said meds is greatly impaired by any interruption and my normal daily functions have and continue to be impaired by these repeat and needless interruptions. Enclosed is a copy of an Emergency Medical Grievance (EMG) that according to the IGP 4.4 requires a response within 24 hours. I expect my chronic-care meds to be provided within 24 hours of receipt or a suitable alternative to be supplied from "Stock Supplies" etc. until the next card can be provided.

Thank you.

Dave W

David Williamson
SBI #183022, W-1, L-12
1181 Paddock Rd.
Smyrna, DE 1977
August 7, 2006

Mr. S. Altman, CMS Ombudsman
Re: Emergency Medical Grievance for On-going Chronic Care Medication Interruptions
Dear Sir:

Greetings, I had questioned you regarding my ninth unnecessary Chronic-care medication interruption (CCMI) in May/June 06. You admitted failure and incredibly offered another empty assurance that the continuous and pervasive problem would be corrected. This was the fourth time CMS had offered such useless assurances. However, CMS has failed to actually correct the problem. CMS made these empty assurances twice in grievance hearings for MG #15453, and twice from your office since this MG was closed. However, like all the proceeding times, this latest assurance proved to be false. I experienced yet another –my tenth consecutive CCMI since July 05- on 7-30-06, and as of 8-7-06 still have not been provided the lapsed meds. Consequently, I filed an Emergency Medical Grievance (EMG) (dated 7/30/06) for the following reasons:

1. because the prior assurances proved false and ineffective;
2. because MG #15453 has not been monitored for compliance;
3. because of experiencing this the tenth consecutive CCMI between July 05 and July 06; and
4. because any such interruption causes me to needless suffer a resurgence of symptoms that do impair my normal daily functions.

Your office received a copy of the EMG directly and CMS has failed to adequately respond to it. The EMG raised this most recent incident, the repeat failures, the useless assurances, and the fact that this is a continuous and pervasive problem. Eight days have elapsed, and to date my EMG has not been addressed. The IGP 4.4 states that EMG are to be determined whether the matter is an "Emergency" and if so to be responded to within "24-hours," however, if it is determined not to be an emergency, then it will be processed through the normal channels. Evidently my EMG has been determined not to constitute an emergency. CMS has not responded to the EMG, has not provided the relief I/Grievant requested, and has not even corrected the avoidable and unacceptable current CCMI. Moreover, whether or not an agent is employed to review medical grievances, it is CMS's responsibility to address and resolve medical grievances. Therefore, I request the following: (a) Who determined my EMG was not an emergency and why? (b) What were the criteria used for the determination? When will I receive the requested relief (e.g. provided all four med cards, 120 doses, upon reorder etc.)? If not, I expect a valid reason why and an explanation of what alternative will be employed to correct this continuous and pervasive problem.

Respectfully,
David W
David Williamson

C.c. Bureau Chief of Prisons

A-C

# ATTACHMENTS FOR SECTION III

## (A-C)

A. Altman's [False Events] Letter 08/08/06  .          .          .          (Marked A-1)

B. Medication Distribution Log          .          .          .          .          (Marked B-1)

C. Affiant's Reply (Altman's 08/08/06 False Events Letter) 08/08/06 (Marked C-1).

&    C-2).

21



Correctional Medical Services

David Williamson
SBI # 183022, W-1, L-12
1181 Paddock Road
Smyrna, DE 19977

8 Aug 2006

Dear Mr. Williamson,

I received your letter dated 30 July 2006. I once again must apologize for my delays in responding to you but I wished to give you a detailed response. The medication problem that we hoped was corrected was responsive this time. Your medications arrived in the pharmacy on 7/17/06 and you were on the medication pick up list on 7/19/amd 7/20. Due to the busy schedule you maintain you did not pick up the medications on either of these dates.

On 8/4/06, I investigated your concern and noted the above information. The pharmacy staff immediately contacted you to come and get your medications. I am told that you responded and received your medications on 8/4/06.

This reinforces the fact that our new procedures appear to be sound. We will continue to monitor the situation for any discrepancies. Please continue to let me know if you experience disruptions in your care so I can investigate and we can solve these problems.

Your Partner in Healthcare,

Scott S. Altman
Quality Assurance Monitor
Correctional Medical Services

CC:  Warden Thomas Carroll
      Medical Record

A-1

The Third 120 dose Lot of CC Meds (5/05/06 to 9/02/06) **THIRD LOT: 3 of 4 CC Med Cards**



Levo. Based on the known/documented Start date of 5/05/06, this Card should have been dispensed before 7/05/06, but CMS chose not to correct the CCMI. Adjusted for the egregious 6/29/06 CCMI, this Card should have been provided before 7/29/06, but CMS again chose not to correct the repeated CCMI(s). Alternatively, CMS did not dispense the lapsed CC Meds to Affiant until an egregious 8/08/06. Result: Unnecessary CCMI 7/30/06 to 8/08/06.



Mtv. Same as above.

*NOTE: The final card (4 of 4) was actually provided before another CCMI occurred. This was the first such instance –after ten consecutive CCMI(s) - that CC Meds were timely provided; however, CMS quickly restored its custom/policy of creating CCMI(s) on the very next opportunity. And CMS did so in spectacular fashion.

$A$ **A-10**

III·C

David Williamson
SBI #183022, W-1, L-12
1181 Paddock Rd.
Smyrna, DE 19977
August _16_, 2006

Mr. S. Altman, Ombudsman
Re: CMS Reply Letter 8/8/06

Dear Sir:

Greetings, I received a CMS reply letter (Reply) from you dated 8/08/06 (See A-1 Reply). It was a reply to my letter dated 7/30/06, in which I complained of a ninth consecutive Chronic-care medication interruption (CCMI), and I challenged the so called "new" corrective med distribution system as a known failure. (See A-2 Complaint). I am extremely disturbed about several distortions that are contained in the CMS reply: It contains several claims that are either preposterous or wholly fictitious.

For example, the Reply states that the pharmacy received my Chronic-care meds (CCM) on "7/17/06" and that I was placed on the medication pick-up list (MPUL) on "7/19 & 7/20." Furthermore, it alleges that I – for the first time-was too busy to pick these meds up on either date.

First, this is preposterous. I diligently check both the hospital schedule and the MPUL daily (Mon. thru Friday), and either my name did not appear on these dates as stated or the MPUL was not posted in our housing unit on these dates. If it had, I would have seen it and been all too happy to receive my CCM(s) early rather than late. Moreover, to date I have never missed a scheduled CCM pick up, not does my work or personal schedule interfere with the 1:30 PM pick up time. It is very important to me to have these CCML(s) corrected, and I deeply resent this allegation.

In addition, this statement is suspect for several reasons:

1. Suspect because 7/17/06 was four days before I even submitted my request for my CCM refill (See A-3 Refill dated 7/21/06). If they were –incredibly- in prior to my request on 7/21/06, then why were they not provided to me until 8/8/06? And assuming arguendo, why was my name removed from the MPUL after only two days? Or why was my name not placed back on the list after my 7/21/06 refill request? The information you were provided does not agree with these concurrent facts or any likely and reasonable inferences drawn from them.

2. Suspect because normal on-site pharmacy behavior has been to post one's name on the MPUL for five consecutive days before removing the name and returning the meds or canceling them. In contrast, you cite only two dates posting –not five. Does this mean that names will no longer be posted for five days or is this yet another anomaly? Also, the meds were not returned or cancelled despite my alleged failure to collect them. Does this mean that they will no longer be returned etc. or is this yet another anomaly? The information you were provided again does not agree with standard operating procedures.

1

3. Suspect because (a) I submitted a request for a refill on 7/21/06, and it went unanswered; (b) I filed an Emergency Medical Grievance (EMG) citing this most recent incident on 7/31/06 (C.c. Altman), and it went unanswered; and (c) I filed another notice of the ongoing CCMI(s) to you on 8/7/06, and it went unanswered. (See A-4 Notice 8/7/06). If the pharmacy had these CCM(s) since 7/17/06 –and more importantly- if the pharmacy was inclined to provide these lapsed CCM(s) to me, then how do you reconcile the fact that I was not provided these very CCM(s) until 8/8/06? The information you were provided does not agree with these concurrent facts or any likely and reasonable inferences drawn from them. Moreover, the Reply contains an outright fabrication.

Specifically, it states that I received my-now lapsed_ CCM(s) on "8/04/06" and that the "pharmacy staff" had "immediately contacted" me for them. This is utterly erroneous. The pharmacy never contacted me, and I would be very interested to hear who allegedly contacted me, how and when they were supposed to have accomplished it, and where it ostensibly took place? Work? My boss did not take any phone call. At the housing unit? No officer took any phone call. The fact is –is that my name appeared on the MPUL on 8/8/06 and that was how I became aware that my meds were available. That is the date I received and signed for them, not 8/04/06 as stated in the Reply. Also, I received them –not immediately- but at the standard time (e.g. 1:30 PM). This is very strange and troubling.

For instance, it is strange that when I attended the first Informal grievance hearing regarding the EMG on 8/10/06 (for this very CCML), before CMS representative Debbie Rodweller; and I informed her that I had just received the CCM(s) on 8/08/06 after an eight-day lapse, that she did not challenge my statement? If I had picked them up on 8/04/06, surely Debbie would know this. She was the investigating CMS rep for this EMG, for this incident, but no she did not! And the reason that she did not have the same erroneous information that you were provided is likely because it is difficult to keep fictitious stories consistent to all investigating parties.

Consequently, the facts speak for themselves. To date CMS has caused me to experience ten consecutive CCMI(s); had not once over the past year (7/07 to 7/06) provided my CCM(s) in a timely fashion – not even when the pharmacy was both aware and did actually possess my lapsed CCM(s). In fact, CMS is aware of several CCMI(s) such instances, in which the on-site pharmacy actually possessed my lapsed CCM(s) but failed to provide them and did exacerbate the interruptions. Moreover, despite CMS's dismall performance regarding this matter, and despite CMS's oft repeated empty token assurances (four to date) to correct the matter but failing directly after each and assurance, we are now to believe this incredible tail: That it is not CMS who is causing the CCMI(s), but that it is alternatively the patient who is to blame! Utterly preposterous and utterly insulting. It is impossible to remedy this continuous and pervasive problem when those involved busy themselves manufacturing incredible and or false claims. I suggest that you investigate the common denominator in this matter: the pharmacy.

In conclusion, I expect that CMS will correct this shocking behavior. Also, when the facts reveal that I picked up my meds on 8/8/06 and not "immediately contacted" on 8/4/06 to pick them up, I expect a full apology. Thank you for your time in this matter.

Dave W.

c c n ..... Chief    A/IU  Staff  Attorney  Julia Graff

2

A-G

# <u>ATTACHMENTS FOR SECTION IV</u>

## (A-G)

A. Altman's Medical Records Rejection 05/10/06    .    .    (Marked A-1)

B. Affiant's Release Form 05/08/06 .    .    .    .    (Marked B-1)

C. David Rush's Release Form 05/20/06    .    .    .    (Marked C-1)

D. Rush-Milstead's Request for Additional Records ~~10/14/06~~    (Marked D-1)    *9·14·06*

E. Altman's [Grant of Additional Records] Letter 09/29/06 .    (Marked E-1)

F. Affiant's [Retribution/Rejection] Grievance 43863 5/17/06    (Marked F-1 – F-2)

G. Affiant's Grievance Report 64863 (Resolution date 09/20/06).    (Marked G-1 –G-3)



David Williamson
SBI # 183022, W-1, L-12
1181 Paddock Road
Smyrna, DE 19977

10 May 2006

Dear Mr. Williamson,

Your medical records are the property of the Department of Corrections and the State of Delaware. Copies of your records will be available after your release. You would address your request to the Department of Corrections Health Services Unit, 245 McKee Road, Dover Delaware 19904. Please include your name, SBI number and dates that you are requesting information about. The cost for these copies would be determined by the Department of Corrections.

Your Partner in Healthcare,

Scott S. Altman
Quality Assurance Monitor
Correctional Medical Services

CC: Warden Thomas Carroll
    Medical Record

    Dorothy Williamson
    19 Cornwall Road
    New Castle DE 19720



CMS

## CORRECTIONAL MEDICAL SERVICES, INC.

## RELEASE OF INFORMATION AUTHORIZATION

| Name | ID Number/Date of Birth |
|------|-------------------------|
| David Williamson | SBI#00183022 ( -66) |

| Facility Releasing Information | Date |
|-------------------------------|------|
| Delaware Correctional Center | 5-8-06 |

I am either the patient named above or the patient's legally authorized representative.    *"Patient"*

By signing this form I authorize and release Correctional Medical Services, Inc. ("CMS") and the Facility from liability relating to the release of the following information, including protected health information, included in my medical record to:    release my medical/dental records to Dorothy Williamson.

| Name/Agency D.O.C. DCC / CMS | Address 1181 Paddock Rd. | City, State, Zip Code Smyrna, DE 19977 |
|---|---|---|

| Information to be released | from the dates of | | to | |
|---|---|---|---|---|
| XX  Admission Reports | XX | Discharge Reports | XX | X-Ray Reports |
| XXXX Operative Summary Reports | XXXX | Special Studies Reports | XXXX | Laboratory Reports |
| Immunization History | | Mental Health Reports* | | Psychiatric Summary Reports* |
| Drug/Alcohol History and Counseling* | | HIV Status and Treatment* | | Sexually Transmitted Diseases Status and Treatment* |

Other: Specify    Copy of the
complete and current medical/ dental file of record; including
but not limited to: blood labs, referals, clinics, chronic care etc.

Purpose for which disclosure is being made:

| XXXXX | Attorney Leo Ramunno, Esq | Insurance | XXXX Doctor |
|---|---|---|---|
| XXXXXX | Other: Discovery | | |

* I understand that my expressed consent is required to release any health care information relating to testing, diagnosis, and/or treatment for HIV (AIDS virus), sexually transmitted diseases, psychiatric disorders/mental health, and/or drug and/or alcohol use. You are hereby specifically authorized to release all health care information relating to such testing, diagnosis, and/or treatment of the aforementioned conditions.

| David W illiamson | 5.8.06 |
|---|---|
| Signature of Patient or Authorized Representative | Date |

X  Dorothy Williamson          X 5-8-06

I understand medical records cannot be disclosed without written consent, except as provided for under federal or state law. This authorization is valid for 90 days after the date signed and is subject to revocation by me at any time if provided in writing to CMS or the Facility, except to the extent that disclosure has already been disclosed in reliance on this authorization.

I understand I am not required to sign this authorization to receive health care or treatment.  I understand that, once information is disclosed pursuant to this Authorization, it is possible that it will no longer be protected by applicable federal medical privacy laws and could be re-disclosed by the person or agency that receives it, however, I do not authorize such secondary disclosure.

State law provides that a health care provider may charge a reasonable fee for these records.

| David Williamson      5-8-06 | |
|---|---|
| Signature of Patient or Authorized Representative* | Date Signed    5-08-06 |

*Authorized Representative's relationship to patient and authority to act for patient:    Mother (Power of Attorney).

CMS 7171 English Rev 08/2004





RECEIVED
CMS
~~~~~~~~ 2006

**CORRECTIONAL MEDICAL SERVICES, INC.**

**RELEASE OF INFORMATION AUTHORIZATION**

Correctional Medical Services
DE Regional Office

Correctional Medical Services
DE Regional Office

| David Rush | 00173418, DOB: ████-60 |
|---|---|
| Name | ID Number/Date of Birth |
| Delaware Correctional Center | 5-20-06 |
| Facility Releasing Information | Date |

I am either the patient named above or the patient's legally authorized representative.

By signing this form I authorize and release Correctional Medical Services, Inc. ("CMS") and the Facility from liability relating to the release of the following information, including protected health information, included in my medical record to:

| SHERYL RUSH-MILSTEAD, ESQ. | 34 W. 10th ST | WILMINGTON, DE 19802 |
|---|---|---|
| Name/Agency | Address | City, State, Zip Code |

| Information to be released | from the dates of | 9-30-05 | to | 8-30-06 |
|---|---|---|---|---|

| | | | | | | |
|---|---|---|---|---|---|---|
| xxx | Admission Reports | | Discharge Reports | xx | | X-Ray Reports |
| xx | Operative Summary Reports | xx | Special Studies Reports | xx | | Laboratory Reports |
| | Immunization History | | Mental Health Reports* | | | Psychiatric Summary Reports* |
| | Drug/Alcohol History and Counseling* | | HIV Status and Treatment* | | | Sexually Transmitted Diseases Status and Treatment* |

Other: Specify
Any and all labs (e.g. MRI etc), Referals (surgery etc.) & or complete medical file.

| Purpose for which disclosure is being made: | SEcond opinion/litigation | | |
|---|---|---|---|
| xx | Attorney | | Insurance | xx | Doctor |
| | Other: _ | | | | |

\* I understand that my expressed consent is required to release any health care information relating to testing, diagnosis, and/or treatment for HIV (AIDS virus), sexually transmitted diseases, psychiatric disorders/mental health, and/or drug and/or alcohol use. You are hereby specifically authorized to release all health care information relating to such testing, diagnosis, and/or treatment of the aforementioned conditions.

*David R Rush*                                                    5/20/06

| Signature of Patient or Authorized Representative | Date |
|---|---|

I understand medical records cannot be disclosed without written consent, except as provided for under federal or state law. This authorization is valid for 90 days after the date signed and is subject to revocation by me at any time if provided in writing to CMS or the Facility, except to the extent that disclosure has already been disclosed in reliance on this authorization.
I understand I am not required to sign this authorization to receive health care or treatment. I understand that, once information is disclosed pursuant to this Authorization, it is possible that it will no longer be protected by applicable federal medical privacy laws and could be re-disclosed by the person or agency that receives it, however, I do not authorize such secondary disclosure.
State law provides that a health care provider may charge a reasonable fee for these records.

| | |
|---|---|
| Signature of Patient or Authorized Representative* | Date Signed |
| *Authorized Representative's relationship to patient and authority to act for patient: | |

CMS 7171 English Rev 08/2004

**Sheryl Rush-Milstead, Esquire**
**31 West 40th Street**
**Wilmington, DE 19802**

September 14, 2006

Scott Altman
CMS DE Regional Offices
1201 College Park Drive
Suite 101
Dover, DE 19904

Dear Mr. Altman:

On June 13, 2006 I submitted a signed release and request for records on behalf of David R. Rush, SBI# 173418, housed at DCC in Smyrna, Delaware. I have received a substantial amount of documents; however, there seems to be some that are missing. Please provide copies of the following:

    1. The order of Dr. Durst for the surgical removal of lymphomas, the actual trip to the outside facility in order to have that surgery performed, and the resulting report of what occurred or did not occur.

    2. Numerous medical grievances, including but not limited to #s 21535, 43843, 49443, and 50583 filed by David R. Rush were not included in the materials received. Please send the grievance as well as the status thereof.

Thank you for your assistance in this matter.

Sincerely,

Sheryl Rush-Milstead

SR-M/wp
encl: med. release
xc:    David R. Rush

1V - E



**CMS**
DEDICATED PEOPLE
MAKING A DIFFERENCE
Correctional Medical Services

29 Sep 2006

FROM:   Correctional Medical Services
            1201 College Park Dr; Suite 101
            Dover DE 19904

TO:   Sheryl-Rush Milstead, Esquire
         31 West 40th Street
         Wilmington DE 19802

SUBJECT: Medical Record Copies

Ms Rush;

The additional information you requested is enclosed. The grievances are not a part of the medical record; they are an administrative process directed by the DDOC and copies of these forms and their resolution would have to be requested from them. There is no charge for the additional information you requested.

Sincerely

Scott S. Altman
CMS QA Monitor

Received
6-7-06

**FORM #585**

**MEDICAL GRIEVANCE**

FACILITY: __DELAWARE CORRECTIONAL FACILITY__     DATE SUBMITTED: __5/17/06__

INMATE'S NAME: __DAVID WILLIAMSOM__     SBI#: __00183022__

HOUSING UNIT: __W-1, L-12__     CASE #: __43863__

/////////////////////////////////////////////////////////////////////////////////////////////////////////////////////////////////////////////

**SECTION #1**

DATE & TIME OF MEDICAL INCIDENT: __5/16/06__

TYPE OF MEDICAL PROBLEM:    CMS is denying Williamson access to the courts and
                            exposing him to retribution for Williamson's MG activity.
Williamson received on 5/16/06 a rejection from Mr. Altman (CMS Ombudsman)
regarding his request of his personal medical records.  Specifically,
Williamson filed -using a CMS Medical Record Request- form his medical
records: dental records, labs, reports,referals, etc...., however, CMS
refused the reqest and stated that the records would be made available
-only- upon Williamson's release from prison. This is unacceptable.
Williamson has a riht to his medical records, has signed the appropriate
release/power of attorney, and is acting pro se in an action naming CMS
(filing will occur in late May), as a Defendant for their Deliberate Indiff-
ence to Williamson's Serious medical needs/conditions. Williamson's attorney
would not or could not be denied the same request, and because Williamson
is acting as his own attorney, he too must have access to the same records.
CMS is acting and has acted to obstruct Williamson's access to the courts,
and this is evidence of the same strategy to deny Williamson this protected
access. CMS continues to evince adverse actions/retribution agianst
Williamson for his grievance activity and procted rights pursuits.
Moreover, these records are compiled by an AGency "DOC" and are subject to
the Freedom of Information Act, and therefore are accessable by Williamson.

GRIEVANT'S SIGNATURE: _David W_     DATE: __5-17-06__

ACTION REQUESTED BY GRIEVANT: Provide the requested records; provide any applicable
    damages, and or fees (restitution) for the costs of any subsequent
    litigation costs in recovering the records.

DATE RECEIVED BY MEDICAL UNIT: _____

RECEIVED

MAY 18 2006

Inmate Grievance Of

**NOTE: EMERGENCY MEDICAL CONDITIONS WILL TAKE PRIORITY. OTHERWISE, MEDICAL
GRIEVANCES WILL BE ADDRESSED AT THE WEEKLY MEDICAL COMMITTEE MEETING.**

## Instructions for Submitting a Regular Grievance

Inmates are required, per DOC Procedure 4.4 [Inmate Grievance Procedure] to attempt to resolve complaints prior to filing a regular grievance. Grievances are to be submitted within seven (7) days from the date of the occurrence or incident or within seven days after the inmate became aware of the incident. The grievance is to be placed in the grievance box located in each housing unit.

Only one issue per grievance form will be addressed. If the grievance is submitted on a weekend or a holiday, it will be received during the next working day.

Return of Unprocessed Grievance

Intake Action: This Grievance Form is being returned to the inmate under the provisions outlined in DOV Procedure 4.4 "Inmate Grievance Procedure" for the following reason(s) :

_____   **Vulgar/Abusive or Threatening Language.** The Language that is unacceptable has been highlighted. The grievance may be resubmitted omitting this language.

_____   **Non-Grievable.** This issue has been defined as non-grievable in accordance with DOC Policy 4.4. These procedures have their own appeal process that must be followed.

_____ **Disciplinary Action**        _____ **Parole Decision**        _____ **Classificatbn Action**

_____   **Request.** Requests are not processed through the grievance procedure. Please correspond with the appropriate Office to secure the information that is requested.

_____   **Duplicate Grievance(s).** This issue has been addressed previously in Grievance # _____.

_____   **Original Grievances must be submitted to the Inmate Grievance Chairperson.** Photocopies are not accepted.

_____   **Inquiry on behalf of other inmates.** Inmates cannot submit grievances for other inmates.

_____   **Expired Filing period.** Grievance exceeds seven (7) days from date of occurrence.

IGC DOES NOT AUTHORIZE MONETARY DAMAGES.

THIS IS NOT A MEDICAL GRIEVANCE

Inmate Grievance Chairperson                                6-2-06
                                                            Date

DCC  Delaware Correctional Center
Smyrna Landing Road
SMYRNA DE, 19977
Phone No. 302-653-9261

Date: 09/20/2006

1v - C-

## GRIEVANCE REPORT

### OFFENDER GRIEVANCE INFORMATION

| | | | |
|---|---|---|---|
| **Offender Name** : WILLIAMSON, DAVID W | **SBI#** : 00183022 | **Institution** : DCC | |
| **Grievance #** : 64863 | **Grievance Date** : 07/31/2006 | **Category** : Individual | |
| **Status** : Resolved | **Resolution Status** : Level 1 | **Resol. Date** : 09/20/2006 | |
| **Grievance Type:** Grievance Process | **Incident Date** : 07/31/2006 | **Incident Time** : | |
| **IGC** : Merson, Lise M | **Housing Location** : Bldg W1, Tier L, Cell 12, Single | | |

### OFFENDER GRIEVANCE DETAILS

**Description of Complaint:** This is a Reprisal Grievance (RG) filed against IGC Capt. McCreanor, Warden T. Carroll, Deputy Warden Pierce, Bureau Chief P. Howard, and Commissioner Taylor (collectively DOC staff/officials). The IGP 4.4 at Procedure A-4 mandates (1) No staff or inmate names in a grievance shall participate in any capacity in the resolution decision. Grievances filed against the IGC or appealing authority shall be referred to the next higher authority. There is no higher authority not already named and because it also raises questions of law, it is appropriate to submit this matter for outside review.

**Remedy Requested** : See page 8 for the action requested by the Grievant due to space restrictions.

### INDIVIDUALS INVOLVED

| Type | SBI # | Name |
|---|---|---|
| | | |

### ADDITIONAL GRIEVANCE INFORMATION

| | |
|---|---|
| **Medical Grievance** : NO | **Date Received by Medical Unit** : |
| **Investigation Sent** : | **Investigation Sent To** : Pierce, David E Jr. |
| **Grievance Amount** : | |

Page 1 of 3

**DCC Delaware Correctional Center**
**Smyrna Landing Road**
**SMYRNA DE, 19977**
**Phone No. 302-653-9261**

Date: 09/20/2006

۱V - G-

## INFORMAL RESOLUTION

| OFFENDER GRIEVANCE INFORMATION | | | |
|---|---|---|---|
| **Offender Name** : WILLIAMSON, DAVID W | **SBI#** : 00183022 | **Institution** : DCC | |
| Grievance # : 64863 | **Grievance Date** : 07/31/2006 | **Category** : Individual | |
| **Status** : Resolved | **Resolution Status:** Level 1 | **Inmate Status :** | |
| **Grievance Type:** Grievance Process | **Incident Date** : 07/31/2006 | **Incident Time :** | |
| **IGC** : Merson, Lise M | **Housing Location** :Bldg W1, Tier L, Cell 12, Single | | |

| INFORMAL RESOLUTION | | | |
|---|---|---|---|

**Investigator Name** : Pierce, David E Jr.                                      **Date of Report** 09/08/2006

**Investigation Report :** Met with David Williamson on 9/12/06 and discussed this grievance. Agreed to open grievance #23193 and #43863 which were ruled to have been improperly returned. Inmate Williamson will be forwarding any additional grievances he states were improperly rejected for my review and consideration for being opened as active grievances.

**Reason for Referring:**

Offender's Signature: _____

Date            : _____

Witness (Officer)    : _____

Page 2 of 3

DCC Delaware Correctional Center
Smyrna Landing Road
SMYRNA DE, 19977
Phone No. 302-653-9261

Date: 09/20/2006

ιV·G

## GRIEVANCE INFORMATION - IGC

### OFFENDER GRIEVANCE INFORMATION

| | | |
|---|---|---|
| Offender Name : WILLIAMSON, DAVID W | SBI#          : 00183022 | Institution    : DCC |
| Grievance #    : 64863 | Grievance Date   : 07/31/2006 | Category    : Individual |
| Status        : Resolved | Resolution Status : Level 1 | Inmate Status : |
| Grievance Type: Grievance Process | Incident Date     : 07/31/2006 | Incident Time : |
| IGC          : Merson, Lise M | Housing Location : Bldg W1, Tier L, Cell 12, Single | |

### IGC

Medical Provider:                     Date Assigned

Comments:


[ ] Forward to MGC             [ ] Warden Notified

[ ] Forward to RGC             Date Forwarded to RGC/MGC : 09/20/2006

[x] Offender Signature Captured      Date Offender Signed      : 09/20/2006

## ATTACHMENTS FOR SECTION V

### (A-F)

A. Affiant's Medical Grievance 37123 04/30/06    .    .    (Marked A-1 –A-2)

B. Affiant's Affidavit 06/12/06 .    .    .    .    .    (Marked B-1)

C. Affiant's Affidavit 07/06/06 .    .    .    .    .    (Marked C-1)

D. Affiant's MG 37123 Complaint Package 08/25/06    .    (Marked D-1 – D-6)

E. Affiant's affidavit ~~11/13/06~~ .    *(11-14-06)*    .    .    (Marked E-1 –E-2)

F. Affiant's Affidavit 10/25/06 .    .    .    .    .    (Marked F-1 –F-2).

**DCC  Delaware Correctional Center**
**Smyrna Landing Road**
**SMYRNA DE, 19977**
**Phone No. 302-653-9261**

Date: 05/08/2006
V - A

# GRIEVANCE REPORT

### OFFENDER GRIEVANCE INFORMATION

| | | |
|---|---|---|
| **Offender Name :** WILLIAMSON, DAVID W | **SBI#** : 00183022 | **Institution** : DCC |
| **Grievance #** : 37123 | **Grievance Date** : 04/30/2006 | **Category** : Individual |
| **Status** : Unresolved | **Resolution Status :** | **Resol. Date :** |
| **Grievance Type:** Health Issue (Medical) | **Incident Date** : 04/30/2006 | **Incident Time :** |
| **IGC** : Merson, Lise M | **Housing Location :** Bldg W1, Tier L, Cell 12, Single | |

### OFFENDER GRIEVANCE DETAILS

**Description of Complaint:** Inmate claims: Dr. Durst examined the 4-3-06 acute knee injury and ordered a MRI and special knee brace. Dr emphasized of being careful until receiving brace and to always wear it. Dr. predicted receiving the brace in a few days. Nearly a month has elapsed and neither brace or MRI has bee provided.

**Remedy Requested** : The ordered knee brace and the MRI be provided directly and that any other follow up procedures be provided that are warranted.

### INDIVIDUALS INVOLVED

| Type | SBI # | Name |
|---|---|---|

### ADDITIONAL GRIEVANCE INFORMATION

**Medical Grievance :** YES     **Date Received by Medical Unit :** 05/08/2006

**Investigation Sent :** 05/08/2006     **Investigation Sent To** : Rodweller, Deborah

**Grievance Amount :**

DCC **Delaware Correctional Center**
**Smyrna Landing Road**
**SMYRNA DE, 19977**
**Phone No. 302-653-9261**

**Date:** 05/08/2006

*V. - A.*

# INFORMAL RESOLUTION

| OFFENDER GRIEVANCE INFORMATION | | |
|---|---|---|
| **Offender Name :** WILLIAMSON, DAVID W | **SBI#** : 00183022 | **Institution** : DCC |
| **Grievance #** : 37123 | **Grievance Date** : 04/30/2006 | **Category** : Individual |
| **Status** : Unresolved | **Resolution Status:** | **Inmate Status :** |
| **Grievance Type:** Health Issue (Medical) | **Incident Date** : 04/30/2006 | **Incident Time :** |
| **IGC** : Merson, Lise M | **Housing Location :** Bldg W1, Tier L, Cell 12, Single | |

| INFORMAL RESOLUTION |
|---|

**Investigator Name** : Rodweller, Deborah                    **Date of Report** 05/08/2006

**Investigation Report :**

**Reason for Referring:**

**Offender's Signature:**_____

**Date**              :_____

**Witness (Officer)**    :_____

## AFFIDAVIT OF DAVID WILLIAMOSN

1. I David Williamson, am the Affiant listed above and do depose and state the following:

2. On 6/05/06 Affiant met with Dr. Durst (Durst) to review the results of a MRI test, which had been done on Affiant's acutely injured right knee.

3. Durst stated that the suspected injury to the ALC was worst than he had hoped for and that the ACL was completely severed; also the meniccus discs, which is the cushion that separates the leg bones at the knee joint, were damaged and that there was water in the lower bone.

4. Affiant inquired about how the meniscus discs could have been damaged and Durst stated that because the ACL was severed completely, the leg bones consequently crushed and ground the discs between them and this caused the damaged.

5. Durst stated that the water in the lower bone was an indication of heavy contusions to the bone.

6. Affiant relayed to Durst that he has experienced a marked increase in the knee's instability and grinding (e.g. buckling-out at unnatural angles) –that it was clearly worse after Affiant's April 03, 06, re-injury, and that Affiant had to wait over a month for the prescribed knee brace (5/09/06), however, even that was knowingly substandard.

7. Affiant explained that the neoprene/velcro knee brace did absolutely nothing to secure the knee from buckling-out sideways or backwards (hyper-extension) and, in fact, Affiant's knee hyper-extended some nine days earlier while wearing the substandard brace.

8. Durst stated: "Well, the kind of brace you need has a metal framework and 'they' won't allow metal braces in the prison."

9. Affiant retqrted that he had seen like knee braces that employed a rigid plastic framework and joint, which is designed to prohibit the knee from hyper-extending. Durst conceded this fact and stated that he would have to determine the availability of such a brace.

10. Durst stated that he would have Affiant seen by an orthopedic specialist to "officially: recommend/confirm the surgery, at which time Durst would then process the remaining paperwork. Durst stated that the surgery must be taken care of "immediately" and that he knew the Orthopedic specialist would likely recommend the surgery because their was no other viable alternatives.

11. The above is true and correct to the best of Affiant's knowledge.

Signed and Subscribed before me this _12th_ day of June 2006.

David Williamson

(Notary Public)

## AFFIDAVIT OF DAVID WILLIAMSON

1. I David Williamson am the Affiant listed above and do depose and state the following:

2. On 6/12/06 Affiant was seen by an orthopedic specialist, Dr. DuShuttle, (240 Beiser Bldv., Suite 101, Dover, DE 19904 –PO Box 662, Dover, DE 19903-0662), in regard to Affiant's completely severed ACL (right knee ligament).

3. After DR. DuShuttle reviewed the MRI results and performed a physical exam, he stated that the severed ACL required orthopedic surgery, a complete ACL replacement/reconstruction, a special knee brace that prohibits hyper-extension of the knee joint and the necessity for the post-op rehab/physical therapy….

4. Dr. DuShuttle further explained that the surgery was required, otherwise Affiant would have to wear the special brace continuously and Affiant would nevertheless experience subsequent degradation and injury to the non-repaired knee.

5. Also, Dr. DuShuttle stressed the importance of post-op rehab/physical therapy and stated that because the replacement ACL was harvested from a cadaver that post-op rehab was crucial to success and that if the necessary rehab etc. was not conducted competently, the replacement would likely "fail." In fact, Dr. DuShuttle opined that the prison health care provider (CMS hereafter) would not provide the needed rehab treatment -that the brace alone costs upwards of a "thousand dollars" and that "they" probably would not provide it. His attempt to dissuade Affiant form pursuing the needed ACL replacement surgery, ACL surgery that was recommended by both himself and Dr. Durst as necessary, is not based on any legitimate medical factors; however, in contrast is rooted in Dr. DuShuttle's belief that CMS would refuse/fail in its duty to provide the needed post-op rehab thus causing the "ACL replacement" to consequently "fail!"

6. Dr. DuShuttle's effort to discourage Affiant is however based on "non-medical factors" of which was the assumption that CMS would be deliberately indifferent to Affiant's medical needs and or grossly negligent.

7. Affiant retorted: "…If the standard treatment for this type of injury is orthopedic surgery and an ACL replacement et cetera, then recommend it and you let me worry about my part and about CMS's duties after the operation. I certainly don't want to continue to experience the pain and suffering of a permanent injury or disability and forego a needed procedure because you assume that CMS will fail in its duty."

8. Officers T. Carr, Hastings, and a third unknown officer were direct witnesses to this conversation.

9. Dr. DuSuttle replied: "Absolutely! I'll recommend it, besides if you didn't have the replacement you would still require the brace and that wouldn't stop you knee from further deterioration and injury, but you are going to have to fight for this!"

10. Affiant believes the above is true and correct to the best of his knowledge.

Signed and subscribed before me this day of __ Ce __ July 2006.

David Williamson

Notary Public

David Williamson
SBI #183022, W-1, L-12
1181 Paddock Rd.
Smyrna, DE 19977
August _25_, 2006

Mr. Altman, CMS Ombudsman
Re: Medical Grievance # _37l23_ _ (ACL-Knee Injury)

Mr. Altman:

Greetings, I am in receipt of a response letter from your office (dated 8/16/06) regarding the above. I find the emerging pattern form your office quite disturbing. Specifically, regarding serious medical issues, you have repeatedly distorted and or attempted to diminish the seriousness of the matter(s) complained of. Moreover, this intentional distortion (i.e. disinformation) and dismissiveness are in no way supported by fact or reasonable inferences.

For example, you state in the 8/16/06 response: "The diagnoses of a completely severed ACL is not supported by the MRI...." This is very interesting, because Dr. Durst read and interpreted the MRI to me, and he specifically stated that my ACL was "completely severed." Subsequently, Doctor DuShuttle confirmed this characterization to me when he recommended reconstructive surgery. Moreover, Dr. DuShuttle stated "Rupture of the ACL," in his 6/12/06 report/recommendation to CMS/DCC Prison. The plain meaning of rupture, as defined in Webster's New College Dictionary (1995), is the following: Rupture 1. (a) The process of breaking open or bursting. (b) The state of being broken open or burst. 2. Divide... (970). Note that DuShuttle's report did not say a partial-rupture; it stated a "rupture."

Consequently, two medical doctors (one a specialist) made a medical finding that my ACL was completely severed; however, you – CMS's Ombudsman – incredibly challenge their medical findings. This raises serious questions that warrant resolution:

I. What is your "medical" opinion based on?

II. Are you substituting your opinion for that of two doctors?

III. Are you substituting your interpretation of the MRI results for that of two doctors?

IV. Are you even qualified to interpret the test results of an MRI?

V. Are you unaware of the plain meaning of "Rupture?"

Your claims are both unsupported by legitimate medical factors and offensive in that they are dismissive of the seriousness of my known acute medical condition (s). Again a pattern is clearly emerging regarding this disturbing behavior. Moreover, these acts cannot be dismissed as mere recklessness. They are indicative of a culture of deliberate indifference to known serious medical needs, of which CMS readily promotes. It has become obscene. It is unacceptable.

Lastly, you claim that the Don Jon ACL knee brace –which is medically required- is ostensibly a "security" issue. First, I am not aware that the DOC has made any such claim. Moreover, it is without merit because other medical devices, such as telescopic metal pole and wooden canes and wheelchairs are readily provided to those who need them. Also, I was instructed be Dr. Durst that a rigid plastic framed knee brace existed, which would be an acceptable alternative. Nevertheless, if DOC is claiming a security issue, then it appears that the DOC is interfering with medical necessities; however, without a legitimate penological objective. Therefore, this medical grievance must be resolved through an outside board.

I trust these distortions, disinformation, and dismissive ness to my serious medical needs will be rectified in a timely fashion. They do not serve any helpful function and only serve to hinder meaningful remedies.

Thank you,

David W———

David Williamson

C.c. Bureau Chief of Prisons (MG # _37l23_ )

V - D

David Williamson
SBI #183022, W-1, L-12
1181 Paddock Rd.
Smyrna, DE 19977
August $\underline{25}$, 2006

Bureau Chief of Prisons

Re: Medical Grievance #  $\underline{37123}$  (ACL-Knee Injury)

Dear Sir:

Greetings, enclosed are copies of a response letter from CMS Ombudsman Mr. Altman and my final reply. These letters (mine and CMS's) reference new issues and claims that warrant an "Outside Review" of the above Medical Grievance. I apologize for the delay in forwarding these materials to you, but some delay can be expected when one must draft a letter, mail it out to be typed and copied, and then returned.

I believe an Outside Review is warranted for several compelling reasons:

1. CMS is distorting the facts regarding my serious medical condition (e.g. Ruptured ACL in the knee joint), of which is in conflict with and absent legitimate medical factors;

2. CMS has created an inordinate delay in providing adequate treatment that is needlessly causing further deterioration of my knee joint;

3. CMS has made claims that the Department of Corrections has prohibited them from providing the medically necessary Don Jon ACL knee brace, and this issue requires resolution; and

4. Assuming the security claim was actually made, it is nevertheless without merit.

For the above reasons, I would respectfully request that this medical matter be resolved by "Outside Review" at the earliest possible convenience.

Thank you,

David Williamson

-2-

V - D



Correctional Medical Services

David Williamson
SBI # 183022, W-1, L-12
1181 Paddock Road
Smyrna, DE 19977

16 Aug 2006

Dear Mr. Williamson,

I received your letter dated 9 Aug 2006.

The diagnosis of a completely severed ACL is not supported by the MRI dated 6 May 06. This showed a torn, not severed ACL. The Don-Joy knee brace requested by Dr DuShuttle cannot be provided due to security concerns. The CMS Medical Staff is in discussion with Dr DuShuttle to find a suitable replacement, which meets security and medical considerations. Once this issue is resolved we will be scheduling you for the required surgery.

In my review of your record I did not note any sick calls related to your pain. Please submit a sick call request for these symptoms.

Your Partner in Healthcare,

Scott S. Altman
Quality Assurance Monitor
Correctional Medical Services

CC:  Warden Thomas Carroll
       Medical Record

- 3 -

V-D

David Williamson
SBI #183022, W-1, L-12
1181 Paddock Rd.
Smyrna, DE 19977
August  9  , 2006

Bureau Chief P. Howard
Re: Factual Addendum to the Final Appeal for Medical Grievance # 37123

Dear Sir:

Greetings, I (grievant) filed a Final Appeal (dated 8-03-06) regarding medical grievance #37123. Enclosed is a medical report I received after filing the appeal and it is appropriate to attach it to the appeal.

First, the initial MG pointed to my serious knee injury, which resulted in a completely severed ACL and related knee damage, and it pointed to CMS's refusal to provide the medically needed and doctors' recommended ACL knee brace and required reconstruction surgery. Attached to the Final Appeal was my affidavit swearing to these facts. Subsequent to filing the appeal, however, doctor DuShuttle provided me a copy of my knee exam report (the same report provided to CMS), and it establishes as fact the statements I made in my affidavit. (See A-1, A-2 DuShuttle's report)

Specifically, DuShuttle stated the following: "…torn cartilage will not heal on its own and if left untreated will only further deteriorate the knee… also [requires] the use of an ACL brace…Don Joy ACL brace…." Also, doctor Durst acknowledge the same; however, CMS knowingly provided a substandard Petella (neoprene/Velcro) knee brace and not the medically required Don Joy ACL brace. CMS intentionally exposes me/grievant to further injury by providing a known substandard medical device and by creating an inordinate delay in providing the medically required reconstructive surgery.

In fact, I made this very claim in my 11-29-05 Emergency Medical Grievance that was improperly and summarily rejected by non-medical personnel McCreanor. I did not receive the needed medical attention then; and consequently, the result was my predicted future injury (e.g. completely severed ACL). Now, I again face further injury because –like then- CMS refuses to provide the requisite medical attention. This is absurd and it is unacceptable.

In closing, I trust that you will give this report due consideration, and I thank you for your time.
Respectfully,

David W.

David Williamson

c.c.  cms Ombudsman, Altman

- 4 -

**Richard P. DuShuttle, M.D.**    V- Ɔ
240 Beiser Blvd, Suite 101
Dover, Delaware  19904
302-678-8447

## PATIENT NAME: DAVID WILLIAMSON    DOB:    05/12/66

**06/12/06:** The patient is seen in the Dover office for an initial evaluation.
He is an inmate accompanied by two prison guards. He is a 40 year old
male with complaints of pain to the right knee that he has had since July of
last year. He states the injury occurred while playing softball. He states he
was sliding into third base; however the base was anchored and did not
move and it caused his right leg to be hyperextended. He states he had
immediate pain to the knee following the injury. He denies ever having a
prior similar problem. Subjectively he describes giving out of the knee.

**PERSONAL MEDICAL HISTORY** is remarkable for hypothyroidism.
Prior surgeries: None listed. Current medications: Synthroid. Allergies:
No known allergies to medications.

**FAMILY MEDICAL HISTORY** is remarkable for diabetes.

**REVIEW OF TESTS:** MRI of the right knee dated 05/08/06-Impression:
Rupture of the ACL. Bilateral meniscal tears.

**OBJECTIVE EXAMINATION OF THE RIGHT KNEE:** Full flexion
and extension with pain and stiffness. Positive tenderness to the both medial
and lateral jointlines. Positive give on Drawer and Lachman test. Mild
effusion. No redness or temperature change. No neuro or sensory deficits
appreciated.

**DIAGNOSIS:**    Right ACL rupture
                Bilateral meniscal tears, right knee

**TREATMENT:** I have explained to the patient that he has a torn cartilage
that will not heal on its own and if left untreated will only further deteriorate
the knee; in addition, he also has a rupture of his ACL. ACL surgery is a
big surgery that requires extensive rehabilitation following surgery and also
the use of an ACL brace that has to be worn for at least 6-8 months

**CONTINUED………………..)**

- 5 -

**06/12/06: CONTINUED..............)**

following surgery. I am not optimistic that he will get the proper care
needed following ACL surgery in the prison system. It is very important
that he attends PT and it very important that he wear the ACL brace. The
pros and cons were discussed in detail with the patient. After a thorough
discussion, the patient states his understanding and desires to proceed. I will
notify the prison of the need for the patient's surgery which would consist of
an arthroscopy of the right knee with medial and lateral meniscectomy and
ACL reconstruction with cadaver graft. The prison was also notified that the
patient needs a Don Joy ACL brace. We will await the decision of the
prison before proceeding with surgery. RPD/cl/it

AFFIDAVIT OF DAVID WILLIAMSON

1. I, David Williamson, am the Affiant listed above and do depose and state the following in support of CA #06-379-SLR:

2. On November 8, 06 Affiant attended a Level One medical grievance hearing (MG #78623), with CMS employee Debbie Rodweller.

3. This latest MG is Affiant's third such filing against CMS regarding Affiant's "ruptured ACL" and CMS's refusal to provide the necessary treatment (e.g. specifically the doctor recommended reconstructive surgery (Surgery) and the doctor recommended ACL Don Joy Knee Brace (ACL knee brace).

4. MG 78623 was filed because Affiant had received several assurances from CMS representatives (Ombudsman Altman & Gail Eller), that appropriate follow up on the Surgery and on providing a suitable alternative ACL knee brace; however, their assurances proved to be false.

5. Affiant subsequently learned on 10/18/06 that doctor Durst's Surgery referral was "ignored" by Regional, and that Affiant's medical file did not contain any evidence of any follow up as promised earlier by Altman and Eller.

6. The following will outline the events leading to this third MG:

7. Specifically, on 4/03/06 Affiant re-injured his right knee and doctor Durst ordered an MRI and ACL knee brace. On 4/30/06 neither had been realized and Affiant filed an Emergency Medical Grievance (EMG #37123).

8. On 5/9/06 Affiant attended a Level One grievance hearing for (EMG 37123) with CMS Rodweller –who finally provided Affiant, for the first time, neoprene knee brace. This type of brace; however, is admittedly substandard and inadequate because it fails to protect the knee from hyper-extending sideways and backwards.

9. On 8/01/06 Affiant attended a Level Two Formal Grievance Hearing for (EMG 37123), with CMS representative Gail Eller, and she erroneously stated that a knee brace had been provided on 4/3/06 (not on 5/09/06 by Rodweller), and Eller stated she would "Follow up on [Surgery] referral written 6/01/06. (Doctor Durst filed the Surgery referral after review of the MRI showed a "Rupture" of the ACL, of which will not heal and will cause future further damage to the knee if left uncorrected through reconstructive surgery.

10. On 8/16/06 CMS Ombudsman, Altman, also promised follow up on the knee brace matter (i.e. stating that he was working with CMS staff at DCC to coordinate with doctor DuShuttle on getting a suitable alternative knee brace). Also, Altman stated that when it 9knee brace issue) was resolved, Affiant would then be scheduled for his "required surgery."

11. On 10/18/06, however, Affiant was notified by doctor Van Dusen that doctor Durst's 6/01/06 referral for ACL reconstructive surgery had not been authorized, but had been "ignored", and that no evidence or notations of any follow up appeared in Affiant's medical file to date.

12. Consequently, Affiant then realized that CMS's 8/01/06 (Eller EMG hearing) and 8/18/06 (Altman's letter) promises to follow up on the referral and schedule for required surgery (respectively) were made in bad faith. Therefore, Affiant filed the latest MG #78623.

13. At the 11/08/06 grievance hearing Rodweller reiterated prior CMS claims that they could not provide the doctor's recommended Don Joy ACL Knee Brace (alleging that it was a security issue because it contained metal).

1

14. Affiant took exception by informing Rodweller that doctors Durst and DuShuttle both stated that a suitable plastic alternative brace existed that would protect Affiant's unstable knee joint from hyper-extension.

15. Rodweller stated: "Well, then Durst can go out and get it for you! I don't know why he is making promises that we can't fulfill."

16. Evidently, Rodweller (CMS staff at DCC) was unaware of Altman's claim to have been working with them to coordinate with doctor DuShuttle on getting a suitable alternative.

17. Affiant continued to explain to Rodweller that on 10/18/06 Affiant had been informed that the assurances CMS had made on two prior occasions (one the last grievance) to follow up on Durst's referral appear to have been made in bad faith; they did not occur as promised; that Regional had "ignored" the referral; and that this failure and the resulting inordinate delay was the primary issue of the latest grievance.

18. Rodweller claimed that the grievance did not mention any prior grievance assurance, inordinate delay, or that Regional had ignored the referral.

19. Affiant produce a copy of his original hand written 10/23/06 MG and pointed out that the version provided and processed by the IGC did not accurately reflect Affiant's written grievance –that a majority of claims and relevant facts had been omitted.

20. Rodweller took Affiant's originally filed MG and stated: "Let me read it...Um, How do they expect us to answer these things if they don't type them out correctly?"

21. Affiant requested that Rodweller retain his copy and attach it to the processed one, but she refused and merely took some notes form it.

22. Rodweller continued: "You are lucky this wasn't dismissed. You requested money –you can't do that! It's against the grievance rules!"

23. Affiant's request for monetary damages was also omitted from the IGC processed MG 78623. Rodweller's claim is without merit, becuase this issue was addressed and resolved in grievant's favor by Deputy Warden Pierce –there is no prohibition in the IGC 4.4 against requesting monetary damages.

24. Finally, Rodweller checked Affiant's medical file and confirmed Durst's 6/01/06 referral for reconstructive surgery, confirmed DuShuttle's concurrence, and confirmed Regional had not replied to the referral. Rodweller offered Affiant –what appears to be the CMS standard line- "I'll put you in for an evaluation."

25. Affiant exclaimed: "I've already been evaluated by two doctors and both stated in their medical opinion that my ACL was ruptured, that it would never heal, that it would only cause further serious injury absent reconstructive surgery, and I don't appreciate CMS giving me the run-around and wasting my time while I continue to suffer and it refuses to provide the needed treatment!" "In fact, I should not have had to file this subsequent grievance if it weren't for CMS's lies!"

26. Rodweller replied: "There's nothing I can do; I can't force them to do anything. I will put you down for another eval and forward your grievance.

27. The above is true and correct according to Affiant's personal experience and belief. Sworn and Subscribed before me this __14__ day of November 2006.

David Williamson

**OSMAN SAMMANDER**
Notary Public
State of Delaware
My Comm. Expires June 14 2008

Notary public

2

## AFFIDAVIT OF DAVID WILLIAMSON

1. I, David Williamson, am the Affiant listed above and do depose and state the following:

2. On 10/18/06 at about 12:15 pm, Affiant was directed by his building officer to report to the hospital: "You won your grievance; you're being called in for an unscheduled medical visit."

3. Affiant had been scheduled in earlier (7:00am) for an unrelated "Reprisal" medical grievance hearing; however, Affiant was not otherwise scheduled for any other medical activity.

4. Affiant checked in and received the standard procedure for a Chronic-care Clinic (Clinic): the purpose of which is to normally place a Refill/Order for one's chronic-care medication (CC Meds); however, a doctor may Reorder one's CC Meds at any time absent a Clinic if circumstances warrant it.

5. Affiant was brought to Doctor Van Dusen upon which Van Dusen began to question Affiant about his chronic-care condition (hypo-thyroidism), and Affiant then realized that the unscheduled call-in was to replace the Clinic that CMS had "faked" on 8/31/06 (disclosed on 9/27/06 at MG #_____ hearing).

6. Affiant had not had a Clinic since May 8, 2006 and was due for one in August 06 (circa) (i.e. 90-days) or no later than Sept. 06 (circa) (i.e. 120-days) - before Affiant's CC Meds ran out (i.e. interrupted).

7. Affiant had written CMS about the past due Clinic –and the inevitable but preventable chronic-care medication interruption (CCMI) - on 9/11/06, again on 9/22/06, and 10/4/06; and on 9/27/06 Affiant received a personal assurance from Gail Eller (CMS employee at the on-site hospital) at the MG hearing that she would take care of Affiant's CC Meds. CMS failed to conduct the Clinic, CMS failed to Reorder Affiant's CC Meds, Eller failed to do either, and on 10/05/06 Affiant experienced an unnecessary CCMI. Affiant wrote again on 10/14/06. CMS caused this, to date, thirteen-day CCMI despite notice.

8. Van Dusen inquired of Affiant: "How is your energy level?" "Doc, I'm suffering chronic fatigue: I can't promote good health through meaningful exercise. I can't do anything that I once enjoyed doing because of this chronic fatigue and my body's turned to fat and is wasting away. Also, I find it difficult to concentrate. In fact, it's not just physical problems, it has adversely affected my work performance and studies," Affiant replied.

9. "I'm not surprised with a TSH [i.e. thyroid stimulating hormone] level of over six," Van Dusen replied.

10. Consequently, CMS had both subjective and objective knowledge of Affiant suffering the impairment of his normal daily functions and of the common symptoms of hypothyroidism.

11. "Yeah, I'm not surprised either with CMS's intentional refusal to provide me my thyroid meds. In fact, it is rational behavior when you consider the economics," Affiant continued.

12. Van Dusen replied: "Unfortunately, *I must agree with you.* I have seen a pattern the past two months that I've worked here –CMS talks a good talk but fails to follow up. They pay us doctors pretty well, but they *short-change you guys.*"

1

13. Affiant was astounded that a CMS employee finally admitted to Affiant CMS's custom/policy of cost-avoidance.

14. Van Dusen indicated he would place the Refill/Order for the CC Meds, and he placed an order for Lab work, and wanted blood pressure reading weekly due to Affiant's elevated blood pressure. Van Dusen stated: "Your blood pressure is probably up due to your frustration, but I want a few more data points before I increase your dosage."

15. Affiant then realized that the already lapsed CC Meds had not been Reordered at all despite all the notices Affiant gave to CMS and Eller's assurance that she would take care of it on 9/27/06.

16. Affiant checked for clarification by relating all his efforts to avoid another unnecessary CCMI (listed above at paragraph 7), and the post 10/15/06 correspondence; and then asking: "With all this notice and Eller's promise, are you telling me that no Refill order was ever placed! I've been out since 10/05/06 –thirteen days!"

17. "No order was entered. I'm doing it now," was Van Dusen's reply.

18. Affiant subsequently asked about the status of his needed ACL reconstructive surgery –that Dr. Durst had filed the appropriate referral and that Dr. DuShuttle had also recommended it?" Van Dusen found Durst's order for the reconstructive surgery and stated: "Looks like regional had not authorized it."

19. "Do you mean not authorized or denied?" Affiant inquired.

20. "Well, it appears as though the request by Doctor Durst was ignored –see the box here is blank – and if Regional had responded, any response would have been recorded in the box," Van Dusen replied.

21. Van Dusen continued, "I will refile the paper work today, but I have to be frank with you, they [CMS] will probably say you need physical therapy."

22. Affiant stated: "Both doctors stated unequivocally that reconstructive surgery was needed; that my ACL was 'ruptured' and that surgery was the only viable option."

23. Van Dusen replied: "I would also recommend the same –any doctor in his right mind would– and I don't mean to laugh, but that is what Regional will probably authorize. See CMS is like an insurance company. They will continue to deny your requests until all your "T's and all your "I"s are dotted. You will have to force them."

24. Again Affiant was astonished at Van Dusen's frankness and admission to Affiant what Affiant had been charging in his repeated Medical Grievances: that CMS was intentionally denying or delaying needed treatment as a custom/policy of cost-avoidance, and of which was not based on any legitimate medical or penological factors.

25. The above is true and correct according to Affiant's personal experience and belief.

Sworn and Subscribed before me this 23 day of October 2006.

David Williamson

Brian D. Engrem
Notary Public, State of Delaware
My Commission Expires June 14, 2008

Notary Public

Brian D. Engrem
Notary Public, State of Delaware
My Commission Expires June 14, 2008

2

$A \cdot D$

# ATTACHMENTS FOR SECTION VI

## (A-D)

A. Affiant's Grievance Appeal Package ( _5 9 1 7 0_ ) 09/27/06 .(Marked A-1 – A-8)

B. Affiant's Reprisal Grievance Package 10/03/06  .        .        (Marked B-1 – B-8)

C. Affiant's Affidavit #1 of 10/25/06 .        .        .        .        (Marked C-1 –C-2)

D. Affiant's Affidavit  #2 of 10/25/06 .        .        .        .        (Marked D-1 – D-2).

V1-A

## Grievance Appeal Form

This must be completed and returned to the IGC within 3 days of receipt of the
Warden/Designee/MGC Decision. This form is to be returned via the Grievance Box.
This form is to be used <u>Only</u> in the event of a decision appeal. Please specify the reason for the appeal in the space below.

Grievant: _Williamson, David_     SBI#: _183022_

Housing Unit: _W·1_          Case#: _59170_

Date: **SEPTEMBER 27, 2006**          Due Date: **OCTOBER 4, 2006**

Grievant filed Emergency Medical Grievance #59170 because the newest incident — an eight·day Chronic-care medication interruption (ccmI)—was the tenth consecutive ccmI between July 05 and July 06, and despite repeated assurances by CMS to correct the continuous yet unnecessary problem (which is documented in a prior completed MG # 15453) CMS has intentionally refused to correct the ccmI(s). In fact, cms flatly refused to implement any reasonable corrected measure — flatly refused to provide Grievant with his doctor's prescribed meds in a timely and appropriate manner. (See attached Affidavit at #2 – #8).

Moreover, CMS has intentionally falsified medical records in Grievant's medical file in a bad faith attempt to fabricate a semblance of corrective action and or to manufacture a defense to cms's deliberate indifference to Grievant's known serious medical condition. (See attached Affidavit at #9 – #18).

The D.O.C. is knowledgable of these on-going and pervasive ccmI(s) by virtue of MG# 15453 and the instant MG# 59170, and it is clear cms refuses to correct the problem — and now CMS is engaged in falsifying Grievant's medical records. These acts demand immediate corrective action to preclude further suffering and further constitutional violations.

_Dave W_
INMATE SIGNATURE

9·27·06

If you need additional space, attach 8.5" X 11" size sheets of paper.

## AFFIDAVIT OF DAVID WILLIAMSON                VI-A

1. I, David Williamson, am the Affiant listed above and do depose the following:

2. Affiant attended a Formal Grievance Hearing on 9-27-06 that was headed by CMS representative Gail Eller and Lt. McCreanor, etc.

3. This hearing regarded Emergency Medical Grievance # 59170, of which claimed that CMS was acting with deliberate indifference by creating and or failing to correct the ongoing incidence of repeat chronic-care medication interruptions (CCMI).

4. Affiant experienced ten consecutive CCMI(s) from July 05 to July 06.

5. Eller began the hearing by declaring: "I am denying your grievance. You (affiant) requested all 120 doses to limit interruptions; we are not going to do that. You had asked that stock supplies be provided within twenty-four hours of notice of an interruption, but you have to realize that though we keep some stock supplies we are not a pharmacy and you will just have to wait. And you had requested damages be awarded - that's not going to happen!"

6. Affiant stated that once the Chronic-care Clinic (Clinic) is provided and the doctor consequently signs-off on the "Refill" for the next 120-day (ie. doses) cycle, there is no legitimate reason not to provide the patient with the four thirty-day med cards; and that this simple and reasonable corrective measure would limit CCMI(s) to no more than three per year as opposed to a potential twelve.

7. Affiant continued to point out CMS's history over the past year where CMS caused Affiant ten consecutive and unnecessary CCMI(s) despite knowledge prior to each and every lapse, and that in view of these repeat failures it is both reasonable and warranted to provide all the order doses at one time to realize meaningful correction.

8. Eller matter-of-factly replied: "Your grievance is denied."

9. Affiant then asked Eller: "Well, how do you propose to correct this continuous problem?" "Heck, its been over 120-

-/-

VI·A

days since my last Clinic and I wrote for the necessary Clinic on 9·11·06 and on 9·22·06, but to date no Clinic has been provided. This will result in another unnecessary med interruption!"

10. Eller flipped open Affiant's medical file and stated: "You were here for your Clinic on 8·31·06. You saw Bailey and she gave you one pill and it says here Bailey told you not to wait so long next time."

11. Affiant responded: "I have not been to a Clinic since May 06 — I'm past due for one now — and I certainly wasn't here on 8·31·06."

12. Eller confirmed Affiant's name and SBI number and stated "I'm looking at you vitals listed here and it says you were out of meds, given one pill, and told not to wait so long next time - on 8·31·06."

13. "That is false - that is a false entry in my medical filed!" Affiant replied. No one denied this or even acted surprised.

14. Affiant proved his accusation without even having to secure his work record or other verifying documentation that would diffinitively place Affiant at another location on 8·31·06 by simply asking: "Well, if I was here on 8·31·06 for a Clinic as you claim, then I suppose my meds were Refilled?"

15. "No, I don't see a Refill order," Eller admitted.

16. Affiant pointed out the obvious: "You say I was here for a Clinic — you say you have my vitals — and we all know that Clinics are scheduled to reorder chronic-care meds, but there is no accompanying Refill order ... that is a false record!"

17. Eller merely dropped her head and said she would get my meds.

18. The above is true and correct as Affiant experienced it.

Signed and Sworn on this 27 day of September 2006.

Dave W

David Williamson, 183022

Brian D Engram

Notary Public

Brian D. Engram
Notary Public, State of Delaware

DCC  Delaware Correctional Center
Smyrna Landing Road
SMYRNA DE, 19977
Phone No. 302-653-9261

Date: 08/08/2006   VI·A

# GRIEVANCE REPORT

## OFFENDER GRIEVANCE INFORMATION

| | | |
|---|---|---|
| **Offender Name** : WILLIAMSON, DAVID W | **SBI#** : 00183022 | **Institution** : DCC |
| **Grievance #** : 59170 | **Grievance Date** : 07/30/2006 | **Category** : Individual |
| **Status** : Unresolved | **Resolution Status** : | **Resol. Date** : |
| **Grievance Type:** Health Issue (Medical) | **Incident Date** : 07/30/2006 | **Incident Time** : |
| **IGC** : Merson, Lise M | **Housing Location :** Bldg W1, Tier L, Cell 12, Single | |

## OFFENDER GRIEVANCE DETAILS

**Description of Complaint:** Inmate claims: Deliberate indifference to my known serious medical needs by CMS by employing / permitting a custom / policy of repeatedly denying / delaying the distribution of chronic care meds for non medical reasons. Tenth consecutive interruption on 7/30/06.

**Remedy Requested** : 1. Provide all prescribed 120 doses, 4 cards, at beginning of cycle to limit interruptions. 2. provide emergency stock supply of chronic care meds within 24 hors of notice of any interruption; and provide damages.

### INDIVIDUALS INVOLVED

| Type | SBI # | Name |
|---|---|---|
| | | |

## ADDITIONAL GRIEVANCE INFORMATION

**Medical Grievance :** YES

**Date Received by Medical Unit :** 08/08/2006

**Investigation Sent** : 08/08/2006

**Investigation Sent To** : Rodweller, Deborah

**Grievance Amount :**

DCC  Delaware Correctional Center
Smyrna Landing Road
SMYRNA DE, 19977
Phone No. 302-653-9261

**Date:** 08/08/2006  V I - A

# INFORMAL RESOLUTION

| OFFENDER GRIEVANCE INFORMATION | | |
|---|---|---|
| **Offender Name :** WILLIAMSON, DAVID W | **SBI#** : 00183022 | **Institution** : DCC |
| **Grievance #** : 59170 | **Grievance Date** : 07/30/2006 | **Category** : Individual |
| **Status** : Unresolved | **Resolution Status:** | **Inmate Status :** |
| **Grievance Type:** Health Issue (Medical) | **Incident Date** : 07/30/2006 | **Incident Time :** |
| **IGC** : Merson, Lise M | **Housing Location :** Bldg W1, Tier L, Cell 12, Single | |

| INFORMAL RESOLUTION |
|---|

**Investigator Name** : Rodweller, Deborah                    **Date of Report** 08/08/2006

**Investigation Report :**

**Reason for Referring:**

Offender's Signature:_____

Date                    :_____

Witness (Officer)    :_____

DCC  Delaware Correctional Center
Smyrna Landing Road
SMYRNA DE, 19977
Phone No. 302-653-9261

Date: 09/29/2006   Vi · A

# GRIEVANCE INFORMATION - MGC

## OFFENDER GRIEVANCE INFORMATION

| | | |
|---|---|---|
| **Offender Name** : WILLIAMSON, DAVID W | **SBI#**       :  00183022 | **Institution**    : DCC |
| **Grievance #**   : 59170 | **Grievance Date**  : 07/30/2006 | **Category**    : Individual |
| **Status**       : Unresolved | **Resolution Status:** | **Inmate Status :** |
| **Grievance Type:** Health Issue (Medical) | **Incident Date**   : 07/30/2006 | **Incident Time :** |
| **IGC**        : Merson, Lise M | **Housing Location :** Bldg W1, Tier L, Cell 12, Single | |

### MGC

**Date Received** : 08/11/2006          **Date of Recommendation:** 09/29/2006

### GRIEVANCE COMMITTEE MEMBERS

| Person Type | SBI # | Name | Vote |
|---|---|---|---|
| Staff | | Eller, Gail | Uphold |
| Staff | | Heddinger, Brenda | Uphold |
| Staff | | Gordon, Oshenka | Uphold |
| Staff | | McCreanor, Michael | Abstain |

### VOTE COUNT

**Uphold : 3**                    **Deny : 0**                    **Abstain :1**

### TIE BREAKER

| Person Type | SBI # | Name | Vote |
|---|---|---|---|

### RECOMMENDATION

Hearing Held 9/28/2006.
Uphold: Check with pharmacy about medications if need order get MD to write order & schedule to see MD.

Inmate verbally informed of MGC Decision and appeal form was supplied.
Appeal due 10/5/2006.

**DCC Delaware Correctional Center**
**Smyrna Landing Road**
**SMYRNA DE, 19977**
**Phone No. 302-653-9261**

Date: 10/10/2006  VI-A

## GRIEVANCE INFORMATION - Appeal

| OFFENDER GRIEVANCE INFORMATION | | | |
|---|---|---|---|
| **Offender Name** : WILLIAMSON, DAVID W | **SBI#** : 00183022 | **Institution** : DCC | |
| **Grievance #** : 59170 | **Grievance Date** : 07/30/2006 | **Category** : Individual | |
| **Status** : Unresolved | **Resolution Status :** | **Inmate Status :** | |
| **Grievance Type:** Health Issue (Medical) | **Incident Date** : 07/30/2006 | **Incident Time :** | |
| **IGC** : Merson, Lise M | **Housing Location :** Bldg W1, Tier L, Cell 12, Single | | |

| APPEAL REQUEST |
|---|

Appeal arrived 10/9/2006. Appeal accepted, Cpl Merson did not collect grievances/appeals due to being out on leave. Appeal states: Grievant filed emergency medical grievance #59170 because the newest incident - an 8 day chronic care medication interruption was the 10th consecutive chronic care medication interruption between July 05 and July 06, and despite repeated assurances by CMS to correct the continuous yet unnecessary problem (which is documented in a prior completed medical grievance #15453) CMS has intentionally refused to correct the chronic care medication interruptions. In fact, CMS has flatly refused to implement any reasonable corrected measure - flatly refused to provide grievant with his doctors prescribed meds in a timely and appropriate. Moreover, CMS has intentionally falsified medical records in Grievant¿s medical file in a bad faith attempt to fabricate a semblance of corrective action and or to manufacture a defense to CMS's deliberate indifference to Grievant¿s known serious medical condition. The DOC is knowledgeable of these on-going and pervasive chronic care medication interruptions by virtue of medical grievance #15433 and the instant medical grievance 59170, and it is clear CMS refuses to correct the problem - and now CMS is engaged in falsifying Grievant¿s medical records. These acts demand immediate corrective action to preclude further suffering and further constitutional violations.

| REMEDY REQUEST |
|---|

Vi-A

David Williamson
SBI #183022, W-1, L-12
1181 Paddock Rd.
Smyrna, DE 19977
September _29_ , 2006

Mr. S. Altman, CMS Ombudsman

RE: CMS's Outright Refusal to Correct the Known and Ongoing Chronic-care
Medication Interruptions and CMS's Intentional Falsification of Medical Records

Dear Mr. Altman:

Enclosed is a copy of the Final Appeal and attached Affidavit for MG# 59170. The
affidavit outlines CMS's outright refusal to take the bare minimal and most reasonable
measures to correct the repeated chronic-care medication interruptions (CCMI), and it
contains an outline of the deliberate falsification of my medical records. (See exhibits A-
1 – A-3).

This behavior is shocking and should have been investigated and corrected by CMS when
I rose nearly identical accusations in my complaint letter dated 8/15/06: That CMS
personnel made falsified claims regarding the distribution of chronic care meds. (See Ex.
B). This prior complaint letter went unanswered, went uncorrected, and now this
outrageous behavior has escalated into the entry of falsified medical records. Falsifying
medical records to (a) make it appear that I received treatment when I did not and to (b)
manufacture a fictitious defense or a bad faith attempt to shift the blame to me is clearly a
likely violation of my constitutional rights and likely to cause me harm.  CMS was bound
to investigate and correct the first (8/15/06) allegation, but evidently did not. I trust this
failure will not be repeated.

In closing, I request that both the 8/15/06 and this instant incident is investigated and
corrected. I also expect a report of your findings and action. Thank you for your time and
consideration with this matter.

Dave N

V1-B

**FORM #584**

**GRIEVANCE FORM**

FACILITY: <u>D.C.C.</u>                     DATE: <u>10·3·06</u>

GRIEVANT'S NAME: <u>David Williamson</u>     SBI#: <u>00183022</u>

CASE#: <u>72883</u>                     TIME OF INCIDENT: <u>Ongoing</u>

HOUSING UNIT: <u>W-1, L-12</u>

BRIEFLY STATE THE REASON FOR THIS GRIEVANCE. GIVE DATES AND NAMES OF OTHERS INVOLVED IN THE INCIDENT OR ANY WITNESSES. <u>CMS intentionally committed "Adverse Acts" against me (grievant) by entering false records in my medical file in direct response to my grievance activity. Adverse actions are prohibited as "Reprisal" by the IGP 4.4 and my Constitutional rights.</u>
<u>    Specifically I attended a Formal Grievance hearing with CMS representative Gail Eller and IGC McCreanor, et al on 9·27·06. It was regarding an Emergency Medical Grievance (EMG 59170), of which claimed that CMS was intentionally creating chronic-care medication interruptions (CCMI). Consequently, in response to this EMG, CMS intentionally fabricated medical records to (a) create the appearance that CMS had provided treatment/corrective action when it had not; and (b) create a bad faith defense by shifting the blame to me for the CCMI (see attached Affidavit A-1 & A-2) (Continued at page 2 of 584 form)</u>

ACTION REQUESTED BY GRIEVANT: _____

<u>1. Immediately seize all my medical records - including medical griev-ances - and copy same and provide copy to me as I am litigating my civil case (06-379-SLR) pro se - and or forward to the U.S. District Court. 2. Correct the matter and reprimand the personnel involved. 3. Provide Damages.</u>

GRIEVANT'S SIGNATURE: <u>David W</u>         DATE: <u>10·3·06</u>

WAS AN INFORMAL RESOLUTION ACCEPTED?        _____(YES)    _____(NO)

<div align="center">(COMPLETE ONLY IF RESOLVED PRIOR TO HEARING)</div>

GRIEVANT'S SIGNATURE:_____    DATE:_____

IF UNRESOLVED, YOU ARE ENTITLED TO A HEARING BY THE RESIDENT GRIEVANCE COMMITTEE.

cc: INSTITUTION FILE
    GRIEVANT

<div align="center">April '97 REV</div>

*( Cont. from page 1 of 10·3·06 Reprisal Grievance.)*

**FORM #584**                                                    V1-B

**GRIEVANCE FORM**

FACILITY: DCC _____       DATE: 10·3·06 _____

GRIEVANT'S NAME: David Williamson    SBI#: 00/83022 _____

CASE#: _____        TIME OF INCIDENT: Ongoing ____

HOUSING UNIT: W-1, L-12 _____

BRIEFLY STATE THE REASON FOR THIS GRIEVANCE. GIVE DATES AND NAMES OF OTHERS INVOLVED
IN THE INCIDENT OR ANY WITNESSES.

Unfortunately for CMS, it created a false record of me attending a chronic-care Clinic for the purpose of placing a "Refill" order for my chronic-care meds; however, CMS forgot to also manufacture the requisite "Refill" order. I flatly charged that the record was "false" and when I pointed out the irreconcilable fact that no Clinic could have taken place because there was no "Refill" order for the same date, their conspiracy unravelled. Also attached are copies of my work attendance that clearly demonstrate the falseness of these records and alleged conversation. (See B-1 & 2) Lastly, this is not the first time I challenged fictitious claims made by CMS employees, and therefore CMS knowingly failed to correct this shocking behavior and it continues to esculate and does evince Reprisal and deliberate indifference to my serious medical needs. (See attached Letter dated 8-15·06 at C-1 & 2).

ACTION REQUESTED BY GRIEVANT: _____

See page one attached. _____

_____

_____

_____

GRIEVANT'S SIGNATURE: David W         DATE: 10·3·06 _____

WAS AN INFORMAL RESOLUTION ACCEPTED?      ____(YES)   ____(NO)

(COMPLETE ONLY IF RESOLVED PRIOR TO HEARING)

GRIEVANT'S SIGNATURE: _____   DATE: _____

IF UNRESOLVED, YOU ARE ENTITLED TO A HEARING BY THE RESIDENT GRIEVANCE COMMITTEE.

cc: INSTITUTION FILE
    GRIEVANT

April '97 REV

## AFFIDAVIT OF DAVID WILLIAMSON

VI·B

1. I, David Williamson, am the Affiant listed above and do depose the following:

2. Affiant attended a Formal Grievance Hearing on 9·27·06 that was headed by CMS representative Gail Eller and Lt. McCreanor, etc.

3. This hearing regarded Emergency Medical Grievance # 59170, of which claimed that CMS was acting with deliberate indifference by creating and or failing to correct the on going incidence of repeat chronic-care medication interruptions (CCMI).

4. Affiant experienced ten consecutive CCMI(s) from July 05 to July 06.

5. Eller began the hearing by declaring: "I am denying your grievance. You (affiant) requested all 120 doses to limit interruptions; we are not going to do that. You had asked that stock supplies be provided within twenty-four hours of notice of an interruption, but you have to realize that though we keep some stock supplies we are not a pharmacy and you will just have to wait. And you had requested damages be awarded — that's not going to happen!"

6. Affiant stated that once the Chronic-care Clinic (Clinic) is provided and the doctor consequently signs-off on the "Refill" for the next 120-day (ie. doses) cycle, there is no legitimate reason not to provide the patient with the four thirty-day med cards; and that this simple and reasonable corrective measure would limit CCMI(s) to no more than three per year as opposed to a potential twelve.

7. Affiant continued to point out CMS's history over the past year where CMS caused Affiant ten consecutive and unnecessary CCMI(s) despite knowledge prior to each and every lapse, and that in view of these repeat failures it is both reasonable and warranted to provide all the order doses at one time to realize meaningful correction.

8. Eller matter-of-factly replied: "Your grievance is denied."

9. Affiant then asked Eller: "Well, how do you propose to correct this continuous problem?" "Heck, its been over 120-

-1-

VI-B

days since my last Clinic and I wrote for the necessary Clinic on 9-11-06 and on 9-22-06, but to date no Clinic has been provided. This will result in another unnecessary med interruption!"

10. Eller flipped open Affiant's medical file and stated: "You were here for your Clinic on 8-31-06. You saw Bailey and she gave you one pill and it says here Bailey told you not to wait so long next time."

11. Affiant responded: "I have not been to a Clinic since May 06 — I'm past due for one now — and I certainly wasn't here on 8-31-06."

12. Eller confirmed Affiant's name and SBI number and stated "I'm looking at you vitals listed here and it says you were out of meds, given one pill, and told not to wait so long next time — on 8-31-06."

13. "That is false — that is a false entry in my medical filed!" Affiant replied. No one denied this or even acted surprised.

14. Affiant proved his accusation without even having to secure his work record or other verifying documentation that would diffinitively place Affiant at another location on 8-31-06 by simply asking: "Well, if I was here on 8-31-06 for a Clinic as you claim, then I suppose my meds were Refilled?"

15. "No, I don't see a Refill order," Eller admitted.

16. Affiant pointed out the obvious: "You say I was here for a Clinic — you say you have my vitals — and we all know that Clinics are scheduled to reorder chronic-care meds, but there is no accompanying Refill order ... that is a false record!"

17. Eller merely dropped her head and said she would get my meds.

18. The above is true and correct as Affiant experienced it.

Signed and Sworn on this 27 day of September 2006.

David W———
David Williamson, 183022

Brian D Engrem
Notary Public
Brian D. Engrem
Notary Public, State of Delaware
My Commission Expires June 14, 2008

Expires 6-14-08

MG # 59170 (Appeal Attachment) -2-
9-17-06

V1-B

David Williamson
SBI #183022, W-1, L-12
1181 Paddock Rd.
Smyrna, DE 19977
August _15_, 2006

Mr. S. Altman, Ombudsman
Re: CMS Reply Letter 8/8/06

Dear Sir:

Greetings, I received a CMS reply letter (Reply) from you dated 8/08/06 (See A-1 Reply). It was a reply to my letter dated 7/30/06, in which I complained of a ninth consecutive Chronic-care medication interruption (CCMI), and I challenged the so called "new" corrective med distribution system as a known failure. (See A-2 Complaint). I am extremely disturbed about several distortions that are contained in the CMS reply: It contains several claims that are either preposterous or wholly fictitious.

For example, the Reply states that the pharmacy received my Chronic-care meds (CCM) on "7/17/06" and that I was placed on the medication pick-up list (MPUL) on "7/19 & 7/20." Furthermore, it alleges that I –for the first time-was too busy to pick these meds up on either date.

First, this is preposterous. I diligently check both the hospital schedule and the MPUL daily (Mon. thru Friday), and either my name did not appear on these dates as stated or the MPUL was not posted in our housing unit on these dates. If it had, I would have seen it and been all too happy to receive my CCM(s) early rather than late. Moreover, to date I have never missed a scheduled CCM pick up, not does my work or personal schedule interfere with the 1:30 PM pick up time. It is very important to me to have these CCML(s) corrected, and I deeply resent this allegation.

In addition, this statement is suspect for several reasons:

1.  Suspect because 7/17/06 was four days before I even submitted my request for my CCM refill (See A-3 Refill dated 7/21/06). If they were –incredibly- in prior to my request on 7/21/06, then why were they not provided to me until 8/6/06? And assuming arguendo, why was my name removed from the MPUL after only two days? Or why was my name not placed back on the list after my 7/21/06 refill request? The information you were provided does not agree with these concurrent facts or any likely and reasonable inferences drawn from them.

2.  Suspect because normal on-site pharmacy behavior has been to post one's name on the MPUL for five consecutive days before removing the name and returning the meds or canceling them. In contrast, you cite only two dates posting –not five. Does this mean that names will no longer be posted for five days or is this yet another anomaly? Also, the meds were not returned or cancelled despite my alleged failure to collect them. Does this mean that they will no longer be returned etc. or is this yet another anomaly? The information you were provided again does not agree with standard operating procedures.

3.  Suspect because (a) I submitted a request for a refill on 7/21/06, and it went unanswered; (b) I filed an Emergency Medical Grievance (EMG) citing this most recent incident on 7/31/06 (C.c. Altman), and it went unanswered; and (c) I filed another notice of the ongoing CCMI(s) to you on 8/7/06, and it went unanswered. (See A-4 Notice 8/7/06). If the pharmacy had these CCM(s) since 7/17/06 –and more importantly- if the pharmacy was inclined to provide these lapsed CCM(s) to me, then how do you reconcile the fact that <u>I was not provided these very CCM(s) until 8/8/06?</u> The information you were provided does not agree with these concurrent facts or any likely and reasonable inferences drawn from them. Moreover, the Reply contains an outright fabrication.

Specifically, it states that I received my-now lapsed_ CCM(s) on "8/04/06" and that the "pharmacy staff" had "immediately contacted" me for them. This is utterly erroneous. The pharmacy never contacted me, and I would be very interested to hear who alledgedly contacted me, how and when they were supposed to have accomplished it, and where it ostensibly took place? Work? My boss did not take any phone call. At the housing unit? No officer took any phone call. The fact is –is that my name appeared on the MPUL on 8/8/06 and that was how I became aware that my meds were available. That is the date I received and signed for them, not 8/04/06 as stated in the Reply. Also, I received them –not immediately- but at the standard time (e.g. 1:30 PM). This is very strange and troubling.

For instance, it is strange that when I attended the first Informal grievance hearing regarding the EMG on 8/10/06 (for this very CCML), before CMS representative Debbie Rodweller; and I informed her that I had just received the CCM(s) on 8/08/06 after an eight-day lapse, that she did not challenge my statement? If I had picked them up on 8/04/06, surely Debbie would know this. She was the investigating CMS rep for this EMG, for this incident, but no she did not! And the reason that she did not have the same erroneous information that you were provided is likely because it is difficult to keep fictitious stories consistent to all investigating parties.

Consequently, the facts speak for themselves. To date CMS has caused me to experience ten consecutive CCMI(s); had not once over the past year (7/07 to 7/06) provided my CCM(s) in a timely fashion –not even when the pharmacy was both aware and did actually possess my lapsed CCM(s). In fact, CMS is aware of several CCMI(s) such instances, in which the on-site pharmacy actually possessed my lapsed CCM(s) but failed to provide them and did exacerbate the interruptions. Moreover, despite CMS's dismall performance regarding this matter, and despite CMS's oft repeated emptly token assurances (four to date) to correct the matter but failing directly after each and assurance, we are now to believe this incredible tail: That it is not CMS who is causing the CCMI(s), but the it is alternatively the patient who is to blame! Utterly preposterous and utterly insulting. It is impossible to remedy this continuous and pervasive problem when those involved busy themselves manufacturing incredible and or false claims. I suggest that you investigate the common denominator in this matter: the pharmacy.

In conclusion, I expect that CMS will correct this shocking behavior. Also, when the facts reveal that I picked up my meds on 8/8/06 and not "immediately contacted" on 8/4/06 to pick them up, I expect a full apology. Thank you for your time in this matter.

Dave W.

C.C.  Bureau Chief (Monitoring MG 15453) ; ACLU J. Graff

Employee Name: _Williamson, David_ SSN: _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_ Class Title: _Clerk 23_

Employment Date: _02/27/04_     Adjusted Service Date: _____

Sick Accrual (hrs per month) - 37.5 hrs: 9.5 / 40.0 hrs: 10
Vacation (hrs per month) - 37.5 hrs: 9.5, at 10 yrs: 11.25, at 15 yrs: 13.25 / 40 hrs: 10, at 10 yrs: 12, at 15 yrs: 14
ACCRUALS ARE NOT APPLIED UNTIL THE END OF THE MONTH (Max. annual vac. accrual: 318 @ 37.5, 336 @ 40)

Accrual Rate: _____
Sick: _____
Vacation: _____

Balance Carried Forward  #37

**Remarks:**

**NOTE TO TIMEKEEPER:** Provide each employee a copy of their timecard
at the end of 2006. Forward the original to Human Resources.

**NOTE TO EMPLOYEES:** Your leave balances for 2006 are displayed here>>
Review and note accruals at top of card. Resolve discrepancies with your timekeeper.

Leave balances at end of 2006

| | HOLIDAY | SICK | VACATION |
|---|---|---|---|

Check here if perfect attendance 2006

| | HOLIDAY | | SICK | | VACATION | |
|---|---|---|---|---|---|---|
| | HOLIDAY | Used in 2006 | SICK | Used in 2006 | VACATION | Used in 2006 |

V l - B

# Employee Attendance Report for P.I. Bldg. #15

| Card # | Worker Name | Date | Reason | Comments |
|--------|-------------|------|--------|----------|
| 19 | Bolden, LaWarren | 8/29/200 | Medical | |
| 20 | Robinson, Harold | 8/2/2006 | Unexcused | to hot |
| | | 8/3/2006 | Unexcused | to hot |
| | | 8/30/200 | Medical | Dr. Appt. |
| 21 | Barnett, Lawarence | 8/3/2006 | Medical | Dr. Appt. |
| | | 8/7/2006 | Scheduled/Volu | |
| | | 8/11/200 | Medical | Dr. Appt. |
| | | 8/29/200 | Medical | Dr. Appt. |
| 23 | Ortiz, Miguel | 8/28/200 | Unexcused | suspended pending |
| | | 8/29/200 | Unexcused | suspended pending |
| | | 8/30/200 | Unexcused | suspended pending |
| 24 | Caudill, William | 8/1/2006 | Medical | grievance |
| | | 8/9/2006 | Medical | X-Ray |
| 25 | Bowen, David | 8/31/200 | Medical | Dr. Appt |
| 26 | Murphy, Robert | 8/9/2006 | Medical | X-Ray |
| | | 8/22/200 | Medical | Dr. Appt |
| 30 | Boatswain, Roger | 8/3/2006 | Visit | |
| | | 8/7/2006 | Scheduled/Volu | |
| | | 8/17/200 | Medical | Dr. Appt. & Group |
| | | 8/30/200 | Medical | Dr. Appt. |
| 31 | Harris, Darnell | 8/9/2006 | Medical | Dr. Appt |
| 32 | Johnson, Jeffrey | 8/7/2006 | Scheduled/Volu | |
| 36 | Martinez, Roberto | 8/7/2006 | Scheduled/Volu | |
| 37 | Williamson, David | 8/1/2006 | Medical | grievance hearing |
| | | 8/10/200 | Medical | grievance hearing |
| | | 8/24/200 | Other | education testing |
| 38 | Marshall, Bobby | 8/28/200 | Unexcused | suspended pending |
| | | 8/29/200 | Unexcused | suspended pending |
| | | 8/30/200 | Unexcused | suspended pending |
| 39 | Cubbage, Phillip | 8/2/2006 | Medical | Dr. Appt. |
| | | 8/3/2006 | Medical | Dr. Appt. |
| | | 8/10/200 | Visit | |
| | | 8/11/200 | Medical | Dr. Appt. |

VI-C

## AFFIDAVIT OF DAVID WILLIAMSON

1. I, David Williamson, am the Affiant listed above and do depose and state the following:

2. On 10/18/06 at about 12:15 pm, Affiant was directed by his building officer to report to the hospital: "You won your grievance; you're being called in for an unscheduled medical visit."

3. Affiant had been scheduled in earlier (7:00am) for an unrelated "Reprisal" medical grievance hearing; however, Affiant was not otherwise scheduled for any other medical activity.

4. Affiant checked in and received the standard procedure for a Chronic-care Clinic (Clinic): the purpose of which is to normally place a Refill/Order for one's chronic-care medication (CC Meds); however, a doctor may Reorder one's CC Meds at any time absent a Clinic if circumstances warrant it.

5. Affiant was brought to Doctor Van Dusen upon which Van Dusen began to question Affiant about his chronic-care condition (hypo-thyroidism), and Affiant then realized that the unscheduled call-in was to replace the Clinic that CMS had "faked" on 8/31/06 (disclosed on 9/27/06 at MG # _59170_ hearing).

6. Affiant had not had a Clinic since May 8, 2006 and was due for one in August 06 (circa) (i.e. 90-days) or no later than Sept. 06 (circa) (i.e. 120-days) - before Affiant's CC Meds ran out (i.e. interrupted).

7. Affiant had written CMS about the past due Clinic –and the inevitable but preventable chronic-care medication interruption (CCMI) - on 9/11/06, again on 9/22/06, and 10/4/06; and on 9/27/06 Affiant received a personal assurance from Gail Eller (CMS employee at the on-site hospital) at the MG hearing that she would take care of Affiant's CC Meds. CMS failed to conduct the Clinic, CMS failed to Reorder Affiant's CC Meds, Eller failed to do either, and on 10/05/06 Affiant experienced an unnecessary CCMI. Affiant wrote again on 10/14/06. CMS caused this, to date, thirteen-day CCMI despite notice.

8. Van Dusen inquired of Affiant: "How is your energy level?" "Doc, I'm suffering chronic fatigue: I can't promote good health through meaningful exercise. I can't do anything that I once enjoyed doing because of this chronic fatigue and my body's turned to fat and is wasting away. Also, I find it difficult to concentrate. In fact, it's not just physical problems, it has adversely affected my work performance and studies," Affiant replied.

9. "I'm not surprised with a TSH [i.e. thyroid stimulating hormone] level of over six," Van Dusen replied.

10. Consequently, CMS had both subjective and objective knowledge of Affiant suffering the impairment of his normal daily functions and of the common symptoms of hypothyroidism.

11. "Yeah, I'm not surprised either with CMS's intentional refusal to provide me my thyroid meds. In fact, it is rational behavior when you consider the economics," Affiant continued.

12. Van Dusen replied: "Unfortunately, *I must agree with you.* I have seen a pattern the past two months that I've worked here –CMS talks a good talk but fails to follow up. They pay us doctors pretty well, but they *short-change you guys.*"

1

VI-C

13. Affiant was astounded that a CMS employee finally admitted to Affiant CMS's custom/policy of cost-avoidance.

14. Van Dusen indicated he would place the Refill/Order for the CC Meds, and he placed an order for Lab work, and wanted blood pressure reading weekly due to Affiant's elevated blood pressure. Van Dusen stated: "Your blood pressure is probably up due to your frustration, but I want a few more data points before I increase your dosage."

15. Affiant then realized that the already lapsed CC Meds had not been Reordered at all despite all the notices Affiant gave to CMS and Eller's assurance that she would take care of it on 9/27/06.

16. Affiant checked for clarification by relating all his efforts to avoid another unnecessary CCMI (listed above at paragraph 7), and the post 10/15/06 correspondence; and then asking: "With all this notice and Eller's promise, are you telling me that no Refill order was ever placed! I've been out since 10/05/06 –thirteen days!"

17. "No order was entered. I'm doing it now," was Van Dusen's reply.

18. Affiant subsequently asked about the status of his needed ACL reconstructive surgery –that Dr. Durst had filed the appropriate referral and that Dr. DuShuttle had also recommended it?" Van Dusen found Durst's order for the reconstructive surgery and stated: "Looks like regional had not authorized it."

19. "Do you mean not authorized or denied?" Affiant inquired.

20. "Well, it appears as though the request by Doctor Durst was ignored –see the box here is blank – and if Regional had responded, any response would have been recorded in the box," Van Dusen replied.

21. Van Dusen continued, "I will refile the paper work today, but I have to be frank with you, they [CMS] will probably say you need physical therapy."

22. Affiant stated: "Both doctors stated unequivocally that reconstructive surgery was needed; that my ACL was 'ruptured' and that surgery was the only viable option."

23. Van Dusen replied: "I would also recommend the same –any doctor in his right mind would- and I don't mean to laugh, but that is what Regional will probably authorize. See CMS is like an insurance company. They will continue to deny your requests until all your "T's and all your "I's are dotted. You will have to force them."

24. Again Affiant was astonished at Van Dusen's frankness and admission to Affiant what Affiant had been charging in his repeated Medical Grievances: that CMS was intentionally denying or delaying needed treatment as a custom/policy of cost-avoidance, and of which was not based on any legitimate medical or penological factors.

25. The above is true and correct according to Affiant's personal experience and belief.

Sworn and Subscribed before me this 23 day of October 2006.

David Williamson

Notary Public

Brian D. Engrem
Notary Public, State of Delaware
My Commission Expires June 14, 2008

Brian D. Engrem
Notary Public State of Delaware
My Commission Expires June 14, 2008

## AFFIDAVIT OF DAVID WILLIAMSON

1. I, David Williamson, am the Affiant listed above and do depose and state the following:

2. Affiant attended the first grievance hearing for a "Reprisal grievance" against CMS (#__72883__) (RG hereafter), with CMS representative Debbie Rodweller on 10/18/06.

3. This RG charged CMS with "Adverse Acts" of "Reprisal" committed against Affiant/grievant by CMS directly due to Affiant's grievance activity. Specifically as follows:

    (i)    In response to Emergency Medical Grievance #59170 (EMG hereafter), CMS intentionally falsified Affiant's medical records to (a) create the appearance that CMS had provided treatment/corrective action when it in fact had not; and (b) create a bad faith defense to current litigation/claims by shifting the blame for the repeat chronic-care medication interruptions to me (Affiant/grievant).

    (ii)   The false medical records were disclosed by Gail Eller (CMS representative) on 9/27/06 at the EMG RGC hearing; IGC McCreanor was present at the hearing.

    (iii)  Affiant immediately charged Eller with a falsified medical record (e.g. false record of a Clinic that never occurred) and easily proved the point by demonstrating that no clinic could have occurred because *no Refill Order was placed* for Affiant's chronic-care meds. (Also, Affiant provided a copy of his P.I. Work Attendance record that definitively proved that Affiant was at work on the alleged Clinic date with the RG).

    (iv)   IGC McCreanor neither did nor said anything to protect the integrity of the RGC Hearing and Affiant's rights to be free from Reprisal for his grievance activities.

4. Consequently, Affiant filed the RG against CMS, and specifically named Eller and McCreanor as involved. It was not a medical grievance, but a Reprisal Grievance.

5. The Inmate Grievance Procedure prohibits anyone named in a "Reprisal" grievance from taking part in any decision making process.

6. Affiant's RG was forwarded to CMS despite CMS specifically being named as the actor (and naming CMS personnel Eller and DCC's McCreanor), despite the fact that the RG was not a medical grievance, and despite the fact that the action requested was directed to the Department of Correction (specifically DCC) to correct behavior that clearly violates both Affiant's constitutional rights and prohibitions of the Department's IGP.

7. Moreover, the Department directed Rodweller to "not talk about" the substance of the RG (e.g. allegation of fabricated medical records/Reprisal); but to only give Affiant a directive that he may view his medical records by appointment only. The Department deliberately refused to investigate the matter –a matter witnessed by DCC personnel, IGC McCreanor- and deliberately refused to correct the matter.

8. Also, the Department violated its own IGP regulations by forwarding the RG to CMS to handle in the process of aiding CMS and denying Affiant his rights. This continues and exacerbates the Reprisal and is likely to also deny Affiant meaning access to the courts, because it will result in a dismissal of any viable "Reprisal" legal claim.

9. For example, Affiant inquired of Rodweller what this grievance was for and Rodweller became visibly agitated and anxious. Rodweller forcefully stated: "I'm not authorized to speak about anything else, but to tell you that you can inspect your medical records by appointment!" (Affiant had not received any processed copy of the RG and did not know which grievance was being heard, so Affiant asked for clarification.)

10. Affiant requested to see the processed RG and quickly determined that it was the RG for the fabricated medical records. Affiant stated: "Oh, this is about CMS fabricating my medical records..." Rodweller

interrupted: "I can't talk to you about that! I'm not going to lose my job over this! I can't talk about this!" Rodweller seemed very upset, fearful, and defensive to Affiant.

11. Affiant replied: "Well, Mrs. Rodweller, the grievance is about CMS fabricating records, and really CMS should not be handling this grievance, but since you are then we must discuss the merits of the allegations if we are to come to understanding. Also, I don't appreciate CMS continuing to manipulate the grievance process, but I guess it is to be expected when you get caught *Red Handed fabricating medical records,* that CMS would attempt to circle the wagons."

12. Rodweller exploded: "I didn't do anything wrong! I'm a good nurse! I try to take care of my patients! I'm not going to lose my job over this! I can't talk about it!"

13. Evidently, Rodweller felt her employment was threatened if she discussed the merits of the RG with Affiant despite the fact that she was ostensibly charged with conducting the RG hearing.

14. Affiant replied to Rodweller's emotional outburst: "Mrs. Rodweller no body has accused you personally of any wrong doing. I was commenting on the behavior of your employer CMS and Mrs. Eller."

15. Rodweller replied: "This direction didn't come from my employer; it came from the Department of Correction –see here!" (She motioned to the second page of the RG and pointed presumably to some type of identifying mark of the D.O.C.).

16. Affiant continued: "Well then the Department is aiding CMS to cover up its malfeasance by creating an impediment or refusing to investigate or process this grievance properly, which will surely permit CMS time to purge the fabricated files, but it was CMS that fabricated the records in the first place –it was CMS that committed the Reprisal for my grievance activity in the first place, and that is who I am directing my attention at."

17. Rodweller replied: "I can't talk to you about this! I'm going to send this grievance forward to the next level. I am authorized to tell you that you can inspect your medical files by appointment, you can't have copies, but you can take pen and paper to make notes."

18. "Who do I make the appointment with?" inquired Affiant.

19. "You can write Lee Ann Dunn in records, and you can have one hour per appointment to inspect your records.

20. Affiant did not request to view his medical records, did not request to inspect the fabricated records, and did not request the Department to violate its own IGP by providing CMS the Reprisal Grievance and fore-knowledge of the Affiant's allegations prior to seizing the incriminating evidence.

21. Affiant did request in the "Action requested" section of the RG the following: (1) Immediately seize all my [medical] records…-and copy same and provide a copy to me as I am litigating my civil case (06-379-SLR) pro se- and or forward to the U.S. District Court, (2) Correct the matter and reprimand the person responsible…, and (3) Provide Damages.

22. The above is True and Correct upon Affiant's personal experience.

25 (B.E)

Sworn and Subscribed before me this ~~23~~ day of October 2006.

David Williamson

Notary Public        **Brian D. Engrem**
**Notary Public, State of Delaware**
Brian D. Engrem  **My Commission Expires June 14, 2008**
Notary Public, St    Delaware
**My Commission**      14, 2008

2

# EXHIBIT A

Affidavit of David Williamson

1. I, David Williamson, am the Affiant listed above and do depose and state the following in support of C.A. 06-379-SLR:

2. Affiant attests the following conclusions are a product of his personal experience, observation, and well reasoned beliefs; Affiant supports same with conclusive and well documented evidence (attached).

3. Affiant provides clear evidence that defendant Correctional Medical Services, Inc. (CMS) has and continues to employ a bad faith campaign of deception in an effort to escape liability for its malfeasance (i.e. deliberate denial of needed care in violation of Affiant's constitutional rights).

4. In short, CMS has and continues to employ several of the following general strategies to realize these ends:

> ➤ By generating seemingly benign distortions of fact that accumulate into a clear pattern of distortion;

> ➤ By generating preposterous conclusions in conflict with the well documented record and or devoid of any reasonable support;

> ➤ By generating outlandish fabrications that were/are easily proven false;

> ➤ By generating fictitious policies that were concurrently proven false; and

> ➤ By generating false medical entries in Affiant's medical records file.

5. Of special note is CMS representative (Rep) Scott Altman (Altman), who is CMS's Ombudsman, and works out of its Delaware Regional Office. Altman is, however, a professional spin doctor who has consistently demonstrated a propensity to distort the facts, fabricate the facts, and otherwise commit fraud in his effort to serve his master's bad faith campaign of deception.

6. Indeed, Affiant will present below clear facts and supporting evidence of Altman's complete lack of veracity and his transparent effort to realize said campaign.

1

7.    I. Altman begins his career of distorting the facts by offering a sham investigation and by generating preposterous conclusions in total conflict with the established record:

_____

8. <u>Established Facts</u>: Between July 05 and February 06, CMS caused Affiant to experience <u>six consecutive</u> Chronic-care medication interruptions (CCMI). Medical records support this fact. (See attached <u>L-A</u> _____)

9. Moreover, Affiant filed multiple medical grievances against CMS (beginning with MG 15453), and attended both requisite MG hearings (7/28/05 & 10/06/05), and at no time did any CMS Rep challenge or debate the accuracy of Affiant's claims/notice of repeat/consecutive CCMI(s). Rather, CMS Reps conceded the fact when they provided assurances –at both hearings- to correct the CCMI(S). (See attached <u>L.–B</u> Affidavit 9/19/05 at items 2-13 and <u>L-C</u> MG 15453 Report at page 7).

10.  CMS's promises to correct the CCMI(s), however, proved false; the CCMI(S) continued unabated and Affiant consequently filed additional notice of his sixth consecutive CCMI with CMS on 2/09/06, and Affiant complained of the ongoing and unnecessary CCMI(s), and Affiant reaffirmed that they caused an acute resurgence of chronic symptoms that impaired his normal daily functions. (See attached <u>L.-D</u> Affiant's Notice 2/09/06). Enter Altman's sham investigation.

11. <u>Altman's Sham Investigation</u>: On 3/09/06 Altman claimed to have investigated Affiant's 2/09/06 Notice, but this turns out to be false. (See attached <u>L-E</u> Altman's Reply 3/09/06)

12. Altman incredibly concluded that Affiant's claims –which over the past eight months have never wavered and were never challenged at the two grievance hearings, etc.—to somehow now be "without merit." (See <u>L-E</u>)

13. Also, though, Affiant clearly complains of on going interruptions of his Chronic-care medications (CC Meds); Altman fends incompetence by appearing to misinterpret said complaint by erroneously stating: "The medications you received are exactly what have been prescribed…." (See <u>L-E</u>) However, Affiant did not claim he never received his CC Meds or that he received the wrong CC Meds, and Altman is at best incompetent or at worst he has faked the investigation and announced erroneous conclusions. The latter will become clear.

2

14. Any cursory review of the prior six consecutive CCMI(s) or the administrative record will not support Altman's newly proclaimed conclusion that Affiant's claims were "without merit." Therefore, Altman could not have conducted a legitimate investigation, but did perpetrate a sham investigation resulting in an erroneous conclusion. Indeed, Altman is forced to reverse course and concede the merit of Affiant's claims.

15. Established Facts: Subsequently, Affiant filed further notice on CMS/Altman on 3/13/06 of yet another CCMI (seventh consecutive). (See attached I.-F Notice of Continuing CCMI 3/13/06).

16. Meanwhile Affiant received Altman's sham investigation letter of 3/09/06, and Affiant immediately challenged Altman's incredible and erroneous "without merit" conclusion. (See attached I.-G Challenge 3/15/06 (internal attachments omitted)).

17. Consequently, Altman realizes his position is untenable and reverses course (3/22/06) and subsequently states that Affiant's claims are now "with merit." Note that Affiant's facts and claims; however, have remained constant –nothing had changed or been added- between Altman's 3/09/06 "without merit" sham investigation and his 3/22/06 "with merit" reinvestigation. Thus it appears Altman falsified his earlier 3/09/06 investigation and conclusions. (See attached I.-H Altman's Reverse Course letter 3/22/06).

18. Affiant was forced to file a follow up to the 3/13/06 CCMI Notice on 3/21/06 due to it being ignored. (See attached I.-I Continuous CCMI(s) 3/21/06).

19. Altman continues preposterous and illogical conclusions in conflict with the record.

20. For example, though Altman exposes his initial investigation as a sham in his 3/22/06 reverse course letter, he contradicts his "with merit" finding by nevertheless questioning the "accuracy" of Affiant's claims and also by claiming in the same letter that CMS had provided "appropriate and well managed" care. (See I.-H)

21. Affaint immediately challenged Altman's erroneous and illogical statements:

> ... For example, Mr. Altman listed several dates on which I was dispensed said meds, but the April and May [05] dates are prior to my July 05 claim and are irrelevant. The relevant dates; however, do not sequentially cover the months from July 05, to the present and current March 06, lapse. The dates that are provided; however, do indeed support my complaint of an interruption/lapse in receiving those meds.... (See attached I.-J Affiant's Challenge 4/19/06)

3

22. As of March 06, Affiant had claimed/experienced seven consecutive CCMI(s) and the record supports these facts. Altman attempts to distort the record by questioning the accuracy of Affiant's claims and is once again is ultimately forced to concede. (See attached I.-K Altman's Thorough Investigation 4/25/06)

23. Moreover, Altman's 3/22/06 reverse course letter admitted that Affiant's claims were "with merit," however, he also claims that CMS has provided "appropriate and well managed" care. This is impossible! Altman is so clumsy in his zeal to distort the record and cater to his master's campaign of deception that he commits a logical fallacy or impossibility: Quite simply, Affiant's claims of deliberate indifference due to denial of care, etc. cannot simultaneously have "merit" and the nevertheless also be "appropriate and well managed."

24. Neither CMS nor Altman ever took exception with any of Affiant's 4/19/06 detailed challenge. In fact, Altman consequently, abandoned his erroneous claims or 3/22/06 and now –after a "thorough investigation" credits Affiant with exposing "the flaws in this [CMS] internal process...." (See attached I-K Altman's Through Investigation 4/25/06)

25. In addition, Altman states that after his "thorough investigation I [Altman] now find this matter to be a valid concern...." (See I-K)(Emphasis added)

26. Evidently Altman's three investigations between 3/09/06 and 4/25/06 run in stages from Scam Investigation, to Re-investigation, to Thorough Investigation; and correspondingly Altman concluded that Affiant's -never wavering and well documented- claims also run the gauntlet from "without merit," to a questionable "with merit," to a "valid concern."

27. It would be premature to dismiss Altman's distortions and outrageous conclusions as being simply reckless or incompetence. Further evidence will demonstrate a clear pattern of willful deception that cannot simply be explained away. Indeed, Altman changes his story more than a chameleon changes its colors; and both have a common theme: deception.

28. Accordingly, Altman does not stop at mere distortions, though; he does escalate into generating outright false statements as will be demonstrated below.

29.    II. Altman escalates from distortions and unsupported erroneous conclusions

to    generating outright false statements:

---

30. Altman's False Statements: In Altman's 4/25/06 "Thorough Investigation" response, Altman now admits that Affiant's claims are "a valid concern." Indeed, Altman even credits Affiant with exposing "the flaws in this [CMS's] internal process," which "led [CMS] to revamp" its "medication distribution and ordering system...." Furthermore, however, Altman falsely claims that CMS's revamped system is a "new process" (effective 4/25/06) and that this ostensible "new process" "should prevent any further lapses in medications...." (See I-K 4/25/06).

31. In reality, however, this ostensible new system described by Altman was identical to a medication distribution process that CMS had employed on a prior contract period with the Delaware DOC (FCM also). It proved a failure then, and ironically the current failed system was touted as a corrective measure when it replaced the former. Now CMS recycles the former (falsely as a new corrective process) in some insane game of musical chairs.

32. CMS/Altman know that their "new process" is anything but new, anything but a corrective measure, and CMS/Altman know by virtue of its failed history that it will likely not prevent future lapses but actually create medication lapses. Altman's statements are absolutely false.

33. Indeed, Affiant had the misfortune to experience CMS's (and FCM's identical) prior failed – but recycled- system and quickly identified and challenged CMS's charade with the above facts. (See attached II-A [Identification of recycled system] Letter 5/30/06)

34. In addition to the above facts, Affiant also accused CMS of creating an "intent[ional] ruse" "with full knowledge of its systemic-wide failures in order to maintain the status quo [ ] (E.g. strategy of cost-avoidance by ...shorting patients their needed... meds)." (See II-A).

35. Neither CMS, Altman, nor Warden Carroll ever took exception to any of Affiant's factual points or claims in his 5/03/06 identification/challenge.

36. Moreover, Affiant accurately predicted that CMS would cause –not prevent- further unnecessary CCMI(s) with its recycled false "new process." (See II-A).

37. For example, CMS cause three more CCMI(s) –the eighth, ninth, and tenth consecutive CCMI(s)- since the implementation of this charade beginning with the very first refill med card after its effective date!

38. Indeed, Altman was again compelled to admit these failures. (See attached II-B Altman's [apology for failures] Letter 7/19/06).

39. Altman's fictitious "new process" not only failed directly, but also created some of the most egregious failures to date.

40. First, Altman gave Affiant directions (4/25/06) to file a Sick Call slip (SCS) (affix self-adhesive medication labels from existing med card) (label) requesting the next med card (i.e. Refill) with a five day notice. (See I-K

41. Affiant did so, but gave a seven day notice for more cushion. (See attached II-C SCS 6/01/06).

42. Five days elapsed without Affiant's name appearing on the Medication Pick up list (Med PU List) and Affiant filed a follow up notice directly with CMS/Altman and the on-site Director of Nursing. (See attached II-D Affiant's Ongoing Notice 6/6/06).

43. Despite following Altman's directions, etc. CMS caused Affiant a twenty-two day CCMI from 6/08/06 to 6/29/06. Affiant predicted as much, and this egregious CCMI bespeaks of intentional harm.

44. Affiant filed yet another notice on 6/19/06, but clearly it too was ignored. (See attached II-E Failure to correct notice 6/19/06).

45. Moreover, this latest CCMI was aggravated because (a) the med distribution date had been manually altered to a later date by a CMS employee –well past the due date- which ensured a CCMI; and (b) the meds were received and processed by the on-site pharmacy on 6/21/06 but withheld from Affiant until 6/29/06 despite his three notices and despite the ostensible "new process."

46. For example, in the CCMI, (which was the second med card) had a distribution date that was altered: First, Affiant received a thirty-day med card on 5/08/06, thus the refill was due no later than 6/08/06 and should have been dated accordingly, but CMS altered the second distribution date to 6/21/06 –not the appropriate 6/08/06 or earlier (within five days of due date).

6

47. Only a CMS employee has access to insert said distribution due dates, and despite having several records that indicate the proper due date and having Affiant's several notices/Refill requests, CMS altered Affiant's due date and this act guaranteed a CCMI. This suggests intentional misconduct.

48. Moreover, even though the on-site pharmacy processed Affiant's CC Meds on 6/21/06 CMS still did not dispense the grossly lapsed CC Meds until 6/29/06. This, too suggests intentional misconduct.

49. Also, the 6/29/06 med card was missing the med label that would be required to affix to the following SCS refill request. Note, though, that in the recently replaced system the on-site pharmacy removed said labels and had employed some type of tickler system and automatically scheduled patients.

50. Thus, because the labels had been removed, Affiant assumed that the recycled fictitious "new process" had been again abandoned, or it had never actually been employed and Altman lied about that too, because the on-site pharmacy was clearly operating as it would with the old failed system..

51. Affiant noted these troubling developments (listed above at 45-50), and questioned Altman pointedly about them. (See attached II-G Notice/Questionnaire Letter 7/06/06).

52. Frustrated and suffering the debilitating resurgence of chronic symptoms common with Affiant's serious medical condition, Affiant outlined his claims in a detailed letter to the ACLU (cc CMS/Altman). (See attached II-F ACLU, et al Intentional Denial of CC Meds 7/01/06).

53. Once again neither CMS, Altman, nor DOC Officials ever took exception with Affiant's factual points or claims.

54. Consequently, Altman replies in part to Affiant's 7/06/06 inquiry by apologized and acknowledged the failures; however, he failed to adequately reply/investigate (1) the altered med distribution date; (2) the refusal of the on-site pharmacy to distribute Affiant's CC Meds on 6/21/06 issues; and (3) the missing med labels. (See II-B 7/19/06).

55. CMS continues to cause avoidable and unnecessary CCMI(s), however, even after this fiasco, that belies its claim to have revamped the system in order to correct meds interruptions: On 7/21/07 Affiant again submitted a refill request ("down to my final eight doses...." (See attached II-H Refill Request 7/21/06).

Then on 7/30/06, Affiant resubmitted claims/questions that had been ignored previously along with a copy of an Emergency Medical Grievance (EMG) that requested a "suitable alternative...[of] 'Stock Supplies' of CC Meds within "24 hours" because the 7/21/06 Refill request was ignored and Affiant faced another eminent CCMI (tenth consecutive). (See attached II-I Continuous CCMI Letter 7/30/06).

56. Subsequently, CMS caused Affiant his tenth consecutive, avoidable, and unnecessary CCMI from 7/31/06 to 8/08/06.

57. Moreover, this latest CCMI was the third consecutive CCMI since the implementation of CMS's recycled ostensible corrective measure; however, it corrected absolutely nothing.

58. Indeed, Affiant identified CMS's recycled failed med distribution process as a recycled failure; identified CMS/Altman's claim as a willful fabrication designed, not to correct CC Med interruptions, but to actually create them; and Affiant correctly predicted the likely outcome. Altman was again forced to concede the failures.

59. Therefore, Altman did willfully generate outright false statements in a bad faith effort to create the illusion of taking corrective action (i.e. campaign of deception).

60. Affiant filed another pointed inquiry with CMS/Altman concerning the following:

> ➤ Why have all four promises to correct the ongoing and pervasive CCMI that CMS issued failed?

> ➤ Why was Affiant's 7/30/06 EMG not processed within 24 hours in accord with IGP 4.4?

> ➤ Who in CMS determined said EMG was not an emergency? (paraphrased)

(See attached II-J EMG Questionnaire 8/07/06).

61. Altman never addressed the valid questions raised by Affiant in regards to CMS's spectacular failures and consistently outrageous behavior spanning the prior year (7/05 to 7/06).

62. Indeed, CMS nor Altman ever took exception or even replied to any claim raised on 8/07/06, but Altman chooses instead to reply to Affiant's 7/30/06 complaint, and he desperately and shamelessly employs a new method of deception: Altman now relates false and preposterous events in order to shift the blame for the July 06 (tenth CCMI) to the victim—Affiant—as to responsible.

63.   III. Altman relates false and preposterous events in a bad faith effort to shift the

blame to the victim –Affiant- for the July 06 CCMI:

_____

64. On 8/08/06 Altman commits his most offensive and egregious bad faith act to date:
Altman states that he is replying to Affiant's 7/30/06 complaint, but he ignores the majority of
the claims/inquiries and instead relates false and preposterous claims.

65. For example, Altman claims the following:

➢  "The medication problem… was responsive this time."

➢   Your medications arrived in the pharmacy on 7/17/06 and
"you were on the medication pick up list on 7/19 and 7/20."

➢  "Due to the busy schedule you maintain you did not pick up the medications on
either of these dates."

➢  The "pharmacy staff immediately contacted you to come and get your
medications… and received your medications on 8/04/06."

(See attached III-A Altman's 8/08/06 [False events] Letter)(emphasis added).

66. The only factually accurate account Altman made is that the pharmacy evidently processed
the CC Meds on 7/17/06, however, every underscored assertion is sheer fabrication. It is easily refuted.

67. Altman's false assertions were also transmitted to Warden Carroll and entered in Affiant's
medical records, so Altman created false medical records by doing so.

68. The facts are, however, that the pharmacy received and processed the CC Meds on 7/17/06,
but once again (in accord with its history of doing so) the on-site pharmacy failed to dispense them.

69. The facts are that Affiant was not notified by the pharmacy immediately or even prior to the
standard listing of Affiant's name on the Med PU List (8/08/06), which is when Affiant received and
signed for the CC Meds –not 8/04/06 as Altman falsely asserts.

70. The facts are that the pharmacy's claim of listing Affiant's name on the Med PU List on 7/19
and 7/20 is suspect because it would have deviated from the standard operating procedure to list one
for only two days as opposed to five (normally one is listed for five consecutive days and if he fails to
pick up his meds then they are returned by the pharmacy).

9

Also, Affiant made his request for CC Meds on 7/21/06, yet no further listings occurred? Presumably, if the pharmacy was inclined to dispense Affiant his CC Meds, then it would have responded accordingly to Affiant's 7/21/06 request, but they did not, why?

71. The facts are Affiant filed an EMG for this very CCMI on 7/31/06 and on 8/10/06 Affiant met with CMS Rep D. Rodweller for the first grievance hearing. Rodweller was charged with investigating and responding to said EMG; Rodweller commonly worked in the very on-site pharmacy in question; and Rodweller knew of Affiant's ongoing CCMI(s) and his grievance activity, but Rodweller never uttered one of Altman's preposterous statements in defense of CMS or Affiant's EMG. Indeed, Affiant specifically stated to Rodweller that he had picked up his belated CC Meds on 8/08/06 through the standard Med PU List methods; she never took exception or even attempted to challenge Affiant. This is because it never happened and it is difficult to keep fabrications straight.

72. The facts are that in all prior nine consecutive CCMI(s), Affiant never missed a listed CC Med pick up and did pick them up on the first listing. Affiant did the same on 8/08/06, which was the first Listing that was posted in Affiant's housing unit, and Affiant's behavior has been consistent and above board throughout these repeated events. The same cannot be said about the on-site pharmacy.

73. The facts are, alternatively, that the pharmacy has demonstrated a history of actually
lapsed
possessing already CC Meds, but failing to dispense them despite Affiant's many notices and pleas.
                                        ^

74. Affiant was enraged at Altman's allegations and fictitious effrontery of 8/08/06 and challenged Altman on each and every underscored false claim with the above points (items 68-73) in a detailed complaint on 8/16/06. (See III-C Affiant's Reply (Altman's 8/8/06) 8/16/06).

75. Affiant made serious claims and supported them with enough facts to warrant a thorough investigation, but Altman never replied to any of Affiant's claims, never replied to any of the anomalies raised by Affiant, and never took exception to any. Altman realized his preposterous position was untenable.

76. This is not surprising because not one of Altman's preposterous and utterly false claims can be taken seriously, can be proven, and they are easily refuted with the fact that Affiant signed for and received his CC Meds on 8/08/06 -not 8/04/06.

10

77. Moreover, not a single DOC Staff member will corroborate the pharmacy's false claim to have immediately contacted Affiant on 8/04/06. Affiant -a prisoner- simply could not have been "contacted" by the pharmacy without the pharmacy first contacting a DOC Staff member (whether at Affiant's work site or his Housing unit), but Altman became too sloppy in his zeal to serve his master CMS and makes fatal mistakes when he relates the impossible.

78. Therefore, it is clear that Altman has generated false and preposterous events in a bad faith effort to shift the blame to the victim –Affiant- for the July 06 CCMI; but which are easily refuted.

79. Moreover, Altman attempts to protect CMS's willful entry of false medical records by blocking Affiant's access to his personal medical records without any legitimate ground, but by announcing shear fictitious policies denying release; however, Altman concurrently grants the same request to another inmate.

      80.          IV. Altman willfully announces fictitious policies denying records request, but concurrently grants another inmate's request:

81. On 5/10/06 Altman announced a flat rejection to Affiant's medical records request stating, in part, that Affiant's "medical records are the property of the Department of Corrections… Copies … will be available after your release… You would address your request to the Department of Corrections…." (See attached IV-A Altman's Medical Records Rejection 5/10/06).

82. Altman's policy announcement denying Affiant access to his personal medical records is another sheer fabrication. Indeed, while Altman was busy uttering fictitious policy rejections to Affiant, Altman nevertheless granted an identical records request to another inmate –no questions asked- and no conditions but payment for copies be made. The facts below are conclusive of Altman's bad faith.

83. On 5/08/06 Affiant completed a "Correctional Medical Services, Inc. "Release of Information Authorization" form (Release form), that requested certain medical records be released to Affiant's mother (who was granted power of attorney for this purpose). Affiant's mother signed the Release form and filed it with CMS. (See attached IV-B release Form 5/08/06).

84. On 5/20/06 Affiant completed a Release form for fellow inmate David Rush (materially identical to Affiant's), however, Rush's sister (Rush-Milstead) was listed as his power of attorney.

11

She filed the Release form but forgot to endorse it with her signature. Rush's was nevertheless granted by Altman. (See attached IV-C Rush's Release Form 5/20/06).

85. Alternatively, Affiant was flatly rejected by Altman and told to contact DOC –after release– for access to his medical records, but Rush's identical request was granted with no questions or directions to contact DOC now or upon his release! Incredibly, Altman provided Rush's personal medical records to Rush's sister despite the fact she failed to complete the release form by signing it. (See attached IV-D Rush-Milstead's Request for additional records·9-14-06 .

86. Indeed, Altman provided the initial request and a second subsequent request to Rush. (See attached IV-E Altman Complies with Rush's request 9/29/06).

87. Moreover, Affiant filed a grievance against Altman's rejection (#43863) and claimed retribution and denial of access to the courts as a result. (See attached IV-F Grievance 43863 5/17/06).

88. Said grievance was improperly and summarily rejected for other reasons than Altman's fictitious claims on 6/02/06. (See attached IV-F at p. 2).

89. Affiant challenged the improper rejection in a Reprisal grievance (#64863) and Deputy Warden Pierce agreed to re-open grievance 43863 because Altman's claims were erroneous and it had been improperly rejected. (See attached IV-G Grievance report 64863 9/20/06 at p. 2).

90. Consequently, Altman's statement and rejection are belied by his concurrent unqualified grant of Rush's identical request; are belied by Pierce's (DOC Official) finding.

91. Therefore, Altman did indeed announce a wholly fictitious policy denial to Affiant, in a bad faith effort to prevent Affiant form having access to his medical records that were concurrently and subsequently proven false. Altman's behavior is clear, is damning, and it is outrageous –it shocks the conscience!

92. Altman's zealous pursuit of deception –in service to his master- is not; however, limited to the above distortions of fact, outright false statements, unsupported and demonstrably erroneous conclusions, false medical entries, and fictitious policies. Indeed, he also employs a bad faith attempt to distort and diminish the seriousness of Affiant's injuries in complete conflict with the established record and wholly devoid of medical authority.

12

93.     V. Altman employs a bad faith attempt to distort and diminish the seriousness of Affiant's knee injury (ruptured ACL), which is in conflict with legitimate medical factors and the record; and, Altman aggravates the matter by falsely misleading Affiant and creating an inordinate delay in providing needed treatment:

94. Affiant conclusively demonstrates Altman's bad faith below and it requires no further evidence; nor can it be refuted whatsoever.

95. Affiant filed a medical grievance (MG 37123) regarding a serious knee injury citing Dr. Durst's examination and requesting the appropriate  follow up treatment. (See attached V-A MG 37123 4/30/06). It was the third MG regarding this matter that Affiant had filed.

96. On 6/05/06 Affiant received Dr. Durst's medical conclusion –based on his physical exam and a reading of an MRI- that Affiant's knee injury was "worst than he had hoped for and that the ACL was completely severed…." (See attached V-B Affidavit 6/12/06).

97. Durst also pre-filed a surgery referral, but informed Affiant that CMS procedure required a confirmation/recommendation from an orthopedic surgeon.

98. On 6/12/06 Affiant received a physical exam and MRI reading from Dr. DuShuttle (Orthopedic specialist) and Dr. DuShuttle concurred with Dr. Durst's recommendation for reconstructive surgery. (See attached V-C Affidavit at 3-5 7/06/06).

99. DuShuttle provided Affiant with the same medical report/recommendation (Report) that he provided to CMS/DOC Officials: It listed "Rupture of ACL…." (See attached V-D MG Complaint package at pp 5-6 8/25/06) (i.e. DuShuttle's Report).

100. After receiving the conclusive Report (i.e. evidence) of a ruptured ACL (i.e. completely severed as characterized by Dr. Durst), Affiant filed an Addendum to his MG 37123 and provided Altman a copy. (See attached V-D Id at p. 4 Addendum Letter 8/09/06).

101. Consequently, on 8/16/06 Altman replies to Affiant's 8/09/06 MG Addendum, and he states the following unsupported, conflicting, and erroneous statements:

> "The diagnosis of a completely severed ACL is not supported by the MRI… showed a torn, not severed ACL";

> "The Don Joy Knee brace requested by Dr. DuShuttle cannot be provided due to security concerns. The CMS Medical Staff is in discussion with Dr. DuShuttle to

13

<u>find a suitable replacement...Once this issue is resolved we will be scheduling you</u>

<u>for the required surgery</u>." (emphasis added). (See attached <u>V-D</u> Id at p. 3 Altman's

reply Letter 8/16/06).

102. Altman's first (underscored) point is false; is not supported by the record or based on

legitimate medical factors; and it is in conflict with the medical diagnosis of two doctors who performed

the physical exams and interrupted the MRI test.

103. Specifically, DuShuttle's Report clearly states under the heading "Diagnosis" that Affiant has

a "<u>Right ACL rupture</u>;" and that [DuShuttle] "...explained to the patient that he has a <u>torn cartilage</u> that

will not heal on its own and if left untreated will only further deteriorate the knee; <u>in addition, he also</u>

<u>has a rupture of his ACL</u>...." (emphasis added) (See attached <u>V-D</u> Id at p. 5 DuShuttle's Report).

104. DuShuttle identifies a torn cartilage; and in addition to that, he identifies a rupture of the ACL

–not a partial rupture or torn ACL, but a rupture. DuShuttle's diagnosis was objectively based on an

MRI and a specialized knee exam; however, Altman incredibly claims that the record/MRI does not

support DuShuttle and Durst's diagnosis of a "completely severed ACL.

105. Also, Dr. Durst confirmed the rupture and specifically characterized it as "completely

severed" (i.e. synonymous with DuShuttle's use of the term rupture); and these terms are not Affiant's

but that of two independent CMS contracted doctors who performed the actual exams.

106. Affiant specifically challenged Altman's erroneous, insensitive, and insulting statements:

> Consequently, two medical doctors...made a medical finding that my ACL was
> completely severed; however, you –CMS's Ombudsman- incredibly challenge
> their medical findings. This raises serious questions that warrant resolution:
> I.      What is your medical opinion based on?
> II.     Are you substituting your opinion for that of two doctors?
> III.    Are you substituting your interpretation of the MRI results for that of two
>         doctors?
> IV.     Are you even qualified to interpret the...MRI?
> V.      Are you unaware of the plain meaning of 'Rupture'?

(See Id <u>V-D</u> 8/25/06 p. 1-2)

107. Not surprisingly, Altman/CMS never replied or took exception to a single challenge or factual

point made by Affiant in the 8/25/06 MG package; nor did DOC (c.c. copies).

108. Moreover, Altman misled Affiant and aggravated the problem by willfully creating an

inordinate delay in providing the "required" treatment to Affiant with his bad faith promises to (a) "find

a suitable replacement [knee brace]" and (b) then schedule Affiant "for the required surgery"; but he failed to follow up on and or realize. (See V-D at p. 3). Indeed, subsequent evidence demonstrates that Altman did not follow up as promised and merely allowed Affiant's knee brace and required surgery to be "ignored" and it otherwise constitutes a defacto denial.

109. In addition, Gail Eller also promised follow up on Affiant's needed surgery at the RGC hearing (formal grievance hearing) on 8/16/06, but both Altman and Eller's promises of follow up appear to be more evidence of CMS's false assurances, of which are employed to pacify a patient while denying/delaying needed treatment without any legitimate medical criteria. (See attached V-E Affidavit p.1 at items 2-12 date _11-14-06_ ).

110. For example, Affiant subsequently learned on 10/18/06 that Dr. Durst's Surgery referral was "ignored" by Regional (i.e. CMS) and that Affiant's medical file did not contain any evidence of any follow up by Altman or Eller.

111. Dr. VanDusen revealed these facts to Affiant on 10/18/06 from Affiant's medical file: shown to Affiant by the doctor and again confirmed by CMS Rep D. Rodweller on 11/18/06 at the subsequent Reprisal Grievance hearing. (See attached V-F Affidavit 10/25/06 p. 2 at items 18-24).

112. Affiant filed the RG 78623 (subsequent to 37123), due to CMS's outrageous behavior, and Affiant met with Rodweller on 11/08/06 for his first hearing (RG 78623).

113. Consequently, Rodweller confirmed Dr. VanDusen's revelations; could not provide any further information about the promised substitute knee brace or subsequent required knee surgery; was unaware of any supposed CMS Staff communications with Dr. DuShuttle about follow up, etc, and she became abusive when Affiant raised the knee brace issue. (See V-E 10/25/06 p. 2 at items 10-17, 24-25).

114. Therefore, Altman did indeed employ a bad faith attempt to distort and diminish the seriousness of Affiant's ruptured ACL; however, completely devoid and in conflict with the legitimate medical criteria/factors, which had been diagnosed by two independent doctors.

115. Therefore, both CMS Reps Altman and Eller aggravated the denial/delay of the acknowledged "required" treatment with promises to follow up, but repeatedly failing to do so, and they misled Affiant into believing the matter was being addressed when it clearly was not.

It was simply fortuitous that Dr. VanDusen disclosed the "ignored" surgery referral, etc. to Affiant, otherwise Altman and Eller's stalling techniques would not have been uncovered.

116. Affiant believes he has clearly illustrated Altman's propensity to freely generate false, erroneous, and outrageous statement/claims; and illustrated Altman's utter lack of veracity.

117. Altman's pattern and theme are just as clear: To create one or more viable –albeit bad faith- defenses to Affiant's legal claims against Altman's master (e.g. deliberate indifference to his serious medical needs). Altman never deviates from this self serving objective and utterly fails to address/correct pervasive and continuous problems in any meaningful manner, as would be expected form an Ombudsman, but Altman actually works to otherwise shield CMS's malfeasance pursuant to a campaign of deception.

118. Altman's behavior is outrageous and is often times in conflict with the established record, and is often times wholly irrational and or sheer fabrication. No reasonable person could conclude Altman's acts to be mere error or negligence. Alternatively, Altman has performed his –unofficial- role as a professional spin doctor with determination and excellence.

119. But CMS does not only rely on Altman to distort, deceive, and falsify the record; it also has Eller and other employees who have and are willing to create false medical records: (e.g. That CMS provided treatment that never occurred, but was actually a false claim in response to Affiant's medical grievance). See below for the final section.

120.         VI. CMS intentionally created false medical records entries in a bad faith
                  response to Affiant's medical grievance activity:

121. On 9/27/06 Affiant attended a Level Two (RGC) grievance hearing for his EMG 59170 with CMS Rep Eller. EMG 59170 was the third MG regarding the "ongoing incidence of repeat [CCMI]." (See attached VI-A EMG 59170 Grievance Appeal package 9/27/06 pp1, 7).

122. Eller flatly denied Affiant's grievance, and in response to the grievance, Eller related an outright false medical record that CMS had provided a Chronic-care Clinic; however, the claimed Clinic was a phantom Clinic: it was never provided. It was needed, however, to Refill/Reorder Affiant's CC Meds.

123. Specifically, Eller claimed that Affiant had been provided a Chronic-care Clinic (Clinic) on 8/31/06 for the purpose of refilling/reordering Affiant's CC Meds.

16

124. Eller even related a phantom conversation that allegedly took place between CMS personnel and Affiant: "You were here for your Clinic on 8/31/06. You saw Bailey and she gave you one pill and it says here Bailey told you not to wait so long next time." (See attached VI-A EMG 59170 Grievance Appeal package 9/27/06 at _A·3 items_). _10·17_).

125. It became clear to Affiant that this phantom clinic was created in order for CMS to once again manufacture the appearance that the victim –Affiant- was to blame for the CCMI by documenting a false statement (i.e. As if Affiant was responsible for the CCMI by not placing a CC Meds/Clinic request in a timely fashion: "told you not to wait so long next time.") CMS's attempt fails miserably, though.

126. Affiant instantly charged Eller that she was relating a False medical entry –that no Clinic was ever provided, that Affiant still had not been provided the needed Clinic, and that no conversation could have occurred because there was no Clinic.

127. Affiant easily refuted CMS's feeble attempts to enter false records at his EMG hearing by inquiring whether his CC Meds were reordered, which would have had to happened if a Clinic was actually provided on 8/31/06 as alleged, but CMS's ruse and conspiracy fell apart quickly because CMS was too sloppy and omitted the most important and damning piece of evidence: CMS forgot to also place the Refill/Reorder for the CC Meds concurrently with its phantom Clinic! Eller merely dropped her head when confronted with this damning fact and stated that she would follow up the CCMI. (See attached VI-A EMG 59170 Grievance Appeal package 9/27/06 at p. 2 at items 16-17).

128. Affiant filed another Reprisal Grievance (RG) concerning this most recent fabricated medical entry. (See attached VI-B Grievance package p.p. 1-2 10/30/06). Affiant also provided his work site attendance record to conclusively demonstrate to CMS/DOC that Affiant could not have been at any Clinic because he was at work that day. (See VI-B RG package pp 7-8)

129. Moreover, the false medical entry (e.g. Clinic) was also consequently demonstrated as false by the fact that CMS had to reschedule and actually hold a real Clinic in order to Refill/reorder Affiant's CC Meds, and the real Clinic was not conducted until Dr. VanDusen's 10/18/06 Clinic –not on 8/31/06 as Eller falsely related in response to Affiant's EMG. (See attached VI-C affidavit 10/25/06 p. 1 at items 2-7).

130. CMS's conspiracy to create a bad faith defense to Affiant's claims by manufacturing a false medical entry crashed in spectacular fashion.

131. Moreover, neither CMS nor DOC ever attempted to refute any of Affiant's claims (claims of a very serious nature: illegal behavior, reprisal for grievance activity, etc.), but rather CMS took evasive and defensive action.

132. Specifically, Affiant subsequently met with CMS Rep Rodweller for the Level One RG Hearing on 10/18/06 (RG 72883) (i.e. RG filed against CMS for the entry of false records in response to Affiant's grievance activity). See VI-D Affidavit 10/25/06 p.1 items 2-4).

133. Rodweller was instructed –on pain to termination- not to discuss Affiant's claims of reprisal/false medical records entry, but to only direct Affiant to write for an appointment to inspect his medical records. (VI-D. at p. 1 items 7-10, p. 2 items 11-17).

134. DOC violated IGP 4.4 by forwarding the RG to CMS and refusing to investigate it, and CMS violated it by continuing to handle it, because the RG was filed with the DOC against CMS/Eller for Reprisal (second regarding medical records), and Inmate Grievance Procedure 4.4 specifically prohibits any named party in a RG from taking part in the decision making process. Not surprisingly, though, CMS Rep Rodweller refused to discuss the merits of the RG. (Id p.1 items 4-8).

135. Therefore, CMS intentionally and with aforethought entered false medical records in a bad faith response to Affiant's grievance 59170, and created false medical records in response to Affiant's EMG. CMS's behavior illustrates culpability in intentionally creating the underlying CCMI, which now total eleven from 7/05 to 11/06.

136. CMS illustrates a clear pattern and willingness to intentionally distort/falsify the record in its campaign of deception in order to escape liability for its malfeasance perpetrated against Affiant.

137. The above is true and correct to the best of Affiant's knowledge and well reasoned beliefs, and is based on Affiant's personal experiences, observations, and accumulated documentation.

Sworn and Subscribed before me this _29_ day of _November_ 2006.

Davo N

David Williamson
SBI # 183022
1181 Paddock Rd.
Smyrna, DE 19977

Brian D. Engrem
Notary Public, State of Delaware
My Commission Expires June 14, 2008

Notary Public

18