IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE

DAVID W. WILLIAMSON,                                        )
    Plaintiff,                                             )
    v.                                                     )       C.A. 06-379-SLR
CORRECTIONAL MEDICAL SERVICES, Inc, et al,   )
    Defendants.                                            )



## PLAINTIFF'S OBJECTION TO AND/OR MOTION TO STRIKE CMS'S AFFIDAVIT/SUPPLIMENTAL RESOPNSE TO WILLIAMSON'S TRO/RI MOTION

Comes Now, Plaintiff, Williamson, pursuant to Fed. R. Civ. P., rule 12 (f) and appropriate Delaware Local Rules and does hereby object to CMS's affidavit/supplemental response (D.I. 147) (CMS's supp. Response). Williamson moves the Court to strike the attached affidavit of doctor Vandusen, because in it CMS presents impertinent and/or scandalous matter in an attempt to resurrect argument/defenses that CMS has long since waived. Moreover, CMS's new argument/defense is nevertheless insufficient, immaterial, untimely, and it is in irreconcilable conflict with the established record. Williamson offers the following:

Williamson is pro se and seeks pleading leniency pursuant to Haines v. Kerner, 404 U.S. 519 (1972).

### NATURE AND STAGE OF THE TRO/PI PROCEEDINGS

1. Williamson filed a TRO/PI on 1-12-07 of which sought medical care for Williamson's (1) thyroid condition, (2) torn ACL/Knee injury, (3) chronic periodontal disease, and (4) broken tooth. (D.I. 38, Memorandum D.I. 39, & Exhibits D.I. 40). (Williamson's TRO/PI). In short, Williamson sufficiently supported all four of the prongs the courts consider for a TRO/PI with evidence, affidavits, reports, CMS communications, and medical grievances (i.e. administrative records). CMS failed to dispute –let alone refute- a single claim by Williamson that any of these conditions were serious medical conditions, and CMS failed to dispute/refute Williamson's claims that he would likely experience serious injury absent the requested medical care. Alternatively, CMS hung its hat largely upon a bold statement that Williamson could not prove that CMS was deliberately indifferent to his medical needs, and that the medication lapses were alleged, but nevertheless corrected (i.e. mooted), and the ACL surgery was scheduled (i.e. mooting that relief too). CMS's position of allegedly correcting Williamson's claims appears to concede that Williamson suffers serious medical conditions that require appropriate medical care. In any event, CMS never disputed the serious nature(s) or the likelihood of serious injury whatsoever. CMS also failed to even address Williamson's periodontal disease. (See CMS's response D.I. 50-51).

2. CMS filed a response on 2-01-07 (D.I. 50-51) (CMS's response). In short, CMS claimed that Williamson's claims of Chronic-care medication interruptions (CCMI) were "alleged lapses" and that Williamson was "receiving his medications as prescribed." (See CMS's response at B). Also, CMS claimed –for the fourth time- that it has implemented "a new medication administration policy." (new policy). (Id). Again, CMS never challenged Williamson's consistent and never wavering claims of experiencing a resurgence of chronic symptoms as a result of the "alleged" CCMI(s) (e.g. chronic fatigue and clinical depression that causes a significant

1

(i.e. the relief requested in his TRO/PI). CMS admitted that it "must adhere" to any grievance that is "upheld." (See D.I. 103 at item 51). Williamson's medical grievance (# 59170), was "upheld" at the highest level by the Bureau Chief of the D.D.O.C. on

3-15-07. Therein, Williamson –in part- requested identical relief to that requested in his TRO/PI regarding the KOP self-meds. Supporting documents were provided to the Court and CMS. CMS still refuses to provide the relief that it admitted CMS "must adhere" to.

      6. On July 19, 07, the Court Ordered CMS "to file with the court... plaintiff's medical and dental records and any information regarding plaintiff's upcoming knee surgery...." (D.I. 119 at item 4).

## ARGUMENT

1. Williamson presented his claims regarding the TRO/PI and CMS presented its response. The parties made their positions known to the Court and to each other. The Court subsequently sought additional information: specifically regarding Williamson's medical and dental records, and the status of said knee surgery. The Court did not request or allow the parties to add materially new pleadings, arguments, or defenses. Indeed, CMS impertinently inserts an affidavit from Vandusen into Williamson's medical records like a Trojan Horse. The analogy is appropriate because the result is the same: deception and confusion. First, CMS hung its hat –regarding Williamson's thyroid medication claims- on the assertion that he "is receiving his medications as prescribed." That Williamson claims are nothing more than "alleged lapses," and that because of these ostensible facts, he cannot prove CMS was deliberately indifferent to his medical needs. CMS never disputed, challenged, or even attempted to refute Williamson's sufficiently plead and supported (1) claims of a serious medical condition (e.g. hypothyroidism) or (2) that his serious medical condition requires timely and consistent medication to manage the resurgence of acute, chronic-symptoms of this disease. Indeed, Williamson has repeatedly and consistently articulated the specific and debilitating resurgence of chronic-symptoms, of which he unnecessarily experiences due to the on going CCMI(s) for over two years. CMS staff, doctors, grievance hearing and administrative personnel have all been made aware and not once had CMS challenged or disputed the nature of Williamson's chronic-symptoms. Several CMS doctors specifically noted Williamson's chronic symptoms and Williamson was diagnosed with depression secondary to a general medical condition due to his thyroidism. Depression is a common symptom of hypothyroidism, and it is aggravated every time Williamson experiences a CCMI, because the meds act to replace essential hormones that are not otherwise being produced naturally in the body. All this was pleaded by Williamson. Williamson never altered his position, claims, or accounts. Williamson has been above board throughout this litigation.

      Alternatively, CMS claimed Williamson was receiving his meds as prescribed, and when that position proved utterly false, CMS now scrambles to change its prior position and challenge –in general terms- the effects of hypothyroidism. It is a self-serving attempt to change direction, hide the ball, and resurrect a long since waived defense by now attempting to diminish the serious nature of said chronic-symptoms. It is untimely and impertinent. Moreover, it is not just impertinent, it is also scandalous.

      Indeed, CMS has demonstrated a clear pattern of deception, misstatements of fact, and manipulation. For instance,

3

a) Williamson articulated eleven CCMI(s) that CMS termed alleged, but the medical records verify all eleven CCMI(s) (See D.I. 40 Aff'd of Medication Log & D.I. 147, Medical Records at Ex-A);

b) CMS presented a med policy that failed to address the issue (i.e. KOP self-meds logistics)(See D.I. 51, Ex-A);

c) CMS claimed on three prior occasions ostensible new corrective med administration policies, but they too proved false/failed. (See Williamson's objection at D.I. 66, 67 "Aff't of Log of Notices); and

d) CMS conducted mock investigations only to be proved false and ultimately forced to concede and reverse its conclusions; fabricated alleged med. Pick-ups/contacts; and employed false statements regarding conducting Chronic-care Clinics that were never conducted. (See Williamson's Reargument dated 08-03-07, D.I.____ ). This is but a small part of the deception employed and said reargument outlines a clear pattern and supports same with his and CMS documentation.

Williamson has never altered his claims or position or held anything back. Williamson has been above board throughout this process and his truthfulness has been vindicated by the now provided medical records. (* Note that the med distribution records are incomplete –they abruptly end on 1-22-07 and omit part of May, June, and July 2007 regarding KOP self-meds distribution). CMS, however, consistently issued false statements, misrepresentations of fact, and/or irrelevant and immaterial matter regarding Williamson's thyroid KOP meds, among other issues. Consequently, CMS now abruptly attempts to change its position and resurrect a waived defense/challenge to Williamson's consistently held characterizations regarding his experiences with said chronic-symptoms. Williamson believes he has established that CMS's untimely about-face is impertinent. In addition, CMS's affidavit is scandalous, too, because of the following compelling reasons:

a) Vandusen's Aff't speaks generally about hypothyroidism, and does not consult the multitudinous accounts of Williamson's experiences of significant impairment, depression, emotional and mental distress, debilitation of cardiovascular/pulmonary and bodily systems, chronic fatigue, and mental confusion all of which conspire to impair his job and academic performance among other tangible things. (See D.I. 46 Sealed Exhibits).

b) Vandusen's Aff't soft-peddles and/or omits some of the common and readily known chronic-symptoms of hypothyroidism (e.g. chronic fatigue, painful edema, higher cholesterol, and increased body fat index), and he fails to outline the long-term residual effects of these chronic-symptoms (e.g. significant muscle mass loss, deterioration of the body, increased body fat index, which conspire to adversely effect the cardiovascular/pulmonary system, internal organs, and overall deterioration on the physical being);

c) Vandusen's Aff't is in irreconcilable conflict with the record and fails to apply Williamson's acute resurgence of chronic-symptoms (e.g. depression, chronic fatigue, etc.), to the standard;

   i. Williamson was diagnosed with depression secondary to a general medical condition (i.e. hypothyroidism) (See Ex-B, Psychological Medical Records),

   ii. Several CMS doctors diagnosed Williamson and or noted his chronic symptoms. (See Ex-C); and

   iii. Williamson has articulated these chronic-symptoms in countless communications and grievances and never has CMS challenged his assertions, but alternatively stated it would provide the meds (See MG #15453, #17197, # 21201, & # 59170 at Williamson's objection, D.I. 67 Exhibits "Aff't of Notices [to CMS] and Ex.: A-3 Letter 7-2205, D-1 11-09-05, D-4 12-30-05, E-1 02-09-06, F-1 3-13-06, F-3 3-21-06, F-5 4-19-06, I-1 7-01-06, I-4 7-30-06, I-5 8-07-06, J-3 10-04-06, J-8 1-16-06, & J-9 1-23-07. Id.).

d) Vandusen's aff'd fails to articulate the legal standard or any understanding of the legal standard as it regards a "serious medical" condition; fails to apply Williamson's known symptoms –neither the recurring or residual and deteriorating effects- to the standard; fails to consider the record and observations/diagnosis of peer physicians/professionals; and fails to provide the Court with a complete unbiased and truthful account of the likely, long-term effects of under-treated hypothyroidism.

4

Indeed, if the Court is inclined to permit CMS to enter its untimely, impertinent, and highly dubious Vandusen affidavit into the record, Williamson renews his request herein for an independent expert opinion regarding this newly contested matter. It is only proper to level the field and provide the fact finder an unbiased and truthful expert opinion. CMS did not oppose Williamson's original request for an expert, and CMS certainly cannot now oppose a renewed request since CMS opened the door to new –never before raise- challenges/defenses.

In summary, Williamson truthfully illustrated a systemic breakdown in the distribution of the KOP meds admin. System. This breakdown is identical to the finding of the Federal Justice Department, in which it too documented a systemic breakdown on 12-29-06. (See 12-29-06 Findings Letter at Ex-E pages 8-9, and 5-6).

Williamson's claims began in July 2005 and run throughout the Justice Department's investigation. CMS repeatedly asserted that it was implementing new corrective med. Admin. Policies, however, they proved false and/or failures. Clearly, CMS is aware of an obvious problem that requires immediate corrective action in order to mitigate constitutional violations. Williamson proposed a painless solution that would reduce the potential for twelve CCMl(s) down to no more than three per year simply by providing Williamson all four KOP med cards at the beginning of the med cycle (e.g. 120 doses each). CMS is bound to dispense these meds anyway and thus cannot claim harm. Alternatively, Williamson is experiencing tangible injury due to the on going CCMl(s). Moreover, D.D.O.C. upheld Williamson's grievance that requested identical relief and CMS admitted that it must adhere to any grievance upheld. However, incredibly, CMS still denies Williamson the relief. The irony is that CMS's continued refusal to provide Williamson his doctor's prescribed meds in a timely and consistent manner – despite the Justice Department's findings, despite CMS's admission that it must adhere to grievances upheld, and despite a clear and obvious problem that demands immediate corrective action, speaks volumes about CMS and suggests malfeasance as well as deliberate indifference to a known serious medical condition. Any reasonable juror could easily infer this just from CMS's continued refusals, let alone the voluminous records, etc.

Lastly, Williamson objects to the fact that not a single of the four dental visits regarding his acute emergency dental episode (e.g. broken tooth), was provided to the Court with Williamson's dental records. (i.e. three visits with Zimble and one visit with Bishop). (See D.I. 15 at 156-178 & D.I. 39. 40 at Ex-IV. A). Again, it appears that CMS is hiding the ball, and again Williamson invokes the mission evidence rule that had CMS provided these relevant dental records, it would have been unfavorable to CMS.

## CONCLUSION

WHREFORE, Williamson requests the Court to deny leave to CMS to insert Vandusen's untimely, impertinent, and scandalous affidavit, and to strike it from the record because it attempts to resurrect long since waived defenses. Alternatively, if the Court is inclined to allow CMS to open the door to materially new argument/defenses, then Williamson moves the Court to appoint an independent expert to provide truthful and unbiased testimony regarding hypothyroidism and apply Williamson's experience of chronic-symptoms to the standard.

_David Williamson_

David Williamson, SBI 183022, 1181 Paddock Rd., Smyrna, DE 19977

$\underline{8-16-07}$
Date

CERTIFICATE OF SERVICE

I, David Williamson, Plaintiff, do swear that I have caused to be delivered upon the defendants listed

below the following true and correct documents:

1. _Plaintiff's Objection to and/or motion to_
_strike cms's Affidavit/Supplemental Response_
_to Williamson's TRO/PI Motion_,

2. _N/A_

By placing same in a U.S. Mail receptacle on the _17_ day of _Aug._ 200_7_.

Daniel McKently, Esq.
(Counsel for FCM, Inc.)
1225 N. King St., Suite 1100
Wilmington, DE 19809-0397

James E. Drnec, Esq
711 N. King St.
Wilmington, DE 19801
(Counsel for Dr. A. Zimble)

Patrick Rock, Esq.
(Counsel for CMS, Inc.)
913 Market St., #800
Wilmington, DE 19801

_N/A_

David Williamson, SBI #183022
1181 Paddock Rd., W-1, L-12
Smyrna, DE 19977

# EXHIBIT E



*Office of the Assistant Attorney General*                    *Washington, D.C. 20530*

DEC 29 2006

The Honorable Ruth Ann Minner
Governor of Delaware
Tatnall Building
William Penn Street, 2nd Fl.
Dover, DE  19901

> RE:  Investigation of Delaware Correctional Center, Symrna,
>      Delaware; Howard R. Young Correctional Institution,
>      Wilmington, Delaware; Sussex Correctional Institution,
>      Georgetown, Delaware; John L. Webb Correctional
>      Facility, Wilmington, Delaware; and Delores J. Baylor
>      Women's Correctional Institution, New Castle, Delaware

Dear Governor Minner:

I am writing to report the findings of the Civil Rights
Division's investigation of conditions and practices at the
following five Delaware Department of Correction ("DOC")
facilities:  the Delaware Correctional Center ("DCC"), the
Howard R. Young Correctional Institution ("HRYCI"), the Sussex
Correctional Institution ("SCI"), the John L. Webb Correctional
Facility ("Webb"), and the Delores J. Baylor Women's Correctional
Institution ("BWCI").

On March 7, 2006, we notified you of our intent to conduct
an investigation of these facilities pursuant to the Civil Rights
of Institutionalized Persons Act ("CRIPA"), 42 U.S.C. § 1997,
which gives the Department of Justice authority to seek remedies
for any pattern and practice of conduct that violates the
constitutional or federal rights of incarcerated persons.  We
informed you that our investigation would focus on medical and
mental health care.

We note that the State has cooperated thoroughly with our
investigation and, under the leadership of DOC Commissioner
Stanley W. Taylor, Jr., has unequivocally indicated its clear
desire to improve medical and mental health care services at the

- 2 -

facilities. From the outset of our investigation, the State has been proactive in evaluating the conditions at the facilities. Indeed, the State retained its own expert consultants, Dr. Ronald Shansky and Dr. Roberta Stellman, to evaluate medical and mental health care services, respectively, at DCC, HRYCI, SCI, Webb, and BWCI in July and September 2006. Following these evaluations, the State shared the results of its internal evaluations with us.

The State's experts identified systemic deficiencies in medical and mental health care at four of the five facilities: DCC, HRYCI, SCI, and BWCI (hereinafter, "the facilities"). These findings were presented to the Department of Justice in oral and written presentations by Fried, Frank, Harris, Shriver & Jacobson, outside counsel for the State. To facilitate our investigation, the State agreed to stipulate to the accuracy of these factual findings. Given the State's complete cooperation with our investigation, the unsolicited disclosure of its comprehensive internal audit of medical and mental health care services, and the State's stipulation, we elected to limit our expert tours to a representative subset of the facilities.

Department of Justice staff toured the five facilities on June 22, 2006, July 17-19, 2006 and August 14-16, 2006. We conducted additional tours of HRYCI, Webb and BWCI, accompanied by expert consultants in the fields of medicine, mental health care, and suicide prevention on October 4-6, 2006, October 23-25, 2006, and November 15-17, 2006. During these tours, we reviewed a wide variety of State and facility documents, including policies, procedures, and medical and mental health records relating to the care and treatment of inmates. We interviewed prison administrators, professionals, staff and inmates at each facility. In keeping with our pledge of transparency and to provide technical assistance where appropriate regarding our investigatory findings, we conveyed our preliminary findings to certain State and facility administrators and staff during verbal exit presentations at the close of each of our on-site visits. As detailed below, our investigative findings mirrored those of the State's experts.

We commend the administrators and staff of the five facilities we toured for their helpful and professional conduct throughout the course of the investigation. In particular, facility personnel cooperated fully and expeditiously with our document requests.

We are confident that our work with the State will continue in the same cooperative manner we have enjoyed throughout our investigation. However, consistent with our statutory obligation

- 3 -

under CRIPA, we set forth below the findings of our
investigation, the facts supporting them, including those facts
stipulated to by the State, and the minimum remedial steps that
are necessary to address the deficiencies we have identified.  As
described below, we conclude that inmates confined at the
facilities suffer harm or are placed at the risk of harm from
constitutional deficiencies in certain aspects of the medical and
mental health care services, including suicide prevention.
Notwithstanding the foregoing, we are pleased to report that we
find no constitutional deficiencies at Webb.

## I.  **BACKGROUND**

Delaware is one of six states that house both pre-trial
detainees and sentenced prisoners in a single unified system,
although detainees and prisoners are not housed together.
Medical and mental health care services at the facilities are
provided through a contract with a private vendor.  DCC is
located in Smyrna, Delaware, and houses approximately 2,500 male
inmates, including both pre-trial detainees and sentenced
prisoners.  DCC also contains the Security Housing Unit ("SHU"),
which houses inmates with disciplinary problems or who otherwise
require the maximum level of security.  DCC also contains the
State's death row.  HRYCI is located in Wilmington, Delaware.
The facility houses approximately 1800 males, both pre-trial
detainees and sentenced inmates.  SCI is located in Georgetown,
Delaware, and houses approximately 1200 male inmates, including a
100-bed boot camp.  BWCI is located in New Castle, Delaware, and
houses approximately 400 female pre-trial detainees and sentenced
inmates at all security levels.  Webb is located in Wilmington,
Delaware, and houses approximately 80 minimum security male
inmates.

## II.  **FINDINGS**

### A.  **MEDICAL CARE**

Under CRIPA, the Department of Justice has authority to
investigate violations of the constitutional rights of inmates in
prisons, and pre-trial detainees in jails.  The rights of
sentenced inmates fall under the Eighth Amendment, which
prohibits the imposition of cruel and unusual punishment.  Under
the Eighth Amendment, jails must provide humane conditions of
confinement, which include adequate medical care.  Farmer v.
Brennan, 511 U.S. 825, 832 (1994).  Failure to provide adequate
care to address the serious medical needs of inmates can
constitute deliberate indifference, a violation of the Eighth
Amendment prohibition against cruel and unusual punishment.

- 4 -

Estelle v. Gamble, 429 U.S. 27 (1976). The responsibility to
provide adequate medical care includes mental health care.
Tillery v. Owens, 907 F.2d 418 (3d Cir. 1990). Failure to
protect a suicidal prisoner from self-harm can also amount to a
constitutional violation. Inmates of Allegheny County v. Pierce,
612 F.2d 754, 763 (3d Cir. 1979); Colburn v. Upper Darby
Township, 838 F.2d 663 (3d Cir. 1988). The responsibility to
protect inmates from harm includes the possibility of future harm
as well as present harm. Helling v. McKinney, 509 U.S. 25, 33
(1993); Tillery, 907 F.2d at 426.

With regard to pre-trial detainees, the Fourteenth Amendment
prohibits imposing conditions or practices on detainees not
reasonably related to the legitimate governmental objectives of
safety, order, and security. Bell v. Wolfish, 441 U.S. 420
(1979). The Third Circuit has opined that the protections
afforded to pre-trial detainees are at least as great as those
afforded to sentenced prisoners. Hubbard v. Taylor, 399 F.3d
150, 166-167 (3d Cir. 2005) (pre-trial detainees claims of
constitutional violations to be analyzed under Fourteenth
Amendment).

Our investigation revealed that the medical care provided at
the facilities falls below the standard of care constitutionally
required in the following areas, all of which were also
identified by the State as deficient: intake; medication
administration and management; nursing sick call; provider sick
call; scheduling, tracking, and follow-up on outside consults;
monitoring and treatment of communicable diseases; monitoring and
treatment of chronic diseases; medical records documentation;
scheduling; infirmary care; continuity of care following
hospitalizations; grievances; and patient confidentiality. In
addition, we found that care for patients with acute medical
urgencies was also constitutionally inadequate.

## 1. Sick Call

The State's expert found that sick call is not being
regularly conducted at the facilities and that sick call
"no-shows" (inmates who do not appear for their scheduled medical
appointments) are not tracked. Our investigation confirmed that
there are inadequate sick call systems in place which directly
interferes with inmates' access to care for their serious medical
needs. Specifically, the systems are deficient in scheduling
appointments, and tracking no-shows. For example, the inadequate
scheduling system at HRYCI resulted in only seven of the
representative sample of 14 patients scheduled for sick call on
one day being seen. In addition, we found that inmates who

- 5 -

missed sick call were not tracked and, as a consequence, often not rescheduled. The sick call process for inmates' requiring mental health care suffers from similar inadequacies in scheduling and follow-up. During our tours of BWCI and HRYCI, we found that the sick call process is not functioning properly and that there were significant delays for inmates who had requested to see the psychiatrist. Overall, these conditions place inmates at serious risk of harm.

## 2. Acute Care

Our investigation revealed that patients with life-threatening conditions are not receiving timely care. We reviewed the records of ten patients sent to the local emergency room; six of these patients were admitted. One patient, known to be infected with HIV, was admitted from HRYCI with pneumocystis carinii pneumonia ("PCP"), a potentially fatal infection in people with AIDS. We determined that this inmate's care had been mismanaged at HRYCI for one month before the inmate was finally sent to the hospital. In addition, this inmate was never tested for active tuberculosis, a likely diagnosis for patients with HIV and pneumonia. The failure to properly diagnose and treat this inmate could have put other inmates and staff at risk of contracting tuberculosis.

## 3. Chronic Care

The State's expert found that there are consistent backlogs with respect to the treatment of chronic care inmates as evidenced by infrequent scheduled appointments. When appointments are scheduled, they are subject to cancellation without explanation or follow-up. The State's expert also found that the chronic care rosters are not adequately maintained.

Our investigation confirmed that there is no functioning chronic disease registry at HRYCI. The absence of a chronic disease registry means that patients with chronic diseases, such as diabetes, hypertension, asthma, HIV, and Hepatitis C are not being followed and treated according to generally accepted medical standards for chronic care. As a result, inmates with chronic disease are at risk for deterioration in function, including blindness, kidney disease, heart disease, liver failure, and death.

We found that care was especially poor for inmates with diabetes, asthma, and HIV. Of nine inmates with diabetes whose charts we reviewed, only four had received tests deemed necessary pursuant to generally accepted professional standards for care of

- 6 -

persons with these serious, chronic diseases. In addition, only two inmates had been immunized against pneumococcus, a bacterium that is the leading cause of bacterial pneumonia. The failure to immunize chronically ill inmates against pneumococcus places them at serious risk of harm, including death from pneumococcal pneumonia, and constitutes a substantial departure from generally accepted standards of care. Another diabetic inmate whose chart we reviewed went without insulin for three days, despite severely elevated blood sugar levels that were known to staff, placing him at risk of death.

Similarly, for inmates with asthma, the chronic care practices also fall below a minimally acceptable standard of care. For example, of nine asthmatic inmates who should have been seen in the chronic care clinic over a three month period, only three were seen. Only two had documented measurement of peak expiratory flow, which is a departure from the generally accepted standard of care for asthmatic patients.

Finally, with respect to HIV-infected inmates, we found that chronic care practices also fall below a minimally acceptable standard of care. Only two of five patients whose records our medical consultant reviewed had documented laboratory measurements of their CD4 cells[1] and their viral load, both of which are necessary to gauge response to medication.

## 4. Specialty Care

The State's expert found that outside consultations are delayed by days or even weeks in non-emergency situations because of bureaucratic obstacles within the private vendor's system for obtaining authorization. The State's expert also found that shortages of security staff available to transport inmates to outside medical appointments contributes to the inadequacy of care. In addition, the State's expert determined that, even when outside consults are scheduled, post-consult follow-up does not consistently occur.

Similarly, our investigation found that access to specialty care is untimely, and that tracking of outside care is deficient, creating an unacceptable barrier to adequate medical care ordered by physicians. For example, of 10 patients who were referred by facility doctors for outside care, three received no care at all.

---

[1] CD4 cells are white blood cells that identify, attack and destroy infections. A normal CD4 cell count measures the strength of a person's immune system.

- 7 -

All three patients had serious medical issues: two had upper
gastrointestinal symptoms, including one patient who had
documented possibly cancerous polyps with a biopsy ordered and
performed, but no results in his file. A third patient had no
documented follow-up with an orthopedist following serious trauma
to his finger.

And, in the most extreme example, specialty care may have
been denied altogether: in March, 2002, an SCI inmate died from
a malignant brain tumor that had grown so large that it distorted
his facial features, and was so noticeable that other inmates
referred to him as "the brother with two heads." Fourteen months
before he died, SCI medical staff allegedly misdiagnosed the
cancerous growth as a cyst or an ingrown hair, and allegedly made
no specialty care referral nor provided any specialty care to the
inmate before he died.

## 5. Skin Infections

It is well-documented that, across the country, the
incidence of skin infections among inmates is rising. These skin
infections can include methicillin-resistant staphylococcus
aureus ("MRSA"), a potentially dangerous drug-resistant bacteria
that can cause serious systemic illness, permanent disfigurement,
and death. MRSA transmission can be prevented by environmental
controls, scrupulous laundry practices, early identification,
effective treatment, wound care, and follow-up.

The State's expert found that, until recently, the medical
staff were generally unfamiliar with the diagnosis and treatment
of MRSA, and that the medical staff did not culture potential
MRSA infections or educate inmates on proper precautions against
the spread of MRSA until Fall 2005.

Our investigation revealed that proper diagnosis of and care
for skin infections falls below the minimally acceptable level of
care. We also found that medical staff routinely failed to
culture skin infections; in addition, we found that wound care
and follow-up were inadequate. For example, we reviewed the
charts of eight inmates with skin infections at HRYCI; only two
of these inmates received adequate care. One had a deep skin
infection of the neck, but had no follow-up to see if his
infection was spreading. Another inmate had inappropriate
treatment for an infection that was accompanied by fever and
chills, indicative of a systemic infection that could have led to
pneumonia, brain infection, and death. Both of these patients
were treated with the antibiotics that are ineffective in
treating MRSA. With respect to wound care, we found another

inmate at BWCI who was inappropriately treated with a topical cream for an infection on her face, but who did not see the doctor for six days, by which time she had developed cellulitis, a deep skin infection that ultimately required hospitalization. Our investigative findings and the State's stipulation are also consistent with reports that DCC staff failed to properly diagnose and treat an MRSA infection in an inmate for four months in 2005.  This failure to recognize and treat MRSA allegedly caused the inmate to be hospitalized for five weeks, lose the skin on his scrotum, and undergo painful skin grafts, resulting in permanent deformity.

Our investigation confirmed that the existence of the above inadequacies place inmates and staff at risk of acquiring the infection and passing it to others in the community beyond the prison walls.  We also found that identification and treatment of skin infections at the facilities is inadequate, including failure to culture and treat wounds.  We found that facility staff does not keep adequate logs of skin infections, which prevents staff from being able to analyze data and identify potential sources of transmission.  Notably, in many cases physicians were prescribing the antibiotic Keflex, which not only is rarely effective for skin infections, including MRSA, but actually leads to prolonged infection and increased opportunities for the infection to spread.  Finally, we found that laundry practices at the Facilities are inadequate to prevent the spread of skin infections, including MRSA.

### 6.  Medication Administration and Management

The State's expert found that prescribed medications are routinely discontinued or delayed and that the current vendor has no systems in place for ensuring that medications do not run out, for notifying inmates when their medications have arrived, or for verifying that the vendor is providing inmates with the correct medications.

Our investigation confirmed these deficiencies which put inmates at risk of harm, particularly those with chronic conditions such as HIV.  We observed significant lapses in medication, due either to lack of availability of medications or the failure to administer medications consistently.  For example, one inmate had missed 20 consecutive days of his anti-viral medication used to treat the HIV, a potentially life-threatening situation; another inmate with HIV had a one month lag in receiving his HIV medications.

- 9 -

We also found that serial refusals to take medications were not monitored. Numerous inmates missed three or more doses of medications on three consecutive days, without any evidence of follow-up by the prescribing practitioner, or evidence that the inmate was sought out or counseled.

The State's expert found that numerous systemic problems with medication administration and management exist at the facilities, including:  failure to distribute medications at the proper time intervals, leading to over- or under-prescribing medications; failure to provide necessary food at night to diabetic inmates; failure to properly monitor whether inmates are actually swallowing their medications; and pre-pouring medications.

Our investigation found similar deficiencies.  Our review of medication administration records at HRYCI revealed that approximately ten percent of the entries were left blank, indicating that inmates had not received their medication, or that the medication administration was undocumented.  We also found that the State routinely prescribes Keflex, an antibiotic, for skin infections, despite the fact that Keflex is rarely effective when used to treat skin infections.  We also learned that the State plans to administer each dose of medication from stock bottles, instead of filling prescriptions for each patient, a practice which we believe will lead to poor inventory control, diversion, error, and lack of accountability.

## B. MENTAL HEALTH CARE

The responsibility to provide adequate medical care includes mental health care.  Inmates of Allegheny County Jail v. Pierce, 612 F.2d 754, 763 (3d Cir. 1979); Tillery v. Owens, 907 F.2d 418 (3d Cir. 1990).  The State is constitutionally required to provide adequate mental health care to inmates with serious mental or emotional disturbances.  The failure to provide necessary psychological or psychiatric treatment to such individuals will result in the "infliction of pain and suffering just as real as would result from the failure to treat serious physical ailments."  Inmates of Allegheny County Jail, 612 F.2d at 763.  The key to determining whether the State has provided constitutionally adequate mental health care depends on whether inmates have reasonable access to "medical personnel qualified to diagnose and treat such illnesses or disturbances."  Id.

The State's mental health expert found substantial deficiencies with the mental health care provided at the facilities.  The State's expert conducted a number of on-site

- 10 -

visits and determined that there is a "continuing need for
substantial remedial efforts, training and auditing of mental
health services provided by [the State's medical care provider]."
The State identified the following deficiencies:  poor responses
to sick call requests, particularly in cases involving
potentially suicidal inmates; inadequate group and individualized
therapy; staffing inadequacies, lack of privacy for inmate mental
health counseling, insufficient discharge planning, inadequate
administration and management of psychotropic medications,
failure to properly develop treatment plans that are regularly
updated, failure to develop site-specific policies and procedures
for mental health care, failure to properly document
medical/mental health records, and failure to obtain consent
forms.  Our investigation confirmed the serious systemic
deficiencies in psychiatric staffing, treatment and counseling,
medication administration and management, and intake and
screening identified by the State's mental health expert.  We
conclude that these deficiencies violate inmates' constitutional
right to adequate care for serious mental illness.

### 1.  Psychiatric Staffing Deficiencies

The State's expert found that low psychiatric staffing at
the facilities have caused a backlog of inmates requiring
psychiatric care.  Although the facilities do have psychiatrists
who are available to provide care on-site, their hours at the
various facilities are limited.

Our investigation confirmed that psychiatric staffing is
inadequate to provide for inmates' serious mental health needs.
For example, during our tour of HRYCI, the State informed us that
there are two part-time psychiatrists who provide care at HRYCI,
but our investigation revealed that their combined time on-site
totals less than twenty hours, and there is no on-site
psychiatric coverage provided for two days out of the week.
Psychiatric coverage at BWCI is even more limited.  Our
investigation revealed that a psychiatrist is on site only four
hours per week, and the "on-call psychiatrist" generally provides
guidance only via telephone.  Further, we understand that
included in the four hours is time that the psychiatrist spends
at the Violation of Probation Center attached to BWCI for two
hours every other week.  Such limited psychiatric staffing is not
constitutionally adequate care because inmates do not have
reasonable access to psychiatrists.  See Inmates of Allegheny
County Jail v. Pierce, 487 F. Supp. 638, 643 (W.D. Pa. 1980).

As a result of inadequate psychiatric staffing, we found
numerous instances in which the mental health clinical staff are

- 11 -

providing care that they are not licensed to provide (e.g., diagnosis of mental health disorders, treatment development without proper psychiatric consultation, decisions regarding suicide watch step-downs, etc.). We found that psychiatrists are routinely unavailable for treatment team and staff meetings, and often are not involved in crucial decision-making, and are not adequately involved in monitoring and supervision of staff. In addition, we found that the psychiatrist who provides most of the care at HRYCI was not familiar with the procedures utilized for making decisions about which medications to prescribe for patients with psychotic disorders. Generally accepted standards of care dictate that a psychiatrist be responsible for providing mental health treatment to seriously mentally ill patients should lead treatment teams, direct medication procedures, and be meaningfully involved in treatment decisions.

## 2. Treatment Planning and Counseling Deficiencies

The State's expert found that treatment plans for inmates need to be developed more regularly so that psychologists do not unnecessarily change diagnoses and so that patients are put on the appropriate problem list. Treatment plan development is an integral part of mental health care. One aspect of treatment planning consists of psychiatric and clinical staff providing consistent notations in medical records to ensure that important information regarding an inmate's care is documented. The State's expert, Dr. Stellman, concluded that there is a continued need for remedial efforts and training in the area of medical records documentation at DOC facilities. Dr. Stellman also found that many medical records do not contain consent forms, and contain improperly completed mental health forms.

Likewise, we found that the poor documentation impacts treatment because it is virtually impossible for a qualified mental health professional to review patient medical records and determine how basic clinical decisions are being made (e.g., why an inmate was admitted to the infirmary; why medications are prescribed; why and how psychiatric close observation levels are changed; what are the bases for diagnostic conclusions). During our tour of BWCI, we reviewed the medical record of an inmate who had recently attempted suicide and found the psychiatric notes were deficient and difficult to interpret. Both the on-site and "on-call" psychiatrists made adjustments to this inmate's medication without any explanation. Also, despite the fact that this inmate had been on suicide watch on three occasions within a four-month period and was obviously in distress, there were sparse psychiatric notes in her file.

- 12 -

Generally accepted standards of care dictate that discharge treatment planning be provided for inmates who have serious mental illness to ensure continuity of care. The State's expert found that its inmate treatment plans fail to address how the patient's care will continue once he or she is released from the DOC facility.[2]

The State's expert also found deficiencies in the individual and group counseling services provided at DOC correctional facilities. There appears to be a limited ability to provide individual counseling sessions to inmates because of a lack of privacy. The State's expert found that when inmates are housed in the infirmary, psychiatrists and mental health staff do their interviews through the cell door and that, because cells typically have at least one other occupant when these interviews are being conducted, the encounters are not confidential. This is a wholly inadequate practice evidencing a denial of reasonable access to psychiatric diagnosis and care. See Inmates of Allegheny County Jail, 612 F.2d at 763.

Group counseling services at the facilities fall below accepted standards, as well. The State's expert found that there was a need for remedial measures and training with respect to the provision of group and individualized therapy.

Similarly, we found the counseling services to be constitutionally inadequate. Because the facilities are substantially understaffed with respect to psychiatrists, physicians generally do not participate in the treatment team or staff meetings. For example, during our tour of BWCI we found that the master's level clinicians who run the group psychotherapy program (e.g., depression group, anger management group, and addiction group) in the Harbor House Unit do not receive any oversight from a psychiatrist. Generally accepted professional standards dictate that the psychiatrist be the treatment team leader and be meaningfully involved in key treatment decisions. However, clinicians are making important treatment decisions that should be left to the professional

---

[2]    NCCHC standards J-E-13 and P-E-13 require jurisdictions to develop discharge planning for inmates with serious mental illness (e.g., medication for a short period of time following release and referrals to community health providers). Also see, Foster v. Fulton County, 223 F. Supp 2d 1301, 1310 (N.D. Ga. 2002) (holding that a jurisdiction was required to develop meaningful discharge planning for physically and mentally ill prisoners).

- 13 -

judgment of a psychiatrist, or at least made with the
consultation of a psychiatrist. Our review of the medical
records at BWCI and HRYCI revealed that clinicians are recording
psychiatric diagnoses and making observation status decisions
about patients in the infirmary, including which inmates should
be removed from suicide watch, and at what pace. Psychiatrists
should be performing these tasks because psychiatric diagnoses
drive treatment decisions.

The State's practice of allowing clinicians to make
important decisions regarding the care and treatment of inmates
with serious mental illness puts patients at risk. There were
three suicides at HRYCI in 2006. A clinician's decision, in May
2006, to downgrade an inmate's observation status may have aided
the inmate's ability to commit suicide a few days after he
entered the facility. The State took custody of this inmate
after his release from a local hospital for treatment related to
a suicide attempt. Apparently he was initially placed on one-to-
one observation status, but he was later downgraded to a less-
restrictive suicide watch despite warnings from a mental health
advocate about his vulnerable mental state and need for a mental
health evaluation.

### 3. Psychotropic Medication Administration and Management

The State's expert found that there is a continuing need for
substantial remedial efforts, training, and auditing with respect
to the management of psychotropic medications.

Our investigation revealed that the medication
administration and management of psychotropics at DOC facilities
is constitutionally inadequate. We observed during our tours at
BWCI and HRYCI that there are systemic problems with initiating
drug therapy for newly admitted inmates. It appears that this
problem may be partially the result of a deficient intake and
screening process. Because the intake process is deficient there
is rarely an attempt to obtain psychiatric records from community
providers which would identify any psychotropic medications that
were previously prescribed. If outside records were routinely
obtained the delay that we observed with regard to initiating
drug therapy for newly admitted inmates might be eradicated or at
least greatly diminished.

We also found that the psychotropic medications that newly
admitted inmates are often prescribed by community providers were
substituted with other medications which may not be as
therapeutically effective. We encountered inmates at HRYCI who
appeared to have diminished symptom control and decreased

- 14 -

functional ability as a result of the substitution of
psychotropic medications.  Another deficiency that we found with
psychotropic medication administration is a lack of consistent
and timely distribution of medications.  Because the medication
inventory does not appear to be properly controlled, medication
shortages have resulted in interrupted drug therapy.

Finally, we found that monitoring of medication is deficient
at the facilities.  The use of certain psychotropic medications
may cause metabolic effects, such as weight gain, hyperlipidemia,
and type II diabetes mellitus.  As such, generally accepted
standards of care require prescribing physicians to monitor
weight, body mass index, and abdominal girth on a regular basis.
Our review of medical records at BWCI and HRYCI indicate that the
State is not following this practice.  Another side effect of
certain psychotropic drugs is tardive dyskinesia (involuntary
movement disorder).  Psychiatrists generally monitor this side
effect by performing the Abnormal Involuntary Movement Scale
("AIMS") on a regular bases.  The State's expert found that AIMS
tests are not being done once every six months as required.

### 4.  Intake and Screening

We found the intake and screening process with respect to
the identification of seriously mentally ill inmates to be
constitutionally inadequate.  The intake and screening process
for medical and mental health is combined and performed by
nursing staff members who do not appear to have received adequate
mental health training or have a sufficient background in mental
health.  Accordingly, they are unable to appropriately identify
symptoms of mental illness.

During our tour of HRYCI, we found that the staff's lack of
experience with mental health issues is exacerbated by the high
volume of newly admitted inmates that are processed per shift.
These deficiencies have resulted in the failure to identify
inmates with serious mental illness which causes delays in
treatment.  Another impact of failing to identify inmates with
mental illness is that disciplinary sanctions may be
inappropriately imposed on mentally ill inmates, because of
behavior that could be more appropriately addressed by mental
health care and treatment instead of discipline.  For example,
during our tour of BWCI, we observed inmates in isolation who had
not been properly identified has having mental illness, or who
had not received adequate treatment for their diagnosed mental
illness.  For such inmates, care should be taken to ensure that
they are not unfairly disciplined for "acting out" when mental
health intervention is a more appropriate response.

- 15 -

We also found that intake and screening for juveniles was constitutionally inadequate at HRYCI. During our tour, we reviewed a number of juvenile medical records to determine whether this special needs population was receiving comprehensive mental health evaluations subsequent to their initial intake survey. However, it appeared that such evaluations were not being routinely performed.

## C. Suicide Prevention

Our investigation revealed that the State's practices regarding suicide prevention substantially depart from generally accepted professional standards and expose inmates to significant risk of harm. Our investigation uncovered a system in which inmates at risk for suicide are not adequately identified, housed. and supervised.

The State fails to adequately assess and identify inmates at risk for suicide. While the form used to conduct intake · assessments is good, the personnel conducting the assessment lack appropriate training and experience with issues related to mental health and suicide prevention. Assessments are often performed by contract or agency LPN's who have not been trained adequately in suicide prevention techniques. Additionally, while the State's medical provider conducts training of its employees on suicide prevention, it has not implemented its training curricula as policy or standard operating procedure. Similarly, correctional staff receive insufficient training in the area of suicide prevention. Training at the academy is only two or three hours, and annual refresher training methods are not adequate.

The intake process also fails to ensure that appropriate action is taken when an inmate reports a history of suicidal thoughts or actions. In these instances, the inmate signs a release, but outside confirmations of their medical and mental health records/histories are not consistently obtained and verified. Furthermore, post-intake follow-up of new inmates, which should be conducted within 14 days, is not done. Instead, follow-up is rolled into the initial intake process, increasing the possibility that at-risk inmates will not be identified.

The State fails to ensure that inmates identified as being at risk for suicide are housed in cells which are sufficient to ensure their safety. Protrusions from walls and ceilings, window frames and grates, and even the design of bunk beds in some cells provide potential anchors strong enough to support an inmate's weight in an attempt at hanging. For example, in August 2006, an

- 16 -

HRYCI inmate who hanged himself at HRYCI was housed in an
infirmary cell following his admission because he was recovering
from a gunshot wound sustained during his arrest. It is not
clear what fixture the inmate used to hang himself, but it is
apparent that the cells in the infirmary, like those in the other
areas of the facility, are not sufficient to ensure the safety of
inmates with suicidal ideations. Hanging was the means used in
the May 2006 and February 2005 suicides at HRYCI. Additionally,
unsafe light fixtures in some cells, if broken, provide a
potential source of sharp-edged pieces of plastic or glass that
could be used for self-harm.

    The State fails to ensure that appropriate levels of
observation are maintained. Documentation of 15- and 30-minute
checks does not indicate that these checks are being done. Staff
at one facility reported conflicting requirements for checks at
lesser levels of observation, highlighting confusion about which
interval was the actual policy. Rounds by mental health staff
for inmates in isolation and on special units are not regularly
done. Additionally, staff at some facilities incorrectly
suggested that the various undocumented incidental contacts with
at-risk inmates throughout the day, such as dispensing medication
or picking up sick call slips, sufficed as a periodic check for
inmates' safety.

### III.  **MINIMUM REMEDIAL MEASURES**

    In order to address the constitutional deficiencies
identified above and to protect the constitutional rights of
inmates, we recommend the following measures:

1.  The State should ensure that appropriate access to medical
    care, including development and implementation of a
    functional sick call system that appropriately schedules
    medical appointments, and properly tracks and reschedules
    "no shows."

2.  The State should ensure that chronic disease registries are
    implemented and maintained at DOC facilities.

3.  The State should provide appropriate continuing care for
    patients with chronic diseases and ensure that backlogs are
    eliminated and do not redevelop.

4.  The State should ensure that outside consultations are not
    unnecessarily delayed and that appropriate post-consult
    follow-up care is provided. The State should ensure that

- 17 -

security staffing levels do not negatively impact the provision of outside consultations.

5.    The State should implement appropriate measures to identify, track, and treat skin infections, including culturing and treating wounds and prescribing effective antibiotics.

6.    The State should ensure the distribution of medication to patients at proper time intervals. The State should implement a system to ensure that proper medications are being received and that sufficient stocks of medications are maintained to avoid interruptions or delays in their delivery.

7.    The State should track serial refusals of medication by patients and ensure that prescribing physicians are notified of such occurrences and that appropriate follow-up with patients takes place.

8.    The State should ensure that there is adequate psychiatric coverage provided at DOC facilities.

9.    The State should ensure that psychiatrists are actively involved in inmate care, including: functioning as the treatment team leader; making psychiatric diagnoses; providing necessary monitoring and supervision of staff; and promoting quality mental health care.

10.   The State should provide appropriate medication distribution and management systems to ensure that psychotropic medications are available, distributed in a timely manner, and adequately monitored.

11.   The State should ensure that psychiatrists prescribe therapeutically effective medications. If a decision is made to adjust or substitute the medications that an inmate was on prior to their detention or incarceration at a DOC facility, the psychiatrist should provide a clear justification for making the adjustment or substitution in the inmate's medical record.

12.   The State should ensure that appropriately trained staff perform a mental health screening at intake.

13.   The State should provide appropriate counseling space for qualified mental health professionals to provide mental health treatment to inmates with serious mental illness.

- 18 -

14.   The State should ensure that the mental health staff is
      appropriately documenting the care provided to inmates with
      serious mental illness.

15.   The State should provide appropriate treatment plans for
      inmates with serious mental illness.  The treatment plans
      will be reviewed on a routine bases to ensure quality of
      care.

16.   The State should develop site specific mental health
      policies for HRYCI and DCC.·

·17. · The State should develop a comprehensive policy regarding
      suicide prevention for DOC facilities.

18.   The State should ensure that all medical, mental health and
      correctional staff are appropriately trained regarding
      issues of suicide prevention, and that the content of their
      training is reflective of that State's suicide prevention
      policy.

19.   The State should ensure that intake staff are sufficiently·
      experienced and qualified to identify inmates that pose a
      risk for suicide, and that follow mental health staff
      conduct appropriate follow-up evaluations of new inmates
      within 14 days of intake.

20.   The State should ensure that inmates identified as at risk
      for suicide are housed in safe cells, free from fixtures and
      design features that could facilitate a suicide attempt.

21.   The State should ensure that 15- and 30-minute checks of
      inmates under observation for risk of suicide are timely
      performed and appropriately documented.

\* \* \*

      Please note that this findings letter is a public document.
It will be posted on the Civil Rights Division's website and we
will provide a copy of this letter to any individual or entity
upon request.

- 19 -

As stated above, we appreciate the cooperation we have received throughout this investigation from State officials and staff at the facilities. We appreciate the State's proactive measures to respond to its own internal audit and our feedback to date to improve the quality of services at the facilities. We hope to be able to continue working with the State in an amicable and cooperative fashion to resolve the deficiencies we found at the facilities. Provided that our cooperative relationship continues, we will forward our expert consultants' reports under separate cover. Although their report are their work – and do not necessarily represent the official conclusions of the Department of Justice – their observations, analyses and recommendations provide further elaboration of the relevant concerns, and offer practical assistance in addressing them. We hope that you will give this information careful consideration and that it will assist in your efforts at prompt remediation.

We are obligated to advise you that, in the unexpected event that we are unable to reach a resolution regarding our concerns, within 49 days after your receipt of this letter, the Attorney General is authorized to initiate a lawsuit pursuant to CRIPA, to correct deficiencies of the kind identified in this letter. See 42 U.S.C. § 1997b(a)(1). We would very much prefer, however, to resolve this matter by working cooperatively with you. Accordingly, we will soon contact State officials and counsel to discuss this matter in further detail.

If you have any questions regarding this letter, please call Shanetta Y. Cutlar, Chief of the Civil Rights Division's Special Litigation Section, at (202) 514-0195.

Sincerely,

Wan J. Kim
Assistant Attorney General

cc:   Carl C. Danberg
      Attorney General

      Stanley W. Taylor, Jr.
      Department of Correction Commissioner

      Thomas L. Carroll, Warden
      Delaware Correctional Center

- 20 -

Raphael Williams, Warden
Howard R. Young Correctional Institution

Rick Kearney, Warden
Sussex Correctional Institution

Robert Young, Acting Warden
John L. Webb Correctional Facility

Patrick Ryan, Warden
Delores J. Baylor Women's Correctional Institution

Colm Connelly
United States Attorney
District of Delaware

Michael R. Bromwich, Esq.
Beth C. McClain, Esq.
Fried, Frank, Harris, Shriver & Jacobson LLP