

FILED

SEP 10 2007

U.S. DISTRICT COURT
DISTRICT OF DELAWARE

IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE

DAVID W. WILLIAMSON, )
)
v. ) C.A. 06-379-SLR
CORRECTIONAL MEDICAL SERVICES, Inc, et al, )
Defendants. )

## MEMORANDUM FOR THE APPOINTMENT OF COUNSEL

Statement of the Case:

This is a civil rights case filed under 42 U.S.C. sections 1983 and 1997, by a state prisoner and he asserts

claims that defendants committed several distinct acts of deliberate indifference to Williamson's objectively known

serious medical needs in violation of his constitutional rights: specifically the Eighth and Fourteenth Amendment's

ban on cruel and unusual punishment clause; deliberate retaliation against Williamson for his exercise of his

protected rights in violation of the Fifth and Fourteenth Amendment's due process clause; and violations of the First

Amendment's freedom of speech clause. Williamson seeks damages as to all his claims, declaratory judgment, and

injunctive relief for the needed medical care he requires.

Statement of Facts:

As stated in the complaint, Williamson suffers from several serious medical diseases/conditions that require

adequate and consistent or immediate medical care:

I. Thyroid disease, of which will not heal on its own and requires uninterrupted Chronic-care medications
   (CC Meds) (See D.I. 15 at 14-97);
II. Ruptured Anterior Cruciate Ligament (ACL), of which will not heal on its own and requires reconstructive
    surgery, physical therapy, and a special ACL knee brace, (Id at 98-136);
III. Periodontal disease, of which requires immediate teeth scrapings for active perio-infections; requires
     continuing/consistent anti-perio dental care (e.g. semi-annual scrapings); and requires replacement teeth for
     the four permanently lost teeth (i.e. dentures) (Id at 137-154, and 189-206); and
IV. Substandard temporary composite repair to broken tooth, of which requires a crown and root canal (Id at
    155-188). (D.I. 15 is incorporated herein).

I. Thyroid disease: Diagnosed by a doctor as a chronic disease and it will never heal. Williamson's hypothyroidism

progressively worsens over time and requires periodic lab work to determine when the CC Meds dosage must be

increased in order to manage his chronic symptoms. Moreover, these CC Meds are of the type that must be taken

uninterrupted (i.e. daily and about the same hour) for them to be effective in managing the disease's common

chronic symptoms. Williamson experiences the following common chronic symptoms as a direct result of the

ongoing and pervasive CC Meds interruptions (CCMI):

A. Chronic fatigue (physical and mental);
B. Dangerous cholesterol production;
C. Dangerous and painful inflammation (e.g. in blood stream, face, extremities, etc.);
D. Disfigurement from Alopecia (i.e. unnatural hair loss about head, face, and body);
E. Impairment of normal daily functions.

These chronic symptoms could be managed if CMS corrected the CCMI(s), but CMS refuses to do so despite the obvious need to correct a pervasive and ongoing problem of which causes Williamson to needlessly suffer. Consequently, CMS has established a clear pattern of intentionally denying (i.e interfering with) Williamson's prescribed CC Meds.

For example, CMS has caused Williamson to needlessly experience eleven avoidable CCMI(s) between July 2005 and November 2006. (See Ex-I-A Aff'd of Medication Distribution Log). They were avoidable because the medication distribution system for "Self Meds" is designed to avoid CCMI(s) providing that it is actually followed; however, CMS refuses to do so.

Williamson has received CC Meds for some four years and they are designated "Self Meds," which means that he is supposed to be provided CC Med Cards (e.g. 30 doses blister pack card of thyroid and another card for the multivitamins) about every twenty-five days. A chronic-care med cycle normally consists of a Refill order for four CC Meds cards on about every ninety days (termed a Clinic) and is to continue automatically. Indeed, the Clinics are supposed to be automatically scheduled about every ninety days to ensure no lapse occurs between Clinics/med cycles. Thus, if CMS wanted to actually correct these pervasive and ongoing incidence of CCMI(s), then all that needs to be done, is to actually employ the med distribution system consistently. CMS has, however, refused to do so despite an obvious need to and despite several promises to correct the CCMI(s). Consequently, Williamson needlessly experiences a resurgence of chronic symptoms each and every time CMS causes him a CCMI. CMS is aware of Williamson's objectively serious medical needs/condition by virtue of Williamson's diagnosis with a chronic disease and by Williamson's repeated notice of impairment of his normal daily functions, etc.

Moreover, though the duration and severity of Williamson's chronic symptoms correlate with the duration of the CCMI, several of the chronic symptoms have caused residual/aggregate adverse effects. These residual/aggregate effects do not altogether dissipate after the CC Meds are resumed, but rather they have continued to build up and cause a marked deterioration of Williamson's general health and well being: deterioration of cardiovascular system and acute loss of muscle mass, while increasing dangerous fat content and cholesterol; and disfigurement among other listed effects in the claim.

Indeed, due to (a) Williamson's acute anxiety associated with the anticipation of being exposed to a likely CCMI (e.g. historical likelihood greater than 80%), and (b) Williamson experiencing the acute adverse effects that these resulting chronic symptoms have upon his mind, body, and emotional well being, Williamson also suffers the following:

    A.  Anxiety,
    B.  Depression,
    C.  Mental and Emotional Distress,
    D.  Humiliation, and
    E.  Damaged reputation or professional and social standing.

For example, Williamson's anxiety is causing dangerous spikes in his blood pressure and all its associated suffering that comes with hypertension. (e.g. frequent debilitating headaches). This physical effect was absolutely foreign to Williamson prior to CMS exposing him to these pervasive/ongoing CCMI(s). Also, Williamson's anxiety and depression precludes him from realizing any meaningful sleep (e.g. average three to four hours a night), and it aggravates his chronic fatigue. Moreover, the depression and humiliation has had a profound adverse effect on Williamson's personality and habits. Indeed, Williamson has mutated from his once energetic and full of life demeanor, and his once responsible and caring extrovert personality; to a withdrawn, lifeless introvert. Williamson, for example, has been forced to limit or even discontinue his long held and important social and civic activates, and or healthy relationships:

A. 50 % reduction in his regularly held attendance at Catholic Mass Services;
B. 50 % reduction in his volunteer work with Saint Vincent DePaul Society (active member 2001-present);
C. 80 % reduction in assisting his peers in need with law work, etc;
D. 50 % reduction in maintaining healthy relationships via letter writing, etc;
E. Withdrew as Lead Trainer with Alternatives to Violence Project (AVP) (Trainer for nearly ten years);
F. Withdrew name from the limited consideration of coveted HVAC vo-tech class;
G. Unable to attend all of his family's scheduled visits, though, he considers this most important;
H. Generally become withdrawn and unable to nurture healthy social relationships; and
I. Withdrew from a Spanish (second language) class he had eagerly joined.

Consequently, Williamson had to finally admit defeat -in his attempt to single handedly manage all these chronic symptoms and their residual effects, and he has had to seek psychiatric counseling. Williamson had already suffered humiliation due to his bizarre disfigurement –teased, mocked, and become the brunt of malicious jibes, etc (e.g. called psycho-killer, ghost, chemo-patient, and powder), however, having to seek psychiatric help has aggravated Williamson's damaged social and professional reputation within the community.

II. Ruptured Anterior Cruciate Ligament (ACL):

Williamson's ACL knee injury was diagnosed in June 2006 by doctors Durst and DuShuttle as a permanent injury, "will not heal on its own and left untreated will only further deteriorate the knee." (i.e. poses a substantial and likely known risk of further future permanent injury).

Indeed, the initial acute injury occurred in July 2004, and because it was deliberately untreated/under treated, it progressed until the ACL completely ruptured. For example, Williamson's residual damage never healed (e.g. acute instability, grinding, shifting, and hyper-extension of his knee), only got worse and exposed Williamson to dangerous falls and or collapsing incidents, because the injured knee/leg would frequently buckle-out at an unnatural angle, etc. This progressive damage has caused further damage to Williamson's meniscus discs and causes contusions to the bone (i.e. water on the knee), and it exposes Williamson to a likely substantial risk of permanent disability as he may lose complete control of his knee.

The obscene pattern of deliberate indifference/gross reckless disregard for this obvious serious condition began with FCM's blatant refusal to acknowledge the clear and obvious "classis symptoms" or Williamson's non-healing acute residual injuries. FCM's indifference, etc, was also solidified by its refusal to perform the medical industry standard knee exams; by its false promises --made in response to Williamson's medical grievance- which did also result in manipulation of the grievance process; and by its countermand of the doctor's ordered MRI, of which countermand was in conflict with legitimate medical factors. All FCM's acts required a conscious decision and it suggests a deliberate/subjective denial of needed medical care. Indeed, any layman could infer the need for medical care.

Subsequently, FCM's contract was cancelled and CMS has since spent the last year employing some of the same tactics to avoid having to provide Williamson the medical care known to be needed. Specifically, despite Williamson receiving several promises from CMS --in response to subsequent MG(s) - for corrective/follow up action; CMS has nevertheless stalled and or avoided doing so. There is no legitimate medical reason for this behavior, and CMS's promises appear to have been made in bad faith. Nevertheless, the inordinate delays and refusals to treat causes Williamson to experience further deterioration of the knee and poses a significant risk of fall related incidents. Also, the obvious impairment of Williamson's normal daily functions aggravates the overall deterioration of his general health and well being as it also precludes any meaningful exercise, etc. Any layman can infer the obvious need to treat one who is nearly disabled. [Note that Williamson is a Certified Tae-kwon-do Martial Arts Instructor with a second degree black belt and he has spent some two decades zealously staying in shape and perfecting his trade --his love.] That has been taken away form Williamson these past two years and it threatens to be an irreversible condition absent timely and adequate medical care.

III. Periodontal disease:

Williamson suffers form chronic periodontal disease that also will not heal on its own and requires timely (emergency) and adequate dental care. Williamson was first diagnosed with periodontal disease in late 1998 under Prison Health Services (PHS) watch. (See Williamson v. Carr, et al, CA 07-971-SLR, D.I. ___ at pp 3 to 4). Dental industry standards for the minimum adequate care require the following:

A. Immediate teeth cleaning/scraping (teeth cleaning), anti-bacterial mouth wash, anti-biotics, and pain meds;
B. Immediate root canal for acute infections or quickly recurring infections; and
C. Semi-annual teeth cleanings to combat recurring incidence of infections and prevent permanent injury.

PHS's contract expired and CMS took over, but CMS employed nearly identical deliberate indifference/gross reckless disregard for Williamson's known serious condition and CMS also refused to treat subsequent recurring perio-infections – understandably the result was also nearly identical (e.g. lost of two more teeth in March 2005). This also resulted in Williamson experiencing unnecessary pain and suffering during the interim, and it impaired his normal daily functions (e.g. inability to eat, sleep, and exercise of socialize).

ʯ

Moreover, even after the additional loss of two teeth (total four at present), CMS still refused to treat subsequent active perio-infections, and refused to clean Williamson's teeth for some eighteen months later. When CMS did provide the needed but acutely belated teeth cleaning, it was grossly substandard. For example, Zimbull affected a teeth cleaning that lasted no more than four or five minutes. He did not engage in the standard teeth cleaning techniques that Williamson is familiar with and expected after waiting eighteen months; expected and or was certainly needed after experiencing no less than two prior perio-infections. Nevertheless, Zimbull intentionally conducted a less efficacious teeth cleaning that did not include or reflect any known dental standard. When Williamson questioned Zimbull, he stated: "There are a lot of [people] to be seen here...." Thus he admitted that the substandard care was because he had such a heavy patient load, and therefore his decision did not include Williamson's medical factors. Moreover, eighteen months is three times the recommended time for regular teeth cleanings for individuals who have trouble free teeth, but CMS not only deviated from the standard normal semi-annual teeth cleanings, it also disregarded Williamson's objective serious medical condition (i.e. active perio-infections, etc.) and refused to provide needed emergency dental care. Not surprisingly, about a month after Zimbull's substandard teeth cleaning, Williamson suffered another perio-infection on 1/08/06, and even then Zimbull refused to provide any further follow up treatment. Thus the cycle of abuse starts anew. Meanwhile, the damage builds with each and every untreated/under treated perio-infection and at some point a line is crossed in which the permanent injury occurs and no treatment will save the damaged teeth. (i.e. Williamson faces a substantial and likely risk of future permanent injury and pain and suffering.) Williamson faces this substantial and known risk, and there is absolutely no legitimate medical concern to deny him the minimal standard of needed dental care.

IV. Substandard Temporary Composite repair to Broken Tooth:

On 2/24/06 CMS provide Williamson with an admittedly substandard temporary composite repair (temp repair) for a tooth that had sheared in half leaving an acutely painful exposed raw nerve. Williamson had needlessly endured acute pain and suffering since the emergency dental episode on 1/08/06, and had met Dr. Zimbull on three occasions during the interim, but Zimbull refused to provide any treatment or pain meds whatsoever. (e.g. 1/11/06, 2/14/06, & 2/21/06). Zimbull did, however, admit that the needed treatment consisted of a crown, but refused it based on a non medical blanket prohibition set by CMS (e.g. budgetary constraints, etc). On all three visits, Williamson explained to Zimbull the acute pain and suffering he endured, and his inability to eat solid food because three of his grinding teeth had been extracted on the right side and the broken tooth was on the opposite side, which obviously impaires Williamson's ability to chew on either side of his mouth. Zimbull, however, still refused to provide the admittedly needed care or even pain meds.

Indeed, over forty days elapsed before Williamson received any treatment whatsoever. When Williamson did receive any, it was admittedly substandard. Dr. Bishop, for example, also acknowledged a crown was the needed

treatment and added that a root canal was also required, but he too refused to provide said care. Instead Bishop performed the admittedly substandard temp repair procedure to accommodate CMS's custom/policy. He also admitted the temp repair would not last the duration of Williamson's incarceration. Thus, Williamson can expect a repeat acutely painful dental episode when the temp repair fails; CMS is aware of this, and the cycle will likely begin anew (e.g. Another painful dental episode with another forty days of refusals and pain and suffering despite being seen by CMS's dentist three times).

VI. Retaliation Against Williamson in Direct Response to His Exercise of Protected Right to Seek Redress:

Also, certain defendants (CMS current employees), engaged in blatant retaliation against Williamson in direct response to Williamson's efforts to seek redress through the grievance process (e.g. grieved CMS's custom/policy of deliberate denial of Williamson's CC Meds, and or by refusing to correct the ongoing and pervasive pattern of CCMI(s)). (See D.I. 15 at 62-80, incorporated herein). Specifically, defendant Ihuoma arbitrarily and capriciously refused to provide Williamson his needed Chronic-care Clinic (Clinic), which was required to Refill his CC Meds order and to avoid yet another unnecessary CCMI. Ihuoma denied the clinic despite the substantial likelihood that it would create another unnecessary CCMI –something that Williamson had already grieved and something that CMS promised to correct. Consequently, Williamson grieved Ihuoma's denial of his Clinic, and shortly thereafter Williamson was rescheduled for another Clinic, but was again denied it –this time however, it appears that Ihuoma had a nurse tell both Williamson and the correctional officer present that there was nobody there to conduct the Clinic for Williamson on that day.

However, this was a bald faced fabrication because Williamson witnessed Ihuoma and her supervisor, D. Plante, "there." Consequently, Williamson filed an addendum to MG 21201 and added this clear retaliation, but the MG was improperly rejected. Williamson experienced his fifth consecutive and longest CCMI (12/07/05 to 1/04/06) as a direct result of Ihuoma's repeated denials to conduct Williamson's needed Clinic.

Said MG was belatedly re-opened by Deputy Warden Pierce due to the improper rejection in violation of Inmate Grievance Procedure 4.4 (IGP), but nearly a year had passed. (See Ex II-A Pierce re-opens MG #21201) and (See Ex II-B Final Appeal package of # 21201, 12/27/06).

However, during the interim, CMS continued to deny Williamson his prescribed CC Meds, and despite the obvious need to correct said CCMI(s), and despite the obvious need to correct the repeat acts of retaliation, CMS permitted the retaliation to exacerbate.

Indeed, CMS was aware of and acquiesced in Ihuoma's blatant retaliation regarding MG #21201, which caused the fifth consecutive and longest CCMI to date, and the act did violate CMS's prior promises to correct the CCMI(s) (e.g. made for MG #15453). Moreover, when Williamson filed subsequent grievances (e.g. 59170 & 72883), which sought redress for the continuing denied Clinics, CCMI(s); and retaliation. CMS retaliated by

fabricating Williamson's medical records to cover CMS's malfeasance regarding the denied Clinics. This act was in direct response to Williamson's grievance activity. (See Ex II-C Final Appeal package MG 59170 at pp 1-8 incorporated herein) and (See Ex II-D Grievance package #72883 at pp 1-8 also incorporated herein). Accordingly, the fabricated medical records was definitively proven as a false entry by Williamson's work attendance record (Id at 8) –because he could not have attended any Clinic while he was present at work all day- and also because the faked Clinic had to eventually be rescheduled and actually conducted in order to Refill Williamson's CC Meds. Something CMS forgot to do in its haste to fabricate said medical record. (See Ex II-E Aff't 10/25/06 at items 2-7; incorporated herein).

Finally, instead of correcting the ongoing CCMI(s) and acts of retaliation, which are both obvious violations of Williamson's rights and of which mandate immediate corrective action, CMS busied itself with circling the wagons and attempting to stall with still more bad faith offers. For example, CMS offered to permit Williamson to access his medical records by written appointment in response to one of the grievances and Williamson complied with CMS's directions; however, CMS then refused to give Williamson the promised access and even refused to reply to Williamson's written request.

### I. Argument

THE COURT SHOULD APPOINT COUNSEL FOR THE PLAINTIFF.

### II. Standard of Review

Granted, a plaintiff has no constitutional or statutory right to the appointment of counsel in a civil case. See Parham v. Johnson, 126 F.3d 454, 456-57 (3d Cir. 1997); Tabron v. Grace, 6 F.3d 147, 153-54 (3d Cir. 1993). However, under certain circumstances, the court may in its discretion appoint an attorney to represent an indigent civil litigant. See 28 U.S.C. section 1915(e)(1). In deciding whether to appoint counsel for an indigent pro se plaintiff, the third Circuit articulated the standard for evaluation as follows:

1. Whether the claim has some arguable merit in fact and law. Parham, supra, at 457 (citing Tabron, 6 F.3d at 157);

2. Whether the plaintiff has the ability to present his own case;

3. Whether the legal issues are too complex for a pro se plaintiff;

4. Whether the testimony of an expert witness will be necessary;

5. Whether extensive factual investigation is necessary to effectively litigate the case and plaintiff's ability to pursue such an investigation;

6. Whether and to what degree the case will turn on credibility;

7. Whether plaintiff can attain and afford counsel on his own behalf. See Parham, supra, at 457-58 (citing Tabron, 6 F.3d at 155-56, and 157 n. 5).

This list is illustrative and not exhaustive. Id at 458. Accordingly, Williamson has additional factors that warrant the Court's consideration:

      8.   Whether settlement negotiations are viable and likely to resolve the litigation and whether plaintiff requires counsel's assistance to realize meaningful settlement negotiations; and

      9.   Whether IFP plaintiff faces prejudice for failure to prosecute due to an inability to realize service of process on all named defendants.

### III. Application of the Case Facts to the Parham Factors

1. Williamson's complaint contains factual and legal merit: His allegations, if proved, would clearly establish a constitutional violation.

First, for a plaintiff to state a violation of the Eighth Amendment's right to adequate health care, plaintiff "must allege acts or omissions sufficiently harmful to evince deliberate indifference to serious medical needs." See Estelle v. Gamble, 429 U.S. 97, 106 (1976); accord White v. Napoleon, 897 F.2d 103, 109 (3d Cir. 1990). A plaintiff must demonstrate: (1) that he/she had an objectively serious medical need, and (2) that defendants were aware of this need (i.e. subjective knowledge), but were deliberately indifferent to it. See West v. Keve, 571 F.2d 158, 161 (3d Cir. 1978); Also, Boring v. Kozakiewicz, 833 F.2d 468, 473 (3d Cir. 1987).

As to the first prong –objectively serious medical need- Williamson has pleaded facts that sufficiently establish several objective serious medical needs.

For example, see the following:

A.   As pleaded, Williamson's thyroid disease is a serious/chronic condition, of which a doctor mandated continuous Chronic-care Meds (CC Meds), and absent these needed/prescribed CC Meds, Williamson is exposed to undue suffering and a likely and substantial risk of future harm/ residual injury; and impairs his normal daily functions;

B.   As pleaded, Williamson's ruptured ACL is a serious/permanent injury, of which two doctors agreed that reconstructive surgery, physical therapy, and a special ACL knee brace was needed, and absent treatment, Williamson is exposed to undue suffering and a likely and substantial risk of future harm/ residual injury; and impairs his normal daily functions;

C.   As pleaded, Williamson's periodontal disease is a serious/chronic condition, of which doctors have diagnosed, and which has already caused permanent injuries. Thus denial of needed treatment causes Williamson to be exposed to undue suffering and a likely and substantial risk of future harm/ residual injury; and impairs his normal daily functions; and

D.    As pleaded, Williamson's broken tooth is a serious medical condition –as it is obvious a broken tooth is a permanent injury and an exposed raw nerve is acutely painful- and two dentists admitted the needed treatment was a crown, etc. However, both doctors admitted that the temporary composite repair was substandard, would not last, and that a crown was required, but that they would not provide it due to CMS's blanket policy/custom prohibitt0ng crowns. The substandard repair exposes Williamson to a repeat painful dental episode; undue suffering and a likely and substantial risk of future harm/ residual injury; and the impairment of his normal daily functions.

Indeed, all four Williamson's diseases/conditions are objectively serious; thus mandate the minimally adequate medical care. See Farmer v. Brennan, 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed. 2d 811 (1994). Moreover, Williamson alleged that his acute chronic symptoms and real residual injuries/effects from his thyroid and periodontal diseases, and his permanently ruptured ACL; and his painful broken tooth that was denied any treatment whatsoever for over forty days, were and are so obviously serious that even a lay person could infer the need for adequate medical care. See Foelker v. Outagamie County, 394 F.3d 510-512 & 513 (7th Cir. 2005). Also, Williamson pleaded that all four had been diagnosed by a doctor as requiring medical care –thus are also considered objectively serious medical needs under this alternate legal theory. See Estelle, supra, 429 U.S. at 105. Additionally, Williamson pleaded that he faces a likely and substantial risk of both current and future tangible physical permanent injury due to the nature of his several serious medical diseases/conditions. See Valentine v. Beyer, 850 F.2d 951, 955 (3d Cir 1988).

As to the second prong: that defendants were subjectively aware of Williamson's needs, but that they were deliberately indifferent to them and or that they disregarded them with gross recklessness. Williamson's complaint equally satisfies this prong also. For example, Williamson establishes facts that defendants intentionally and or with gross reckless disregard committed -but not limited to- the following acts:

A.    Intentionally interfered with medical treatment that had been prescribed by a doctor, such as by creating the avoidable CCMI(s); by providing the substandard knee brace and or by refusing to provide the ACL reconstructive surgery; (Jackson v. F.C.M.S., 380 F.Supp 387 (D. Del 2005); Spruill v. Gillis, 372 F.3d 218, 236 (2004); and Estelle, supra);

B.    By creating a continuous pattern of CCMI(s) and or by refusing to correct said CCMI(s) despite the obvious need to do so. Jackson, supra.

C.    By employing policies that fail to meet the immediate/emergency and obvious needs of Williamson, such as during an active perio-infection, broken tooth episode, or acute hyper-extension of ACL, etc, See Natale v. Camden County Corr' Facility, 318 F.3d 575, 583 (3d Cir 2003); See also Martin v. Tyson, 845 F.2d 1451, 1457 (7th Cir. 1988) (lengthy delay in providing dental care or one that results in serious

pain or permanent damage violates constitution). And <u>Ramos v. Lamm,</u> 639 F.2d 559, 576 (10 th Cir. 1980) (inordinate delay causing "infections and abscesses leading to continued and unnecessary loss of teeth" states cause of action).

D.  By denying needed/prescribed medications that resulted in undue pain or suffering or in residual injury, such as those caused by Williamson's untreated/under treated thyroid condition, and or his untreated/under treated perio-infections; See <u>Monmouth County Corr. Inst. Inmates v. Fauver,</u> 479 F. Supp 326, 347 (3d Cir 1987); <u>Pace v. Fauver,</u> 479 F. Supp. 456, 458 (D. N.J. 1979);

E.  By denying treatment that results in permanent injury, such as untreated/under treated perio-infections, ruptured ACL, thyroid condition, and broken tooth; See <u>White v. Napoleon,</u> 897 F.2d 103, 111 (3d Cir 1990); <u>Estelle, supra, Spruill; supra,; Monmouth County, supra;</u> and <u>Martin, supra;</u>

F.  By intentionally employing less efficacious treatments, however, for non-medical factors, such as budgetary restrictions and or a custom/policy of cost-avoidance, which was admitted regarding the temp repair to Williamson's tooth, and may also be inferred by CMS's conduct regarding the ACL knee brace and CMS's refusal to conduct teeth cleanings or correct the pervasive CCMI(s). All of which exposed Williamson to undue pain and suffering and or permanent injury. <u>West v. Keve,</u> 571 F.2d 158 (3d Cir 1978); <u>Williams v. Vincent,</u> 508 F.2d 541 (2d Cir 1974); <u>Tillery v. Owens,</u> 719 F.Supp 1256, 1287 (W.D. PA 1989) Affirmed 907 F.2d 418 (3d Cir 1990); and <u>Durma v. O'Carroll,</u> 991 F.2d 64, 68-69 (3d Cir 1993); See also <u>Fields v. Gander,</u> 734 F.2d 1313, 1315 (8th Cir. 1984) (three-week delay accompanied by swelling and pain states a cause of action).

G.  By intentionally employing a custom/policy of blanket denials of certain needed treatments for non-medical factors, such as refusal to provide emergency/routine teeth cleanings, refusing to provide crowns, refusing to provide root canals, and refusing to provide and or creating an inordinate delay in providing reconstructive surgery despite the obvious need to do so. (<u>West, supra, Tillery, supra</u> at 1287); and

H.  By intentionally attempting to inflict harm upon Williamson and or by doing so through gross reckless disregard to obvious painful/suffering conditions, which CMS was placed on repeated and adequate notice, and is evinced -in the complaint- by CMS's various acts of malicious, hostile, sadistic, and or retaliatory behavior towards Williamson. (<u>Spruill, supra</u> at 231).

Consequently, Williamson has properly alleged and properly supported with facts the essential elements of an Eighth Amendment claim for deliberate indifference against defendants: therefore, Williamson's claim has merit in both fact and law and he has satisfied the threshold question of Parham. It is appropriate for the Court to consider the remaining Parham factors.

2. Williamson's ability to present his case is greatly impaired by his medical conditions, and it is further impeded by a gross lack of meaningful access to the Law Library.

First, it is admitted that Williamson is fairly articulate, has a fair idea of the deliberate indifference standard, and he has a fair idea of how to assemble a motion, etc. However, being fairly articulate and knowledgeable does not necessarily equate to having a sufficient ability to present his own case without facing prejudice due to other compelling impairments.

For example, Williamson's thyroid disease causes him to suffer the following chronic symptoms:

a) Acute chronic fatigue, which impairs his physical and mental facilities (e.g. low energy & difficulty with concentration and focus);

b) Acute mental and emotional distress; and

c) Acute depression and anxiety, etc. (See Affidavit in support of appointment of counsel (Aff't) above at 4); Also (Statement of Facts (Facts) at I. Thyroid disease).

Consequently, Williamson's chronic-fatigue has adversely effected his work and academic performance. The former earned Williamson his first ever Counseling Report and poor Worker's Evaluation due to an abrupt increase in clerical errors. (See Ex-III A-1 Counselor's Report 7/25/05 and Ex-III A-2 Evaluation 12/06/05). The latter nearly resulted in Williamson failing to earn his college degree and breach his contract with the college. (See Ex-III A-3 Notice "beyond ...allotted time..." 7/11/06 and III-Ex A-4 Williamson's Request for an Extension 8/03/06). These embarrassing incidents were a shock to Williamson because he had always enjoyed a reputation for being sharp and considered as having an above average intelligence and drive. These incidents were a blow to Williamson's professional and social reputation, and they were a blow to Williamson's self image. Indeed, the resurgence of symptoms and theresulting mental and emotional distress, depression, anxiety, and fatigue, etc, all conspire to aggravate Williamson's chronic-fatigue and or they impair his ability to present his case (i.e. suppresses motivation, desire, and causes him difficulty with concentration and organization of thoughts...). For example, Williamson's depression and anxiety are so severe that it is common for him to feel absolutely overwhelmed as he approaches any task –let alone the challenging tasks associated with this complex/extensive case. Indeed, Williamson was paralyzed with inaction from depression and anxiety for some three-four days when it came time to tackle his TRO/PI, which is a motion Williamson places the greatest importance on. Moreover, once Williamson overcame his paralization, he spent no less than five hours a day for twelve days to wrestle with an inability to concentrate/organize his thoughts enough to draft the TRO/PI in a timely manner. Several drafts and some sixty hours later, said motion was complete (does not include the initial three-four days of utter paralyzation). Meanwhile, for this near three week period, Williamson was rendered physically, mentally, and emotionally bankrupt and was virtually unable to be of any use in any other aspect of his life.

Additionally, the initial TRO/PI filing –like most initial filings- is not subject to time/pressure constraints, but is basically filed at the litigant's leisure. Williamson, however, simply cannot sustain the physical and mental demand of prosecuting his meritorious case while experiencing these medical impairments –impairments that the defendants have themselves caused by creating an ongoing and pervasive denial of Williamson's Chronic-care medications and by causing him needless pain and suffering, etc. Accordingly, if the Court denies Williamson's request for appointment of counsel,

then defendants will capitalize and gain an unfair advantage due to a situation that they created with dirty hands. It is appropriate to level the playing field and appoint counsel.

In addition, Williamson's ability to prosecute his case is impaired by woefully insufficient access to the Compound's Law Library. For example, inmate workers/programmers only have access to the Law Library on, at best, two sessions per week (scheduled 7:00pm to 8:40 pm) however, in reality it works out to, at best, 1 ½ hours per session for a total of three hours a week. Even then it is not uncommon to be bumped from one of the sessions due to space shortages. Thus, Williamson can hope to receive no more than a total three hours per week of access to legal materials.    (See Ex-III B-1 Insufficient Law Library Access Complaint Letter 10/18/06). Absent this three hours maximum access to legal research materials, etc. Williamson is limited to his personal legal materials (e.g. a Black's Legal Dictionary). DCC prison does not provide any mail ordering system or photocopies of legal materials/cases/ rules etc. for compound inmates (Williamson is both a worker and compound resident). Thus if one needs to brief a court case, he must spend his limited and valuable 1 ½ hours of Law Library time –per session- taking long hand notes. No member of the bar could be expected to prosecute a complicated civil case with a mere three hours a week access to legal materials -except for a Black's Dictionary- and what little personal materials he may have in his one cardboard box (e.g. past court orders, etc.). Williamson, however, is not a member of the bar but a pro se litigant, and he certainly cannot be expected to do more than a member of the bar could do. Indeed, Williamson should not be forced to experience likely prejudice in his case before action is taken. He does not wish to experience unnecessary litigation (e.g. appeals, etc), and he is not interested in filing additional claims against the Department of Corrections for any denial of access to the courts that will likely arise when Williamson experiences prejudice as a result of being impeded from prosecuting his meritorious case. Williamson only wishes for a level playing field.

Moreover, if opposing counsel is so confident that three hours a week of access to legal materials is sufficient, including computer and type writer access and delayed photocopies, then Williamson expects that opposing counsel will stipulate to adhere to the same conditions. Otherwise, Williamson expects opposing counsel to agree as to these facts. See also Rayes v. Johnson, 969 F. 2d 700, 703-04 (8th Cir. 1992) (citing lack of ready access to a law library as a factor supporting appointment of counsel).

Even if Williamson did not experience chronic fatigue and mental and emotional distress, he could not hope to present his own case in any meaningful manner under such conditions. Consequently, both sets of conditions greatly impair/impede Williamson's ability to adequately present his own meritorious case.

3. Williamson's case is uncommonly complicated. (See above Aff't at 5 (a)-(g). It is clear after considering these facts that Williamson's case is not factually simple and or a legally straight forward deliberate indifference claim.

Indeed, our Sister Circuit recently held that counsel was warranted for a pro se deliberate indifference claim, though, plaintiff "Greeno" faced less variety and less a complex issue than Williamson has presented here. For example, the Greeno Court disagreed with the lower district court's assessment that Greeno's case was

> [F]actually simple and legally straight forward [,] because [a]s Greeno points out, his
> medical records, letters, health services requests, and inmate complaints span over two
> years. His case is also legally more complicated than a typical failure to treat claim,

> [and] because it requires an assessment of the adequacy of the treatment that Greeno
> did receive, a question that will likely require expert testimony. See Greeno v. Daley,
> 414 F.3d 645, 658 (7ᵗʰ Cir. 2005).

At a minimum, Williamson's case facts are not only substantially similar –but are actually more involved and complex than Greeno's. For instance, like Greeno, Williamson's medical conditions/complaints span over two years, but unlike Greeno's single medical condition (e.g. bleeding ulcer), Williamson's claims involve four serious medical conditions –three of which meet of exceed two years as a continuing violation. Thus, they also involve questions of statute of limitations. Inherently, all involve the voluminous red tape, complaints, and documentation in excess of Greeno's case. In addition, like Greeno, Williamson's claims will likely require an assessment of the adequacy of treatment regarding (1) thyroid meds/interruptions, (2) FCM & CMS's treatment or lack thereof of Williamson's ruptured ACL injury, (3) the periodontal treatment rendered, and (4) the temp composite repair of his broken tooth. Indeed, Williamson claims that both FCM and CMS intentionally provided him less efficacious medical care and such claims require an assessment of the adequacy of said care –questions that will require expert testimony.

Additionally, Williamson claims that two defendant corporations engaged in a custom/policy to deny him care and or a pattern of gross reckless disregard or denial that equated to deliberate indifference. Courts have held that the " 'difficult and subtle question' of state of mind required for deliberate indifference is too complex for pro se plaintiff[s] to understand and present to a jury." Id at 658 (citing Swofford v. Mondrell, 969 F. 2d 547, 552 (7ᵗʰ Cir. 1992).

This can only become more complicated when it involves –as here- two defendant corporations.

Consequently, Williamson's case is uncommonly complicated and counsel is required to sort and present the multiple complex issues and personal involvement.

4. Williamson's case requires the testimony of a medical expert. Plaintiff incorporates Ex-III C-1 "…motion for expert witness" at items 4-11).

5. Williamson's case requires extensive discovery and though he has already attempted t secure his medical records, etc, he has been rebuffed by CMS and lied to by CMS regarding same. (See Ex-III D-1 CMS Medical Records request 5/10/06, and Ex-II D | ·8  above #72883 Grievance Package.) Also, please see above Aff't at items 7 (a) –(c). In addition, discovery is required to determine the identity of Jane Doe defendant and or to identify multiple witnesses –both current and past employees of corporate defendants; secure medical records, and cross-check with multiple sources because CMS has intentionally introduced fabricated medical entries into Williamson's medical file; and, research corporate contracts, responsibility, holdings, past/current consent decrees of other similar litigation and grievances; and or subpoena and depose corporate policy decision makers.

Consequently, Williamson's several claims, several individual defendants, and several corporate defendants will require extensive discovery –and not merely written because Williamson does not intend to forego arguably the most valued discovery device available to a litigant: verbal/taped depositions –especially for cooperating past-employee defendants. See Tucker v. Dickey, 613 F. Supp 1124, 1133-34 (W.D. Wis 1985).

13

6. Williamson's facts will be strongly disputed and credibility will be a "key" issue in this case. (See above Aff't at item 8; and item VI above "Retaliation… "with exhibits for an example of CMS's conflicting and strongly opposing position. Moreover, deliberate indifference involves a defendant's subjective state of mind and this inherently thrusts their credibility into a contest with Williamson's claims.

Credibility issues support appointment of counsel. Gatson v. Coughlin, 679 F. Supp. 270, 273 (W.D.N.Y. 1988).

7. Williamson is unable to afford counsel, though he has unsuccessfully attempted to solicit counsel on nine occasions. (See Ex-III E-1-7 ). For example, Williamson wrote the following law firms, but was unsuccessful at gaining their services:

(i) Brandt & Dalton 12/01/06; Outcome: Returned to sender;
(ii) Hudson Bruce L. Esq. 12/01/06; Outcome: NO reply;
(iii) Benson Joseph W. Esq. 12/01/06; Outcome:Rejected;
(iv) Bifferato Bifferato & Gentilotti 12/01/06; Outcome:No reply;
(v) Ramunno Lee 12/01/06; Outcome: Rejected;
(vi) Connoly Bove Lodge & Hutz May 06; Outcome: No reply;
(vii) Marshall, Dennehey, Warner, Coleman & Goggin 12/31/06 Outcome: No reply;
(viii) Hampton Stephen A. May 06; Outcome: rejected; and
(ix) Neuberger Thomas S. Esq. May 06; Outcome: NO reply.

Naturally, Williamson is indigent as demonstrated by his in forma pauperis motion.

8. Williamson requires counsel to effect meaningful, good faith settlement negotiations with multiple past employee defendants: D. Plante, C. Mahanely, S. Alie, and or M. Robinson. Williamson believes these past employee defendants will cooperate with Williamson by providing him with truthful testimony regarding corporate defendant's custom/policy to deny needed medical care, because Williamson will offer to waive all claims against them in exchange for said cooperation. Williamson is a prisoner and logistics impede his ability to effectively negotiate, contract, and subsequently examine and cross-examine and depose any cooperating defendant witnesses. Counsel is warranted to dispose of these claims and defendants.

9. Williamson requires counsel to assist him realize service of process on several hard to find defendants and to avoid unnecessary prejudice. For example, defendants Plante, Malaney, Robinson, and Alie and a Jane Doe defendant have not been located for Williamson to effect service. Williamson is threatened with prejudice for lack of prosecution if he is unable to serve these defendants. Indeed, Warren Wyant –another pros se litigant- actually experienced this very prejudice when he was unable to locate a hidden defendant: Michelle Robinson (same defendant that Williamson is also looking for). Michelle Robinson eluded service in Wyant's case and he was prejudiced. (Please see Wyant v. CMS, et al, C.A. No. 02-1346-GMS at D.I. 96 Order dismissing Michelle Robinson for failure to effect service).

## CONCLUSSION

For the foregoing reasons, the Court should grant Williamson's motion and appoint counsel in this case.

David Williamson
183022
DCC
1181 Paddock Rd.
Smyrna, DE 19977

_1-17-07_
Date

_14_

# Exhibits

I-A   Aff'd of Medication Log   11/29/06

# I - **EXHIBIT A**

*Medication Distribution Log Via the*

## AFFIDAVIT OF DAVID WILLIAMSON

1. I, David Williamson, am the Affiant listed above and do depose and state the following in support of C.A. 06-379-SLR:

2. CMS caused Affiant to experience eleven needless and avoidable Chronic-care Medication Interruptions (CCMI) between July 2005 and November 2006.

3. These eleven CCMI(s) are summarized below at (e.g. Summary... 8 (a-c)), and detailed (e.g. Details... 9 - 41), but first Affiant must describe the relative terms of the medication distribution system as it pertains to Chronic-care patients (below Background 4 - 7).

4. BACKGROUND: First, Chronic-care patients (CC Patients) receive Chronic-care Clinics (Clinics), which are scheduled automatically about every ninety days, for the purpose of ordering a "Refill" of the next lot of Chronic-care medications (CC Meds). Typically, a Refill order comprises four (thirty dose) blister pack cards (Med Cards) totaling 120 doses if a CC Patient is on "Self Meds." The additional thirty doses are supposed to act as a buffer between the ninety day Clinics to ensure that no medication interruptions occur.

5. Affiant is on Self Meds and receives two Med Cards: one is Levothyroxine (i.e. thyroid medication) and Multivitamins (Mtv) that acts to supplement the thyroid meds and assist in converting food to useful energy.

6. CMS's medication distribution system (Med System) employs a "Fax and Fill" ordering method in which a Clinic's Refill order is placed with the drug distributor and the CMS on-site pharmacy (pharmacy) in turn receives the ordered meds as fast as "twenty-four hours" but no later than "four days." This was verified by CMS representative Mr. Linton at Affiant's Grievance hearing (MG # 15453). Moreover, once the Refill is realized at said Clinic, the pharmacy is to automatically provide the subsequent Med Cards (i.e. second, third, and fourth cards) within the final five doses of any prior card to eliminate CCMI(s). In theory it works, and if followed it works, but in practice it is an utter failure.

7. The pharmacy processes the meds and notifies the CC Patient to retrieve them by listing his name on a Medication Pick-up List (MPL). Typically, the listing continues for five consecutive days, if the CC Patient fails to retrieve his meds- and thereafter is removed from the MPL.

8. SUMMARY OF CCMI(s):

(a). The first lot of CC Meds (i.e. 120 doses ea) were ordered to run form 7/18/05 through 11/15/05, but it was stretched out until 1/06/06 instead due to CMS causing four consecutive CCMI(s):

I. CCMI from 7/15/05 to 7/27/05 (12 days) (pharmacy possessed them since 7/22/05 but withheld them);

II. Consecutive CCMI from 8/27/05 to 9/05/05 (9 days);

III. Consecutive CCMI from 10/04/05 to 10/06/05 (2 days) (pharmacy also failed to post MPL): and

IV. Consecutive CCMI from 11/05/05 to 11/09/05 (4 days) (pharmacy possessed them since 11/05/05 but withheld them);

(b). The second lot of CC Meds (i.e. 120 doses ea) should have been Refilled around 10/18/05 (i.e. within ninety days of the first Clinic date of 7/18/05), but CMS failed to correct the CCMI(s) and belatedly ordered this lot to run from 1/06/06 to 05/05/06:

V. Consecutive CCMI from 12/07/06 to 1/04/06 (28 days) (pharmacy possessed alternative "Stock" supplies but withheld them);

VI. Consecutive CCMI from 02/11/06 to 02/13/06 (2 days) (pharmacy
possessed them on either 02/09 or 02/10/06, but withheld them); and
VII. Consecutive CCMI from 03/13/06 to 03/28/06 (15 days) (pharmacy
possessed them since 03/22/06, but withheld them);

*Note that only three Med Cards were supplied with this lot, thus it is
actually a 90-dose lot with the next lot beginning thereafter.

(c). The third lot of CC Meds (i.e. 120 doses ea) should have been Refilled around
01/18/06 (i.e. within 180 days of the first Clinic date of 7/18/05), but CMS failed to
correct the CCMI(s). Nevertheless, adjusting for the belated second 01/06/06 Clinic
Refill order, this third lot should have been Refilled around 04/06/06, but CMS failed
to correct the CCMI(s) and belatedly ordered this lot to run from 05/05/06 through
09/02/06 and causing still more CCMI(s):
VIII. Consecutive CCMI from 04/27/06 to 05/09/06 (12 days) (pharmacy
also failed to post MPL):
IX. Consecutive CCMI from 06/08/06 to 06/29/06 (22 days) (pharmacy
possessed them since 06/21/06, but withheld them);
X. Consecutive CCMI from 07/30/06 to 08/08/06 (8 days); and
XI. CCMI from 10/05/06 to 10/25/06 (19 days) (pharmacy possessed them
since 10/21/06, but withheld them).

9. DETAILS OF CCMI: On 07/01/05 Affiant was scheduled for a Clinic, but it was
cancelled and CMS caused the first of eleven unnecessary CCMI(s).

10. On 07/18/06 (circa) Dr. Alie placed a Refill order for 120 doses of Affiant's CC Meds
(begin On 07/18/05 through 11/15/05), in lieu of providing said Clinic. This was in response to
complaint Affiant filed on 07/11/05 regarding the cancelled 07/01/05 Clinic, which Affiant
predicted would cause an avoidable CCMI.

11. On 07/15/05 CMS caused a CCMI of twelve days (7/15 to 7/27); however, the
pharmacy actually possessed these lapsed CC Meds on 07/22/05 but refused to dispense them to
Affiant until 07/27/05. (See Ex. AA-1).

12. Based on Alie's 07/18/05 Refill order, Affiant's second set of Med Cards should have
been provided before 08/18/05, but CMS refused to correct the CCMI and did not dispense them
until 09/05/05.

13. For example, on 08/27/05 CMS caused the second consecutive CCMI of nine days
(08/27 to 09/05) and also failed to provide the doctor's ordered Multivitamin (Mtv). (See AA-2).

14. Adjusting for the second CCMI, Affiant's third set of Med Cards should have been
provided before 10/04/05, but CMS still refused to correct the CCMI and did not dispense them
until 10/06/05.

15. For example, on 10/04/05 CMS caused the third consecutive CCMI of two days
(10/04 to 10/06), however, the pharmacy had no intent even then to provided the CC Meds
because it failed to notify Affiant via the MPL and Affiant only received them because he
attended a medical grievance hearing at the hospital on 10/06/05 for the very issue. (See AA-3).

16. Adjusting for the third CCMI, Affiant's fourth and final set of Med Cards should
have been provided before 11/05/05, but CMS still refused to correct the CCMI and did not
dispense them until 11/08 or 11/09/05.

17. For example, on 11/05/05 <u>CMS caused the fourth consecutive CCMI of four days</u> (11/05 to 11/09); however, the pharmacy actually possessed these lapsed CC Meds on 11/05. (See A·4).

18. During the interim, a ninety day Clinic should have been automatically scheduled around 10/18/05 (based on the previous/known 07/18/05 Clinic) in order to Refill the nest 120 dose lot, but CMS still refused to correct the CCMI and did not schedule the Clinic until 11/11/05, and, however, did not conduct a Clinic until 1/04/06.

19. For example, on 11/11/05 affiant was sent to a Clinic forty-five minutes tardy; however, this was due to the hospital failing to post Affiant's name on the "Offender activity Schedule" (not his fault or responsibility), and Nurse practitioner Ihuoma refused to conduct the necessary Clinic and refused to otherwise complete the "Refill" order (as Alie had done on 07/18/05).

20. Affiant filed a medical grievance (second regarding CCMI) on 11/14/05 specifically against Ihuoma for her refusal to conduct the Clinic, and provided the deficient "Offender Activity Schedule," and accurately predicted that it would cause another unnecessary CCMI.

21. On 11/29/05, Affiant was again scheduled with Ihuoma for the belated Clinic but she again refused to conduct it or complete the Refill intentionally causing the fifth Consecutive CCMI.

22. Adjusting for the fourth CCMI of 11/05/05, Affiant should have been provided the first Med Card of the second 120 dose lot before 12/08/05, but CMS still refused to correct the CCMI and did not dispense them until an egregious 01/04/06.

23. For example, on 12/07/05 <u>CMS caused the fifth consecutive CCMI of twenty-eight days</u> (12/05 to 01/05/06) and CMS refused to provide any Mtv. in violation of the doctor's order. Indeed, Affiant only received any CC Meds on 01/04/06 because Dr. Burns –who finally conducted the Clinic and who placed the next lot to run from 1/06/06 to 05/05/06- had produced an alternative supply from the pharmacy's "Stock" supplies, which had been there all along (dated since 03/19/05).

24. For example, on 01/11/06 Affiant received his first Med Card (absent the Mtv) and experienced his fifth unnecessary CCMI (See A·5).

25. Adjusting for the fifth CCMI (based on receiving the 1/11/06 Card), Affiant should have been provided his second set of Med Cards before 02/11/06, but CMS still refused to correct the CCMI and did not dispense them until 02/13/06.

26. For example, on 02/11/06 <u>CMS caused the sixth consecutive CCMI of three days</u> (2/11 to 2/13), however, the pharmacy actually possessed the lapsed CC Meds on either 2/09 or 2/10 but refused to dispense the lapsed CC Meds to Affiant until 2/13/06. (See A·6).

27. Adjusting for the sixth CCMI of 2/11/06, Affiant should have been provided his third set of Med Cards before 3/12/06, but CMS still refused to correct the CCMI and did not dispense them until an egregious 3/28/06.

28. For example, on 3/13/06 <u>CMS caused the seventh consecutive CCMI of fifteen days</u> (3/13/06 to 3/28/03); however, it is asserted that the pharmacy actually possessed the lapsed CC Meds since 03/22/06 but refused to dispense them until 3/28/06. (See A·7) and (                    ).

29. Adjusting for the seventh CCMI of 03/13/06, Affiant should have been provided the fourth set of his CC Meds before 04/27/06, but CMS still refused to correct the CCMI and did not dispense them until 05/09/06. *Note that the fourth set was not actually provided as a third lot of 120 doses began in its place, thus this lot was in fact a ninety dose lot instead of a 120 dose lot.

I - A

30. During the interim the ninety day Clinic should have been provided around 4/06/06 (adjusted for the last known/documented Clinic of 1/06/06 by Dr. Burns) in order to Refill Affiant's CC Meds and avoid another unnecessary CCMI, but CMS still refused to correct the CCMI and did not provide the necessary Clinic until 05/08/06. (Clinic held Refill ordered to run from 05/05/06 to 9/02/06).

31. For example, on 4/27/06 CMS <u>caused the eighth consecutive CCMI of twelve days</u> (4/27/06 to 5/09/06). (See A\8).

32. Adjusting for the eighth CCMI of 4/27/06, Affiant should have been provided his second set of Med Cards before 6/08/06, but CMS still refused to correct the CCMI and did not dispense them until 6/26/06.

33. For example, on 6/08/06 CMS caused the ninth consecutive CCMI of an egregious twenty-two days (6/08/06 to 6/29/06), and even then the pharmacy did not intend to provide them because it refused to list Affiant on the MPL. Affiant was called in at 7:30 pm due to the Deputy Warden's intervention. (See A\9).

34. Again the pharmacy actually possessed the lapsed CC Meds earlier on 6/21/06, but refused to dispense them to Affiant until 6/29/06. (See Altman's 7/19/06 Letter at II-6-1    ).

35. Adjusted for the ninth CCMI or 6/08/06, Affiant should have been provided his third set of Med Cards before 7/29/06, but CMS still refused to correct the CCMI and did not dispense them until 8/08/06.

36. For example, on 7/30/06 <u>CMS caused the tenth consecutive CCMI of eight days</u> (7/30/06 to 8/08/06). (See A\10).

37. Adjusted for the tenth CCMI the fourth set of Med Cards was due before 9/07/06, and for the first time since July 05, Affiant received this set in a timely manner. Accordingly, the first set of the nest 120 dose lot should have been provided before 10/07/06, but CMS still reverted back to its custom/policy of creating unnecessary CCMI and did not dispense them until an egregious 10/24/06.

38. But first, during the interim, a ninety day Clinic should have been provided around 8/5/06 (adjusted for the last known/documented Clinic of 05/05/06), but CMS refused to conduct the necessary Clinic until an outrageous 10/18/06, and that was only realized after Affiant filed an Emergency Medical Grievance and went to the first hearing.

39. It appears the CMS's one and only instance of providing Affiant his CC Meds in a timely fashion was merely anomaly.

40. For example, on 10/05/06 <u>CMS caused the eleventh CCMI of an egregious nineteen days</u> (10/05/06 to 10/24/06); however, the pharmacy actually possessed the lapsed CC Meds since 10/21/06, but refused to dispense the lapsed CC Meds until 10/24/06 (even then the pharmacy did not notify Affiant via the MPL or provide Affiant his Mtv.). (See A\11).

41. Indeed, eight of the eleven CCMI(s) were grossly aggravated –unnecessarily- because the pharmacy either actually possessed the lapsed CC Meds but refused to dispense them or refused to otherwise notify Affiant via the MPL. Moreover, this outrageous behavior persisted despite Affiant providing adequate notice before and after each and every CCMI, and despite Affiant filing three related medical grievances.

42. The above is True and Correct based on Affiant's personal experience, observaton, and to the best of his knowledge.

Sworn and Subscribed before me this 29 day of November 2006.

David W.
David Williamson

Brian D. Engrem
Notary Public, State of Delaware
My Commission Expires June 14, 2008

Brian D. Engrem
Notary Public

The First 120 dose Lot of CC Meds [1] was ordered by Dr. Alie to run from 7/18/05 to 11/15/05 (i.e. four blister pack cards [2] of thirty-dose each) to run consecutively. Below are photocopies and relevant history of CMS's mismanagement of CC Meds distribution. **FIRST LOT: 1 of 4 CC Med Cards**



Levothroxine (Levo.) Start: 7/18/05  Processed by Pharmacy: 7/22/05    Dispensed: 7/27/05

Result: Unnecessary CCMI form 7/15/05 to 7/27/05

```
                                    Rec'd  7-27-05
MULTIVITAMIN
 ONE-A-DAY VIT .      CAUTION: FEDERAL LAW PROHIBITS THE TRANSFER OF THIS DRUG TO ANY PERSON OTHER THAN THE PATIENT FOR WHOM IT WAS PRESCRIBED.
TABS
ONE 0001   30   Exp:07/2006     PharmaCorr  (IND) (800)259-3067   6002 Corporate Way Indianapolis, IN 46218
MAJOR       11463713                                              Fax: (800)259-3056
                          00    WILLIAMSON,DAVID                             183022
00904053080.30                  6362-   MAIN      10152347   Stop: 11/15/05
                                30                          ~ONE-A-DAY VIT~
                                MULTIVITAMIN   TABS
                                TAKE 1 TAB BY MOUTH DAILY FOR 120 DAYS

                                                          r. ALIE, SITTA B,
                                                          Start: 07/18/05
                                                          Disp: 07/18/05
```

Multivitamin (Mtv.)  Same as above.

[1] Affiant's CC Meds consist of Levothyroxine for his chronic thyroid condition, of which must be taken daily –at the same time- and uninterrupted to ensure their effectiveness; and consists of Multivitamins to supplement the former and assist in converting food to useable energy.

[2] CC Meds come in thirty dose blister packs and normally contain the following information: (1) type and dosage of drug, (2) prescribing physician, (3) the date range (i.e. "Start," Dispense "Disp," and "Stop" dates), and it lists the remaining Refills "RFL" (e.g. after the first of four cards it would read as RFL: 3, which indicates that three thirty dose cards remain to be dispensed). Note that around the Ninety day mark a Clinic is to be held for the purpose of ordering a subsequent "Refill" of the next 120 dose Lot.

A **A-1**

I - A

The First 120 dose Lot of CC Meds (7/18/05 to 11/15/05): **FIRST LOT: 2 of 4 CC Med Cards**



Levo: Based on the known/documented 7/18/05 Start date, this Card should have been dispensed before
8/15/05, but CMS chose not to correct the Chronic-care Medication Interruption (CCMI). 
Adjusted for the prior 7/27/05 CCMI, this Card should have been dispensed before 8/27/05, but
CMS again chose not to correct the CCMI. Alternatively, CMS did not dispense the lapsed CC
Meds to Affiant until 9/05/05. Result: Unnecessary CCMI form 8/27/05 to 9/05/05.



Mtv: ~~Sumeestietis~~.

I - AA

The First 120 dose Lot of CC Meds (7/18/05 to 11/15/05) **FIRST LOT: 3 of 4 CC Med Cards**



Levo.  Based on the known/documented 7/18/05 Start date, this Card should have been dispensed before 9/15/05, but CMS chose not to correct the CCMI. Adjusted for the prior known/documented 9/05/05 CCMI, this Card should have been dispensed before 10/05/05, but CMS again chose not to correct the CCMI. Alternatively, CMS did not provide these lapsed CC Meds to Affiant until 10/0605. Also, the pharmacy did not intend to dispense the lapsed CC Meds, because it refused to notify Affiant via the Medication Pick up List (MPL); Affiant only received them on 10/06/05 because he attended a Medical grievance hearing (# 15453) at the hospital that day.
Result: Unnecessary CCMI form 10/04/05 to 10/06/05.



Mtv:  Same as above.

$A$ **A-3**

$T \cdot A$

The First 120 dose Lot of CC Meds (7/18/05 to 11/15/05) **FIRST LOT: 4 of 4 CC Med Cards**



Levo.  Based on the known/documented 7/18/05 Start date, this Card should have been dispensed before 10/15/05, but CMS chose not to correct the CCMI. Adjusted for the prior known/documented 10/06/05 CCMI, this Card should have been dispensed before 11/06/05, but CMS again chose not to correct the CCMI. Alternatively, CMS did not dispense these lapsed CC Meds to Affiant until 11/09/05. Also, the pharmacy aggravated the CCMI because it actually possessed the CC Meds by at least 11/05/05, but withheld them.

Result: Unnecessary CCMI form 11/05/05 to 11/09/05.



Mtv.

Mtv. Same as above.

A A-4

T-A

The Second 120 dose Lot of CC Meds was ordered by Dr. Burns to run from 1/06/06 to 5/06/06, however, Affiant's prior -known/documented- Clinic of 7/18/05 required the subsequent Clinic to be provided around 10/18/05 (i.e. around the ninety day mark), and it required this Lot to begin before 11/15/05, but CMS chose not to correct the continuous CCMI (s). **SECOND LOT: 1 of 4 CC Med Cards**



Levo: Start: 1/06/06, but underlined_adjusted for the prior known/documented 11/09/05 CCMI, this Card should have been dispensed before 12/08/05; CMS still chose not to correct the (CCMI. Alternatively CMS did not dispense these egregiously lapsed CC Meds to Affiant until 1/11/06. This also violated Dr. Burns' Refill order, which was to begin on 1/06/06.

Result: Unnecessary CCMI form 1/04/06 to 1/11/06.

**NOT PROVIDED**

Mtv: was withheld from Affiant in violation of Dr. Burns' 1/06/06 Refill order.

\* Note: This Lot actually consisted of only 90 doses (i.e. three cards) and the fourth was skipped as this next Lot began.

The Second 90 dose Lot of CC Meds (1/06/06 to 5/6/06): **SECOND LOT: 2 of 3 CC Med Cards**



Levo.  Based on the known/documented 1/06/06 Start date, this Card should have been dispensed before 2/06/06, but CMS chose not to correct the CCMI. Also, the pharmacy aggravated the CCMI because it actually possessed the CC Meds on either 2/09 or 2/10/06, but withheld the lapsed CC Meds until 2/13/06.

Result: Unnecessary CCMI form 2/11/06 to 2/13/06.



**NOT PROVIDED**

Mtv. was withheld from Affiant in violation of Dr. Burns' 1/06/06 CC Med order.

A A-6

I·A

I-AA

The Second 90 dose Lot of CC Meds (1/06/06 to 5/6/06): **SECOND LOT: 3 of 3 CC Med Cards**



Levo.   Based on the known/documented Start date of 1/06/06, this Card should have been dispensed

before 3/06/06, but CMS chose not to correct the CCMI. Adjusted for the 2/13/06 CCMI, this

Card should have been provided before 3/13/06, but CMS again chose not to correct the repeated

CCMI(s). Alternatively, CMS did not dispense the lapsed CC Meds to Affiant until an egregious

3/28/06. Also, once again the pharmacy aggravated the CCMI, because it possessed the lapsed

CC Meds as early as 3/22/06 but withheld them. Result: Unnecessary CCMI 3/13/06 to 3/28/06.



Mtv.   Same as above.

\* Note:

The Third 120 dose Lot of CC Meds was ordered by Nurse Practitioner Ihuoma to run from 5/05/06 to
9/02/06, however, Affiant's prior -known/documented- prior Med Card of 3/28/06 (adjusted for the
CCMI) required the this Lot to begin before 4/28/06.  **THIRD LOT: 1 of 4 CC Med Cards**



Levo: Start: 5/05/06, but adjusted for the prior known/documented 3/28/06 CCMI, this Card should have

    been dispensed before 4/28/06; CMS chose not to correct the CCMI. Alternatively CMS did not

    dispense these egregiously lapsed CC Meds to Affiant until 5/09/06.This also violated Ihuoma's

    Refill order, which was to begin on 05/05/06.

    Result: Unnecessary CCMI form 4/27/06 to 5/09/06.



Mtv: Same as above.

The Third 120 dose Lot of CC Meds (5/05/06 to 9/02/06) **THIRD LOT: 2 of 4 CC Med Cards**



Levo. Based on the known/documented Start date of 5/05/06, this Card should have been dispensed before 6/05/06, but CMS chose not to correct the CCMI. Adjusted for the 5/09/06 CCMI, this Card should have been provided before 6/09/06, but CMS again chose not to correct the repeated CCMI(s). Alternatively, CMS did not dispense the lapsed CC Meds to Affiant until an egregious 6/29/06. Also, once again the pharmacy aggravated the CCMI, because it possessed the lapsed CC Meds as early as 6/21/06 (according to Altman's 7/19/06 letter (See I1-3-1 ), but withheld them. Result: Unnecessary CCMI 6/08/06 to 6/29/06.



Mtv. Same as above.

I - A

The Third 120 dose Lot of CC Meds (5/05/06 to 9/02/06) **THIRD LOT: 3 of 4 CC Med Cards**



Levo.  Based on the known/documented Start date of 5/05/06, this Card should have been dispensed before 7/05/06, but CMS chose not to correct the CCMI. Adjusted for the egregious 6/29/06 CCMI, this Card should have been provided before 7/29/06, but CMS again chose not to correct the repeated CCMI(s). Alternatively, CMS did not dispense the lapsed CC Meds to Affiant until an egregious 8/08/06. Result: Unnecessary CCMI 7/30/06 to 8/08/06.



Mtv. Same as above.

*NOTE: The final card (4 of 4) was actually provided before another CCMI occurred. This was the first such instance –after ten consecutive CCMI(s) - that CC Meds were timely provided; however, CMS quickly restored its custom/policy of creating CCMI(s) on the very next opportunity. And CMS did so in spectacular fashion.

$A$ **A-10**

$\mathcal{I}$ - $A$

The Fourth 120 dose Lot of CC Meds was belatedly ordered by Dr. VanDusen to run from 10/20/06 to 2/17/07, however, Affiant's prior -known/documented- Clinic of 5/05/06 required the a subsequent Clinic to occur around 8/05/06, but of course it did not. **FOURTH LOT: 1 of 4 CC Med Cards**



Levo: Start: 10/20/06, but based on the known/documented "Stop" date of the prior Lot 9/02/06, this

Card should have been dispensed before 10/02/06, but CMS chose not to correct the CCMI.

Alternatively CMS did not dispense these egregiously lapsed CC Meds to Affiant until 10/25/06.

Moreover, this belated Clinic was the very same Clinic that CMS had falsified in response to

Affiant's grievance activity (phantom Clinic of 8/31/06), and CMS had to concede by actually

conducting the Clinic on 10/18/06. (See Section VI-A-2 & 3, items 5-17 (9-27-06)   ).

Result: Unnecessary CCMI form 10/05/06 to 10/25/06.



**NOT PROVIDED**

Mtv: Was mistakenly not ordered.

# Exhibits

II- A 1-17   Deputy Warden Pierce Re-opens   MG # 21201

II- B 1-11   Final Appeal Package for MG # 21201

II-C 1-8   Final Appeal Package Form for # 59170

II-D 1-8   Final Appeal Package Form for # 72883

II- E 1-2   Aff·t   10/25/06

II - Exhibit-A



STATE OF DELAWARE
DEPARTMENT OF CORRECTION
**OFFICE OF THE DEPUTY WARDEN**
DELAWARE CORRECTIONAL CENTER
1181 Paddock Road
SMYRNA, DELAWARE 19977
Telephone: (302) 653-9261
Fax: (302) 659-6668

## MEMORANDUM

TO:         IM David Williamson SBI# 183022 W1 L12

FROM:      Deputy Warden Pierce

DATE:      October 16, 2006

RE:         Grievance
_____

I received your letter dated September 12, 2006, regarding a grievance. Grievance #21201 is being accepted.

DP/dc
Attachment
cc:      File

$\text{II} - 4$

David Williamson
183022, W-1-L-12
September 12, 2006

RECEIVED

SEP 1 3 2006

DEPUTY WARDEN I

Deputy Warden Pierce

RE: Reprisal Grievance Agreement

Deputy Warden Pierce:

Greetings. As per our discussion/agreement, I am providing three medical grievances (MGs)(copies of originals) that were improperly rejected/obstructed by the IGC without ever processing them. You had already identified MG# 23193 & # 43863 (broken tooth & medical records respectively) so I did not include them herein. I am encouraged that these MGs will finally be re-opened and heard. They are as follows:

1. MG # 21201 (11-14-05) grieved the intentional denial of a needed chronic-care clinic. It is four pages and it also includes an addendum dated 11-30-05 that identified "Retaliation" (i.e. reprisal) by a subsequent but separate incident of the same nature by the same CMS personnel. The IGP 44 specifically allows separate grievances for "individual incidents," but because the IGC on a prior occasion summarily rejected MG# 17197 as a "duplicate" of MG# 15453 — despite the fact that #17197 grieved a subsequent and separate incident, it was necessary for me to file said addendum to avoid another IGC rejection. Moreover, the 11-30-05 incident is continuous and related to the 11-14-05 incident, and it is appropriate to incorporate the addendum so that CMS receive full notice and a fair opportunity to reply to the claims. I am not opposed to either incorporation or alternatively processing the 11-30-05 incident as a separate MG, I just wished to avoid IGC rejection/obstruction. If however a separate case number is preferred assign me a case number and I will reproduce the 11-30-05 incident on another MG form and also complete a separate "Action Requested" since the addendum had originally relied on the 11-14-05 MG# 21201.

Subsequently, MG# 21201 was improperly rejected due to my

II. A    -1-

damages request, but I also requested 2) CMS personnel training and 3) correction of the medication interruptions. The addendum was also rejected in sympathy with MG # 21201's rejection. (See attachment A). I filed a timely appeal to the Bureau Chief (12-19-05), but no decision was ever rendered.

2. MG(s) 11-29-05 (one for an acute knee injury, etc.) and the other 11-29-05 (for the lose of two teeth and CMS's policy/custom of refusing to provide timely and adequate dental treatment) were both rejected for phantom deficiencies as a package; however, improperly because the IGC stated that the "Action Requested" sections were incomplete. This was erroneous. Both sections were completed at the second page - identicle to my prior filed and rejected MG # 21201, and the IGC even stamped "Received...." under both completed sections! Clearly they were improperly rejected/obstructed.

Additionally, because my prior MG # 21201 had been improperly rejected due to the "damages" request, I purposely omitted from both 11-29-05 MG(s) the offensive damages requests in the hope to avoid more improper rejections, but even this strategy failed. Nevertheless, a grievant need not waive a claim of right just to have his MG processed and besides this particular matter has been resolved. Thus, to preserve my legal claims, I have added a request for damages to the other requests for specific treatment for CMS to consider. (See att. B).

Consequently, I filed a "Reprisal Grievance" against the IGC's adverse actions directly to the W/WD pursuant to IGP 4.4, but it too was rejected. I then filed a timely final appeal to the Bureau Chief (1-13-06) and it too has never received a final decision. Over nine months have elapsed since filing these three MG(s), and well over 180 days have elapsed since I filed their final appeals, and I have never received any decision or corrective action. This is why I filed the latest, albeit reluctantly, Reprisal Grievance against DOC officials - an act of final desperation.

I am encouraged now, however, that these improperly rejected MG(s) will finally be processed and exhausted, etc. I do respectfully request your consideration, however, concerning the hearings: specifically because of the already excessive delay perhaps it would be warranted to hold joint hearings to expidite the matter?

Lastly, I greatly appreciate that this matter has received your personal attention Mr. Pierce; nor do I take for granted the valuable time you have invested to resolve this matter.

Thank you,

Davee W—

# EXHIBIT A

FORM #585

MEDICAL GRIEVANCE

FACILITY: D.C.C.

INMATE'S NAME: David Williamson

HOUSING UNIT: W-1 (L-12)

DATE SUBMITTED: 11-14-05

SBI#: 00183022

CASE #: 2120/

//////////////////////////////////////////////////////////////////////////////////////////////////////////

SECTION #1

DATE & TIME OF MEDICAL INCIDENT: 11-11-05

TYPE OF MEDICAL PROBLEM:

Nov. 11, 05 (10:45 Am) grievant - a chronic-care patient - was arbitrarily denied a "Chronic-care Clinic" by Ms. Ioma. The "clinic" was scheduled in response to a letter of complaint/notice that grievant filed 11-9-05 (A-1); Grievant inquired why he was being denied the clinic and Ioma stated: "I'm not seeing you because you didn't come when you were supposed to." Grievant stated that he was not responsible for being tardy because the list posted in the housing unit did not include his name, but Ioma replied "I don't care, you will have to be rescheduled." (continued on page 2).

GRIEVANT'S SIGNATURE: _David W._ DATE: 11-14-05

ACTION REQUESTED BY GRIEVANT: (See page 2)

DATE RECEIVED BY MEDICAL UNIT: _____

**RECEIVED**

NOV 2 1 2005

Inmate Grievance Office

NOTE: EMERGENCY MEDICAL CONDITIONS WILL TAKE PRIORITY. OTHERWISE, MEDICAL GRIEVANCES WILL BE ADDRESSED AT THE WEEKLY MEDICAL COMMITTEE MEETING.

( P. no 1 )( EX - A-1 )( pg 1 )

π · A

FORM #585

MEDICAL GRIEVANCE

FACILITY: D.C.C.

INMATE'S NAME: David Williamson

HOUSING UNIT: W-1, L-12

DATE SUBMITTED: 11-14-05

SBI#: 00183022

CASE #: _____

SECTION #1

DATE & TIME OF MEDICAL INCIDENT: 11-11-05 (page 2)

TYPE OF MEDICAL PROBLEM:

(See attached A-2 "Offender Activity Schedule" page 1 of 1) Grievant then inquired: "So, I'm going to be denied my chronic-care clinic and be punished because someone else omitted my name from the sick call list, which is not my fault or responsibility?" Ioma nodded in the affimative and restated that I would be rescheduled. Grievant is concerned with avoiding yet another med interruption and filed the Nov. 9, 05 notice because CMS had already failed to schedule him in within the 90 days cycle. Clearly denying treatment, wrongfully punishing patients, and constructing malicious obstacles is more important to CMS and its personnel √than correcting on-going problems and providing adequate treatme.

GRIEVANT'S SIGNATURE: David N      DATE: 11-11-05

ACTION REQUESTED BY GRIEVANT: Because this behavior is blatent evidence of CMS's deliberate indifference to Mr. Williamson's serious medical needs, and because the grievance process has failed to correct this indifference grievant requests: monetary damages, cms personnel training & a timely correction to the repeat med interruptions. (Damages will be negotiated at hearing or via cms counsel √)

DATE RECEIVED BY MEDICAL UNIT: _____

NOTE: EMERGENCY MEDICAL CONDITIONS WILL TAKE PRIORITY. OTHERWISE, MEDICAL GRIEVANCES WILL BE ADDRESSED AT THE WEEKLY MEDICAL COMMITTEE MEETING.

RECEIVED

NOV 2 1 2005

Inmate Grievance Office

(Page 2) (EX. A-1) (pg 2)

π - A

David Williamson
SBI # 183022
W-1, L12
November _?__, 2005

Mrs. Plante

Re: Chronic-care Medication Lapses/Refill Order

Dear Mrs. Plante:

Greetings, I am writing because my current 120 day allotment of chronic-care medications are due to end on 11/15/05; however, I have not been scheduled in for a Chronic-care "Refill" visit as is normal. I am concerned with avoiding another interruption in receiving my thyroid meds. In fact, since my last "Refill" order in July 05, I have experienced **four consecutive** med interruptions. This is in the wake of me recently exhausting the Medical Grievance procedure and receiving assurances that this problem would be corrected. It appears that my timely Appeal was indeed appropriate to challenge these hollow promises.

These repeat lapses cause an unnecessary resurgence in common symptoms (e.g. inflammation & hive-like reactions, chronic-fatigue, high cholesterol). For example, I suffer painful inflammation of my extremities (hands & feet, and face) as a result. This has left me in such pain I can barely walk, and I was bed-ridden just recently over the weekend. Moreover, it is now recognized that high levels of inflammation causes damage to the coronary system and is a major contributor to heart disease, yet I suffer this painful and dangerous inflammation on a regular basis due to repeat med interruptions. Also, I suffer chronic fatigue –as is common with this disease- that adversely affects my normal daily functions (e.g. inability to focus on work & college studies) and an inability to pursue and promote a healthy life style (e.g. engage in meaningful & necessary exercise etc). Then there is the incidence of high cholesterol, also common with my ailment. This concerns me greatly, because alone, they are difficult enough to live with; however, the combined effects of the inflammation, inability to consistently promote health, and build-up of cholesterol conspire to degrade and permanently damage my health unnecessarily. As you are aware, this type of medication is required to be taken consistently without lapses or its effectiveness is hindered, and every time I experience a lapse I suffer the pain of the inflammation and complications of the other common symptoms. I simply wish to avoid needless suffering.

Moreover, I find it troubling that the 120 day dosage allotment was instituted to avoid lapses by providing an additional 30 day med card as a cushion greater than the 90 day intervals between the Chronic-care "Refill" visits, yet the last refill interval and this one have both exceeded the 90 day cycles. This defeats the purpose entirely and has aggravated the problem of interruptions.

Still more troubling is that, of the most recent four consecutive med lapses I gave notice prior to the interruptions (e.g. Mrs. Plante, Dr. Alie, and CMS Pharmacy), however, I still experienced the med lapses. This is disturbing because on two of those occasions the pharmacy actually signed in and possessed these meds several days before dispensing them to me, and on the others the pharmacy carried Stock Supplies yet failed again to dispense them. Despite my notices, no one cared to follow up and see to it that when these meds were checked in at the pharmacy, that I am provided them; this behavior unnecessarily prolonged the interruptions. This is unacceptable.

In closing, I request that assistance from CMS personnel with avoiding yet another interruption. Also, since the Medical Grievance hearing was abused by CMS personnel and has clearly failed to rectify this on-going problem, I would request some follow up from the parties listed below.

David Williamson
c.c. Nikita Robins, DCJ
c.c. Thomas Carroll, Warden of DCC
c.c. Dr. Alie

Instructions for Submitting a Regular Grievance

Inmates are required, per DOC Procedure 4.4 [Inmate Grievance Procedure] to attempt to resolve complaints prior to filing a regular grievance. Grievances are to be submitted within seven (7) days from the date of the occurrence or incident or within seven days after the inmate became aware of the incident. The grievance is to be placed in the grievance box located in each housing unit.

Only one issue per grievance form will be addressed. If the grievance is submitted on a weekend or a holiday, it will be received during the next working day.

Return of Unprocessed Grievance

Intake Action: This Grievance Form is being returned to the inmate under the provisions outlined in DOV Procedure 4.4 "Inmate Grievance Procedure" for the following reason(s) :

_____ Vulgar/Abusive or Threatening Language. The Language that is unacceptable has been highlighted. The grievance may be resubmitted omitting this language.

_____ Non-Grievable. This issue has been defined as non-grievable in accordance with DOC Policy 4.4. These procedures have their own appeal process that must be followed.

_____ Disciplinary Action    _____ Parole Decision    _____ Classification Action

_√_ Request. Requests are not processed through the grievance procedure. Please correspond with the appropriate Office to secure the information that is requested.

_____ Duplicate Grievance(s). This issue has been addressed previously in Grievance # _____.

_____ Original Grievances must be submitted to the Inmate Grievance Chairperson. Photocopies are not accepted.

_____ Inquiry on behalf of other inmates. Inmates cannot submit grievances for other inmates.

_____ Expired Filing period. Grievance exceeds seven (7) days from date of occurrence.

IGC IS NOT A COURT AND CANNOT AUTHORIZE MONETARY DAMAGES

_____
Inmate Grievance Chairperson

_12-14-05_
Date

Received 12-16-05

(EX-A-1) (pg 5)

II-A

TO: Ms. L. Merson, IGC

From: David Williamson, 00183022, W-1, L-12

Re: Pending Medical Grievance   (Addendum to MG 21201)

Date: 11·30·05


Ms. Merson, IGC:

      Grievant filed a Medical Grievance (dated 11·14·05) due to the arbitrary and capricious denial of a Chronic-care clinic, which evidences their deliberate indifference to grievants known serious medical needs/condition. This grievance is still pending and no response or informal hearing has occurred as yet.

      Subsequent acts, however, that are directly related to the 11-11-05 incident (depicted in said pending 11·14·05 MG) evidence and establish a pattern of continued and "on-going" deliberate indifference to grievant's serious medical needs, as well as actual malice and retaliation towards grievant for his exercising a protected right to seek redress.

      Because the facts below are continuing acts directly related to the above incident/grievance, filing another grievance would be considered a "duplicate" and dismissed like grievant's 8-30·05 Emergency Medical Grievance was. Therefore, grievant would request that this information be incorporated as an addendum to the pending MG. No prejudice will ensue because it has not been heard yet; moreover, respondents health care provider must be made aware and given an opportunity to correct this behavior.

(A-1)    II-A

The following facts are in support:

1. Grievant - a Chronic-care patient - has experienced no less than four consecutive chronic-care medication lapses between July and November 05, and the health care provider and specifically Dr. Alie and Mrs. Plante have been placed on Notice that these repeat and on-going lapses impair grievant's normal daily functions, cause him harm, suffering, and an inability to promote good health unnecessarily.

2. Health care provider has failed to address and or acknowledge the on-going problem, failed to correct the problem, and does intentionally exacerbate the problem with full knowledge of the resulting harm.

3. Also, when grievant is erroneously scheduled for a medical visit and or scheduled and denied being actually seen, he suffers a day's wages and a loss of good-time credits unnecessarily. This has occurred three times during the July to Nov. 05 period.

4. Moreover, CMS has failed to adhere to pledges made a grievance hearings "... follow medication administration system to avoid repeat of lapse in medication" (July 05 hearing); failed to schedule grievant for his Chronic-care Clinic within 90 days and arbitrarily and capriciously denied him this clinic, which is needed to "Refill" the med prescription.

5. Grievant filed the 11-14-05 Medical Grievance against Ms. Ioma (sp?) for the 11-11-05 denial of clinic and she has subsequently denied another and retaliated against grievant for same.        II. A

6. Grievant's name appeared on the medical schedule for Chronic-care Clinic again on 11.29.05 and while waiting grievant witnessed both Mrs. Plante and Ioma present.

7. Grievant inquired with the officer present about his clinic and the officer returned stating: "They're not going to see you today - you can go." Grievant replied that this clinic was already a reschedule and well past the normal 90 days interval at over 120 days, and that grievant was about to run out of meds.

8. The officer conversed with a nurse in the presence of grievant and she stated: "She's not here - he will just have to come back." "What about tommorrow?" inquired the officer. "She's out tommorow too, maybe later in the week," the nurse finished.

9. As stated, Ioma was present and it was she who grievant was schedule with for his denied 11.11.05 clinic of which he grieved her actions specifically. Yet Ioma was present again on 11.29.05 and grievant was again denied his scheduled Chronic-care clinic.

10. Moreover, Mrs. Plante is on Notice for the deliberate indifference claims regarding meds. lapses and was also present.

11. These acts will result in yet another intentional med lapse and evidence a continuing pattern and culture of deliberate indifference ... do illustrate intentional acts of malice and retaliation.

David W _____          12.1.05          c.c. Tom Carroll, Warden

 **EXHIBIT B**

## FORM #585

## MEDICAL GRIEVANCE

FACILITY: _DCC_

DATE SUBMITTED: _11-29-05_

INMATE'S NAME: _David Williamson_

SBI#: _183022_

HOUSING UNIT: _W-1_

CASE #: _____

//////////////////////////////////////////////////////////////////////////////////////////////////////////////////////

### SECTION #1

DATE & TIME OF MEDICAL INCIDENT: _On-going_

TYPE OF MEDICAL PROBLEM:

_Grievant incurred an acute knee injury (right leg) 7-26-04 and was forced to file a grievance due to nontreatment (e.g. #7463). Eventually an order for an MRI was placed, however, countermanded by Dr. Alie. Grievant was told he would be rescheduled in six months for a follow up examination to determine whether the injury was temporary or more permanent - which would require undisclosed "other" treatment. Grievant complained of a grinding & shifting knee, and which will buckle out without warning following a sharp pain, however, after a one-to-two minute prodding examination,_ (Cont. 2)

GRIEVANT'S SIGNATURE: _See p. 2_        DATE: _____

ACTION REQUESTED BY GRIEVANT: _____

_____

_____

_____

DATE RECEIVED BY MEDICAL UNIT: _____

(B-1)

RECEIVED

DEC 1 3 2005

Inmate Grievance Office

**NOTE: EMERGENCY MEDICAL CONDITIONS WILL TAKE PRIORITY. OTHERWISE, MEDICAL GRIEVANCES WILL BE ADDRESSED AT THE WEEKLY MEDICAL COMMITTEE MEETING.**

FORM #585

MEDICAL GRIEVANCE

FACILITY: _DCC_____

INMATE'S NAME: _David Williamson_

HOUSING UNIT: _W-1_____

DATE SUBMITTED: _11-29-05_

SBI#: _183022_

CASE #: _____

( CONT. p. 2 )

SECTION #1

DATE & TIME OF MEDICAL INCIDENT: _On-going_

TYPE OF MEDICAL PROBLEM:

_was told by Dr. Alie that I would be rescheduled. Grievant also stated that his normal daily functions were being adversely effected due to the pain and instability of the injured knee. To date the promised follow up has never occurred, however, grievant's knee has never healed. In fact, his knee routinely buckles out without warning upon standing or while standing - following a sharp pain, and when grievant bends down, the knee dislocates and must be gingerly popped back in. Grievant should not have to incur pain & permanent injury before he can receive even appropriate exploritory examination and/or treatment. A custom of nontreatment has been employed._

GRIEVANT'S SIGNATURE: _David W_____     DATE: _11-29-05_

ACTION REQUESTED BY GRIEVANT: _Because grievant has incurred a permanent knee injury and has received assurances via Dr. Alie that follow up would be realized, but never did (merely a stalling technique), grievant requests a thorough examination by an outside specialist and MRI. Also provide monetary damages for the deliberate indifference._

DATE RECEIVED BY MEDICAL UNIT: _____

RECEIVED
DEC 13 2005
Inmate Grievance Office

**NOTE: EMERGENCY MEDICAL CONDITIONS WILL TAKE PRIORITY. OTHERWISE, MEDICAL GRIEVANCES WILL BE ADDRESSED AT THE WEEKLY MEDICAL COMMITTEE MEETING.**

## FORM #585

## MEDICAL GRIEVANCE

FACILITY: D.C.C.

DATE SUBMITTED: 11-29-05

INMATE'S NAME: David Williamson

SBI#: 183022

HOUSING UNIT: W-1 L-12

CASE #:

///////////////////////////////////////////////////////////////////////////////////////////////////////////////////////////////////

### SECTION #1

DATE & TIME OF MEDICAL INCIDENT: On-going

TYPE OF MEDICAL PROBLEM:

On or about March 2005, grievant incurred a permanent injury via the extraction of two teeth (#28 & #29). This permanent injury was the final and culminating result of multiple and re-occurring periodontal gum infections of which knowingly went untreated and grossly undertreated by dental staff. Specifically, for example, an infection would occur, however, grievant was routinely denied the standard teeth cleaning, which is one of the first responses to such gum infections, and told that I would have to lose those teeth in the infected area. (Cont. p. 2)

GRIEVANT'S SIGNATURE: see p. 2          DATE:

ACTION REQUESTED BY GRIEVANT:

DATE RECEIVED BY MEDICAL UNIT:

(C-1)

RECEIVED
DEC 13 2005

NOTE: EMERGENCY MEDICAL CONDITIONS WILL TAKE PRIORITY. OTHERWISE, MEDICAL GRIEVANCES WILL BE ADDRESSED AT THE WEEKLY MEDICAL COMMITTEE MEETING.

II-B    II-A

FORM #585

MEDICAL GRIEVANCE

FACILITY: O.C.C.

DATE SUBMITTED: 11·29·05

INMATE'S NAME: David Williamson

SBI#: 183022

HOUSING UNIT: W-1, L-12

CASE #:

(Cont. p. 2)

SECTION #1

DATE & TIME OF MEDICAL INCIDENT: On-going

TYPE OF MEDICAL PROBLEM:

Grievant was also told that the dental facilities could not do cosmetic teeth scrapings for the large O.C.C. population, however, grievant pointed out that treatment for active and recurring periodontal gum infections is not cosmetic but necessary and standard treatment for my known serious medical condition. Finally, after grievant threatened litigation, I was told that I would be placed on a "waiting list," and that I should not expect a cleaning very soon due to the lengthy line. Nearly 18 months has passed since grievant was allegedly placed on said list. Instead of timely & adequate treatment a custom is employed to result in extractions.

GRIEVANT'S SIGNATURE: David W___    DATE: 11-29-05

ACTION REQUESTED BY GRIEVANT: Immediate teeth cleaning, and grievant needs to be placed on a semi-annual teeth cleaning schedule to treat and combat the on-going and recurring periodontal gum infections. Also provide monetary damages for the deliberate indifference.

RECEIVED
DEC 1 3 2005

DATE RECEIVED BY MEDICAL UNIT: ___

NOTE: EMERGENCY MEDICAL CONDITIONS WILL TAKE PRIORITY. OTHERWISE, MEDICAL GRIEVANCES WILL BE ADDRESSED AT THE WEEKLY MEDICAL COMMITTEE MEETING.

II-B    II-A

## Instructions for Submitting a Regular Grievance

Inmates are required, per DOC Procedure 4.4 [Inmate Grievance Procedure] to attempt to resolve complaints prior to filing a regular grievance. Grievances are to be submitted within seven (7) days from the date of the occurrence or incident or within seven days after the inmate became aware of the incident. The grievance is to be placed in the grievance box located in each housing unit.

Only one issue per grievance form will be addressed. If the grievance is submitted on a weekend or a holiday, it will be received during the next working day.

Return of Unprocessed Grievance

Intake Action: This Grievance Form is being returned to the inmate under the provisions outlined in DOV Procedure 4.4 "Inmate Grievance Procedure" for the following reason(s) :

_____ Vulgar/Abusive or Threatening Language. The Language that is unacceptable has
been highlighted. The grievance may be resubmitted omitting this language.

_____ Non-Grievable. This issue has been defined as non-grievable in accordance with
DOC Policy 4.4. These procedures have their own appeal process that must be followed.

_____ Disciplinary Action          _____ Parole Decision          _____ Classification Action

_____ Request. Requests are not processed through the grievance procedure. Please
correspond with the appropriate Office to secure the information that is requested.

_____ Duplicate Grievance(s). This issue has been addressed previously in
Grievance # _____.

_____ Original Grievances must be submitted to the Inmate Grievance Chairperson.
Photocopies are not accepted.

_____ Inquiry on behalf of other inmates. Inmates cannot submit grievances for other inmates.

_____ Expired Filing period. Grievance exceeds seven (7) days from date of occurrence.

*You Need To Complete Action Requested Section Of Grievance Form.*

Inmate Grievance Chairperson

12·22-05
Date

*Grievant Rec'd*
*12-27-05 via*
*In House Mail*

Ⅱ - Exhibit-B

## Grievance Appeal Form

This must be completed and returned to the IGC within 3 days of receipt of the
Warden/Designee/MGC Decision. This form is to be returned via the Grievance Box.
This form is to be used Only in the event of a decision appeal. Please specify the reason for the appeal in the space below.

Grievant: David Williamson          SBI#:  183022

Housing Unit:  W-1, L-12          Case#:  2/201

Date:  12-20.06          Due Date:  12-27.06

Grievant appeals the grossly mismanaged handling of his Reprisal
Grievance (RG) for : (1) cms / DOC repeatedly violated IGP 4.4 (4.4);
(2) DOC failed to monitor grievance compliance in related or nearly
identicle med grievances (MG) or RGes; and DOC's repeated failures
/refusals to meaningful corrective action to CMS's well documented
deliberate indifference and acts of prohibited reprisal has and
continues to expose grievant to repeat /identicle violations
of his Constitutional Rights. (Grievant incorperates herein his
properly/timely filed 11-21-06 Appeal #21201 at Exh. A 1-6 and
his 11-29-06 Letter regarding the continued abuse of the 4.4
procedure and Grievant's rights at Exh. B). Moreover, the
reprisal and abuse of 4.4 continues unabated, because the RGC
re-hearing of 12-20-06 was still conducted before CMS rep.
G. Eller and IGC McCreanor dispite prior claims that it would be
inappropriate and unnecessarily rejecting Grievant's 11-21-06 Appeal.
Indeed, Grievant's properly filed 11-21-06 Appeal was rejected in
order to force him through more of the same redundant and
abusive hoops; however, to still deny Grievant the relief
requested. (Continued at page 2).

Dave W
INMATE SIGNATURE

12-21-06

If you need additional space, attach 8.5" X 11" size sheets of paper.

<u>Grievance Appeal   # 21201   p. 2</u>

More importantly is that CMS is permitted to continue (a) to refuse to correct the repeat Chronic-care medications interruptions (CCMI) — which cause Grievant to needlessly suffer a resurgence of chronic symptoms that impairs his normal daily functions and poses a substantial threat to his future health; and (b) to intentionally subject Grievant to prohibitted acts of reprisal (e.g. See 72883 where CMS falsified medical records of providing a Clinic when it had not in direct response to EMG # 59170 — which of course grieved the on going CCMI(s)).

Thus, CMS has demonstrated a clear history of deliberate indifference to Grievant's serious medical needs and of its repeat acts of reprisal against Grievant in direct response to his medical grievance activity.

These facts are well documented over an extensive time period, and they are so obviously likely to violate Grievant's Constitutional Rights, that DOC Officials —involved with the grievance procedure / positioned to make corrections — (i.e. S. Taylor, P. Howard, T. Carroll, & Mc Creanor) are required to take timely corrective action.

12-31-06
DATE

David W——
David Williamson

II-B

21201

B

# Grievance Appeal Form

This must be completed and returned to the IGC within 3 days of receipt of the
Warden/Designee/MGC Decision. This form is to be returned via the Grievance Box.
This form is to be used Only in the event of a decision appeal. Please specify the reason for the appeal in the space below.

Grievant: David Williamson                SBI#: 183022

Housing Unit: W-1 L-12                    Case#: 21201

Date: 11-14-06                           Due Date: 11-21-06

Grievant appeals the grossly mismanaged handling of this Reprisal
Grievance (RG) for the following reasons: (1) DOC repeatedly violated IGP
4.4 (4.4); (2) DOC failed to monitor grievance compliance in related or
nearly identicle medical grievances (MG) / Reprisal Grievances (RG); (3) DOC's
repeated failures and refusals to effect meaningful corrective action
exposed Grievant to repeat/identicle violations of his Constitutional
Rights (CR) (eg. deliberate indifference to Grievant's serious medical
needs by denying Grievant his needed Chronic-care Clinics (Clinic),
which subsequently cause unnecessary/avoidable Chronic-care Medication
Interruptions (ccmI); and for exceeding the 180 day Grievance Resolution
time period of 4.4 exposing grievant to above without a valid peno-
logical objective. The management of 21201 was grossly mismanaged:
For example, Grievant began grieving CMS's ongoing/pervasive
CCMI(s) on 7-15-05 (MG 15453) and subsequently filed MG 21201 due
to a malicious denial of Grievant's Clinic by Thuoma, which was
required to avoid additional ccmI(s). Consequently, Grievant was malicious-
ly denied a second Clinic by Thuoma, but under false pretenses and
Grievant filed an Addendum to 21201 due to Thuoma's clear Reprisal
on 11-30-05. (See A-1 Addendum pp 2-3 items 5-10). Continued at p 2.

**RECEIVED**

NOV 20 2006

**Inmate Grievance Office**    — 1 —

Ward W
INMATE SIGNATURE

11-17-06

If you need additional space, attach 8.5" X 11" size sheets of paper.

Thereafter, IGC McCreanor improperly and summarily rejected 21201 in violation of 4.4, and Grievant subsequently experienced his fifth consecutive CCMI (28-days, 12-07-05 to 1-04-06) as a direct result. (See B-1, Aff'd items 2-11). Some eleven months later, however, 21201 was re-opened by DW Pierce 10-16-06 (circa) due to the blatent violations of 4.4-agreement of RG 64863. Consequently, 21201 was mishandled — it should've never been rejected; Grievant should've never experienced that 28-day CCMI; should've never taken ten months to re-open (exceeding the 180 days mandated for resolution in 4.4; and Grievant should've never experienced CMS's subsequent acts of identicle behavior (e.g. Repeat CCMI and Repeat Reprisal), but Grievant did as a result of this gross mismanagement.

Indeed, Grievant has filed two sets (four total) of nearly identicle grievances covering over a year: MG 15453 (7/05) for CCMI and related MG 21201 for CCMI and Reprisal (1/05); then MG 59170 7/06 for CCMI and related RG 72883 (10/06) for yet subsequent reprisal of 59170. Still CMS continues both the CCMI(s) — eleven to date between 7/05 & 10/06 — and its Reprisal — as noted recently in 72883 where CMS falsified medical records in response to 59170 regarding another <u>CCMI and denied Clinic</u>.

Indeed, this latest CCMI/clinic denial resulted in a 19-day CCMI (10-05-06 to 10-24-06). However, if DOC had not willingly mismanaged MG 21201 & Addendum and then ignored Grievant's pleas/notices/Direct Appeals, etc. for nearly a year — in violation of 4.4- then perhaps Grievant would not have been exposed to CMS's repeat deliberate indifference/Reprisals when Grievant employed the grievance process. DOC Officials (S. Taylor, P. Howard, T. Carroll, D.W. Pierce, & IGC McCreanor) have all been placed on Notice, but fail/refuse to correct the matter.

Thus, this behavior has already and still is so obvious/likely to violate Grievant's Const. rights that DOC must take immediate corrective action: Grievant incorporates 72883 herein, and also requests he be supplied all 120 doses of both ~~RECEIVED~~ care Meds at the begining of the cycle to limit potential CCMI(s) to three per year.

RECEIVED
NOV 20 2006

Dave W ————

II-B

11-17-06

B

TO: Ms. L. Merson, IGC

From: David Williamson, 00183022, W-1, L-12

Re: Pending Medical Grievance    (Addendum to MG 21201)

Date: 11-30-05


Ms. Merson, IGC:

Grievant filed a Medical Grievance (dated 11-14-05) due to the arbitrary and capricious denial of a Chronic-care clinic, which evidences their deliberate indifference to grievant's known serious medical needs/condition. This grievance is still pending and no response or informal hearing has occurred as yet.

Subsequent acts, however, that are directly related to the 11-11-05 incident (depicted in said pending 11-14-05 MG) evidence and establish a pattern of continued and "on-going" deliberate indifference to grievant's serious medical needs, as well as actual malice and retaliation towards grievant for his exercising a protected right to seek redress.

Because the facts below are continuing acts directly related to the above incident/grievance, filing another grievance would be considered a "duplicate" and dismissed like grievant's 8-30-05 Emergency Medical Grievance was. Therefore, grievant would request that this information be incorporated as an addendum to the pending MG. No prejudice will ensue because it has not been heard yet, moreover, respondents health care provider must be made aware and RECEIVED an opportunity to correct this behavior. NOV 20 2006

(A-1)    II-B

The following facts are in support:

1. Grievant - a Chronic-care patient - has experienced no less than four consecutive chronic-care medication lapses between July and November 05, and the health care provider and specifically Dr. Alie and Mrs. Plante have been placed on Notice that these repeat and on-going lapses impair grievant's normal daily functions, cause him harm, suffering, and an inability to promote good health unnecessarily.

2. Health care provider has failed to address and or acknowledge the on-going problem, failed to correct the problem, and does intentionally exacerbate the problem with full knowledge of the resulting harm.

3. Also, when grievant is erroneously scheduled for a medical visit and or scheduled and denied being actually seen, he suffers a day's wages and a loss of good-time credits unnecessarily. This has occurred three times during the July to Nov. 05 period.

4. Moreover, CMS has failed to adhere to pledges made a grievance hearings "... follow medication administration system to avoid repeat of lapse in medication" (July 05 hearing); failed to schedule grievant for his Chronic-care Clinic within 90 days and arbitrarily and capriciously denied him this clinic, which is needed to "Refill" the med prescription.

5. Grievant filed the 11-14-05 Medical Grievance against Ms. Ioma (sp?) for the 11-11-05 denial clinic and she has subsequently denied another retaliated against grievant for same.

RECEIVED
NOV 20 2006
Inmate Grievance Office

II-B

B

6. Grievant's name appeared on the medical schedule for Chronic-care Clinic again on 11·29·05 and while waiting grievant witnessed both Mrs. Plante and Ioma present.

7. Grievant inquired with the officer present about his clinic and the officer returned stating: "They're not going to see you today — you can go." Grievant replied that this clinic was already a reschedule and well past the normal 90 days interval at over 120 days, and that grievant was about to run out of meds.

8. The officer conversed with a nurse in the presence of grievant and she stated: "She's not here — he will just have to come back." "What about tommorrow?" inquired the officer. "She's out tommorow too, maybe later in the week," the nurse finished.

9. As stated, Ioma was present and it was she who grievant was schedule with for his denied 11·11·05 clinic of which he grieved her actions specifically. Yet Ioma was present again on 11·29·05 and grievant was again denied his scheduled Chronic-care clinic.

10. Moreover, Mrs. Plante is on Notice for the deliberate indifference claims regarding meds. lapses and was also present.

11. These acts will result in yet another intentional med lapse and evidence a continuing pattern and culture of deliberate indifference ... do illustrate intentional acts of malice and retaliation.

RECEIVED

NOV 20 2006

Inmate Grievance Office

(A-1)

Darrel W——       12·1·05       c.c. Tom Carroll, Warden

AFFIDAVIT OF DAVID WILLIAMSON                                                                  β

1. I am the Affiant listed above and do depose and state the following:

2. Affiant is a Chronic-care patient who unnecessarily suffers a resurgence of symptoms related to his chronic disease, which does substantially limit Affiant's "Major Life Activities" (e.g. ability to work, learn, concentrate, and realize meaningful exercise and does pose a likely substantial threat to his future health) due to CMS intentionally causing Chronic-care Medication Lapses (CCML) and or intentionally failing to correct the CCML.

3. Affiant has experienced five consecutive CCML from July 05 to January 06 with the fifth one lasting 28 days (12/07/05 to 1/04/06), however all were unnecessary lapses and otherwise avoidable.

4. In fact, CMS's behavior evinces a deliberate and intent to inflict harm upon Affiant with this recent CCML.

5. CMS stated on 7/28/05 (Medical Grievance (MG)) "CMS will follow the medication administration system (Med System) to avoid a repeat of a lapse in medicine;" and further stated on the subsequent MG of 10/6/05 "Inmate will be placed on the pill call to prevent missed medication." CMS failed to do as stated.

6. According to the Med System, Affiant should have been scheduled in for a Chronic-care Clinic (Clinic) on or about 10/15/05 to renew his Chronic-care Meds (CC Meds), but CMS failed to follow the Med System.

7. Affiant filed Notice to Mrs. Plante: that his Clinic was needed to avoid yet another CCML.

8. Affiant was arbitrarily and capriciously rejected for a Clinic on 11/11/05 by Ioma, and Affiant filed a MG against Ioma (MG # 21201)The Clinic was allegedly scheduled but was not actually listed on the "Activity Schedule" in Affiant's housing unit and Affiant had no way to know.

9. Affiant was maliciously rejected for a subsequent Clinic on 11/29/05 and CMS personnel lied as to the reason for the rejection. Affiant filed an Addendum to the MG #21201 that added "Retaliation" as a claim against Ioma and Mrs. Plante. Copies were mailed directly to the CMS Office, IGC, and to the Warden of DCC.

10. CMS failed to renew Affiant's CC Meds; failed to provide alternate "Stock Supplies" despite having them in the on-site pharmacy; and failed to investigate and correct the continuing problem of CCML and the shocking behavior of its personnel despite having been notified on several occasions and receiving the grievances.

11. Affiant experienced his fifth consecutive CCML that ran from 12/07/05 to 1/04/06, and even here CMS had to be forced to provide his CC Meds by a third party.

12. Specifically, Affiant's mother called the Warden's Office with a complaint on 12/29/05 and received from Dep. Warden Pierce that the current CCML would be corrected.

13. Affiant also filed a Complaint Letter (outlining the outrageous and shocking behavior of CMS/personnel) with Comm. Taylor (c.c. CMS, Dr. James Weich, Admin. DCC etc.) on 12/30/05.

14. On 1/04/06 Affiant was *not scheduled* for either Med Pick-up or Clinic, however was contacted at his work-site about 10:00AM and instructed to go to the hospital. The fact that Affiant was not scheduled demonstrates that CMS did not initiate or intend to see Affiant, but was seen due to third party intervention.

15. Affiant met Dr. Burns (who he has never had contact with before) and she was unaware of Affiant's current CCML or grievance activity until Affiant informed her on 1/04/06 at what turned out to be a impromptu Clinic. Dr. Burns renewed Affiant's CC Meds and provided 27 doses from "Stock Supplies," which were there –on site- during Affiant's entire 28 day CCML.

16. Thus Affiant needlessly experienced yet another CCML (fifth consecutive at 28-days) despite providing Notice prior to and during the lapse (Mrs. Plante) and filing an MG and Addendum (CMS Offices); despite CMS's empty/token promises (lip service) made at grievance hearings; and despite CMS actually having these very CC Meds on-site in Stock Supplies.

17. This behavior evinces deliberate indifference to Affiant's known serious medical condition and it *shocks the conscious* because CMS didn't willingly respond to Affiant's many pleas for help, but was forced by Dep. Warden Pierce to call Affiant in on an otherwise unplanned and unscheduled Clinic. In fact, CMS clearly intended to inflict harm upon Affiant by delaying for as long as possible Affiant's CC Meds.

18. The above is True and Correct to Affiant's best knowledge.

SWORN and SUBSCRIBED before me this 20th RECEIVED January 2006.

_David Williamson, 00183022_

NOV 20 2006

Inmate Grievance Office

Notary Public

David Williamson
SBI #183022
1181 Paddock Rd.
Smyrna, DE 19977
November 29, 2006

Bureau Chief Paul Howard

Re: Formal Final Appeals for Reprisal Grievances # 21201 & # 72883

Dear Sir:

On 11/14/06 I attended a RGC (second grievance hearing) for the above two grievances, and IGC McCreanor determined at this late date that it would be inappropriate for either himself or CMS representative Gail Eller to hear the grievances.

Nevertheless, McCreanor provided grievant with the Formal Appeal Forms for both grievances, and stated that they had to be completed and returned to the IGC by 11/21/06. Grievant did as directed and sent copies to Your Office and Deputy Warden Pierce. The IGC, Mrs. Mercer, however, returned the appeals dated received 11/20/06 and stated

> "There were no hearings held and no decisions made on 21201 & 72883. Therefore, there is nothing to appeal yet. Hearings will be held in the near future. Cpl. Merson"

This is no surprise to Grievant, because both of his Reprisal grievances have already been grossly mishandled in violation of IGP 4.4, and Grievant has and continues to be subjected to both the underlying grieved behavior and the subsequent reprisals without any meaningful corrective action taken. Indeed, the grievance procedure has and continues to abused and mishandled to Grievant's detriment by CMS and the Department. There is no legitimate penological objective in continuing to abuse the IGP.

In any event, a decision was made (a) Not to investigate the reprisal grievances, (b) Not to correct the behavior, (c) Not to comply with IGP 4.4 by prohibiting those named in the reprisal grievance from participating in the grievance process, and (d) At the last minute, to stall and not discuss or attempt to resolve the matter but all of a sudden claim concern over the IGP 4.4 regulations that have freely been abused up to this date. Indeed, Grievant's timely filed appeals largely note this mishandling as grounds.

In any event, grievant has in good faith followed the IGP 4.4, followed the directions of the IGC McCreanor when Grievant filed his final appeals and to stall corrective with further illegitimate mechanisms is evidence of sill more mishandling. Indeed, # 21201 has been mishandled for over a year, and this is despite the 180 day time limit for resolution for a grievance according to IGP 4.4. Moreover, # 72883 should have never been brought before CMS reps and Grievant requested and outside board do to the nature of the reprisal claims, etc.

In conclusion, Grievant requests that his timely filed appeals be decided and that no further mishandling occurs.

Respectfully,

Dave N

Commissioner S. Taylor            II-B

DCC   Delaware Correctional Center
Smyrna Landing Road
SMYRNA DE, 19977
Phone No. 302-653-9261

## GRIEVANCE INFORMATION - MGC

### OFFENDER GRIEVANCE INFORMATION

**Offender Name :** WILLIAMSON, DAVID W

**SBI#** : 00183022

**Institution** : DCC

**Grievance #** : 21201

**Grievance Date** : 11/14/2005

**Category** : Individual

**Status** : Unresolved

**Resolution Status:**

**Inmate Status :**

**Grievance Type:** Health Issue (Medical)

**Incident Date** : 11/11/2005

**Incident Time :** 10:45

**IGC** : Merson, Lise M

**Housing Location :** Bldg W1, Tier L, Cell 12, Single

### MGC

**Date Received** : 10/30/2006

**Date of Recommendation:** 12/20/2006

### GRIEVANCE COMMITTEE MEMBERS

| Person Type | SBI# | Name | Vote |
|---|---|---|---|
| Staff | | Eller, Gail | Deny |
| Staff | | McLaren, Jan | Deny |
| Staff | | Gordon, Oshenka | Deny |
| Staff | | McCreanor, Michael | Abstain |

### VOTE COUNT

| Uphold : 0 | Deny : 3 | Abstain :1 |
|---|---|---|

### TIE BREAKER

| Person Type | SBI# | Name | Vote |
|---|---|---|---|

### RECOMMENDATION

Hearing held 20 December 2006.

Deny: Cannot offer monetary damages or any compensation for possible medical issue stated within.

Inmate provided with an appeal form. Appeal due 27 December 2006.

$\text{II} \cdot \text{B}$

DCC Delaware Correctional Center
Smyrna Landing Road
SMYRNA DE, 19977
Phone No. 302-653-9261

## GRIEVANCE INFORMATION - MGC

### OFFENDER GRIEVANCE INFORMATION

| | | |
|---|---|---|
| **Offender Name :** WILLIAMSON, DAVID W | **SBI#** : 00183022 | **Institution** : DCC |
| **Grievance #** : 78623 | **Grievance Date** : 10/23/2006 | **Category** : Individual |
| **Status** : Unresolved | **Resolution Status:** | **Inmate Status :** |
| **Grievance Type:** Health Issue (Medical) | **Incident Date** : 10/23/2006 | **Incident Time :** |
| **IGC** : Merson, Lise M | **Housing Location :** Bldg W1, Tier L, Cell 12, Single | |

### MGC

**Date Received :** 11/13/2006                **Date of Recommendation:** 12/20/2006

### GRIEVANCE COMMITTEE MEMBERS

| Person Type | SBI # | Name | Vote |
|---|---|---|---|
| Staff | | Eller, Gail | Uphold |
| Staff | | McLaren, Jan | Uphold |
| Staff | | Gordon, Oshenka | Uphold |
| Staff | | McCreanor, Michael | Abstain |

### VOTE COUNT

| | | |
|---|---|---|
| **Uphold :** 3 | **Deny :** 0 | **Abstain :** 1 |

### TIE BREAKER

| Person Type | SBI # | Name | Vote |
|---|---|---|---|
| | | | |

### RECOMMENDATION

Hearing held 20 December 2006.
Uphold: 11/27/06 Waiting for approval of brace by DuShuttle/Warden.

Inmate provided with an appeal form. Appeal due 27 December 2006.

II - B

Ⅱ−    Exhibit-C

## Grievance Appeal Form

This must be completed and returned to the IGC within 3 days of receipt of the
Warden/Designee/MGC Decision. This form is to be returned via the Grievance Box.
This form is to be used Only in the event of a decision appeal. Please specify the reason for the appeal in the space below.

Grievant: _Williamson, David_          SBI#: _183022_

Housing Unit: _W·1_                        Case#: _59170_

Date: SEPTEMBER 27, 2006                    Due Date: OCTOBER 4, 2006

Grievant filed Emergency Medical Grievance #59170 because the newest
incident – an eight day Chronic-care medication interruption (ccmI)-was the
tenth consecutive ccmI between July 05 and July 06, and despite
repeated assurances by CMS to correct the continuous yet unnecessary
problem (which is documented in a prior completed MG# 15453) CMS
has intentionally refused to correct the ccmI(s). In fact, CMS
flatly refused to implement any reasonable corrected measure –
flatly refused to provide Grievant with his doctor's prescribed meds in
a timely and appropriate manner. (See attached Affidavit at #2 – #8).
Moreover, CMS has intentionally falsified medical records in
Grievant's medical file in a bad faith attempt to fabricate
a semblance of corrective action and or to manufacture a
defense to CMS's deliberate indifference to Grievant's known
serious medical condition. (See attached Affidavit at #9 – #18).
The D.O.C is knowledgable of these on-going and pervasive ccmI(s)
by virtue of MG# 15453 and the instant mG# 59170, and it is clear
cms refuses to correct the problem – and now CMS is engaged in
falsifying Grievant's medical records. These acts demand immediate
corrective action to preclude further suffering and further constitutional
violations.

_Dave W_
INMATE SIGNATURE
9-27-06

If you need additional space, attach 8.5" X 11" size sheets of paper.

## AFFIDAVIT OF DAVID WILLIAMSON

VI-A

1. I, David Williamson, am the Affiant listed above and do depose the following:

2. Affiant attended a Formal Grievance Hearing on 9-27-06 that was headed by CMS representative Gail Eller and Lt. McCreanor, etc.

3. This hearing regarded Emergency Medical Grievance # 59170, of which claimed that CMS was acting with deliberate indifference by creating and or failing to correct the on going incidence of repeat chronic-care medication interruptions (CCMI).

4. Affiant experienced ten consecutive CCMI(s) from July 05 to July 06.

5. Eller began the hearing by declaring: "I am denying your grievance. You (affiant) requested all 120 doses to limit interruptions; we are not going to do that. You had asked that stock supplies be provided within twenty-four hours of notice of an interruption, but you have to realize that though we keep some stock supplies we are not a pharmacy and you will just have to wait. And you had requested damages be awarded — that's not going to happen!"

6. Affiant stated that once the Chronic-care Clinic (Clinic) is provided and the doctor consequently signs-off on the "Refill" for the next 120-day (ie. doses) cycle, there is no legitimate reason not to provide the patient with the four thirty-day med cards, and that this simple and reasonable corrective measure would limit CCMI(s) to no more than three per year as opposed to a potential twelve.

7. Affiant continued to point out CMS's history over the past year where CMS caused Affiant ten consecutive and unnecessary CCMI(s) despite knowledge prior to each and every lapse, and that in view of these repeat failures it is both reasonable and warranted to provide all the order doses at one time to realize meaningful correction.

8. Eller matter-of-factly replied: "Your grievance is denied."

9. Affiant then asked Eller: "Well, how do you propose to correct this continuous problem?" "Heck, its been over 120-

days since my last Clinic and I wrote for the necessary Clinic on 9-11-06 and on 9.22.06, but to date no Clinic has been provided. This will result in another unnecessary med interruption!"

10. Eller flipped open Affiant's medical file and stated: "You were here for your Clinic on 8-31-06. You saw Bailey and she gave you one pill and it says here Bailey told you not to wait so long next time."

11. Affiant responded: "I have not been to a Clinic since May 06 — I'm past due for one now — and I certainly wasn't here on 8-31-06."

12. Eller confirmed Affiant's name and SBI number and stated "I'm looking at you vitals listed here and it says you were out of meds, given one pill, and told not to wait so long next time — on 8-31-06."

13. "That is false — that is a false entry in my medical filed!" Affiant replied. No one denied this or even acted surprised.

14. Affiant proved his accusation without even having to secure his work record or other verifying documentation that would diffinitively place Affiant at another location on 8-31-06 by simply asking: "Well, if I was here on 8-31-06 for a Clinic as you claim, then I suppose my meds were Refilled?"

15. "No, I don't see a Refill order," Eller admitted.

16. Affiant pointed out the obvious: "You say I was here for a Clinic — you say you have my vitals — and we all know that Clinics are scheduled to reorder chronic-care meds, but there is no accompanying Refill order ... that is a false record!"

17. Eller merely dropped her head and said she would get my meds.

18. The above is true and correct as Affiant experienced it.

Signed and Sworn on this 27 day of September 2006.

Dave W

David Williamson, 183022

MC # 59170 (Appeal Attachment) -2-

Brian D Engram

Notary Public

Brian D. Engram
Notary Public, State of Delaware
My Commission Expires June 14, 2008

Expires

DCC  Delaware Correctional Center
Smyrna Landing Road
SMYRNA DE, 19977
Phone No. 302-653-9261

Date: 08/08/2006    Ⅵ·Ａ

# GRIEVANCE REPORT

## OFFENDER GRIEVANCE INFORMATION

Offender Name : WILLIAMSON, DAVID W

Grievance # : 59170

Status : Unresolved

Grievance Type: Health Issue (Medical)

IGC : Merson, Lise M

SBI# : 00183022

Grievance Date : 07/30/2006

Resolution Status :

Incident Date : 07/30/2006

Housing Location : Bldg W1, Tier L, Cell 12, Single

Institution : DCC

Category : Individual

Resol. Date :

Incident Time :

## OFFENDER GRIEVANCE DETAILS

Description of Complaint: Inmate claims: Deliberate indifference to my known serious medical needs by CMS by employing / permitting a custom / policy of repeatedly denying / delaying the distribution of chronic care meds for non medical reasons. Tenth consecutive interruption on 7/30/06.

Remedy Requested : 1. Provide all prescribed 120 doses, 4 cards, at beginning of cycle to limit interruptions. 2. provide emergency stock supply of chronic care meds within 24 hors of notice of any interruption; and provide damages.

## INDIVIDUALS INVOLVED

| Type | SBI # | Name |
|------|-------|------|

## ADDITIONAL GRIEVANCE INFORMATION

Medical Grievance : YES

Investigation Sent : 08/08/2006

Grievance Amount :

Date Received by Medical Unit : 08/08/2006

Investigation Sent To : Rodweller, Deborah

Ⅱ · Ⅰ

DCC  **Delaware Correctional Center**
**Smyrna Landing Road**
**SMYRNA DE, 19977**
**Phone No. 302-653-9261**

Date: 08/08/2006  $\sqrt{1} \cdot A$

# INFORMAL RESOLUTION

| OFFENDER GRIEVANCE INFORMATION | | |
|---|---|---|
| **Offender Name :** WILLIAMSON, DAVID W | **SBI#** : 00183022 | **Institution** : DCC |
| **Grievance #** : 59170 | **Grievance Date** : 07/30/2006 | **Category** : Individual |
| **Status** : Unresolved | **Resolution Status:** | **Inmate Status :** |
| **Grievance Type:** Health Issue (Medical) | **Incident Date** : 07/30/2006 | **Incident Time :** |
| **IGC** : Merson, Lise M | **Housing Location :** Bldg W1, Tier L, Cell 12, Single | |

| INFORMAL RESOLUTION | |
|---|---|
| **Investigator Name** : Rodweller, Deborah | **Date of Report** 08/08/2006 |

**Investigation Report :**

**Reason for Referring:**


Offender's Signature:_____

Date                  :_____

Witness (Officer)      :_____

$\text{II} \cdot C$

DCC  **Delaware Correctional Center**
**Smyrna Landing Road**
**SMYRNA DE, 19977**
**Phone No. 302-653-9261**

Date: 09/29/2006   Vi · A

## GRIEVANCE INFORMATION - MGC

### OFFENDER GRIEVANCE INFORMATION

| | | |
|---|---|---|
| **Offender Name** : WILLIAMSON, DAVID W | **SBI#**            : 00183022 | **Institution**    : DCC |
| **Grievance #**    : 59170 | **Grievance Date** : 07/30/2006 | **Category**    : Individual |
| **Status**         : Unresolved | **Resolution Status:** | **Inmate Status :** |
| **Grievance Type:** Health Issue (Medical) | **Incident Date**    : 07/30/2006 | **Incident Time :** |
| **IGC**            : Merson, Lise M | **Housing Location** : Bldg W1, Tier L, Cell 12, Single | |

### MGC

**Date Received** : 08/11/2006          **Date of Recommendation:** 09/29/2006

### GRIEVANCE COMMITTEE MEMBERS

| Person Type | SBI # | Name | Vote |
|---|---|---|---|
| Staff | | Eiler, Gail | Uphold |
| Staff | | Heddinger, Brenda | Uphold |
| Staff | | Gordon, Oshenka | Uphold |
| Staff | | McCreanor, Michael | Abstain |

### VOTE COUNT

| | | |
|---|---|---|
| **Uphold : 3** | **Deny : 0** | **Abstain : 1** |

### TIE BREAKER

| Person Type | SBI # | Name | Vote |
|---|---|---|---|
| | | | |

### RECOMMENDATION

Hearing Held 9/28/2006.
Uphold: Check with pharmacy about medications if need order get MD to write order & schedule to see MD.

Inmate verbally informed of MGC Decision and appeal form was supplied.
Appeal due 10/5/2006.

Ⅱ · C

DCC **Delaware Correctional Center**
**Smyrna Landing Road**
**SMYRNA DE, 19977**
**Phone No. 302-653-9261**

**Date:** 10/10/2006   VI·A

## GRIEVANCE INFORMATION - Appeal

| OFFENDER GRIEVANCE INFORMATION | | | |
|---|---|---|---|
| **Offender Name :** WILLIAMSON, DAVID W | **SBI#** : 00183022 | **Institution** : DCC | |
| **Grievance #** : 59170 | **Grievance Date** : 07/30/2006 | **Category** : Individual | |
| **Status** : Unresolved | **Resolution Status :** | **Inmate Status :** | |
| **Grievance Type:** Health Issue (Medical) | **Incident Date** : 07/30/2006 | **Incident Time :** | |
| **IGC** : Merson, Lise M | **Housing Location :** Bldg W1, Tier L, Cell 12, Single | | |

| APPEAL REQUEST |
|---|

Appeal arrived 10/9/2006. Appeal accepted, Cpl Merson did not collect grievances/appeals due to being out on leave. Appeal states: Grievant filed emergency medical grievance #59170 because the newest incident - an 8 day chronic care medication interruption was the 10th consecutive chronic care medication interruption between July 05 and July 06, and despite repeated assurances by CMS to correct the continuous yet unnecessary problem (which is documented in a prior completed medical grievance #15453) CMS has intentionally refused to correct the chronic care medication interruptions. In fact, CMS has flatly refused to implement any reasonable corrected measure - flatly refused to provide grievant with his doctors prescribed meds in a timely and appropriate. Moreover, CMS has intentionally falsified medical records in Grievant¿s medical file in a bad faith attempt to fabricate a semblance of corrective action and or to manufacture a defense to CMS's deliberate indifference to Grievant¿s known serious medical condition. The DOC is knowledgeable of these on-going and pervasive chronic care medication interruptions by virtue of medical grievance #15433 and the instant medical grievance 59170, and it is clear CMS refuses to correct the problem - and now CMS is engaged in falsifying Grievant¿s medical records. These acts demand immediate corrective action to preclude further suffering and further constitutional violations.

| REMEDY REQUEST |
|---|

II·C

VI-A

David Williamson
SBI #183022, W-1, L-12
1181 Paddock Rd.
Smyrna, DE 19977
September 29, 2006

Mr. S. Altman, CMS Ombudsman

RE: CMS's Outright Refusal to Correct the Known and Ongoing Chronic-care
Medication Interruptions and CMS's Intentional Falsification of Medical Records

Dear Mr. Altman:

Enclosed is a copy of the Final Appeal and attached Affidavit for MG# 59170. The
affidavit outlines CMS's outright refusal to take the bare minimal and most reasonable
measures to correct the repeated chronic-care medication interruptions (CCMI), and it
contains an outline of the deliberate falsification of my medical records. (See exhibits A-
1 – A-3).

This behavior is shocking and should have been investigated and corrected by CMS when
I rose nearly identical accusations in my complaint letter dated 8/15/06: That CMS
personnel made falsified claims regarding the distribution of chronic care meds. (See Ex.
B). This prior complaint letter went unanswered, went uncorrected, and now this
outrageous behavior has escalated into the entry of falsified medical records. Falsifying
medical records to (a) make it appear that I received treatment when I did not and to (b)
manufacture a fictitious defense or a bad faith attempt to shift the blame to me is clearly a
likely violation of my constitutional rights and likely to cause me harm. CMS was bound
to investigate and correct the first (8/15/06) allegation, but evidently did not. I trust this
failure will not be repeated.

In closing, I request that both the 8/15/06 and this instant incident is investigated and
corrected. I also expect a report of your findings and action. Thank you for your time and
consideration with this matter.

Dave N

II-C

II - Exhibit-D

**FORM  #584**

**GRIEVANCE FORM**

FACILITY: D.C.C.                    DATE: 10·3·06

GRIEVANT'S NAME: David Williamson    SBI#: 00183022

CASE#: 72883                    TIME OF INCIDENT: Ongoing

HOUSING UNIT: W-1, L-12

BRIEFLY STATE THE REASON FOR THIS GRIEVANCE. GIVE DATES AND NAMES OF OTHERS INVOLVED
IN THE INCIDENT OR ANY WITNESSES. CMS intentionally committed "Adverse Acts"
against me (grievant) by entering false records in my medical file in
direct response to my grievance activity. Adverse actions are prohibited
as "Reprisal" by the IGP 4.4 and my Constitutional rights.
    Specifically, I attended a Formal Grievance hearing with CMS
representative Gail Eller and IGC McCreanor, et al on 9·27·06. It was
regarding an Emergency Medical Grievance (EMG 59170), of which claimed
that CMS was intentionally creating chronic-care medication interruptions
(CCMI). Consequently, in response to this EMG, CMS intentionally
fabricated medical records to (a) create the appearance that CMS had
provided treatment/corrective action when it had not; and (b) create
a bad faith defense by shifting the blame to me for the CCMI
(See attached Affidavit A-1 & A-2) (Continued at page 2 of 584 form)

ACTION REQUESTED BY GRIEVANT:

1. Immediately seize all my medical records - including medical griev-
ances - and copy same and provide copy to me as I am litigating my
civil case (06-379-SLR) pro se - and or forward to the U.S. District Court.
2. Correct the matter and repremand the personnel involved. 3. Provide Damages.

GRIEVANT'S SIGNATURE: David W         DATE: 10·3·06

WAS AN INFORMAL RESOLUTION ACCEPTED?        ____(YES)    ____(NO)

(COMPLETE ONLY IF RESOLVED PRIOR TO HEARING)

GRIEVANT'S SIGNATURE:_____    DATE:_____

**IF UNRESOLVED, YOU ARE  ENTITLED TO A HEARING BY THE RESIDENT GRIEVANCE COMMITTEE.**

cc: INSTITUTION FILE
     GRIEVANT

April '97 REV

- 1 -    II-D

(Cont. from page 1 of 10-3.06 Reprisal Grievance.)

**FORM #584**

V1-B

**GRIEVANCE FORM**

FACILITY: DCC

DATE: 10-3-06

GRIEVANT'S NAME: David Williamson

SBI#: 00183022

CASE#:

TIME OF INCIDENT: Ongoing

HOUSING UNIT: W-1, L-12

BRIEFLY STATE THE REASON FOR THIS GRIEVANCE. GIVE DATES AND NAMES OF OTHERS INVOLVED IN THE INCIDENT OR ANY WITNESSES.

Unfortunately for cms, it created a false record of me attending a chronic-care Clinic for the purpose of placing a "Refill" order for my chronic-care meds; however, cms forgot to also manufacture the requisite "Refill" order. I flatly charged that the record was "false," and when I pointed out the irreconcilable fact that no Clinic could have taken place because there was no "Refill" order for the same date, their conspiracy unravelled. Also attached are copies of my work attendance that clearly ✓ demonstrate the falseness of these records and alleged conversation. (See B-1 & 2) Lastly, this is not the first time I challenged fictitious claims made by CMS employees, and therefore CMS knowingly ✓failed to correct this shocking behavior and it continues to esculate ✓and does evince Reprisal and ✓deliberate indifference to my serious medical needs. (See attached Letter dated 8-15-06 at C-1 & 2).

ACTION REQUESTED BY GRIEVANT:

See page one attached.

GRIEVANT'S SIGNATURE: David W

DATE: 10·3·06

WAS AN INFORMAL RESOLUTION ACCEPTED?        _____(YES)    _____(NO)

(COMPLETE ONLY IF RESOLVED PRIOR TO HEARING)

GRIEVANT'S SIGNATURE:_____    DATE:_____

**IF UNRESOLVED, YOU ARE ENTITLED TO A HEARING BY THE RESIDENT GRIEVANCE COMMITTEE.**

cc: INSTITUTION FILE
    GRIEVANT

April '97 REV

## AFFIDAVIT OF DAVID WILLIAMSON

VI·B

1. I, David Williamson, am the Affiant listed above and do depose the following:

2. Affiant attended a Formal Grievance Hearing on 9-27-06 that was headed by CMS representative Gail Eller and Lt. McCreanor, etc.

3. This hearing regarded Emergency Medical Grievance # 59170, of which claimed that CMS was acting with deliberate indifference by creating and or failing to correct the ongoing incidence of repeat chronic-care medication interruptions (CCMI).

4. Affiant experienced ten consecutive CCMI(s) from July 05 to July 06.

5. Eller began the hearing by declaring: "I am denying your grievance. You (affiant) requested all 120 doses to limit interruptions; we are not going to do that. You had asked that stock supplies be provided within twenty-four hours of notice of an interruption, but you have to realize that though we keep some stock supplies we are not a pharmacy and you will just have to wait. And you had requested damages be awarded — that's not going to happen!"

6. Affiant stated that once the Chronic-care Clinic (Clinic) is provided and the doctor consequently signs-off on the "Refill" for the next 120-day (i.e. doses) cycle, there is no legitimate reason not to provide the patient with the four thirty-day med cards; and that this simple and reasonable corrective measure would limit CCMI(s) to no more than three per year as opposed to a potential twelve.

7. Affiant continued to point out CMS's history over the past year where CMS caused Affiant ten consecutive and unnecessary CCMI(s) despite knowledge prior to each and every lapse, and that in view of these repeat failures it is both reasonable and warranted to provide all the order doses at one time to realize meaningful correction.

8. Eller matter-of-factly replied: "Your grievance is denied."

9. Affiant then asked Eller: "Well, how do you propose to correct this continuous problem?" "Heck, its been over 120-

-1-

II·D

V1-B

days since my last Clinic and I wrote for the necessary Clinic
on 9·11·06 and on 9.22.06, but to date no Clinic has been
provided. This will result in another unnecessary med interruption!"
   10. Eller flipped open Affiant's medical file and stated:
      "You were here for your Clinic on 8·31·06. You saw
       Bailey and she gave you one pill and it says here
       Bailey told you not to wait so long next time."
   11. Affiant responded: "I have not been to a Clinic since
May 06 — I'm past due for one now — and I certainly wasn't here
on 8·31·06."
   12. Eller confirmed Affiant's name and SBI number and stated
"I'm looking at you vitals listed here and it says you were out of
meds, given one pill, and told not to wait so long next time — on 8·31·06."
   13. "That is false — that is a false entry in my medical
filed!" Affiant replied. No one denied this or even acted surprised.
   14. Affiant proved his accusation without even having to secure
his work record or other verifying documentation that would
diffinitively place Affiant at another location on 8·31·06 by simply
asking: "Well, if I was here on 8·31·06 for a Clinic as you claim,
then I suppose my meds were Refilled?"
   15. "No, I don't see a Refill order," Eller admitted.
   16. Affiant pointed out the obvious: "You say I was here for a
Clinic — you say you have my vitals — and we all know that Clinics are
scheduled to reorder chronic-care meds, but there is no accompanying
Refill order ... that is a false record!"
   17. Eller merely dropped her head and said she would get my meds.
   18. The above is true and correct as Affiant experienced it.


Signed and Sworn on this  27  day of September 2006.


Dave W.                                        Brian D. Engrem

David Williamson, 183022                       Notary Public
                                               Brian D. Engrem
MG # 59170  (Appeal Attachment)-2-             Notary Public, State of Delaware    Expires
            9.17.06                II-D        My Commission Expires June 14, 2008   10-14-08

V1-B

David Williamson
SBI #183022, W-1, L-12
1181 Paddock Rd.
Smyrna, DE 19977
August _15_, 2006

Mr. S. Altman, Ombudsman
Re: CMS Reply Letter 8/8/06

Dear Sir:

Greetings, I received a CMS reply letter (Reply) from you dated 8/08/06 (See A-1 Reply). It was a reply to my letter dated 7/30/06, in which I complained of a ninth consecutive Chronic-care medication interruption (CCMI), and I challenged the so called "new" corrective med distribution system as a known failure. (See A-2 Complaint). I am extremely disturbed about several distortions that are contained in the CMS reply: It contains several claims that are either preposterous or wholly fictitious.

For example, the Reply states that the pharmacy received my Chronic-care meds (CCM) on "7/17/06" and that I was placed on the medication pick-up list (MPUL) on "7/19 & 7/20." Furthermore, it alleges that I--for the first time-was too busy to pick these meds up on either date.

First, this is preposterous. I diligently check both the hospital schedule and the MPUL daily (Mon. thru Friday), and either my name did not appear on these dates as stated or the MPUL was not posted in our housing unit on these dates. If it had, I would have seen it and been all too happy to receive my CCM(s) early rather than late. Moreover, to date I have never missed a scheduled CCM pick up, not does my work or personal schedule interfere with the 1:30 PM pick up time. It is very important to me to have these CCML(s) corrected, and I deeply resent this allegation.

In addition, this statement is suspect for several reasons:

1. Suspect because 7/17/06 was four days before I even submitted my request for my CCM refill (See A-3 Refill dated 7/21/06). If they were --incredibly- in prior to my request on 7/21/06, then why were they not provided to me until 8/8/06? And assuming arguendo, why was my name removed from the MPUL after only two days? Or why was my name not placed back on the list after my 7/21/06 refill request? The information you were provided does not agree with these concurrent facts or any likely and reasonable inferences drawn from them.

2. Suspect because normal on-site pharmacy behavior has been to post one's name on the MPUL for five consecutive days before removing the name and returning the meds or canceling them. In contrast, you cite only two dates posting --not five. Does this mean that names will no longer be posted for five days or is this yet another anomaly? Also, the meds were not returned or cancelled despite my alleged failure to collect them. Does this mean that they will no longer be returned etc. or is this yet another anomaly? The information you were provided again does not agree with standard operating procedures.

II·D

3.  Suspect because (a) I submitted a request for a refill on 7/21/06, and it went unanswered; (b) I filed an Emergency Medical Grievance (EMG) citing this most recent incident on 7/31/06 (C.c. Altman), and it went unanswered; and (c) I filed another notice of the ongoing CCMI(s) to you on 8/7/06, and it went unanswered. (See A-4 Notice 8/7/06). If the pharmacy had these CCM(s) since 7/17/06 –and more importantly- if the pharmacy was inclined to provide these lapsed CCM(s) to me, then how do you reconcile the fact that I was not provided these very CCM(s) until 8/8/06? The information you were provided does not agree with these concurrent facts or any likely and reasonable inferences drawn from them. Moreover, the Reply contains an outright fabrication.

Specifically, it states that I received my-now lapsed_ CCM(s) on "8/04/06" and that the "pharmacy staff" had "immediately contacted" me for them. This is utterly erroneous. The pharmacy never contacted me, and I would be very interested to hear who alledgedly contacted me, how and when they were supposed to have accomplished it, and where it ostensibly took place? Work? My boss did not take any phone call. At the housing unit? No officer took any phone call. The fact is –is that my name appeared on the MPUL on 8/8/06 and that was how I became aware that my meds were available. That is the date I received and signed for them, not 8/04/06 as stated in the Reply. Also, I received them –not immediately- but at the standard time (e.g. 1:30 PM). This is very strange and troubling.

For instance, it is strange that when I attended the first Informal grievance hearing regarding the EMG on 8/10/06 (for this very CCML), before CMS representative Debbie Rodweller; and I informed her that I had just received the CCM(s) on 8/08/06 after an eight-day lapse, that she did not challenge my statement? If I had picked them up on 8/04/06, surely Debbie would know this. She was the investigating CMS rep for this EMG, for this incident, but no she did not! And the reason that she did not have the same erroneous information that you were provided is likely because it is difficult to keep fictitious stories consistent to all investigating parties.

Consequently, the facts speak for themselves. To date CMS has caused me to experience ten consecutive CCMI(s); had not once over the past year (7/07 to 7/06) provided my CCM(s) in a timely fashion –not even when the pharmacy was both aware and did actually possess my lapsed CCM(s). In fact, CMS is aware of several CCMI(s) such instances, in which the on-site pharmacy actually possessed my lapsed CCM(s) but failed to provide them and did exacerbate the interruptions. Moreover, despite CMS's dismall performance regarding this matter, and despite CMS's oft repeated emptly token assurances (four to date) to correct the matter but failing directly after each and assurance, we are now to believe this incredible tail: That it is not CMS who is causing the CCMI(s), but the it is alternatively the patient who is to blame! Utterly preposterous and utterly insulting. It is impossible to remedy this continuous and pervasive problem when those involved busy themselves manufacturing incredible and or false claims. I suggest that you investigate the common denominator in this matter: the pharmacy.

In conclusion, I expect that CMS will correct this shocking behavior. Also, when the facts reveal that I picked up my meds on 8/8/06 and not "immediately contacted" on 8/4/06 to pick them up, I expect a full apology. Thank you for your time in this matter.

Dav~ W~

c.c. Aurea Chief (Monitoring MG 15453) ; ACLU J.Graff    $\text{I} \cdot \text{D}$

#37

Employee Name: _Williamson, David_ SSN: _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_ Class Title: _Clerk L3_

Employment Date: _02/27/04_  Adjusted Service Date: _W_

Accrual Rate: _____
Sick: _____
Vacation: _____

Balance Carried Forward

Sick Accrual (hrs per month) - 37.5 hrs: 9.5 / 40.0 hrs: 10

Vacation (hrs per month) - 37.5 hrs: 9.5, at 10 yrs: 11.25, at 15 yrs: 13.25 / 40 hrs: 10, at 10 yrs: 12, at 15 yrs: 14

CRUALS ARE NOT APPLIED UNTIL THE END OF THE MONTH  (Max. annual vac. accrual: 318 @ 37.5, 336 @ 40)

| | HOLIDAY | SICK | VACATION |
|---|---|---|---|
| Used in 2006 | | | |

Check here if perfect attendance 2006 ☐

Leave balances at end of 2006

| | HOLIDAY | SICK | VACATION |
|---|---|---|---|

II. D

Remarks:

**NOTE TO TIMEKEEPER:** Provide each employee a copy of their timecard at the end of 2006. Forward the original to Human Resources.

**NOTE TO EMPLOYEES:** Your leave balances for 2006 are displayed here>>

Review and note accruals at top of card. Resolve discrepancies with your timekeeper.

V i · B

# Employee Attendance Report for P.I. Bldg. #15

| Card # | Worker Name | Date | Reason | Comments |
|---|---|---|---|---|
| 19 | Bolden, LaWarren | 8/29/200 | Medical | |
| 20 | Robinson, Harold | 8/2/2006 | Unexcused | to hot |
| | | 8/3/2006 | Unexcused | to hot |
| | | 8/30/200 | Medical | Dr. Appt. |
| 21 | Barnett, Lawarence | 8/3/2006 | Medical | Dr. Appt. |
| | | 8/7/2006 | Scheduled/Volu | |
| | | 8/11/200 | Medical | Dr. Appt. |
| | | 8/29/200 | Medical | Dr. Appt. |
| 23 | Ortiz, Miguel | 8/28/200 | Unexcused | suspended pending |
| | | 8/29/200 | Unexcused | suspended pending |
| | | 8/30/200 | Unexcused | suspended pending |
| 24 | Caudill, William | 8/1/2006 | Medical | grievance |
| | | 8/9/2006 | Medical | X-Ray |
| 25 | Bowen, David | 8/31/200 | Medical | Dr. Appt |
| 26 | Murphy, Robert | 8/9/2006 | Medical | X-Ray |
| | | 8/22/200 | Medical | Dr. Appt |
| 30 | Boatswain, Roger | 8/3/2006 | Visit | |
| | | 8/7/2006 | Scheduled/Volu | |
| | | 8/17/200 | Medical | Dr. Appt. & Group |
| | | 8/30/200 | Medical | Dr. Appt. |
| 31 | Harris, Darnell | 8/9/2006 | Medical | Dr. Appt |
| 32 | Johnson, Jeffrey | 8/7/2006 | Scheduled/Volu | |
| 36 | Martinez, Roberto | 8/7/2006 | Scheduled/Volu | |
| 37 | Williamson, David | 8/1/2006 | Medical | grievance hearing |
| | | 8/10/200 | Medical | grievance hearing |
| | | 8/24/200 | Other | education testing |
| 38 | Marshall, Bobby | 8/28/200 | Unexcused | suspended pending |
| | | 8/29/200 | Unexcused | suspended pending |
| | | 8/30/200 | Unexcused | suspended pending |
| 39 | Cubbage, Phillip | 8/2/2006 | Medical | Dr. Appt. |
| | | 8/3/2006 | Medical | Dr. Appt. |
| | | 8/10/200 | Visit | |
| | | 8/11/200 | Medical | Dr. Appt. |

II · D

## AFFIDAVIT OF DAVID WILLIAMSON

1. I, David Williamson, am the Affiant listed above and do depose and state the following:

2. On 10/18/06 at about 12:15 pm, Affiant was directed by his building officer to report to the hospital: "You won your grievance; you're being called in for an unscheduled medical visit."

3. Affiant had been scheduled in earlier (7:00am) for an unrelated "Reprisal" medical grievance hearing; however, Affiant was not otherwise scheduled for any other medical activity.

4. Affiant checked in and received the standard procedure for a Chronic-care Clinic (Clinic): the purpose of which is to normally place a Refill/Order for one's chronic-care medication (CC Meds); however, a doctor may Reorder one's CC Meds at any time absent a Clinic if circumstances warrant it.

5. Affiant was brought to Doctor Van Dusen upon which Van Dusen began to question Affiant about his chronic-care condition (hypo-thyroidism), and Affiant then realized that the unscheduled call-in was to replace the Clinic that CMS had "faked" on 8/31/06 (disclosed on 9/27/06 at MG # __59/70__ hearing).

6. Affiant had not had a Clinic since May 8, 2006 and was due for one in August 06 (circa) (i.e. 90-days) or no later than Sept. 06 (circa) (i.e. 120-days) - before Affiant's CC Meds ran out (i.e. interrupted).

7. Affiant had written CMS about the past due Clinic –and the inevitable but preventable chronic-care medication interruption (CCMI) - on 9/11/06, again on 9/22/06, and 10/4/06; and on 9/27/06 Affiant received a personal assurance from Gail Eller (CMS employee at the on-site hospital) at the MG hearing that she would take care of Affiant's CC Meds. CMS failed to conduct the Clinic, CMS failed to Reorder Affiant's CC Meds, Eller failed to do either, and on 10/05/06 Affiant experienced an unnecessary CCMI. Affiant wrote again on 10/14/06. CMS caused this, to date, thirteen-day CCMI despite notice.

8. Van Dusen inquired of Affiant: "How is your energy level?" "Doc, I'm suffering chronic fatigue: I can't promote good health through meaningful exercise. I can't do anything that I once enjoyed doing because of this chronic fatigue and my body's turned to fat and is wasting away. Also, I find it difficult to concentrate. In fact, it's not just physical problems, it has adversely affected my work performance and studies," Affiant replied.

9. "I'm not surprised with a TSH [i.e. thyroid stimulating hormone] level of over six," Van Dusen replied.

10. Consequently, CMS had both subjective and objective knowledge of Affiant suffering the impairment of his normal daily functions and of the common symptoms of hypothyroidism.

11. "Yeah, I'm not surprised either with CMS's intentional refusal to provide me my thyroid meds. In fact, it is rational behavior when you consider the economics," Affiant continued.

12. Van Dusen replied: "Unfortunately, *I must agree with you.* I have seen a pattern the past two months that I've worked here –CMS talks a good talk but fails to follow up. They pay us doctors pretty well, but they *short-change you guys.*"

1

T·ε

13. Affiant was astounded that a CMS employee finally admitted to Affiant CMS's custom/policy of cost-avoidance.

14. Van Dusen indicated he would place the Refill/Order for the CC Meds, and he placed an order for Lab work, and wanted blood pressure reading weekly due to Affiant's elevated blood pressure. Van Dusen stated: "Your blood pressure is probably up due to your frustration, but I want a few more data points before I increase your dosage."

15. Affiant then realized that the already lapsed CC Meds had not been Reordered at all despite all the notices Affiant gave to CMS and Eller's assurance that she would take care of it on 9/27/06.

16. Affiant checked for clarification by relating all his efforts to avoid another unnecessary CCMI (listed above at paragraph 7), and the post 10/15/06 correspondence; and then asking: "With all this notice and Eller's promise, are you telling me that no Refill order was ever placed! I've been out since 10/05/06 –thirteen days!"

17. "No order was entered. I'm doing it now," was Van Dusen's reply.

18. Affiant subsequently asked about the status of his needed ACL reconstructive surgery –that Dr. Durst had filed the appropriate referral and that Dr. DuShuttle had also recommended it?" Van Dusen found Durst's order for the reconstructive surgery and stated: "Looks like regional had not authorized it."

19. "Do you mean not authorized or denied?" Affiant inquired.

20. "Well, it appears as though the request by Doctor Durst was ignored –see the box here is blank – and if Regional had responded, any response would have been recorded in the box," Van Dusen replied.

21. Van Dusen continued, "I will refile the paper work today, but I have to be frank with you, they [CMS] will probably say you need physical therapy."

22. Affiant stated: "Both doctors stated unequivocally that reconstructive surgery was needed; that my ACL was 'ruptured' and that surgery was the only viable option."

23. Van Dusen replied: "I would also recommend the same –any doctor in his right mind would- and I don't mean to laugh, but that is what Regional will probably authorize. See CMS is like an insurance company. They will continue to deny your requests until all your "T's and all your "I"s are dotted. You will have to force them."

24. Again Affiant was astonished at Van Dusen's frankness and admission to Affiant what Affiant had been charging in his repeated Medical Grievances: that CMS was intentionally denying or delaying needed treatment as a custom/policy of cost-avoidance, and of which was not based on any legitimate medical or penological factors.

25. The above is true and correct according to Affiant's personal experience and belief.

Sworn and Subscribed before me this 23 day of October 2006.

David Williamson

**Brian D. Engrem**
Notary Public, State of Delaware
My Commission Expires June 14, 2008

Notary Public

Brian D. Engrem
Notary Public State of Delaware
My Commission Expires June 14, 2008

2

# Exhibits

III- A-1  Counselor's Report    7/25/05

III- A-2  Worker's Evaluation    12/6/05

III- A-3  Notice "...beyond ... alloted time....  7/11/06

III- A-4  Williamson's Request for an Extension of Time  8/03/06

III- B-1  Insufficient Law Library Access Complaint  10/18/06

III- C-1  Motion for Expert Witness

III- E-1-7  Representation Requests / Rejections

III- D-1  CMS Medical Records Denial  5/10/06

III ⅟ D-2  Subsequent Written Request for Records as per MG# 72883

III - A

FORM #: 123

**COUNSELING REPORT**

| Number | Name | Institution | Date of Report |
|--------|------|-------------|----------------|
| 183022 | David Williamson | DCC | 7/25/05 |

1. Specific Rule Violated (Offense) This is to serve as documentation of a verbal conseling for I/M

   worker's recent increase in clerical errors in order that he be made aware and correct them.

2. Facts:

| Date of Offense | Time of Offense | Location |
|-----------------|-----------------|----------|
| 7/12 thru 7/25/05 | 11:00AM | Bldg. #15 |

   I/M Williamson is a clerk with CDGM since 2-27-04 and was promoted to Skilled E-grade worker due to his

   merits, however, the weeks of 7-14 & 7-25-05 he has made several clerical errors. Though this is

   uncharacteristic of him, it has become a concern and may affect his next evaluation.

3. Advice to Inmate: I/M Williamson states that he is suffering from "chronic fatigue" and that his focus and

   energy level is suffering because he has not received his thyroid medications. We would suggest that he get

   this problem corrected and perhaps get more sleep if necessary.

4. This report shall be placed in the above inmate's file and a copy shall be given to him/her.

5. The above inmate may prepare a response to this counseling report, which shall be placed with this report in his/her file.

CLERK L3
_____
Employee's Name & Title

Dave W
_____
Signature

$\underline{III \cdot A \ 1}$

PRISON INDUSTRIES
INMATE WORKER PERFORMANCE EVALUATION

NAME: WILLIAMSON, DAVID

DATE OF REVIEW: 12/6/05

SBI NO. 183022

WORK LOCATION: BLDG. 15

HIRE DATE: 2/27/04

SHOP ASSIGNMENT: CDGM

JOB TITLE: CLERK L3

CATEGORY: E    STEP: 2

YEARS TO RELEASE: UNDER 5 _____    UNDER 10 XXX _____    OVER 10 _____

1.    Attendance
___    0 Absent more than 3 days
___    2 Absent 2-3 days
___    4 Absent 1 day
XX    6 No absence

5.    Care of Working Area
___    1 Needs reminding
___    2 Fair
___    3 Avg. Keeps acceptable level
XX    5 Maintains area neat & clean

2.    Observes Safety Rules
___    1 Lax on rules
XX    2 Observes most of time
___    4 Observes rules all the time
___    5 Helps promote safety

6.    Care of All Property
___    1 Marginal
___    2 Fair
___    3 Careful, minimal losses
XX    5 No losses, handles with care

3.    Initiative & Skill Development
___    1 Marginal
___    3 Fair
XX    5 Good, upper 50%
___    7 Seeks respect – self starter

7.    Quantity of Work
___    2 Marginal
___    4 Fair
XX    6 Good, upper 50%
___    8 Exceptional, top 20%

4.    Quality of Work
___    1 Marginal
XX    3 Fair
___    5 Good, upper 50%
___    8 Very low errors – top 20%

8.    Attitude Toward Peers & Supervisor
___    1 Marginal cooperation
___    3 Generally cooperative
___    4 Usually cooperative
XX    6 Full coop. promotes harmony

Total Points: 46

Form #: 199
F&B

III - A - 2

**College for**
**Professional Studies**

July 11, 2006

David Williamson-SBI
C/O- ED Program- M. Alvidrez
Delaware Corr Ctr. 1181 Paddoc
Smyrna, DE 19977

Dear David Williamson-SBI,

This letter shall be official notification that College for Professional Studies
will cease teaching the PB2 - Paralegal Bachelors Degree on or about
September 29, 2006. Our records reflect that you are currently beyond the
allotted time frame for the completion of the PB2 - Paralegal Bachelors
Degree as indicated in the Enrollment Agreement and your record will be
closed.

If you have any questions, please do not hesitate to communicate with
Finance Department at 1-800-817-8272 or email finance@kaplan.edu.

It has been our pleasure to serve you. Best wishes for all your future
endeavors.

Sincerely,

Finance Department
College for Professional Studies

David Williamson
SBI # 183022, W-1, L-12
Student ID 0146709
1181 Paddock Rd.
August 03, 2006

Dean/President of College of Professional Studies
Re: Request for Two Week Extension to Complete the Final Course

To Whom It May Concern:

Greetings, I am writing in the hope that I may secure a fourteen day extension to complete my final course of the Paralegal Bachelor's Degree program. I am in receipt of a July 11, 2006 Notification letter that states the program will discontinue on or about September, 29, 2006. I must admit that this comes as a surprise. I have diligently pursued this endeavor while incarcerated and suffering from hypothyroidism, which causes chronic fatigue among other aggravating symptoms. In fact, I believe my efforts are commendable, considering the obstacles, as demonstrated by my ninety-plus point grade average.

For example, my chronic fatigue and related impairment of concentration that I experience are aggravated by a continuous interruption in my medication distribution regiment. The prison contract health care provider has caused some ten consecutive thyroid med interruptions over this past year and it has caused me great difficulty. I spend some three to four hours six days a week in study; however, I often have to reread a chapter several times. It is not uncommon for me to actually review a text three or more times because of my aggravated symptoms. This is outside my control and I making every attempt to overcome these obstacles. I just require a little more time is all.

Consequently, "On or about" appears to suggest the date may not be so firm as to preclude such a request. I had a family member contact the college to determine the cause of this abrupt announcement and the significance of the September date. It was relayed to me that in December 06, the college was discontinuing operations and that your professors would be taking vacations throughout November/December. Evidently, September was chosen as a cushion prior to the staff limitations of Nov/Dec. This still leaves October 06, and all I ask is for two weeks to complete my final course (Advanced Legal Writing). I requested a thirty day extension via my agent, but the college representative stated it could not be done. I would like to believe that we can come to a mutually agreeable resolution that is reasonable. Specifically, I request a small extension from 9/29/06 until 10/16/06. I believe this will provide me with enough time to adequately complete this involved course, and it will not extend into your scheduled events. I am within sight of my goal. I only request a little consideration and assistance.

In closing, I look forward to your reply, and I thank you in advance for your time and consideration in this matter.

Sincerely,

David W

David Williamson

III · A - 4

III - B-1

David Williamson
SBI #183022, W-1, L-12
1181 Paddock Rd.
Smyrna, DE 19977
October _18_, 2006

Mike Little ✓
RE: Failure to Provide Meaningful Access to the Law Library

Mr. Little:

Greetings, I am writing to notify officials of a troubling development regarding the failure to provide meaningful access to the Law Library/courts. I seek cooperation from the administration in resolving this acute problem prior to experiencing any of the inevitable prejudice to my pro se litigation.

Specifically, I was scheduled for two evening Law Library sessions on 10/02/06 and 10/04/06, of which would normally run from 5:30 pm to 7:30 pm (approximately two hours a piece at a total of four hours). Unfortunately, I was prevented access to the Law Library on 10/02/06 until 7:05 pm and on 10/04/06 until 7:25 pm, and I only received some forty-five minutes of wholly inadequate Law Library time/access. Needed Law Library time was reduced by about a three quarters. I was prevented from attending the Law Library at the scheduled 5:30 pm (circa) time due to having to arbitrarily wait for the Housing Unit to complete its dinner meal run; a head count, though it was not code red; and then every other function scheduled (e.g. PRP, Ramadan, Chapel, et cetera).

Prior to DCC ever running early meal runs for pm scheduled programs et cetera, the custom for those of us who were scheduled for the Law Library was to acquire our Passes at or around 5:30 pm and proceed to the Law Library; if the meal had not been served then we merely chose which was more important. In fact, I chose to forego the meals on both listed dates; however, was still prevented from going to the Law Library in a timely fashion. Forty-five minutes a week is wholly inadequate.

Indeed, this has prevented me, and others I imagine, from working on my properly filed pro se litigation (06-379-SLR). Certainly, not even a member of the Delaware Bar could hope to properly prosecute even a single complaint with such limited resources and circumstances, let alone a pro se litigant. Consequently, this acute limitation of access to the Law Library is so likely to result in prejudice to my litigation (litigation that seeks redress for my serious medical needs) that it is dangerously close to denying me meaningful access to the courts that it warrants corrective action. This administration has -in the past- recognized that meaningful access to the courts is a right and not merely a privilege, and as such, met its obligations and normally provided adequate access to the Law Library. I am sure that this development is only a temporary one now that the administration is aware of the problem.

In conclusion, I am hopeful that DCC will realize a viable corrective action. I thank you in advance for your assistance with this matter and I look forward to your response.

Dave W

c.c. Warden Tom Carroll ✓
     Deputy Warden Pierce ✓

III-B 1

III – **EXHIBIT C**

IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE

DAVID W. WILLIAMSON,                          )
      Plaintiff,                              )
      v.                                      )    C.A. 06-379-SLR
CORRECTIONAL MEDICAL SERVICES, Inc, et al,   )
      Defendants.

## PLAINTIFF'S MOTION FOR APPIONTMENT OF AN EXPERT WITNESS

COMES NOW, Plaintiff, pursuant to Fed. R. Evid. 702, 706 (a); and 28 U.S.C. section 1915, and all other applicable authority, and does request the Court to appoint a medical expert to assist both the Court and trier of fact to understand evidence and or to determine the medical facts in issue. Plaintiff offers the following in support:

1.    Plaintiff is pro se and he sees pleading leniency pursuant to Haines v. Kerner, 404 U.S... 519 (1972).

2.    The Court granted Plaintiff in forma pauperis status on 6/23/06 and Plaintiff's complaint is non-frivolous.

3.    Plaintiff's complaint primarily concerns –but are not limited to- the deliberate indifference to his serious medical needs in violation of his constitutional rights.

4.    Plaintiff's complaint raises four primary serious medical diseases/conditions[1] of which he seeks immediate medical care. They are as follows:

    I.    Thyroid disease (See I. items 3-16 of Declaration (Decl), of which requires uninterrupted Chronic-care medications (CC Meds);
    II.    Ruptured Anterior Cruciate Ligament (ACL) (See II items 17-40 of Decl), of which will not heal on its own and requires reconstructive surgery, etc;
    III.    Periodontal disease (See III. Items 41-56 of Decl), of which requires immediate teeth scrapings for active perio-infections; requires continuing/consistent anti-perio dental care (E.g. semi-annual scrapings); and requires replacement teeth for the four permanently lost teeth (i.e. dentures).
    IV.    Substandard temporary composite repair to broken tooth (See IV. Items 57-67 of Decl), of which requires a crown and root canal.
        (See Memorandum in Support of TRO/PI –incorporated herein- at Statement of Facts).

5.    Plaintiff avers appointment of a medical expert is necessary because the issues of fact of which the Court and or jury must decide will likely center on whether each of the above diseases/conditions are objectively serious medical conditions, which would require medical care.

## ARGUMENT

6.    Rule 702 of the Federal Rules of Evidence provides, in pertinent part, "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert… may testify thereto…." Fed. R. Evidence 702. Moreover, F.R.E. 706 provides for appointment of an independent expert.

---

[1] Plaintiff does not limit/waive any additional claims that may also arise from the facts thus stated or that may discovered in the future.

ℐℐℐ-C

7.      Although it appears that the Third Circuit has yet to address the issue, other federal courts have addressed the

issue of whether, and when, an expert witness should be appointed in a pro se deliberate indifference case.    See

Helling v. McKinney, 509 U.S. 25, 113 S.Ct. 2475 (1993). (Suggesting the appointment of expert witness on the health

risks of environmental tobacco smoke).

8.      Plaintiff's complaint and TRO/PI raises complicated primary (e.g. physical) and secondary (e.g. emotional

and psychological) health risks, which are associated with his several medical diseases/conditions. For example, his

thyroid disease (i.e. a chronic condition) has causes the following primary health risks:

> Thyroid disease: Diagnosed as a chronic disease –will never heal– Plaintiff's hypothyroidism
> progressively worsens over time and requires periodic lab work to determine when the CC Meds
> dosage must be increased in order to manage Plaintiff's chronic symptoms. Moreover, these CC
> Meds are of the type that must be taken uninterrupted (i.e. daily and about the same hour) for them
> to be effective in managing the disease's common chronic symptoms. Plaintiff experiences the
> following chronic symptoms as a direct result of the ongoing and pervasive CC Meds interruptions
> (CCMNI):
> A.      Chronic fatigue (physical and mental);
> B.      Dangerous cholesterol production;
> C.      Dangerous and painful inflammation (e.g. in blood stream, face, extremities, etc.);
> D.      Disfigurement from Alopecia (i.e. unnatural hair loss about head, face, and body);
> E.      Impairment of normal daily functions (See D.I. 15).
> (See Memorandum of TRO/PI at Statement of Facts)

Indeed, a direct and primary result of the ongoing and pervasive Chronic-care medication interruptions (CCMI)

is a resurgence of these chronic symptoms of which cause the above health risks and endanger Plaintiff's health and

well being.

Granted, Plaintiff was diagnosed by a doctor as having a chronic disease –that by definition, it is

considered a serious medical condition– and therefore, the Court is warranted in taking judicial notice of the fact.

However, absent the Court exercising its discretion and taking judicial notice of this fact, and or absent defendant CMS

conceding the serious health risks said chronic symptoms pose for Plaintiff, expert testimony is necessary. Our sister

circuit advised that complex medical diagnosis makes expert witnesses necessary. Ledford v. Sullivan, 105 F.3d 354,

358-59 (7th Cir 1997).

Also, regarding complex psychological conditions/effects, the courts have sought expert opinion. Jordan v.

Gardner, 986 F.2d 1521, 1525-26 (9th Cir 1993) (en banc); Davis v. Locke, 936 F.2d 1208, 1213 (11th Cir 1991);

Davenport v. DeRobertis, 844 F.2d 1310, 1315 (7th Cir 1988), cert. denied, 488 U.S. 908 (1989); Fisher v. Koehler, 692

F. Supp. 1519, 1543-46 (S.D N Y 1988) aff'd, 902 F.2d 2 (2d Cir 1990).

Plaintiff, for example, also claimed as a secondary consequence –though no less severe– that repeated exposure

of said chronic symptoms have caused him to experience acute anxiety associated with the anticipation of being

exposed to a likely CCMI (e.g. historical likelihood greater than 80%), and due to the acute adverse effects on

Plaintiff's mind/body of said chronic symptoms, Plaintiff also suffers the following:

2                    $\overline{III}$ - C

violate the civil rights of prisoners here in Delaware. Dr. Kramer's familiarity and expertise would also aid this Court and the jury with these specialized fact issues, of which Plaintiff's health and well being hang in the balance. Appointment would likely serve judicial economy in this respect.

11.    Moreover, concerning defendant CMS (i.e. professional contracted health care provider and as such is a state official), is likely to present expert testimony. The courts have stated that when defendants utilize experts to prove there case, the denial to a plaintiff is manifest injustice. Parham v. Johnson, 126 F.3d 454, 460 (3d Cir 1997). Experts are required t give opinion on matters in response to or independent of state official opinions. Cabrales v. County of Los Angeles, 864 F.2d 1454, 1460 (9th Cir 1988), vacated, 490 U.S. 1087 (1989), reinstated, 886 F.2d 235 (9th Cir 1989), cert. denied, 494 U.S. 1091 (1990); Lisco v. Warren, 901 F.2d 274, 275-76 (2d Cir 1990).Indeed, examination and cross examination of expert witnesses is one of the more complicated aspects of trial practice and is beyond the scope of a pro se prisoner to defend against. (Helling v. McKinney, supra, at _____).

## CONCLUSION

WHEREFORE, Plaintiff prays that this Honorable Court appoints a medical expert for any of the following compelling reasons:

> ➢  To aid the Court in gaining a full and informed understanding of Plaintiff's serious medical diseases/conditions for its decision regarding TRO/PI or motion to dismiss fact issues;

> ➢  To serve as an independent opinion to state officials experts;

> ➢  To assist the trier of fact with specialized knowledge necessary to understand the facts/evidence; and

> ➢  To serve judicial economy and ensure manifest justice.

David Williamson, SBI # 183022
1181 Paddock Rd.
Smyrna, DE 19977

/·7·07
Date

4                    $\mathit{III}$ ·C

# III – EXHIBIT D



**CMS**

**DEDICATED PEOPLE**
**MAKING A DIFFERENCE**

Correctional Medical Services

David Williamson
SBI # 183022, W-1, L-12
1181 Paddock Road
Smyrna, DE 19977

10 May 2006

Dear Mr. Williamson,

   Your medical records are the property of the Department of Corrections and the
State of Delaware. Copies of your records will be available after your release. You
would address your request to the Department of Corrections Health Services Unit, 245
McKee Road, Dover Delaware 19904. Please include your name, SBI number and dates
that you are requesting information about. The cost for these copies would be
determined by the Department of Corrections.

Your Partner in Healthcare,

Scott S. Altman
Quality Assurance Monitor
Correctional Medical Services

CC:  Warden Thomas Carroll
     Medical Record

     Dorothy Williamson
     19 Cornwall Road
     New Castle DE 19720

III - D - 1

A

David Williamson
SBI #00183022, DOB 5/12/66
W-1, L-12
October 20, 2006

Mrs. Lee Ann Dunn, Medical Records

RE: Appointment to Inspect My Medical Records

Dear Mrs. Dunn:

Greetings. As per authorization of the Department of Corrections –in regard to Reprisal Grievance (# 72883 )- I have been authorized to inspect my medical records by personal appointment. Mrs. Rodweller informed me that the Department will allow me an "hour per appointment" to inspect my medical records, and that the only stated condition was that I could not make copies absent a lawyer, but that I could bring pen and paper for notes. Rodweller directed me to contact you for the purpose of making this appointment, etc.

Consequently, I request an appointment for this purpose at your earliest convenience. I work until 1:30pm Mon-Friday; perhaps any time after that would be convenient for your office as well –especially since there is less traffic during the 3:00 to 4:00 pm time frames. I hope to be able to complete my inspection in a single appointment, and if I receive adequate cooperation, I believe one –nor more than two-appointments- will suffice. Thus we can avoid subsequent appointments if you ensure that the following is collected for the inspection:

1. Complete and current medical/dental file (records) including but not limited to chronic care clinic schedulings, results, orders; and any medical/dental orders, recommendations, referrals (e.g. ACL/knee referrals and MRI results and or doctor's notes); and any responses or failures to respond from CMS regional or Administrative body;

2. All Chronic-care medication distribution (med-pick up) cards for the period 7/01/05 to the present; and

3. Any blood work or labs for the same period.

Thank you for your time and assistance with this matter. I shall expect a positive response notifying me of the appointment for inspection within the next two weeks.

David Williamson

1   III · D · 2

# ⚓ – **EXHIBIT E**

*Copy:*
*Returned to Sender*
*Undelivered*
*12-19-06*

David Williamson
SBI #183022
1181 Paddock Rd.
Smyrna, DE 19977
December __/__, 2006

The Law Offices of Brandt & Dalton
919 N. Market St.
Wilmington, De 19801

RE: Request for Representation for C.A. 06-379-SLR

To Whom It May Concern:

I am a pro se inmate plaintiff who has filed the above action for the deliberate indifference to my serious medical needs in violation of my constitutional rights. I am seeking professional representation in this matter, and I offer the following in support of my request:

Attached please find a courtesy copy on my complaint (Ex. A), and the District Court's October 6, 2006 Order (Ex. B) for your review. I believe my claims are viable, well documented, and the administrative remedies have been exhausted. I am confident that I will be the prevailing party – as I was in C.A. 97-710-SLR, which pales in comparison to the current and more egregious action- and attorney's fees are likely to be awarded under court rules. Nevertheless, I welcome any reasonable financial arrangement for representing my interests in this matter, and I encourage your office to review the complaint and Order so that you may draw your own conclusions. Also, I have complied with the Court's October 6, 2006 Order and the service of process has been made.

In conclusion, I thank you in advance for your time and consideration in this matter. I patiently look forward to your decision regarding my humble request.

Respectfully,

David W

David Williamson

III · E 1

Copy
No Reply

David Williamson
SBI #183022
1181 Paddock Rd.
Smyrna, DE 19977
December _1_, 2006

The Law Offices of Hudson, Bruce L. Esq.
300 Delaware Ave.
Wilmington, De 19801

RE: Request for Representation for C.A. 06-379-SLR

To Whom It May Concern:

I am a pro se inmate plaintiff who has filed the above action for the deliberate indifference to my serious medical needs in violation of my constitutional rights. I am seeking professional representation in this matter, and I offer the following in support of my request:

Attached please find a courtesy copy on my complaint (Ex. A), and the District Court's October 6, 2006 Order (Ex. B) for your review. I believe my claims are viable, well documented, and the administrative remedies have been exhausted. I am confident that I will be the prevailing party – as I was in C.A. 97-710-SLR, which pales in comparison to the current and more egregious action- and attorney's fees are likely to be awarded under court rules. Nevertheless, I welcome any reasonable financial arrangement for representing my interests in this matter, and I encourage your office to review the complaint and Order so that you may draw your own conclusions. Also, I have complied with the Court's October 6, 2006 Order and the service of process has been made.

In conclusion, I thank you in advance for your time and consideration in this matter. I patiently look forward to your decision regarding my humble request.

Respectfully,

David W——

David Williamson

III. 3. 2

LAW OFFICES

# JOSEPH W. BENSON, P.A.

JOSEPH W. BENSON*
ANDREW G. AHERN III
CARL W. HECKERT **

1701 N. MARKET STREET
P. O. BOX 248
WILMINGTON, DELAWARE 19899
(302) 656-8811
FAX (302) 656-4230

*ADM. DE, DC
** ADM. DE & PA

December 11, 2006

David Williamson – SBI 183022
1181 Paddock Road
Smyrna, Delaware 19977

      RE:    C.A. No. 06C-379-SLR

Dear Mr. Williamson:

In response to your request for legal representation arising out of the above-captioned case, please be advised that my office does not handle civil rights violation type claims. Therefore, I must respectfully decline entering an appearance on your behalf.

I am returning your documents regarding this matter.

Very truly yours,

JOSEPH W. BENSON, P.A.

Joseph W. Benson, Esquire
Enclosure

III - E - 3

Copy: No Reply

David Williamson
SBI #183022
1181 Paddock Rd.
Smyrna, DE 19977
December _1_, 2006

The Law Offices of Bifferato, Bifferato, & Gentilotti
1308 Delaware Ave.
Wilmington, De 19801

RE: Request for Representation for C.A. 06-379-SLR

To Whom It May Concern:

I am a pro se inmate plaintiff who has filed the above action for the deliberate indifference to my serious medical needs in violation of my constitutional rights. I am seeking professional representation in this matter, and I offer the following in support of my request:

Attached please find a courtesy copy on my complaint (Ex. A), and the District Court's October 6, 2006 Order (Ex. B) for your review. I believe my claims are viable, well documented, and the administrative remedies have been exhausted. I am confident that I will be the prevailing party – as I was in C.A. 97-710-SLR, which pales in comparison to the current and more egregious action- and attorney's fees are likely to be awarded under court rules. Nevertheless, I welcome any reasonable financial arrangement for representing my interests in this matter, and I encourage your office to review the complaint and Order so that you may draw your own conclusions. Also, I have complied with the Court's October 6, 2006 Order and the service of process has been made.

In conclusion, I thank you in advance for your time and consideration in this matter. I patiently look forward to your decision regarding my humble request.

Respectfully,

_Dave W_

David Williamson

III - E - 4

**RAMUNNO, RAMUNNO & SCERBA, P.A.**
ATTORNEYS-AT-LAW
903 N. FRENCH STREET
WILMINGTON, DELAWARE 19801-3371

(302) 656-9400
FAX (302) 656-9344

L. VINCENT RAMUNNO
LAWRENCE A. RAMUNNO
DAVID R. SCERBA
VINCENT RAMUNNO, JR
LOUIS JOSEPH RAMUNNO

MIDDLETOWN OFFICE
702 ASH BOULEVARD
MIDDLETOWN VILLAGE SHOPPING CENTER
MIDDLETOWN, DE 19709
(302) 376-9100

December 4, 2006

David Williamson
SBI# 183022
1181 Paddock Rd.
Smyrna, DE 19977

Dear Mr Williamson:

I received your recent letter that you sent to me. However, I am unable to

represent you, Therefore I am returning your documents..

Very truly yours

L. VINCENT RAMUNNO

LVR/np
Enclosures

III . 8 . 5



David Williamson
SBI #183022
1181 Paddock Rd.
Smyrna, DE 19977
December ___, 2006

The Law Offices of Ramunno, Lee
903 French St.
Wilmington, De 19801

RE: Request for Representation for C.A. 06-379-SLR

To Whom It May Concern:

I am a pro se inmate plaintiff who has filed the above action for the deliberate indifference to my serious medical needs in violation of my constitutional rights. I am seeking professional representation in this matter, and I offer the following in support of my request:

Attached please find a courtesy copy on my complaint (Ex. A), and the District Court's October 6, 2006 Order (Ex. B) for your review. I believe my claims are viable, well documented, and the administrative remedies have been exhausted. I am confident that I will be the prevailing party – as I was in C.A. 97-710-SLR, which pales in comparison to the current and more egregious action- and attorney's fees are likely to be awarded under court rules. Nevertheless, I welcome any reasonable financial arrangement for representing my interests in this matter, and I encourage your office to review the complaint and Order so that you may draw your own conclusions. Also, I have complied with the Court's October 6, 2006 Order and the service of process has been made.

In conclusion, I thank you in advance for your time and consideration in this matter. I patiently look forward to your decision regarding my humble request.

Respectfully,

David W ——

David Williamson

III - 8 - 6

**GRADY & HAMPTON, LLC**
6 NORTH BRADFORD STREET
DOVER, DELAWARE 19904

JOHN S. GRADY
STEPHEN A. HAMPTON
LAURA F. BROWNING

DOVER    (302) 678-1265
SUSSEX   (302) 855-1313
FAX      (302) 678-3544

June 30, 2006

David Williamson
SBI # 183022, W-1, L-12
Delaware Correctional Center
1181 Paddock Road
Smyrna, DE 19977

Dear Mr. Williamson:

My caseload is too heavy to take your case. If you would like your paperwork returned, please let me know.

Sincerely yours,

Stephen A. Hampton

SAH:slh

III- ६·7